## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | **Case No. 15-16835 MER** |
| | ) | |
| **MIDWAY GOLD US INC. *et al.*,**[1] | ) | **Chapter 11** |
| | ) | **Jointly Administered Under** |
| Debtors. | ) | **Case No. 15-16835 MER** |
| | ) | |

---

### MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE PRIVATE SALE OF THE SPRING VALLEY PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS PURSUANT TO SECTIONS 363(b) AND (f) OF THE BANKRUPTCY CODE, (B) APPROVING THE ASSET PURCHASE AGREEMENT WITH SOLIDUS RESOURCES, LLC, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (D) GRANTING RELATED RELIEF

---

Midway Gold US Inc. ("Midway Gold") and its affiliated debtors and debtors in possession (the "Debtors") hereby file this *Motion for Entry of an Order (A) Authorizing the Private Sale of the Spring Valley Property Free and Clear of Liens, Claims, and Interests Pursuant to Sections 363(b) and (f) of the Bankruptcy Code, (B) Approving the Asset Purchase Agreement with Solidus Resources, LLC, (C) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (D) Granting Related Relief* (the "Motion"). In support of the Motion, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT

This Motion seeks authority for Debtors Midway Gold US Inc. ("Midway") and Nevada Talon LLC ("Talon," and together with Midway, the "Sellers") to sell Midway's 30% undivided

---

[1] The Debtors and their respective case numbers are: Midway Gold US Inc. (15-16835 MER); Midway Gold Corp. (15-16836 MER); Golden Eagle Holding Inc. (15-16837 MER); MDW-GR Holding Corp. (15-16838 MER); RR Exploration LLC (15-16839 MER); Midway Services Company (15-16840 MER); Nevada Talon LLC (15-16841 MER); MDW Pan Holding Corp. (15-16842 MER); MDW Pan LLP (15-16843 MER); MDW Gold Rock LLP (15-16844 MER); Midway Gold Realty LLC (15-16845 MER); MDW Mine ULC (15-16846 MER); GEH (B.C.) Holding Inc. (15-16847 MER) , GEH (US) Holding Inc. (15-16848 MER).

interest in its Spring Valley joint venture (the "Spring Valley Project") with Barrick Gold Exploration, Inc. ("Barrick"), and certain related property owned by Sellers (collectively, the "Spring Valley Property")[2], to Solidus Resources, LLC ("Solidus"), an indirect, wholly-owned subsidiary of Waterton Precious Metals Fund II Cayman, LP ("Waterton"), by private sale for $25 million on the terms set forth in the Asset Purchase Agreement (the "APA") attached hereto as Exhibit A, and to assume and assign certain executory contracts and unexpired leases relating to the Spring Valley Project. Solidus has also executed an asset purchase agreement with Barrick (the "Barrick APA") to acquire Barrick's 70% interest in the Spring Valley Project.[3] With the approval of this Motion and the consummation of Sellers' sale transaction with Solidus (and assuming the consummation of Solidus' sale transaction with Barrick), Solidus will own 100% of the Spring Valley Project.

The Debtors respectfully submit that the proposed private sale, and all of its terms, including the $25 million purchase price as set forth in the APA, are fair and reasonable and will maximize the value of Sellers' interest in the Spring Valley Project and the related assets being sold. This determination is supported by, among other things:

(i) the Debtors' prepetition effort to sell Sellers' interest in the Spring Valley Property, including the Spring Valley Project, which yielded no offers;

(ii) the execution of the Barrick APA, after an extensive marketing process conducted by Barrick and its investment banker CIBC, which provides for the same pro rata

---

[2] The term "Spring Valley Property" as used herein is intended to reference the same property as "Purchased Assets" under the APA.

[3] The Barrick APA transaction has not yet been consummated. It remains subject to the exercise of a right of first refusal by Midway and to the possible issuance of a preliminary injunction in conjunction with the Barrick Litigation (as defined below).

purchase price as provided in the APA[4] thus indicating fair market value for Midway's 30% interest in the Spring Valley Project; and

(iii) the Debtors' business judgment based on the experience and extensive knowledge of the market by the Debtors' senior management and its investment banker, including expressions of interest that the Debtors and their investment banker have received to date.

In addition to maximizing value, the proposed sale would resolve numerous disputes including (i) the pending adversary proceeding against Barrick to sell the Spring Valley Project as co-owned property under section 363(h) of the Bankruptcy Code, (ii) Midway's pending motion for a preliminary injunction in connection with that litigation, and (iii) all of Barrick's purported secured claims against the Debtors' estates as set forth in the proofs of claim filed by Barrick[5]. These disputes have been costly to date and have also diverted the Debtors' attention from focusing on the more pressing issues of how to proceed with their reorganization efforts and the strategy for exiting these cases.

If the proposed sale is approved, the Barrick litigation will be rendered moot and all of Barrick's purported claims against the Debtors will be purchased by Solidus and disallowed in their entirety. If the proposed sale is denied, however, the estates will have no choice but to continue to incur significant cost and expense in litigating the section 363(h) issues with Barrick as well as future objections to the amount, validity, and priority of Barrick's purported secured claims, the success of which is not guaranteed. The proposed sale, on the other hand, is expected

---

[4] The respective purchase prices in the Barrick APA and the APA represent a 70%-30% allocation of the combined purchase price. And, Section 2.7(a)(ii) of the APA provides that if there is an increase in the purchase price paid by Solidus under the Barrick APA there will be a corresponding increase to the $25 million purchase price in the APA to continue to reflect the 70%-30% allocation. This further demonstrates that Waterton/Solidus is paying fair value for Midway's 30% undivided interest in the Spring Valley Project.

[5] One of the terms of the proposed sale is the acquisition by Solidus of all claims of Barrick, including its filed proofs of claim, against the Debtors and the disallowance of such claims in their entirety.

to close quickly and will generate not less than $25 million in gross cash proceeds that can be used by the Debtors in their reorganization efforts.

Furthermore, the proposed sale has the full support and consent of the Debtors' secured lenders – the Commonwealth Bank of Australia ("CBA") and Hale Capital Partners ("HCP"). Although the Committee has not provided its consent to the sale as of the filing of this Motion, counsel for the Committee has advised that the Committee has no objection to the Court's consideration of the Motion on an expedited basis and expects that the Committee will be in a position to support the sale at the hearing.

For these reasons, and those set forth below, the Debtors' respectfully submit that the relief requested in this Motion is justified, will maximize value and otherwise benefit the Debtors' estates and creditors, and should be approved.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over these cases under 28 U.S.C. §§ 157 and 1334.

2.      This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

3.      The Debtors' corporate headquarters and their executive level and senior management are all located in Englewood, Colorado and have been for the 180 days immediately prior to the Petition Date.  Accordingly, venue of these cases and related proceedings is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.      On June 22, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are continuing in possession of their property and are operating and

4

managing their business and affairs as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. On July 1, 2015, the Office of the United States Trustee appointed the Committee. No trustee or examiner has been appointed.

6. The Debtors hereby incorporate by reference the factual background set forth in the *Declaration of Bradley J. Blacketor in Support of Chapter 11 Petitions and Various First Day Applications and Motions* [Docket No. 22], which includes, *inter alia*, a detailed description of the Debtors' business and affairs, the Debtors' capital structure and prepetition indebtedness, and the events leading to the commencement of these cases.

7. The statutory predicates for the relief sought in this Motion are sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, [9008] and 9014 of the Bankruptcy Rules and Rules 2002-1 and 6004-1 of the Local Rules.

## The Spring Valley Agreement and Joint Venture

8. Midway Gold and Barrick are parties to that certain Exploration, Development and Mine Operating Agreement, dated as of March 9, 2009 (as amended or otherwise modified from time to time, the "Spring Valley Agreement"). The Spring Valley Agreement has been amended from time to time by (i) the First Amendment to Exploration, Development and Mine Operating Agreement, dated March 15, 2010, (ii) the Letter Agreement titled Re: Spring Valley, dated April 19, 2013, (iii) the Third Amendment to Spring Valley Exploration, Development and Mine Operating Agreement, dated January 10, 2014, and (iv) the Fourth Amendment to Spring Valley Exploration, Development and Mine Operating Agreement dated, dated February 24, 2014. A true and correct copy of the Spring Valley Agreement, including the foregoing

amendments, was attached to the Complaint filed by Midway in the Barrick Litigation (defined below).

9.      Pursuant to the Spring Valley Agreement, Midway Gold and Barrick agreed, among other things, that (a) property known as Spring Valley, located in Pershing County, Nevada, would be explored and developed by Barrick for the benefit of both parties, and (b) Barrick would have an exclusive right to explore and develop, and have an opportunity to earn an ownership interest in, the Spring Valley Project by, among other things, incurring certain expenditures.

10.      The Spring Valley Project is generally comprised of all "Assets" (as defined in the Spring Valley Agreement) and includes, among other things, (i) the properties identified on Exhibit A-1 to the Spring Valley Agreement (subject to the exceptions to the representations and warranties identified in the Spring Valley Agreement and its exhibits), (ii) the unpatented mining claims identified on Exhibit A-2 to the Spring Valley Agreement, (iii) the Barrick Agreements identified on Exhibit A-3 to the Spring Valley Agreement, (iv) the Permits identified on Exhibit A-4 to the Spring Valley Agreement, and (v) the property within the Area of Interest identified on Exhibit A-5 to the Spring Valley Agreement.  Additional properties and assets have been acquired (both within and outside of the Area of Interest) and critical data, information and analyses have been developed in the day to day management and operation of the project by either Barrick and/or the Joint Venture that also constitutes property and Assets in which Midway Gold owns a 30% interest (notwithstanding the fact that certain of such property might remain titled in Barrick's name and has not yet been formally conveyed to the Joint Venture and/or to Midway Gold).

11.     The Spring Valley Project does not include, however, all real property, mining claims, and improvements, together with all personal property located on such real property, that is separately owned solely by Midway Gold and its subsidiary, Nevada Talon LLC, that adjoins or is within two miles of the real property, including mining claims, that was not acquired for the benefit of the Joint Venture and is outside of the Area of Interest, and thus, is not the subject of the Spring Valley Agreement.   Such property is wholly-owned by Midway Gold and its subsidiary and neither the Joint Venture nor Barrick hold any ownership interest in the same. These additional properties and assets, together with the properties comprising the Spring Valley Project, are the Purchased Assets under the APA (referred to herein as the Spring Valley Property), and constitute the whole of the property sought to be sold by this Motion.

12.     In November, 2013, Barrick earned an undivided 70% interest in the Spring Valley Project by meeting certain requirements under the Spring Valley Agreement, and on February 23, 2014, Midway Gold exercised its option under the Spring Valley Agreement to enter into a joint venture with Barrick for the Spring Valley Property (the "Joint Venture"). Upon formation of the Joint Venture, a management committee[6] (the "Management Committee") was established pursuant to Article VII of the Spring Valley Agreement and Barrick became the manager (the "Manager") of the Joint Venture pursuant to Article VIII of the Spring Valley Agreement.   Except as provided in Section 5.1(a) of the Spring Valley Agreement and as otherwise delegated to the Manager, the Management Committee was given "exclusive authority to determine all matters related to overall policies, objectives, procedures, methods and actions under [the Spring Valley Agreement]."   Spring Valley Agreement at § 7.3.   The Manager's

---

[6] Midway Gold has two representatives on the Management Committee, one of which is Mr. William Zisch, the Chief Executive Officer of the Debtors.

powers and duties are expressly set forth in Article VIII of the Spring Valley Agreement. Among other limitations, without the prior authorization from both Barrick and Midway Gold, the Manager is prohibited from beginning "a liquidation of the Business" or "disposing of all or a substantial part of the Assets necessary to achieve the purposes of the Business." *Id*. at § 8.2(i).

13.      Upon formation of the Joint Venture, Midway Gold had the exclusive option under section 5.2(c) of the Spring Valley Agreement to require Barrick to (i) fund Midway Gold's proportionate share of Exploration Expenses above a certain threshold and (ii) arrange financing for Midway Gold "Development Costs" until the commencement of commercial production.  If Barrick complies with those obligations, it will earn an additional 5% interest upon completion of construction of a mine.  If a mine is constructed and commercial production is achieved, then the Development Costs that Barrick incurs from "carrying" Midway Gold to commercial production can be recouped by Barrick solely from 90% of Midway Gold's share of production.  Spring Valley Agreement, § 5.2(c).  Thus, Barrick has no recourse directly to Midway Gold for payment on account of any Development Costs.

14.      As of the Petition Date, Midway Gold and Barrick owned thirty percent (30%) and seventy percent (70%) undivided interests, respectively, in the Spring Valley Project.

15.     Neither Midway Gold's interests in the Spring Valley Project under the Spring Valley Agreement, nor any of the other Spring Valley Property, are subject to any perfected liens or security interests.[7]

16.     The Spring Valley Property is mining-related property and is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

### **Efforts to Sell Spring Valley**

17.     Prior to the Petition Date, Midway Gold and its then investment banker conducted a six-week transaction process to identify possible equity and/or asset transactions, including with respect to a sale of Midway Gold's 30% ownership interest in the Spring Valley Project. That process generated interest from prospective purchasers with respect to the Spring Valley Property but did not result in any binding offers.  Certain potential purchasers were interested in acquiring 100% of the Spring Valley Property, but they viewed the path to full ownership as unlikely in light of Barrick's majority position in the Spring Valley Project.  Against this backdrop, the Debtors determined that a sale of 100% of the Spring Valley Property will best maximize the value of such property for the benefit of their estates and creditors.

18.     As previously disclosed in various filings with the Court, on two separate occasions since the petition date, the Debtors tried to obtain an agreement with Barrick to

---

[7] In recent filings made by Barrick in these cases – e.g., its Proof of Claim and its response to the Debtors' application to retain Moelis as their investment banker (Doc. No. 366) (the "Barrick Response") – Barrick asserts that it was granted a security interest in Midway's ownership interests in the Spring Valley Project under the terms of the Spring Valley Agreement.  However, the Debtors dispute both the existence of any non-contingent and allowable claim and that there is a perfected security interest in favor of Barrick to support any such claim.  Pursuant to section 544(a) of the Bankruptcy Code, the Debtors' status and rights as a hypothetical lien creditor and bona fide purchaser of real property are superior to the right of a creditor asserting an unperfected security interest or lien in property of the estate.  The Debtors reserve the right to object to Barrick's proof of claim and to file an adversary proceeding with respect to the validity of and/or that seeks to avoid the purported Barrick security interests.

conduct a joint sale process for 100% of the Spring Valley Property. These efforts were unsuccessful and ultimately led to the commencement of the Barrick Litigation (as defined below) by Midway in an effort to sell 100% of the Spring Valley Property without Barrick's consent.

## The Barrick Litigation

19.     On October 15, 2015, Midway commenced an adversary proceeding against Barrick (Adv. Pro. No. 15-01412) seeking to sell the entirety of the co-owned Spring Valley Property pursuant to section 363(h) of the Bankruptcy Code and to obtain a preliminary injunction enjoining Barrick from continuing with its independent efforts to sell its own interest in Spring Valley (the "Barrick Litigation"). Barrick has opposed the preliminary injunction and the Court's ability to authorize a sale under section 363(h) over Barrick's objection.

20.     Prior to the scheduled hearing on the preliminary injunction motion, however, the Debtors became aware of Waterton's interest in acquiring Midway's 30% interest and Barrick's 70% interest in the Spring Valley Project, as well as related assets owned by Midway. The Debtors determined, in consultation with their advisors and in light of prior sale efforts, that the $25 million offer from Waterton was as high as they could reasonably expect Midway's 30% interest to realize given current market conditions and Waterton's tentative agreement to acquire the remaining 70% interest from Barrick. Accordingly, following extensive, around-the-clock, good faith negotiations, the Debtors executed a non-binding letter of intent with Waterton, which allowed Midway and Barrick to stipulate to the adjournment of the Barrick Litigation while both parties used their best efforts to reach agreement with Waterton for what, in effect, will be the acquisition of 100% of the Spring Valley Property on a consensual basis.

21.     Barrick has since executed its own asset purchase agreement with Solidus and, on November 16, 2015, sent notice to Midway that Barrick intends to move forward with the transaction subject to Midway's contractual right of first refusal, which expires on December 16, 2015.

22.     Similarly, Midway continued to negotiate final documentation with Waterton with respect to its 30% interest in the Spring Valley Project.  These negotiations resulted in the APA, which is the subject of this Motion.

## The Proposed Sale

23.     The terms of the proposed sale are set forth in detail in the APA.  However, the following is a summary of the material provisions:

- Sellers. Debtors Midway Gold US Inc. and Nevada Talon LLC
- Purchase Price.  $25 million in cash, plus Assumed Liabilities and amounts needed to make cure payments to non-debtor parties to Assigned Contracts.[8]
- Purchased Assets.  The Sellers' 30% undivided interest in the Spring Valley Project, plus related owned and leased real property, owned and leased mining claims, water rights, assigned contracts, permits, tangible property and other related assets.
- Excluded Assets.  Any of the assets or properties that are not owned by Sellers or are unrelated to the Spring Valley Project, cash and cash equivalents, certain excluded contracts, insurance policies and related proceeds, tax assets and other specified assets. The Debtors' Pan Mine assets are excluded.
- Assumed Liabilities.  All liabilities and obligations related to specified assigned contracts, certain disclosed litigation, certain taxes, post-closing date liabilities arising out of the Spring Valley Project and other specified liabilities.
- Closing Date.  Third business day after satisfaction of the closing conditions identified in the APA.  The intended closing is December 17, 2015, the same day that the Barrick APA is likely to close.

24.     In connection with the proposed sale, Solidus obtained an executed equity commitment letter from Waterton dated the date of the APA (the "Equity Commitment Letter"),

---

[8] The Debtors may require debtor-in-possession financing ("DIP Financing") and are in the process of finalizing financing terms with Waterton as a potential provider of DIP Financing.  In the event that Waterton provides DIP Financing that is secured by the Spring Valley Project prior to the Closing, the APA provides Waterton with the right to credit bid the obligations owed to Waterton on the DIP Financing toward the Purchase Price.

pursuant to which Waterton has committed, subject to the terms and conditions set forth therein, to provide cash to Solidus in an amount sufficient to allow Solidus to meet its obligations under the APA.  The Debtors are satisfied that the Equity Commitment Letter allows Solidus to close. The Equity Commitment Letter is confidential and is not being disclosed, although a copy has been provided to counsel for CBA, HCP and the Committee.

25.     This Motion does not seek authorization to distribute sale proceeds to creditors. Rather, the Debtors reserve the right, and currently intend, to use the proceeds in the ordinary course of their business for operating and reorganization related costs, subject to applicable Bankruptcy Code provisions.   The Spring Valley Property is not encumbered by liens or mortgages in favor of CBA or HCP, and is otherwise unencumbered property to the best of the Debtors' knowledge, information, and belief.

**The Executory Contracts and Unexpired Leases Relating to the Spring Valley Property**

26.     The proposed sale also contemplates the assumption and assignment to Solidus of certain executory contracts and unexpired leases (the "Assigned Contracts") that relate to the Spring Valley Property.  A list of the Assigned Contracts (the "Schedule of Contracts") and the proposed cure amounts for each (the "Cure Amounts") is attached to the APA and filed separately with the Court concurrently herewith.

27.     Solidus has identified the Assigned Contracts as those for which it is interested in possibly taking assignment.  However, this list is not final and does not represent a commitment by the Debtors to assume and/or by Solidus to take assignment of any particular Assigned Contract.  The Debtors reserve the right to add or remove executory contracts and unexpired leases to Schedule of Contracts as may be determined by the Debtors or requested by Solidus.

12

## RELIEF REQUESTED

28.     The Debtors respectfully request that the Court enter an order (the "Sale Order"), substantially in the form attached hereto, (i) authorizing the sale of the Spring Valley Property to Solidus on the terms set forth in the APA and in the Sale Order by private sale, (ii) authorizing, but not directing, Midway to execute, deliver, and perform the APA, (iii) authorizing, but not directing, the Debtors to assume and assign the Assigned Contracts to Solidus, (iv) approving the Assumption and Assignment Procedures (defined below), (v) waiving the 14-day stay otherwise applicable under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, and (vi) granting such other relief as the Court deems just and proper.

## BASIS FOR RELIEF

A.     General Standard

29.     The Debtors have the power, after notice and a hearing, to sell property of the estate outside of the ordinary course of business.  11 U.S.C. § 363(b).  In determining whether to approve such a request, bankruptcy courts generally apply the "business judgment rule."  *See, e.g.*, *In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004); *In re Psychrometric Sys*., 367 B.R. 670, 674 (Bankr. D. Colo. 2007).  In particular, a sale outside of the ordinary course of business should be approved if: (i) a sound business reason exists to sell the property; (ii) adequate and reasonable notice of the terms has been given to parties in interest; (iii) the proposed sale price is fair and reasonable; and (iv) the buyer has acted in good faith.  *In re Buerge*, 2014 Bankr. LEXIS 1264, at 34-35 (B.A.P. 10th Cir. Apr. 2, 2014).

30.     In assessing the good faith of a purchaser, courts have considered factors such as: (i) whether the sale was negotiated at arm's length; (ii) whether any officer or director of the debtor holds any interest in or is otherwise related to the potential purchaser; and (iii) whether

13

fraud or collusion exists among the prospective purchaser, any other bidders or the trustee. *Id.* at 53. Additionally, the United States Court of Appeals for the Tenth Circuit has defined a good faith purchaser as one who buys (i) "in good faith," i.e., through a sale that does not involve "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders," and (ii) for "value," i.e., by paying "at least 75% of the appraised value of the assets." *In re Bel Air Associates, Ltd.*, 706 F.3d 301, 305 & nn. 11-12 (10th Cir. 1983).

31.     In reviewing proposed transactions outside the ordinary course under section 363(b), bankruptcy courts should give great judicial deference to the debtor's business judgment. *See, e.g., Psychrometric Sys.*, 367 B.R. at 674; *Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.),* 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987). However, "the court must always scrutinize whether the trustee has fulfilled his duty to maximize the value obtained from a sale, particularly in liquidation cases." *Psychrometric Sys.*, 367 BR. At 674 (internal quotations and citations omitted).

B.     <u>Sales Outside the Ordinary Course can be Through Private Sales</u>

32.     Importantly, a sale outside of the ordinary course of business can be by private sale or public auction. Fed. R. Bankr. P. 6004(f)(1). Indeed, bankruptcy courts have "wide latitude" in approving private sales. *In re Ancor Exploration Co.*, 30 B.R. 802, 808 (N.D. Okla. 1983). In approving or disapproving private sales, courts have focused on the sufficiency of the evidence presented in demonstrating that the proposed purchase price maximizes value and whether the debtor's estate would benefit from competitive bidding. See, e.g. *Psychrometric Sys.*, 367 B.R. at 677 (denying a private sale where the Court believed "the estate would benefit from a more competitive and complete bidding process"); *In re Donohue*, 410 B.R. 311, 315

14

(Bankr. D. Kan. 2009) (denying a private sale because "the asset could draw a higher price through competitive bidding."). If a trustee has not solicited other prospective purchasers, a court may consider whether there are facts that justify the trustee not doing so. *In re Ancor*, 30 B.R. at 808.

33.     Moreover, in the context of approving a private sale, this Court has explained that "in the absence of any likelihood of a competing bid, the Trustee is not required to conduct an auction." *In re Brumfiel*, 2015 Bankr. LEXIS 896, *21 (Bankr. D. Colo. March 20, 2015).

C.      Sales Free and Clear of Liens, Claims, and Other Interests

34.     Pursuant to section 363(f) of the Bankruptcy Code, the Court may authorize the sale of assets free and clear of existing liens, claims and encumbrances, if any, if:

> (a) applicable non-bankruptcy law permits the sale of such property free and clear of such interest;
>
> (b) the entity holding the lien, claim or encumbrance consents to the proposed sale;
>
> (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (d) such interest is in bona fide dispute; or
>
> (e) such entity could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Old CarCo LLC*, 2010 U.S. Dist. LEXIS 143101, at *6 (S.D.N.Y. July 2, 2010).

D.      The Proposed Sale Meets the Business Judgment Test and Should be Approved

35.     The Debtors have determined, in an exercise of their business judgment, that the proposed sale of the Spring Valley Property to Solidus on the terms set forth in the APA will maximize value and benefit their estates and creditors.

36.     As demonstrated by the Debtors' prepetition transaction process, there was little interest in the market in acquiring only Midway's 30% interest in the Spring Valley Project without also acquiring Barrick's 70% interest.  Indeed, the prepetition transaction process generated no binding offers for Midway's 30% interest.  As such, the Debtors determined, in consultation with their advisors, that the best way to maximize the value of Midway's interest is to sell 100% of the Spring Valley Property.  Having been unable to reach an agreement with Barrick for the sale of 100% of the Spring Valley Property, the Debtors pursued the next best alternative – exercising their statutory rights under section 363(h) of the Bankruptcy Code.

37.     Fortunately, however, Waterton, through Solidus, reached an agreement to purchase Barrick's 70% interest and then agreed to purchase Midway's 30% interest at a more than reasonable price.   Notably, having reached an agreement with Barrick, Waterton presumptively became the most likely purchaser for Midway's interest.   This is because Waterton will acquire Barrick's right of first refusal on Midway's 30% interest.[9]

38.     The Debtors believe that the $25 million purchase price is reasonable for several reasons.  First, both the Debtors' management and Moelis & Co., their investment bankers, believe that $25 million is toward the high range of the expected value of Midway's 30% interest in the Spring Valley Project.  Notably, the Debtors and Moelis have received oral and written expressions of interest with values significantly less than the proposed $25 million purchase price.  Second, as noted above, the $25 purchase price for Midway's interest represents 30% of the aggregate purchase price that Waterton/Solidus is paying to Barrick and Midway for 100% of the Spring Valley Property.  The fact that Waterton/Solidus is paying the same pro rata amount

---

[9] Nothing contained in this Motion shall constitute a waiver of any rights of Midway with respect to the right of first refusal including its applicability, all of which rights are reserved.

for Midway's share of the Spring Valley Property as it is paying for Barrick's share, which was marketed widely to the gamut of potentially interested parties, demonstrates that Midway is receiving fair market value for its interest.  Furthermore, the fact that Barrick itself conducted its own independent sale process and is willing to sell its 70% interest to Solidus, a third party buyer, in an arm's length transaction for the same pro rata purchase price demonstrates that the purchase price is indicative of fair market value.

39.     Moreover, the fact that the $25 million purchase price is demonstrably reasonable and fair establishes that there would be no material benefit to subject Midway's interest in the Spring Valley Property to an auction or additional marketing.  Rather, exposing the asset to an auction or additional marketing would merely cause the Debtors' estates to suffer additional and unnecessary expense and delay and would jeopardize a very substantial "bird in the hand."

40.     The proposed sale also provides substantial benefit in resolving the Barrick Litigation.  To date, the litigation has resulted in meaningful, albeit necessary, expense and in a diversion of the attention of the Debtors' senior management.  The proposed sale will, therefore, not only generate immediate cash proceeds and an overall purchase price that the Debtors and their advisors believe is likely the most that can reasonably be expected, it will also render the Barrick litigation moot, avoid the need for future litigation concerning Barrick's purported secured claims, and allow the Debtors to focus on moving forward with the other aspects of their reorganization efforts.  Thus, the propose sale represents a very sound exercise of the Debtors' business judgment.

41.     As indicated above, the Debtors' believe that the Spring Valley Property is unencumbered.  However, out of an abundance of caution, the Debtors seek to sell the Spring Valley Property free and clear of all liens, claims, and encumbrances that might otherwise exist

17

pursuant to section 363(f) of the Bankruptcy Code, with any such purported liens, claims, and encumbrances attaching to the sale proceeds in the same priority and to the same extent as they may currently exist.

42.     For these reasons, the Debtors respectfully submit that the proposed sale is in the best interest of the Debtors' estates and creditors, will maximize value, and should be approved.

E.     Assumption and Assignment of the Assigned Contracts and Approval of Proposed Cure Amounts

43.     As stated above, the Debtors also seek authority to assume and assign the Assigned Contracts to Solidus, subject the right of the Debtors to modify or amend the list of Assigned Contracts as determined by the Debtors or as may be requested by Solidus prior to the closing of the proposed sale.  The Debtors have the power to assume executory contracts or unexpired leases subject to the Court's approval so long as the statutory requirements for assumption under section 365 of the Bankruptcy code are met.  11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code codifies the statutory assumption requirements, and provides in relevant part as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

18

44.     The standard that is applied in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests.  *See, Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also, NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113); *In re III Enters., Inc. V*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), *aff'd*, 169 B.R. 551 (E.D. Pa. 1994).

45.     It is well established that courts should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its business judgment.  *See, In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard."); *see also, Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citations omitted).

46.     To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate.").  Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate."

19

*Network Access Solutions*, 330 B.R. at 75.   Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion.  *See, Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003); *Lubrizol Enters. v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985).

47.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992); *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *see also, In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("[a]though no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

48.    Adequate assurance of future performance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

49.    In addition, section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of or impose an economic impairment to an executory contract or unexpired lease.  *See, e.g., Coleman Oil Co., Inc. v.*

20

*Circle K Corp. (In re Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365."), *cert. denied*, 522 U.S. 1148 (1998).  Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (finding that section 365(f)(3) prohibits enforcement of any lease clause creating a right to a terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

50.     Here, the assumption and assignment of the Assigned Contracts to Solidus in connection with the proposed sale meets the business judgment standard and satisfies all requirements for assumption and assignment under section 365 of the Bankruptcy Code.  The Assigned Contracts relate specifically to the Spring Valley Project and have no use or value to the Debtors or their estates other than with respect to the Spring Valley Project.  The Assigned Contracts were specifically identified by Solidus as contracts and leases potentially needed to operate the Spring Valley Project going forward.  As such, the assumption and assignment of the Assigned Contracts is essential to facilitating the sale of the Spring Valley Project and the other property being sold in the proposed sale.

51.     The Debtors have also received evidence of Solidus' ability to close the proposed sale and to otherwise perform its obligations under the Assigned Contracts and will share such confidential information with any counterparty to an Assigned Contract that so requests in writing.

52.     The Debtors will separately file the Schedule of Contracts with the Court and will send to all counterparties a separate notice that will (i) have a copy of the Schedule of Contracts attached, (ii) direct the counterparties to locate their contracts and leases and the proposed Cure Amounts, if any, on the Schedule of Contracts, and (iii) direct the counterparties to file any objections to the proposed Cure Amounts and to any other aspect of the proposed assumption and assignment by the date that objections to this Motion are due (each such objection, a "Cure Payment Objection").  If the Debtors subsequently determine or Solidus subsequently requests that one or more contracts be added to or removed from the Schedule of Contracts, the Debtors will promptly file with the Court and serve on affected counterparties a supplement that clearly identifies the specific contracts and leases being added and/or removed and, where applicable, the proposed Cure Amounts.  Counterparties to any contract or lease added through a supplement will have the opportunity to file any Cure Payment Objections up to the date that is three business days prior to the hearing on this Motion.  For the avoidance of doubt, the inclusion of any contract or lease on the Schedule of Contracts does not obligate the Debtors to assume and assign any of the Assigned Contracts.   The foregoing procedures (the "Assumption and Assignment Procedures") are simply to establish the correct Cure Amounts and to resolve all objections to assumption and assignment in the event that the Debtors and Solidus determine to proceed with assuming and assigning a particular contract in connection with the closing of the proposed sale.  The Debtors respectfully submit that the foregoing Assumption and Assignment Procedures are reasonable and appropriate and in compliance with Bankruptcy Rules 6006 and 9014, and should be approved.

F.      <u>Waiver of 14-Day Stay</u>

53.     To facilitate the consummation of the proposed sale as soon as practicable after entry of the Sale Order, the Debtors respectfully request that the Court suspend the operation of the 14-day stay under Fed. R. Bankr. P. 6004(h).

WHEREFORE, the Debtors respectfully request that the Court enter the Sale Order, substantially in the form attached hereto, granting the relief requested herein and such other relief as the Court deems just and proper.

Dated: December 1, 2015

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

/s/ *Stephen D. Lerner*
Stephen D. Lerner (Ohio #0051284)
Squire Patton Boggs (US) LLP
221 E. Fourth Street, Suite 2900
Cincinnati, OH 45202
(513) 361-1200 (phone)
(513) 361-1201 (fax)
Stephen.lerner@squirepb.com
Admitted to District Court for District of
Colorado

Nava Hazan (NY # 3064409)
Squire Patton Boggs (US) LLP
30 Rockefeller Plaza, 23rd Floor
New York, NY 10112
(212) 872-9800
(212) 872-9815
Nava.hazan@squirepb.com
Admitted to District Court for District of
Colorado

SENDER WASSERMAN WADSWORTH, P.C.

/s/ *Harvey Sender*
Harvey Sender, #7546
Aaron J. Conrardy, #40030
1660 Lincoln Street, Suite 2200
Denver, Colorado 80264
(303) 296-1999; (303) 296-7600 (fax)
hsender@sww-legal.com
aconrardy@sww-legal.com

**Attorneys for the Debtors and Debtors in
Possession**

24