## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | Case No. 15-16835 (MER) |
| MIDWAY GOLD US INC., et al.,[1] | Chapter 11 |
| Debtors. | Jointly Administered Under Case No. 15-16835 (MER) |
| | **Re: Docket No. 507** |

## ORDER (A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, <u>AND (C) GRANTING RELATED RELIEF</u>

Upon the motion, dated December 1, 2015 [Docket No. 507] (the "***Motion***")[2], of Midway Gold US Inc. and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), for entry of an order, pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rules 2002-1 and 6004-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Colorado (the "***Local Rules***"), seeking, among other things, approval of the sale (the "***Sale***") to Solidus Resources, LLC (the "***Purchaser***")[3] of

---

[1] The Debtors and their respective case numbers subject to this order are: Midway Gold US Inc. (15-16835 MER); Midway Gold Corp.(15-16836 MER); Golden Eagle Holding, Inc. (15-16837); MDW-GR Holding Corp. (15-16838 MER); RR Exploration, LLC (15-16839 MER); Midway Services Company (15-16840); Nevada Talon, LLC (15-16841 MER); MDW Pan Holding Corp. (15-16842 MER); MDW Pan LLP (15-16843 MER); MDW Gold Rock LLP (15-16844 MER); Midway Gold Realty LLC (15-16845 MER); MDW Mine ULC (15-16846 MER); GEH (B.C.) Holding Inc. (15-16847 MER); GEH (US) Holding Inc. (15-16848 MER).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion, or, if not defined in the Motion, shall have the meanings ascribed to them in the Asset Purchase Agreement (as defined herein).

[3] Purchaser is an indirect, wholly-owned subsidiary of Waterton Precious Metals Fund II Cayman, LP ("***Waterton***").

all of the right, title and interest in the Selling Debtors'[4] Purchased Assets (as defined in the Motion), free and clear of all liens, claims (including, without limitation, as defined in section 101(5) of the Bankruptcy Code), rights or claims based on any successor or transferee liability, interests, encumbrances, rights, remedies, restrictions, liabilities and contractual commitments of any kind or nature whatsoever, whenever arising, whether at law or in equity, and granting certain related relief; and the Selling Debtors having agreed to enter into and consummate the Asset Purchase Agreement attached hereto as Exhibit A with the Purchaser (such Asset Purchase Agreement, as amended, the "*Asset Purchase Agreement*"); and the Sale Hearing having been held on December 14, 2015; and upon the record of the Sale Hearing, and all of the proceedings before this Court; and this Court having reviewed the Motion and any objections thereto and having found and determined that the relief sought in the Motion, and entry of this Order, is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest; and after due deliberation thereon and sufficient cause appearing therefore:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:[5]**

A.   **Jurisdiction, Venue and Core Proceeding:**   This Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334.   The matters are core proceedings under 28 U.S.C. § 157(b)(2).   Venue is proper in this district and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.   Venue in this district and before this Court was proper as of the Petition Date and continues to be proper.

---

[4] The Selling Debtors are Midway Gold US Inc. ("*Midway Gold*") and Nevada Talon, LLC.

[5] Findings of fact shall be construed as conclusions of law and conclusions of law shall be constructed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

B.    **Statutory Predicates**.  The statutory predicates for the relief sought in the Motion are 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9008 and 9014 of the Bankruptcy Rules and Rules 2002-1 and 6004-1 of the Local Rules.  The consummation of the transactions contemplated by the Motion, the Asset Purchase Agreement and this Order is legal, valid and properly authorized under all such provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transactions.

C.    **Notice.**  As evidenced by the affidavits of service and publication filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the procedures for assumption and assignment of Assigned Contracts (as defined in paragraph U below), the proposed Cure Amounts, the Sale and all transactions contemplated therein or in connection therewith, and all deadlines related thereto, was given and no further notice need be provided.  A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

D.    Actual written notice of the Motion, the Sale Hearing, the procedures for assumption and assignment of contracts and leases, the proposed Cure Amounts, the Sale and all transactions contemplated therein or in connection therewith, and all deadlines related thereto has been given to all interested persons and entities, including, without limitation: (i) all entities that assert any Lien, Claim or Interest (each as defined below) in the Purchased Assets; (ii) all parties to the Executory Contracts and Unexpired Leases; (iii) all parties to the Assigned Contracts assumed and sold and assigned pursuant to this Order; (iv) all governmental taxing authorities that have or as a result of the Sale may have Claims, contingent or otherwise, against

3

the Debtors; (v) all state and local taxing authorities having jurisdiction over any of the Purchased Assets, including the Internal Revenue Service; (vi) all state and local governmental agencies and environmental agencies in any jurisdiction where the Debtors own or have owned or used real property; (vii) the Nevada Division of Environmental Protection; (viii) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (ix) all known creditors (whether liquidated, contingent or unmatured) of the Selling Debtors; (x) all interested governmental, pension, environmental and other regulatory entities; (xi) the Office of the Attorney General of the State of Nevada; (xii) the Nevada Department of Taxation; (xiii) any other applicable state attorneys general; (xiv) the Office of the United States Trustee for the District of Colorado; (xv) the United States Department of Justice; (xvi) counsel to Barrick Gold Exploration Inc., (xvi) counsel to the Purchaser and all other notice parties reasonably requested by Purchaser in accordance with the Asset Purchase Agreement; and (xvii) the United States Department of the Interior, Bureau of Land Management.  The foregoing constitutes proper, timely, adequate, and sufficient notice under the particular circumstances of these Chapter 11 Cases, and no further notice need be provided.

E.     The Publication Notice was published in *The Mining Journal* and *The Reno Gazette-Journal* on December 4, 2015.  See Docket No. 543.  Such publication notice was sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtors.

F.     **Extensive Efforts by Debtors.**  The Sale is the product of extensive efforts by the Debtors to identify all available alternatives to maximize the value of their interest in the Purchased Assets, including the Spring Valley Project, including, among other things, (i) a prepetition six-week transaction process to identify possible equity and/or asset transactions

4

which yielded no offers for Midway Gold's 30% interest in the Spring Valley Project; (ii) two postpetition efforts to engage with Barrick with respect to a process to conduct a consensual sale of 100% of the Spring Valley Project, which efforts were ultimately unsuccessful; (iii) the commencement of the Barrick Litigation to exercise their statutory rights under section 363(h) of the Bankruptcy Code to sell 100% of the Spring Valley Project over Barrick's objections; and (iv) extensive negotiations with Waterton over the terms of the Sale and the necessary documentation, which were conducted in good faith and at arm's length. In effect, the Sale will result in a consensual sale of 100% of the Spring Valley Project, resolve pending and future disputes with Barrick, maximize value by generating not less than $25 million in cash proceeds, and otherwise benefit the Debtors' estates and creditors and other stakeholders.

G. **Business Justification.** The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale. In light of the circumstances of these Chapter 11 Cases, time is of the essence in (i) consummating the Sale and all related transactions, (ii) preserving the value of the Debtors' assets, and (iii) minimizing the widespread and adverse economic consequences to the Debtors, their estates, and their creditors.

H. **Adequate Marketing; Highest or Best Offer.** As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, (a) the Debtors' prepetition efforts to sell Midway Gold's 30% interest in the Purchased Assets, including the Spring Valley Project, yielded no offers; (b) Barrick executed the Barrick APA with respect to, among other things, its 70% interest in the Spring Valley Project, after an extensive marketing process conducted by Barrick and its investment banker CIBC, which provides for the same pro rata

5

purchase price as provided in the Asset Purchase Agreement for Midway Gold's 30% interest, thus indicating fair market value for Midway Gold's interest; (c) in the opinion of the Debtors' senior management and their investment banker, the consideration provided by the Purchaser in the Asset Purchase Agreement is toward the high range of the value of Midway Gold's 30% interest in the Spring Valley Project that they would have reasonably expected to realize through any further marketing of the Purchased Assets and exceeds the values set forth in prior oral and written expressions of interest received by the Debtors and their investment banker; (d) the consideration provided by the Purchaser in the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Purchased Assets; (e) the consideration provides fair and reasonable consideration for the Purchased Assets and constitutes reasonably equivalent value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia; (f) the Sale will provide a greater recovery for the Debtors' creditors with respect to the Purchased Assets than would be provided by any other practically available alternative, including an auction or other sale process; (g) taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Purchased Assets for greater economic value to the Debtors or their estates; (h) the Debtors' determination that the Asset Purchase Agreement constitutes the highest or best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment; and (i) the sale of the Purchased Assets on the terms set forth in the Asset Purchase Agreement and this order will resolve significant pending and future disputes between the Debtors and Barrick.

I.      **Opportunity to Object.**  A reasonable opportunity to object or be heard with respect to the Motion, and all relief requested therein has been afforded to all interested parties.

J.     **Assets Property of the Estate.**  The Purchased Assets are property of the Selling Debtors' estates and title thereto is vested in the Selling Debtors' estates.

K.     **Sale in Best Interests.**   The actions represented to be taken by the Selling Debtors and the Purchaser are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Debtors, their estates and creditors, and other parties in interest.  Approval of the Asset Purchase Agreement and of the Sale and all related transactions at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

L.     **No *Sub Rosa* Plan.**  The consummation of the Sale outside of a chapter 11 plan pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors.  The Sale and the transactions contemplated therein do not constitute a *sub rosa* plan.

M.     **Arm's-Length Sale.**   The Asset Purchase Agreement, the Sale and the transactions contemplated therein and associated therewith were negotiated, proposed, and entered into by the Selling Debtors and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.   Neither the Debtors, their insiders and affiliates, nor the Purchaser have engaged in any conduct that would cause or permit the Asset Purchase Agreement, the Sale, or any part of the transactions thereby to be avoided under section 363(n) of the Bankruptcy Code.

N.     **Good Faith Purchaser.**  The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

7

O.    **Prompt Consummation.**  The Sale and the transactions related thereto must be approved and consummated as promptly as practicable in order to preserve the value of the Purchased Assets.

P.    **Corporate Authority.**  Each Selling Debtor (i) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale has been duly and validly authorized by all necessary corporate action of each of the Selling Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, (iii) has taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Selling Debtors of the transactions contemplated thereby, and (iv) needs no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, which may be waived in accordance with the terms therewith.

Q.    **Free and Clear Findings Required by the Purchaser.**  The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale if the Assets were not being sold to the Purchaser pursuant to section 363(f) of the Bankruptcy Code, free and clear, except for Permitted Encumbrances and Assumed Liabilities, of (i) all liens (statutory or otherwise), claims, mortgages, deeds of trust, pledges, charges, security interests, charges, rights of first refusal, hypothecations, encumbrances, royalties, easements, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, subleases, leases or conditional sale arrangements (collectively, the "*Liens*"), (ii) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights or causes of action (whether in law or in equity), Proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment,

8

indemnity or contribution, obligations, demands, restrictions, indemnification claims or liabilities relating to any act or omission of the Selling Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively the "*Claims*"), and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively the "*Interests*").  Except for Permitted Encumbrances and Assumed Liabilities, the Sale shall be free and clear of, and the Purchaser shall not be responsible for, any Liens, Claims or Interests, including, without limitation, in respect of the following: (i) any rights or Claims based on any successor or transferee liability, (ii) any Liens, Claims or Interests that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Selling Debtors' or the Purchaser's interest in the Purchased Assets, or any similar rights; (iii) any labor or employment agreements; (iv) mortgages, deeds of trust and security interests; (v) intercompany loans and receivables between the Selling Debtors and any Debtors or non-Debtor affiliates; (vi) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit

9

plans, agreements, practices and programs, including, without limitation, any pension plans of the Selling Debtors or any multiemployer plan to which the Selling Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state law (collectively, "*COBRA*"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (viii) the Federal Mine Safety and Health Act of 1977 or its associated regulations; (ix) penalties of any kind whatsoever assessed against the Debtors by the United States Department of Labor's Mine Safety and Health Administration; (x) any bulk sales or similar law; (xi) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing; (xii) any Executory Contract or Unexpired Lease that is not an Assigned Contract that will be assumed and assigned pursuant to this Order and the Asset Purchase Agreement; (xiii) any other Excluded Liabilities as provided in the Asset Purchase Agreement.  A sale of the Purchased Assets other than one free

and clear of all Liens, Claims, and Interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale as contemplated. Therefore, the Sale contemplated by the Asset Purchase Agreement free and clear of all Liens, Claims and Interests, except for Permitted Encumbrances and Assumed Liabilities, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

R. **Binding and Valid Transfer.** The transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets and, except for the Permitted Encumbrances and Assumed Liabilities, will vest the Purchaser with all right, title, and interest of the Selling Debtors to the Purchased Assets free and clear of all Liens, Claims, and Interests and any liabilities of the Selling Debtors.

S. **Satisfaction of 363(f) Standards.** The Selling Debtors may sell the Purchased Assets free and clear of all Liens, Claims and Interests of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens, Claims and Interests, and non-Debtor parties to the Assigned Contracts who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. In all cases, each such person with Liens, Claims or Interests in the Purchased Assets is enjoined from taking any action against the Purchaser, the Purchaser's affiliates or any agent of the foregoing to recover any such Lien, Claim or Interest.

T. **Necessity of Order.** The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions without all of the relief provided for in this Order (including, but not limited to, that the transfer of the Purchased Assets to the Purchaser be free and clear of all Liens, Claims and Interests). The consummation of the

11

transactions pursuant to this Order and the Asset Purchase Agreement is necessary for the Debtors to maximize the value of their estates for the benefit of all creditors and other parties in interest.

U.    **Assigned Contracts.**    The Selling Debtors have demonstrated that it is an exercise of their sound business judgment to sell, assume and assign the Executory Contracts and Unexpired Leases listed on Schedule 2.1(h) of the Asset Purchase Agreement (collectively, the "***Assigned Contracts***", and individually, an "***Assigned Contract***") to the Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest.   The Assigned Contracts being assigned to the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser, and, accordingly, such assumption and assignment of the Assigned Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtors' bankruptcy estates.

V.    **Cure and Adequate Assurance.**    The Selling Debtors have cured or the Selling Debtors have demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Closing under any of the Assigned Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code.   The proposed Cure Amounts or any other cure amount reached by agreement after a Cure Payment Objection are deemed the amounts necessary to "cure" within the meaning of section 365(b)(1) of the Bankruptcy Code all "defaults" within the meaning of section 365(b) of the Bankruptcy Code under such Assigned Contracts.   Pursuant to the terms of Asset Purchase Agreement, Purchaser shall pay all such cure amounts directly to the counterparties to the Assigned Contracts.   The Purchaser's promise to perform the obligations under the Assigned Contracts arising after the Closing shall constitute

12

adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  All counterparties to the Assigned Contracts who did not file a Cure Payment Objection or an objection to the assumption and assignment of the Assigned Contracts prior to the Sale Hearing, are deemed to consent to the assumption by the Debtors of their respective Assigned Contract and the assignment thereof to the Purchaser.  The objections of all counterparties to the Assigned Contracts that did file an objection to the assumption and assignment of such parties' respective Assigned Contract or proposed Cure Amount relating thereto were heard at the Sale Hearing (to the extent not withdrawn), were considered by this Court, and are overruled on the merits with prejudice.  This Court finds that with respect to all such Assigned Contracts the payment of the proposed Cure Amounts in accordance with the terms of the Asset Purchase Agreement is appropriate and is deemed to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code. This Court further finds that the Assumption and Assignment Procedures were reasonable and gave contract counterparties adequate notice of and opportunity to respond to the proposed assumption and assignment of the Assigned Contracts.  Accordingly, all of the requirements of section 365(b) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the Debtors to the Purchaser of each of the Assigned Contracts.  To the extent any Assigned Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Purchaser in accordance with the terms of this Order that are applicable to the Purchased Assets.

      W.    **Unenforceability of Anti-Assignment Provisions.**  Anti-assignment provisions in any Assigned Contract shall not restrict, limit, or prohibit the assumption, assignment, and sale

of the Assigned Contracts and should be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

X.   **Final Order.**   This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).   Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

Y.   Entry of this Order is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest.

## ORDER

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

1.   **Motion is Granted.**   The Motion is granted and the relief requested therein with respect to the Sale is granted and approved in its entirety, as set forth herein.

2.   **Objections are Overruled.**   Any objections to the entry of this Order or to the relief granted herein or the relief requested in the Motion, including any objections to the proposed Cure Amounts or the assumption and assignment of any Assigned Contracts, that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, are hereby denied and overruled on the merits with prejudice.

3.   **Approval.**   The Asset Purchase Agreement, and all the terms and conditions thereof, is approved.   Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Selling Debtors are authorized to perform their obligations under, and comply with the terms of, the Asset Purchase Agreement and consummate the Sale and the related transactions pursuant to, and in accordance with, the terms and conditions of the Asset Purchase Agreement and this

14

Order. The Selling Debtors are authorized to execute and deliver, and empowered to perform under, consummate, and implement, the Asset Purchase Agreement, together with all additional instruments and documents that the Selling Debtors or the Purchaser deem necessary or appropriate to implement the Asset Purchase Agreement and effectuate the transactions contemplated therein, and to take all further actions as may reasonably be required by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to Purchaser's possession the Purchased Assets or as may be necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement.

    4. **Binding Effect of Order.** This Order and the Asset Purchase Agreement shall be binding in all respects upon all known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of Liens, Claims and Interests, all counterparties to the Assigned Contracts, all successors and assigns of the Purchaser, each of the Debtors and their Affiliates and subsidiaries, the Purchased Assets, and any trustees appointed in the Chapter 11 Cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code and this Order shall not be subject to amendment or modification and the Asset Purchase Agreement shall not be subject to rejection. Subject to the terms and conditions of the Asset Purchase Agreement, the terms of this Order shall apply in the event the Sale under the Asset Purchase Agreement is consummated by and under any chapter 11 plan, and may be incorporated into any confirmation order. Nothing contained in any chapter 11 plan confirmed in the Chapter 11 Cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the Asset Purchase Agreement or this Order.

5.      **Injunction.**  All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Selling Debtors to transfer the Purchased Assets to the Purchaser in accordance with the Asset Purchase Agreement and this Order.  Following the Closing, except for persons entitled to enforce Assumed Liabilities and Permitted Encumbrances, all Persons (including, but not limited to, (i) the Debtors and/or their respective successors (including any trustee), (ii) creditors, (iii) investors, (iv) current and former employees and shareholders, (v) administrative agencies, (vi) governmental units, (vii) secretaries of state, (viii) federal, state, and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and (ix) the successors and assigns of each of the foregoing) holding Liens, Claims or Interests in the Purchased Assets or against the Selling Debtors in respect of the Purchased Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing any Liens, Claims or Interests of any kind or nature whatsoever against the Purchaser or any Affiliate of the Purchaser or any of their respective property, successors and assigns, or the Purchased Assets, as an alleged successor or on any other grounds.  No Person shall assert, and the Purchaser and the Purchased Assets shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), liabilities, claims and interests, or basis of any kind or nature whatsoever to delay, defer, or impair any right of the Purchaser or the Selling Debtors, or any obligation of any other party, under or with respect to, any Purchased Assets, with respect to any act or omission that occurred prior to the Closing or with respect to any other agreement or any obligation of the Debtors that is not an Assumed Liability.

16

6.      **General Assignment.**  Upon the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Selling Debtors' interests in the Purchased Assets and a bill of sale transferring good and marketable title in the Purchased Assets to the Purchaser free and clear of all Liens, Claims and Interests, except for the Permitted Encumbrances and Assumed Liabilities.  Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions.

7.      **Transfer Free and Clear.**  Except for the Permitted Encumbrances and Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser as required under the Asset Purchase Agreement, and such transfer shall be free and clear of all Liens, Claims, and Interests of any Person, including, without limitation, all such Liens, Claims, and Interests specifically enumerated in paragraph Q of this Order, whether arising by agreement, by statute or otherwise and whether occurring or arising before, on or after the Petition Date, whether known or unknown, occurring or arising prior to such transfer, with all such Liens, Claims and Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of a Lien, Claim or Interest claims or may claim a Lien, Claim or Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Selling Debtors may possess with respect thereto.  No proceeds of the Sale shall be paid to any party or otherwise used by the Debtors except in accordance with the *Final Order (A) Authorizing Post-Petition Use of Cash Collateral, (B) Granting Adequate Protection to Secured*

17

*Parties, and (C) Granting Related Relief [Docket No. 452]* or pursuant to a further order of the Court after written notice and an opportunity to object and be heard is given to parties in interest.

8.  **Valid Transfer.**  The transfer of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title, and interest of the Selling Debtors in and to the Purchased Assets free and clear of all Liens, Claims and Interests of any kind or nature whatsoever, except for the Permitted Encumbrances and Assumed Liabilities.

9.  **Exculpation and Release.**  Neither the Purchaser nor any of its affiliates, successors, and assigns, shall have, or incur any liability to, or be subject to any action by, the Debtors or any of their predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the Asset Purchase Agreement and the entry into and consummation of the Sale, except as expressly provided in the Asset Purchase Agreement and this Order.

10.  **Direction to Release Interests.**  Upon the Closing, each of the Selling Debtors' creditors and any other holder of a Lien, Claim or Interest is authorized and directed to execute such documents and take all other actions as may be necessary to release its Lien, Claim or Interest in the Purchased Assets, if any, as such Lien, Claim or Interest may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing a Lien, Claim or Interest in the Selling Debtors or the Purchased Assets shall not have delivered to the Selling Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens, Claims and Interests, which the person or entity has with respect to the Debtors or the Purchased Assets or otherwise,

18

then (i) the Selling Debtors are authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Debtors or the Purchased Assets, and (ii) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all Liens, Claims and Interests of any kind or nature whatsoever in the Selling Debtors or the Purchased Assets.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Order.  This Order shall be binding upon and shall govern the acts of all Persons including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments (including, without limitation, the Nevada Department of Taxation), secretaries of state, federal, state, and local officials, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or other property interests.

11.    **No Interference.**  Following the Closing, no holder of any Lien, Claim or Interest in the Purchased Assets (except holder of Permitted Encumbrances and Assumed Liabilities solely in accordance with applicable law) shall interfere with the Purchaser's title to, or use and enjoyment of, the Purchased Assets based on, or related to, any such Lien, Claim or Interest, or based on any actions the Selling Debtors may take in the Chapter 11 Cases.

12.    **Surrender of Possession.**  All entities that are currently, or on the Closing may be, in possession of some or all of the Purchased Assets are hereby directed to surrender

possession of the Purchased Assets to the Purchaser on the Closing, unless the Purchaser otherwise agrees.

13. **Post-Closing Actions and Transactions.** The Selling Debtors and the Purchaser, and each of their respective officers, employees, and agents, will be authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Selling Debtors or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the Asset Purchase Agreement and this Order. Further, effective as of the Closing, the Purchaser, its successors and assigns, shall be designated and appointed the Selling Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Selling Debtors' name and stead, its successors and assigns, to demand and receive any and all of the Purchased Assets, and from time to time institute and prosecute in the name of the Purchaser, for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity, or otherwise, that the Purchaser, its successors or assigns, may deem proper for the collection or reduction to possession of any of the Purchased Assets, and to do all acts and things with respect to the Purchased Assets that the Purchaser, its successors and assigns, shall deem desirable. All of the foregoing powers granted to the Purchaser are coupled with an interest and are irrevocable by the Selling Debtors.

14. **Sale is Self-Executing**. The Sale is self-executing, and neither the Selling Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

15. **No Discriminatory Treatment.** To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any

20

permit, license, or similar grant relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement.

16.   **Assumption and Assignment of Contracts.**  Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and subject to and conditioned upon the Closing, the Selling Debtors' sale, assumption and assignment to the Purchaser of the Assigned Contracts is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.  In addition, the Assumption and Assignment Procedures are reasonable and approved in their entirety.

17.   The Debtors are authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Purchaser, effective as of the Closing, as provided by, and in accordance with, the Asset Purchase Agreement, the Assigned Contracts free and clear of all Liens, Claims and Interests of any kind or nature whatsoever, other than the Permitted Encumbrances and Assumed Liabilities, and (ii) execute and deliver to the Purchaser such documents or other instruments as the Purchaser reasonably deems necessary to assign and transfer the Assigned Contracts to the Purchaser.

18.   The Assigned Contracts shall be transferred and assigned to, pursuant to the Asset Purchase Agreement, and thereafter remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.  The Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assumption and assignment to the Purchaser.  The Debtors may assign each Assigned Contract in accordance with sections 363

21

and 365 of the Bankruptcy Code, and any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contracts or terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assigned Contracts, constitute unenforceable anti-assignment provisions which are void and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of each Assigned Contract have been satisfied.

19.   All defaults and all other obligations or liabilities under any Assigned Contract occurring, arising or accruing prior to the date of the assignment or transfer to the Purchaser shall be deemed cured or satisfied upon payment by the Purchaser of the proposed Cure Amount or any other cure amount reached by agreement after a Cure Payment Objection, and, without limiting the foregoing, no effect shall be given to any default of the type set forth in section 365(b)(2) of the Bankruptcy Code, or the type of default concerning an unexpired lease of real property described in section 365(b)(1) of the Bankruptcy Code whether or not such Assigned Contract is an executory contract within the meaning of section 365 of the Bankruptcy Code. The Cure Amounts listed on Schedule 3.7(c) of the Asset Purchase Agreement, or any other cure amount reached by agreement after a Cure Payment Objection, reflect the sole amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due to the non-Debtor parties in connection with the assumption by the Debtors and assignment to the Purchaser of the Assigned Contracts.

20.   Except as provided in the Asset Purchase Agreement or this Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect

22

to any Assigned Contract, and all holders of such claims arising from and after Closing under any Assigned Contract are forever barred and estopped from asserting any claims under any Assigned Contract against the Debtors, their successors or assigns, and their estates.

21.    The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of the Assigned Contracts.

22.    **No Successor Liability.**  Except for the Assumed Liabilities, to be paid solely to the extent provided for in the Asset Purchase Agreement and this Sale Order, neither the Purchaser, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Lien, Claim or Interest that arose or occurred prior to the Closing, or otherwise is assertable against the Selling Debtors or is related to the Purchased Assets prior to the Closing. The Purchaser is not and shall not be deemed a "successor" to the Selling Debtors or their estates, have, de facto or otherwise, merged with or into the Debtors or be a mere continuation or substantial continuation of the Selling Debtors or the enterprise of the Selling Debtors under any theory of law or equity as a result of any action taken in connection with the Asset Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets.

23.    Without limiting the foregoing, and except to the extent the Purchaser assumes the Assumed Liabilities, or takes the Purchased Assets subject to the Permitted Encumbrances, or as otherwise set forth in the Asset Purchase Agreement, the Purchaser shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Liens, Claims or Interests, including under any theory of successor or transferee liability, de facto

23

merger or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to of any of the following: (i) any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, antitrust, environmental, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules or regulations); (ii) under any products liability law, rule, regulation, or doctrine with respect to the Debtors' liability under such law, rule or regulation, or doctrine, or under any product warranty liability law or doctrine; (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which the Debtors are a party; (iv) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (v) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to the (a) Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967, (g) the Americans with Disabilities Act of 1990, or (h) COBRA; (vi) environmental liabilities, debts, Claims, or obligations arising from conditions first existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contamination substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.; (vii) any liabilities, debts, or obligations of or required to be paid by the

24

Debtors for any taxes of any kind for any period; (viii) any liabilities, debts, commitments, or obligations for any taxes relating to the operation of the Purchased Assets prior to the Closing; (ix) any bulk sale law; and (x) any litigation.

24. **Fair Consideration.**    The consideration provided by the Purchaser for the Purchased Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale may not be avoided under section 363(n) of the Bankruptcy Code.  The Asset Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Selling Debtors nor the Purchaser have entered into the Asset Purchase Agreement or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities.  No other person or entity or group of persons or entities has offered to purchase the Purchased Assets for an amount that would provide greater value to the Debtors and their estates than the value provided by the Purchaser.  The Court's approval of the Motion and the Asset Purchase Agreement are in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

25. **Retention of Jurisdiction.**    This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) compel delivery of

25

the Purchased Assets to the Purchaser; (ii) interpret, implement, and enforce the provisions of this Order; (iii) protect the Purchaser, any of the Purchaser's affiliates, or any agent of the foregoing, against any Liens, Claims or Interests against the Selling Debtors or the Purchased Assets of any kind or nature whatsoever, except for the Permitted Encumbrances and Assumed Liabilities and (iv) enter any order under sections 363 and 365 of the Bankruptcy Code.

26.    **Good Faith Purchaser.**    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the transactions shall not affect the validity of the transactions (including the assumption and assignment of any of the Assigned Contracts).  The Purchaser is a purchaser in good faith of the Purchased Assets and is entitled to all the protections afforded by section 363(m) of the Bankruptcy Code.

27.    **No Bulk Law Application.**    No bulk sales law or similar law, shall apply in any way to the transactions contemplated by the Sale, the Asset Purchase Agreement, the Motion, and this Order.

28.    **Subsequent Plan Provisions.**    Nothing contained in any chapter 11 plan confirmed in any Debtor's bankruptcy case or any order confirming any such plan or in any other order in the Chapter 11 Cases shall alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement or this Order.

29.    **Inconsistencies with Prior Orders, Pleadings or Agreements**.  To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in the Chapter 11 Cases, the terms of this Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale.  To

26

the extent there is any inconsistency between the terms of this Order and the terms of the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

30.   **Failure to Specify Provisions.**  The failure to specifically include any particular provisions of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Asset Purchase Agreement be authorized and approved in its entirety.

31.   **Non-Material Modifications.**  The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, or supplement does not, based on the Debtors' judgment, have any adverse effect on the Debtors' estates.

32.   **No Stay or Order.**  Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Selling Debtors and the Purchaser are authorized to close the transactions immediately upon entry of this Order.  Time is of the essence in closing the transactions referenced herein, and the Selling Debtors and the Purchaser intend to close the transactions as soon as practicable.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry of this Order.

33.   **Appointment of Trustee.**  The provisions of the Asset Purchase Agreement and this Order may be specifically enforced in accordance with the Asset Purchase Agreement notwithstanding the appointment of any chapter 7 or chapter 11 trustee after the Closing.

27

34.    **Barrick Claims.**  Effective as of the Closing, assuming the Closing (as defined in the Barrick Asset Purchase Agreement) shall have occurred prior to, or contemporaneously with, the Closing, all Claims of Barrick acquired by the Purchaser (including, without limitation, Proof of Claim No. 223 filed by Barrick against Debtor Midway Gold US Inc.) against any of the Debtors, including the Selling Debtors, are disallowed in their entirety and there shall be no recovery from the Debtors, including the Selling Debtors, in respect of such Claims, whether or not such Claims were asserted by Barrick in proofs of claim filed in these Chapter 11 Cases or scheduled by any of the Debtors.  Proof of Claim No. 224 filed by Barrick Gold US Inc. (an affiliate of Barrick) against Debtor MDW Pan LLP is not affected in any way by this Order.  Debtor MDW Pan LLP, the other Debtors and parties in interest retain any and all rights to object to Proof of Claim No. 224.[6]  For the avoidance of doubt, it is the intention that all Claims of Barrick acquired by the Purchaser arising out of or relating to the Spring Valley Project in any way are disallowed pursuant to this Order.

35.    **Equity Commitment Letter**.  The Equity Commitment Letter dated November 30, 2015 issued by Waterton to the Selling Debtors is an essential component of the transactions contemplated by the Asset Purchase Agreement and this Order without which the Selling Debtors would not have entered into the Asset Purchase Agreement.  The Court retains jurisdiction to hear and determine, on an expedited basis, any action by the Selling Debtors arising from a breach by Waterton of its obligations under the Equity Commitment Letter to seek specific performance by Waterton.

---

[6] Reference is made to the *Stipulation Regarding Proofs of Claim Filed by (1) Barrick Gold Exploration Inc. Against Midway Gold US Inc. (Claim No. 223) and (2) Barrick Gold U.S. Inc. Against MDW Pan LLP (Claim 224)* filed on December 8, 2015, which clarifies the claims asserted by Barrick and Barrick Gold US Inc. in Proofs of Claim 223 and 224, respectively.

36.   **Headings.**  Headings utilized in this Order are for convenience of reference only, and do not constitute a part of this Order for any other purpose

37.   **Time Periods.**  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

38.   **Nonseverability.**  The provisions of this order are nonseverable and mutually dependent.

39.   **Royalty Matters**.  Notwithstanding anything provided in this Order or the Asset Purchase Agreement to the contrary, the Purchaser will assume the Assigned Contracts specifically identified on Schedule 2.1(h) as (i) "Mining Deed with Reservation and Conveyance of Royalty dated August 13, 2007 by and between Paul G. Schmidt and MGC Resources, Inc. Recorded in Pershing County, Nevada as Entry No. 356954 at Book: 427, Page: 443 of Official Records" and (ii) "Mining Deed with Reservation of Royalty dated May 5, 2006 by and between Seymork Investments, Ltd. and MGC Resources, Inc. Recorded in Pershing County, Nevada as Entry No. 248839 at Book: 408, Page: 207 of Official Records", and the royalty obligations associated therewith shall continue as obligations of the Purchaser; provided, however, that nothing herein is intended to affect or alter any ongoing litigation concerning such particular Assigned Contracts, nothing herein shall in any way operate to, or have the effect of, expanding the scope of, altering or impairing in any respect the pre-Closing Date legal, equitable, property, or contractual rights, obligations or defenses if any, of the parties to such Assigned Contracts, and such parties reserve any and all rights, claims and defenses with respect thereto.  The Purchaser acknowledges receipt of a copy of that certain Deed of Royalty Interest to the Lutheran Community Foundation, dated December 12, 2012 and recorded in the Official

29

Records of Pershing County, Nevada on December 31, 2012 at Document #0483605, Book 490 Page, 0022.

40. **Environmental Matters**.  Nothing in this Order releases, discharges, nullifies, precludes, or enjoins the enforcement of any environmental liability to a governmental unit that any entity would be subject to as the owner or operator of the Purchased Assets after the Closing Date (as defined in the Asset Purchase Agreement).  Nothing in this Order authorizes the transfer or assignment to the Purchaser of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments.  Notwithstanding the foregoing sentence, nothing in this Order shall: (i) be interpreted to deem the Purchaser as the successor to the Selling Debtors under any successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to the Closing Date or for liabilities relating to off-site disposal of waste by the Selling Debtors prior to the Closing Date; (ii) create for any governmental unit any substantive right that does not already exist under law; or (iii) be deemed or construed to be an admission of liability by the Selling Debtors.  Nothing in this Order shall be construed to guarantee that any water right is in good standing or otherwise bind the State of Nevada Division of Water Resources and the Nevada State Engineer to any interpretation of the terms and conditions of any water right set forth in Schedule 2.1(g) of the Asset Purchase Agreement which conflict with the official records maintained by the State of Nevada Division of Water Resources with respect to each water right permit.

41. **Resolution of Cure Objection**.  In resolution of the objection of Lamonte J. Duffy to the Sale (Doc. No. 551), the Purchaser shall pay a cure amount of $3,399.56 with

30

respect to that certain Mineral Lease Agreement and Option to Purchase dated April 25, 2006 by and between Lamonte J. Duffy and MGC Resources, Inc., listed as agreement No. 6 on the Schedule of Contracts and Proposed Cure Amounts (Doc. No. 510).

Dated:  December 15 , 2015
        Denver, Colorado

                            THE HONORABLE MICHAEL E. ROMERO
                            UNITED STATES BANKRUPTCY JUDGE

31

ASSET PURCHASE AGREEMENT

BY AND AMONG

MIDWAY GOLD US INC.

and

NEVADA TALON LLC,

as SELLERS

and

SOLIDUS RESOURCES, LLC,

as BUYER

DATED AS OF

NOVEMBER 30, 2015

Exhibit A

# TABLE OF CONTENTS

Page

ARTICLE 1    DEFINITIONS .................................................................................................... 1

ARTICLE 2    PURCHASE AND SALE ................................................................................... 8

    Section 2.1     Purchase and Sale of Assets .......................................................................... 8
    Section 2.2     Excluded Assets ............................................................................................. 9
    Section 2.3     Assumed Liabilities ........................................................................................ 9
    Section 2.4     Excluded Liabilities ..................................................................................... 10
    Section 2.5     Exclusion of Assigned Contracts ................................................................. 10
    Section 2.6     Non-Assignable Purchased Assets ............................................................... 10
    Section 2.7     Purchase Price .............................................................................................. 11
    Section 2.8     Closing ......................................................................................................... 12
    Section 2.9     Transactions to be Effected at the Closing .................................................. 12
    Section 2.10   Allocation of Purchase Price ....................................................................... 13
    Section 2.11   Withholding .................................................................................................. 13

ARTICLE 3    REPRESENTATIONS AND WARRANTIES OF SELLERS ........................... 14

    Section 3.1     Organization ................................................................................................. 14
    Section 3.2     Due Authorization, Execution and Delivery; Enforceability ...................... 14
    Section 3.3     No Conflicts; Consents ................................................................................ 14
    Section 3.4     Assets ........................................................................................................... 15
    Section 3.5     [Reserved] .................................................................................................... 16
    Section 3.6     Ordinary Course of Business ....................................................................... 16
    Section 3.7     Material Contracts ........................................................................................ 16
    Section 3.8     Legal Proceedings ........................................................................................ 16
    Section 3.9     Compliance with Laws; Permits .................................................................. 16
    Section 3.10    Environmental Matters ................................................................................ 17
    Section 3.11    [Reserved] .................................................................................................... 17
    Section 3.12    Taxes ............................................................................................................ 17
    Section 3.13    Financial Advisors ....................................................................................... 18
    Section 3.14    Reclamation Bonds ...................................................................................... 18
    Section 3.15    No Other Representations and Warranties ................................................... 18

ARTICLE 4    REPRESENTATIONS AND WARRANTIES OF BUYER ............................... 18

    Section 4.1     Organization ................................................................................................. 18
    Section 4.2     Due Authorization, Execution and Delivery; Enforceability ...................... 18
    Section 4.3     No Conflicts; Consents ................................................................................ 18
    Section 4.4     Financial Advisors ....................................................................................... 18
    Section 4.5     Sufficiency of Funds .................................................................................... 19
    Section 4.6     Solvency ....................................................................................................... 19
    Section 4.7     Legal Proceedings ........................................................................................ 19
    Section 4.8     Independent Investigation ............................................................................ 19

ARTICLE 5    COVENANTS .................................................................................................... 19

    Section 5.1     Conduct of Business Prior to the Closing .................................................... 19
    Section 5.2     Access to Information ................................................................................... 20
    Section 5.3     Notice of Certain Events .............................................................................. 21
    Section 5.4     Confidentiality .............................................................................................. 21
    Section 5.5     Governmental Approvals and Other Third-Party Consents ......................... 21
    Section 5.6     Right of First Refusal ................................................................................... 22
    Section 5.7     Books and Records ....................................................................................... 22
    Section 5.8     Closing Conditions ...................................................................................... 23
    Section 5.9     Public Announcements ................................................................................. 23

**TABLE OF CONTENTS**
(continued)

Page

Section 5.10    Further Assurances .............................................................................. 23
Section 5.11    [Reserved.] ......................................................................................... 23
Section 5.12    [Reserved.] ......................................................................................... 23
Section 5.13    Taxes .................................................................................................. 23
Section 5.14    [Reserved.] ......................................................................................... 24
Section 5.15    Financing ............................................................................................ 24
Section 5.16    [Reserved.] ......................................................................................... 24
Section 5.17    [Reserved.] ......................................................................................... 24
Section 5.18    Nature of Transaction ........................................................................ 24
Section 5.19    Supplements to Schedules ................................................................. 25
Section 5.20    Bankruptcy Matters ........................................................................... 25

**ARTICLE 6    CONDITIONS TO CLOSING** ........................................................... 27

Section 6.1    Conditions to Obligations of All Parties ........................................ 27
Section 6.2    Conditions to Obligations of Buyer ............................................... 28
Section 6.3    Conditions to Obligations of Seller ............................................... 29

**ARTICLE 7    [RESERVED]** ..................................................................................... 30

**ARTICLE 8    TERMINATION** ............................................................................... 30

Section 8.1    Automatic Termination .................................................................... 30
Section 8.2    Termination by the Parties .............................................................. 30
Section 8.3    Effect of Termination ...................................................................... 31

**ARTICLE 9    MISCELLANEOUS** ......................................................................... 32

Section 9.1    Survival ............................................................................................. 32
Section 9.2    Expenses ........................................................................................... 32
Section 9.3    Notices .............................................................................................. 32
Section 9.4    Interpretation .................................................................................... 33
Section 9.5    Headings ........................................................................................... 33
Section 9.6    Severability ....................................................................................... 33
Section 9.7    Entire Agreement ............................................................................. 33
Section 9.8    Successors and Assigns .................................................................... 34
Section 9.9    No Third-Party Beneficiaries .......................................................... 34
Section 9.10    Amendment and Modification; Waiver ........................................... 34
Section 9.11    Governing Law; Submission to Jurisdiction; Venue ...................... 34
Section 9.12    Specific Performance ....................................................................... 34
Section 9.13    Limitation on Damages .................................................................... 34
Section 9.14    Disclosure Schedules ....................................................................... 35
Section 9.15    Counterparts ..................................................................................... 35

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of November 30, 2015 is entered into by and among Midway Gold US Inc., a Nevada corporation ("Midway US"), Nevada Talon LLC, a Nevada limited liability company ("Nevada Talon" and, together with Midway US, "Sellers") and Solidus Resources, LLC, a Nevada limited liability company ("Buyer").

## RECITALS

A.     On June 22, 2015 (the "Petition Date"), each Seller filed a voluntary petition for relief (commencing the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court").

B.     Sellers collectively own, among other things, (a) a 30% undivided interest in the Spring Valley Venture (as defined below), which owns the Spring Valley development project in Pershing County, Nevada (the "Spring Valley Development Project") and (b) all the Additional Spring Valley Assets (as defined below), including the Spring Valley East development project (the "Spring Valley East Development Project").

C.     Upon the terms and subject to the conditions contained in this Agreement, and as authorized under sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, all of the right, title and interest of Sellers in the Purchased Assets (as defined below), including Sellers' interests in the Spring Valley Development Project and all the Additional Spring Valley Assets, and to assume from Sellers the Assumed Liabilities.

In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE 1:

"Additional Spring Valley Assets" means those assets of Sellers described in Schedule 2.1(m), including the Spring Valley East Development Project.

"Additional Spring Valley Business" means the business conducted by Sellers with respect to the Additional Spring Valley Assets.

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Schedule" has the meaning set forth in Section 2.10.

"Assigned Contracts" means the Contracts in which any Seller or any of its Affiliates has an interest relating to the Spring Valley Business or the Additional Spring Valley Business set forth in Schedule 2.1(h).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as in effect from time to time.

"Barrick" means Barrick Gold Exploration Inc., a Delaware corporation.

"Barrick Asset Purchase Agreement" means that certain Asset Purchase Agreement, dated November 11, 2015, by and among Barrick, Barrick Gold Corporation, an Ontario Corporation, Buyer and Buyer Parent.

"Base Purchase Price" has the meaning set forth in Section 2.7(a).

"Books and Records" means books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, suppliers lists, production data, quality control records and procedures, assay reports, environmental studies, reports and analysis, mine plans, nonproprietary mining and reserve models, sales records, tax records, strategic plans, material and research, including all technical records, files, papers, surveys and plans or specifications.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in Toronto, Canada or Denver, Colorado are closed for business.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Parent" means Waterton Precious Metals Fund II Cayman, LP, a Cayman Islands exempted limited partnership.

"Cash Amount" has the meaning set forth in Section 2.7(a)(ii).

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claims" means all rights or causes of action (whether in law or equity), legal proceedings, obligations, demands, restrictions, warranties, guaranties, indemnities, consent rights, options, contract rights, rights of recovery, setoff, recoupment, indemnity or contribution, covenants and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including all "claims" as defined in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.8.

"Closing Date" has the meaning set forth in Section 2.8.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the Non-Disclosure Agreement dated as of July 7, 2015 between Waterton Global Resource Management, Inc. and Midway Gold Corp.

"Contract" means any agreement, indenture, contract, lease, deed of trust, royalty, license, option, instrument, or other written commitment.

"Credit Documents" means the DIP Credit Agreement collectively with any other agreements and documents executed or delivered in connection therewith, including the "Credit Documents" as defined in the DIP Credit Agreement.

"Cure Amounts" means the amounts which must be paid or otherwise satisfied by Buyer, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assigned Contracts to the Buyer as provided herein as those amounts are allowed by the Bankruptcy Court, unless such amounts are otherwise agreed upon by the Buyer and the counterparty to the applicable Assigned Contract, including the Cure Amounts set forth on Schedule 3.7(c) (as may be supplemented or modified in accordance with Section 2.5 and Section 5.19).

"Cut-Off Date" has the meaning set forth in Section 2.5.

"DIP Credit Agreement" means the Debtor-In-Possession Credit Agreement (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms) by and among Midway US, as borrower, each of the other debtors party thereto as guarantors, and Waterton Precious Metals Fund II Cayman, LP, as lender.

"Disclosed Litigation" means only those actions, suits, claims and legal proceedings set forth in Schedule 3.8.

"Disclosure Schedules" means the Disclosure Schedules delivered by Sellers concurrently with the execution and delivery of this Agreement and all references in this Agreement to a particular Schedule are references to Schedules in the Disclosure Schedules and not schedules to this Agreement.

"Dollars" and "$" means the lawful currency of the United States.

"Drop Dead Date" has the meaning set forth in **Error! Reference source not found.**.

"Encumbrance" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

"Environmental Claim" means any action, suit, claim, investigation or other legal proceeding alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (i) the presence, Release of, or exposure to, any Hazardous Materials, or (ii) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Law" means any applicable Law, Governmental Order or binding agreement with any Governmental Authority: (i) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata), or (ii) concerning the Release or presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials.

"Environmental Notice" means any written directive, notice of violation or infraction, or notice or written communication from a Governmental Authority relating to actual or potential liability arising under or non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"Environmental Permit" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"Equity Commitment Letter" has the meaning set forth in Section 4.5.

"Excess Consideration Amount" means an amount equal to (a) 0.3, *multiplied by* (b) the excess, if any, of (i) the Base Purchase Price (as defined in the Barrick Asset Purchase Agreement) *plus* the Base Purchase Price (as defined in this Agreement), *over* (ii) $83,100,000.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means any Contract that is not an Assigned Contract.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Exploration Agreement" means the Exploration, Development and Mine Operating Agreement dated March 9, 2009 between Midway US (f/k/a to MGC Resources Inc.) and Barrick.

"FIRPTA Certificate" has the meaning set forth in Section 6.2(e).

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authorities have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Hazardous Materials" means: (i) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or man-made, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws, and (ii) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"Knowledge" of each Seller means the actual knowledge of William M. Zisch, after making diligent inquiry of other responsible officers and employees of Sellers to inform himself as to the relevant matters, but without the requirement to make any inquiries of third parties or Governmental Authorities or to perform any search of any public records.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"Leased Mining Claims" means unpatented mining claims, including any associated royalties, leased by any Seller or the Spring Valley Venture and held for use in connection with the Spring Valley Business or the Additional Spring Valley Business.

"Leased Real Property" means real property (other than unpatented mining claims), including any associated royalties, leased by any Seller or the Spring Valley Venture and held for use in connection with the Spring Valley Business or the Additional Spring Valley Business.

"Loss" or "Losses" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

4

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or would reasonably be expected to be, materially adverse to the business, results of operations, financial condition, rights or assets of the Spring Valley Business taken as a whole; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions, (ii) conditions generally affecting the industries in which the Sellers and the Spring Valley Venture operate, (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates or capital costs or commodity markets, (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof, (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer, (vi) any change in the price of gold or other relevant metals or any change in currency exchange rates, (vii) any changes in applicable Laws or accounting rules, (viii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with the Spring Valley Business, (ix) any natural or man-made disaster or acts of God, (x) any failure by the Spring Valley Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided, however, that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded), or (xi) the pendency of the Chapter 11 Cases and any action approved by, or motion made before, the Bankruptcy Court, except in the case of clause (i), (ii) or (vii), where such change, effect, circumstance or event has a materially disproportionate effect on the Spring Valley Business, relative to comparable businesses operating in the mining industry.

"Material Contracts" means each Assigned Contract to which any Seller or any of its Affiliates is a signatory that relates to the Spring Valley Business, the Additional Spring Valley Business or the Purchased Assets (i) which, if terminated or modified or if it ceased to be in effect, would result in a Material Adverse Effect, (ii) that has annual payment obligations that are in excess of $500,000 and which may not be cancelled on 30 days' prior notice or less, (iii) that relates to indebtedness for borrowed money, whether incurred, assumed, guaranteed or secured by any asset, with an outstanding principal amount in excess of $500,000, (iv) that relates to the acquisition of any business (whether by merger, sale of stock, sale of assets or otherwise), for consideration in excess of $500,000, (v) that materially limits or restricts the operator of the Spring Valley Business or the Additional Spring Valley Business from engaging in any line of business, in any geographic area or with any other person, or (vi) that provides for the assumption of any material liability of any other Person by any Seller.

"Material Permits" has the meaning set forth in Section 3.9(b).

"Midway US" has the meaning set forth in the Preamble.

"Nevada Talon" has the meaning set forth in the Preamble.

"Obligations" has the meaning set forth in the DIP Credit Agreement.

"Other Contracts" has the meaning set forth in Section 3.7(a).

"Owned Mining Claims" means unpatented mining claims, including any associated royalties, owned by any Seller, its Affiliates or the Spring Valley Venture and held for use in connection with the Spring Valley Business or the Additional Spring Valley Business.

"Owned Real Property" means real property (other than unpatented mining claims), including any associated royalties, owned by any Seller or the Spring Valley Venture and held for use in connection with the Spring Valley Business or the Additional Spring Valley Business.

"Permits" means all permits, licenses, franchises, approvals, authorizations and consents required to be obtained from Governmental Authorities and held for use in connection with the Spring Valley Business or the Additional Spring Valley Business.

"Permitted Encumbrances" means: (i) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings, (ii) mechanics', carriers', workers', repairers' and similar liens arising or incurred in the ordinary course of business and that do not, and would not, materially interfere with the mine development and operation of the Spring Valley Business or the Additional Spring Valley Business in the ordinary course of business, as such development and operation are currently contemplated in the Site Visit Presentation delivered by Midway US to Buyer entitled "Spring Valley Project, Pershing County, Nevada dated September 2015" (the "Management Presentation"), (iii) environmental regulations by any Governmental Authority, (iv) title of a lessor under a capital or operating lease, (v) terms and conditions of, and liens and security interests created by, any Material Contract, including the Exploration Agreement, that have been disclosed in the Disclosure Schedules, (vi) all covenants, conditions, restrictions, easements, charges, rights-of-way, title defects or other encumbrances on title and similar matters filed of record in the real property records to which they relate or are located in the Nevada State Office of the Bureau of Land Management or the Nevada Division of Water Resources and that do not materially interfere with the mine development and operation of the Spring Valley Business or the Additional Spring Valley Business in the ordinary course of business, as such development and operation are currently contemplated in the Management Presentation, (vii) such liens, imperfections in title, charges, easements, restrictions, encumbrances or other matters that are due to zoning or subdivision, entitlement, and other land use Laws or regulations, (viii) encumbrances on, or reservations in, title arising by operation of any applicable United States federal, state or foreign securities Law, (ix) liens or encumbrances that arise solely by reason of acts of, or with the written approval of, Buyer, (x) liens not created by either Seller or the Spring Valley Venture that affect the underlying interest of any Owned Real Property, Leased Real Property, Owned Mining Claims, Leased Mining Claims or Water Rights and that do not, and would not, materially interfere with the mine development and operation of the Spring Valley Business or the Additional Spring Valley Business in the ordinary course of business, as such development and operation are currently contemplated in the Management Presentation, (xi) any set of facts an accurate up-to-date survey would show, provided, however, that such facts do not materially interfere with the mine development and operation of the Spring Valley Business or the Additional Spring Valley Business in the ordinary course of business, as such development and operation are currently contemplated in the Management Presentation, (xii) orders or rulings of the Nevada State Office of the Bureau of Land Management or the Nevada Division of Water Resources, (xiii) any Encumbrances listed in the Disclosure Schedules, (xiv) royalties or similar interests disclosed on Schedule 2.3(e) or Schedule 3.4(i) and (xv) any Encumbrance that will no longer burden any of the Purchased Assets following the entry of the Sale Order by the Bankruptcy Court.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Petition Date" has the meaning set forth in the recitals.

"Purchase Price" has the meaning set forth in Section 2.7(a).

"Purchased Assets" has the meaning set forth in Section 2.1.

"Reclamation Bonds" has the meaning set forth in Section 3.14.

"Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient

air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"ROFR" means the right of first refusal to purchase the Purchased Assets pursuant to the terms of the Exploration Agreement.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Order" means an Order or Orders of the Bankruptcy Court issued pursuant to sections 105, 363, and 365 of the Bankruptcy Code, in substantially the form set forth in Exhibit A hereto, authorizing and approving, among other things, (a) the sale, transfer and assignment of the Purchased Assets to Buyer in accordance with the terms and conditions of this Agreement, free and clear of all Claims and Encumbrances (except for Permitted Encumbrances), (b) the assumption and assignment of the Assigned Contracts in connection therewith and (c) that Buyer is a "good faith" purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

"Sellers" has the meaning set forth in the Preamble.

"Spring Valley Business" means the business conducted by the Spring Valley Venture.

"Spring Valley Development Project" has the meaning set forth in the recitals.

"Spring Valley East Development Project" has the meaning set forth in the recitals.

"Spring Valley Venture" means the business relationship between Midway US and Barrick in respect of the Spring Valley Development Project, including under the Exploration Agreement.

"Straddle Period" has the meaning set forth in Section 2.3(c).

"Tangible Property" means all tangible personal property listed on Schedule 2.1(j) and, to the extent not included therein, any tangible personal property included in the Additional Spring Valley Assets.

"Tax" or "Taxes" means (i) all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties, unclaimed property and escheat obligations, or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties, and (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of the operation of Law or any express or implied obligation to indemnify any other Person.

"Tax Return" means any return, document, declaration, report, election, estimated tax filing, claim for refund, declaration of estimated Tax, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Taxes" has the meaning set forth in Section 5.13(a).

"Transitional Services Agreement" means the transitional services agreement to be entered into between Buyer and Barrick pursuant to the Barrick Asset Purchase Agreement.

"Water Rights" means water rights owned or leased by any Seller, its Affiliates or the Spring Valley Venture and held for use in connection with the Spring Valley Business or the Additional Spring Valley Business.

## ARTICLE 2
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets. Subject to the terms and conditions set forth in this Agreement and in the Sale Order, at the Closing, Sellers shall irrevocably sell, assign and transfer to Buyer, and Buyer shall purchase from Sellers, free and clear of all Encumbrances other than Permitted Encumbrances, all of Sellers' right, title and interest in, to and under the following assets, properties and rights, whether held as an equitable interest, as a tenant in common interest or otherwise (the "Purchased Assets"):

(a)    Sellers' 30% undivided interest in the Spring Valley Venture, including all of Sellers' right, title and interest in, to and under the Exploration Agreement;

(b)    Sellers' interest in the Spring Valley East Development Project;

(c)    the Owned Real Property, all of which is described in Schedule 2.1(c);

(d)    the Leased Real Property, all of which is described in Schedule 2.1(d);

(e)    the Owned Mining Claims, all of which are described in Schedule 2.1(e);

(f)    the Leased Mining Claims, all of which are described in Schedule 2.1(f);

(g)    the Water Rights, all of which are described in Schedule 2.1(g);

(h)    the Assigned Contracts;

(i)    the Permits;

(j)    the Tangible Property;

(k)    originals, or where not available, copies, of all Books and Records relating to (i) the Additional Spring Valley Business or (ii) the Spring Valley Business that are in the possession of either Seller;

(l)    all of the rights of Sellers and, to the extent applicable, their Affiliates under warranties, indemnities and all similar rights against third parties (including Barrick) to the extent related to the Spring Valley Business or the Additional Spring Valley Business;

(m)    to the extent not covered by clauses (a) through (k) above, the Additional Spring Valley Assets; and

(n)    all Claims to the extent related to the Purchased Assets described in Section 2.1(a) through Section 2.1(m) or the Assumed Liabilities, including all Claims (i) against Barrick or its Affiliates or (ii) arising under chapter 5 of the Bankruptcy Code (A) against counterparties who are party to (or Affiliates of a party to) any Assigned Contract, (B) otherwise arising under or related to the Purchased Assets, or (C) against Buyer (or Buyer's Affiliates).

Section 2.2 <u>Excluded Assets</u>. Other than the Purchased Assets, Buyer expressly acknowledges and agrees that it is not purchasing or acquiring, and Sellers are not selling or assigning, any other assets or properties of Sellers, and all such other assets and properties shall be excluded from the Purchased Assets (the "<u>Excluded Assets</u>"). For greater certainty, Excluded Assets include the following assets and properties of each Seller:

(a)     all cash and cash equivalents, bank accounts and securities of such Seller;

(b)     the Excluded Contracts;

(c)     the organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of such Seller, all employee-related or employee benefit-related files or records, and any other books and records which such Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

(d)     all insurance policies of such Seller and all rights to applicable claims and proceeds thereunder;

(e)     all Tax assets (including Tax refunds and prepayments) of such Seller;

(f)     all personal property used by such Seller in its business other than the Tangible Property;

(g)     any Claims of such Seller's estate under article 5 of the Bankruptcy Code or analogous state statutes including Claims under section 547, 548, 549 or 550 of the Bankruptcy Code, but excluding Claims expressly included in <u>Section 2.1(n)</u>;

(h)     the rights which accrue or will accrue to such Seller under this Agreement and the documents and instruments delivered in connection herewith; and

(i)     the assets, properties and rights set forth in <u>Schedule 2.2(i)</u>.

Section 2.3 <u>Assumed Liabilities</u>. Subject to the terms and conditions set forth herein, Buyer shall assume, pay, satisfy, perform and discharge when due only the following liabilities and obligations of Sellers with respect to the Purchased Assets, the Spring Valley Business and the Additional Spring Valley Business (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all liabilities and obligations under the Assigned Contracts, Permits and Environmental Claims whether arising prior to or on or after the Closing Date, including, without limitation, the Cure Amounts;

(b)     all liabilities and obligations with respect to the Disclosed Litigation, excluding any expenses or costs (including legal costs and work-in-progress) accrued with respect to the defense of such Disclosed Litigation prior to the Closing Date;

(c)     all liabilities and obligations for (i) Taxes relating to the Spring Valley Business, the Additional Spring Valley Business, the Purchased Assets or the Assumed Liabilities for any taxable period or portion thereof following the Closing Date (and for this purpose, any Taxes for any Straddle Period shall be allocated between the portion of such Straddle Period ending on the Closing Date and the portion of such Straddle Period beginning after the Closing Date on an interim "closing of the books method", provided that any Taxes (such as property Taxes) that are not imposed on income, receipts or otherwise on a transactional basis shall be allocated on a daily basis, with "<u>Straddle Period</u>" meaning any taxable period beginning before and ending after the Closing Date), and (ii) Taxes for which Buyer is liable pursuant to <u>Section 5.13</u>;

9

(d)     all liabilities and obligations arising on or after the Closing Date from or relating to any condition of the Purchased Assets, the Spring Valley Business or the Additional Spring Valley Business, whether known or unknown or contingent; and

(e)     all liabilities listed in Schedule 2.3(e).

Section 2.4     Excluded Liabilities. Other than the Assumed Liabilities and Permitted Encumbrances , Buyer shall not assume and shall not be responsible to pay, perform or discharge any debts, liabilities or obligations of any Seller or with respect to the Purchased Assets, the Spring Valley Business or the Additional Spring Valley Business, whether known, unknown, direct, indirect, absolute, contingent or otherwise, or arising out of facts, circumstances or events in existence on or prior to Closing including the following (collectively, the "Excluded Liabilities"):

(a)     any liabilities or obligations relating to or arising out of the Excluded Assets;

(b)     all liabilities and obligations resulting from any (i) fine, (ii) penalty, (iii) claim for damages, (iv) health and safety violation, (v) regulatory order or (vi) breach of Law or Contract, in each case, due to any Seller's acts or omissions as the operator or manager of the Additional Spring Valley Assets;

(c)     any liabilities or obligations for Taxes: (i) relating to the Spring Valley Business, the Additional Spring Valley Business, the Purchased Assets or the Assumed Liabilities for any taxable period or portion thereof ending on or prior to the Closing Date (and for this purpose, any Taxes for any Straddle Period shall be allocated in the same manner as Section 2.3(c)); and (ii) Taxes of any Seller or an Affiliate of any Seller not related to the Spring Valley Business;

(d)     any liabilities or obligations relating to or arising out of the broker fees disclosed in Section 3.13;

(e)     any liabilities or obligations relating to any employees of, or employment contracts with any employees of, any Seller or its Affiliates or any employee benefit plans, unemployment benefit, bonus, incentive, profit sharing, termination, pension, retirement, stock option, stock purchase, health, welfare, medical, disability or life insurance or similar plan in respect of the employees of any Seller or its Affiliates; and

(f)     any liabilities and obligations of any Seller set forth in Schedule 2.4(f).

Section 2.5     Exclusion of Assigned Contracts. From the date hereof until two (2) Business Days prior to the Sale Hearing (the "Cut-Off Date"), Buyer shall have the right, upon written notice to Sellers, to exclude any Contract from the Assigned Contracts that is related solely to the Additional Spring Valley Assets, or supplement the list of  Assigned Contracts to include any Contract that is related solely to the Additional Spring Valley Assets that should have been listed on Schedule 2.1(h) (in each case, subject to the requirements of sections 365(a) and 365(f) of the Bankruptcy Code), for any reason.  Any Contract so excluded by Buyer shall be deemed to no longer be an Assigned Contract and shall be deemed an Excluded Asset.  Any Schedules hereto shall be amended to reflect any changes made pursuant to this Section 2.5 and Buyer shall have no obligation to pay the Cure Amount (if any) associated with any Contract that is excluded from the Assigned Contracts pursuant to this Section 2.5.  For the avoidance of doubt, any such exclusion or addition of any Assigned Contract shall not result in a change to the amount of the Cure Amount.  Buyer shall assume, and be obligated to pay, the Cure Amount with respect to (i) any Contract added pursuant to its right to supplement the list of Assigned Contracts and Cure Amounts under this Section 2.5 and (ii) any increased Cure Amounts set forth in any order of the Bankruptcy Court to the extent Buyer fails to exclude the Contract associated with such Cure Amount within five (5) Business Days of the issuance of such order (and any such Cure Amounts shall be deemed added to Schedule 2.1(h) and become an Assumed Liability).

Section 2.6    Non-Assignable Purchased Assets.

(a)    To the extent that the sale, assignment, transfer, conveyance or delivery, or attempted sale, assignment, transfer, conveyance or delivery, to Buyer of any Purchased Asset would violate any Governmental Order which is in effect, result in a violation of applicable Law or would require the consent, authorization, approval or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement (including any Governmental Authority), and (i) such consent, authorization, approval or waiver has not been obtained, (ii) the Bankruptcy Court has not entered a final Governmental Order, which may include the Sale Order, providing that such consent, authorization, approval or waiver is not required or that the Purchased Asset subject to such consent, authorization, approval or waiver shall be assigned or transferred regardless of any such necessary consent, authorization, approval or waiver and that there shall be no breach or adverse effect on the rights of Buyer thereunder for the failure to obtain any such consent, authorization, approval or waiver or, (iii) in the case of Permits included in the Purchased Assets, where such consent, authorization, approval or waiver is not ordinarily obtained prior to the Closing, no Seller shall sell and this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery, or an attempted sale, assignment, transfer, conveyance or delivery thereof; provided, however, that, subject to the satisfaction or waiver of the conditions contained in ARTICLE 6, the Closing shall occur, notwithstanding the foregoing, without any adjustment to the Purchase Price on account thereof. Following the Closing, Sellers and Buyer shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent, authorization, approval or waiver, or any release, substitution or amendment required to transfer all of the rights and benefits, and assign or novate all liabilities and obligations under any and all Assigned Contracts, Permits included in the Purchased Assets and other Purchased Assets and Assumed Liabilities, so that Buyer may have the benefit and rights of such Assigned Contracts and Permits and Purchased Assets and be responsible for such Assumed Liabilities from and after the Closing Date; provided, however, that neither Sellers nor Buyer shall be required to pay any consideration therefor other than routine filing fees. Once such consent, authorization, approval, waiver, release, substitution or amendment is obtained, such applicable Purchased Assets shall be deemed to be transferred or, if required, Sellers shall sell, assign, transfer, convey and deliver to Buyer the relevant Purchased Asset to which such consent, authorization, approval, waiver, release, substitution or amendment relates for no additional consideration. Applicable sales, transfer and other similar Taxes in connection with such sale, assignment, transfer, conveyance or license shall be paid by Buyer in accordance with Section 5.13.

(b)    To the extent that any Purchased Asset or Assumed Liability cannot be transferred to Buyer following the Closing pursuant to Section 2.6(a), Buyer and Sellers shall use commercially reasonable efforts to enter into such arrangements (such as subleasing, sublicensing or subcontracting) to provide to the parties the economic and, to the extent permitted under applicable Law, operational equivalent of the transfer of such Purchased Asset or Assumed Liability to Buyer as of the Closing. To the extent permitted under applicable Law, Buyer shall, as agent or subcontractor for Sellers, pay, perform and discharge fully the liabilities and obligations of Sellers thereunder from and after the Closing Date and Sellers shall, at Buyer's expense, hold in trust for and pay to Buyer promptly upon receipt thereof, such Purchased Asset and all benefits, income, proceeds and other monies received by Sellers to the extent related to such Purchased Asset in connection with the arrangements under this Section 2.6(b). Sellers shall be permitted to set off against such amounts all direct costs associated with the retention and maintenance of such Purchased Assets. Notwithstanding anything herein to the contrary, the provisions of this Section 2.6(b) shall not apply to any consent or approval required under any antitrust, competition or trade regulation Law, which consent or approval shall be governed by Section 5.5.

(c)    The provisions of Section 2.6(a) and Section 2.6(b) shall not apply to any consent, authorization, approval or waiver relating to the ROFR (if applicable).

11

Section 2.7    Purchase Price.

(a)    The aggregate consideration for the Purchased Assets (the "Purchase Price") shall consist of:

(i)    a credit bid of the Obligations (if any) owed by Sellers to Buyer under the Credit Documents in an amount (as determined by Buyer in its sole discretion) up to $5 million; *plus*

(ii)    cash in an amount equal to the excess of (A) the sum obtained by adding (1) $25 million (the "Base Purchase Price") and (2) any Excess Consideration Amount, over (B) the amount of the credit bid described in clause (i) above (the "Cash Amount"); *plus*

(iii)    the assumption of the Assumed Liabilities.

(b)    No later than three Business Days prior to Closing, Sellers shall deliver to Buyer a statement indicating wire transfer instructions for Sellers. At the Closing, Buyer shall deliver to Sellers by wire transfer an amount equal to the Cash Amount in accordance with such instructions in cash.

Section 2.8    Closing.    Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated herein, including the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "Closing"), shall take place electronically via email or facsimile beginning at 9:00 a.m., Mountain time, on the third Business Day after the last of the conditions to Closing set forth in ARTICLE 6 have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date) or at such other time or on such other date or at such other place as Sellers and Buyer may mutually agree upon in writing (the day on which the Closing takes place being the "Closing Date").

Section 2.9    Transactions to be Effected at the Closing. At the Closing:

(a)    Each Seller shall deliver to Buyer the following, substantially in the applicable form attached hereto as Exhibit B with respect to the items listed in Section 2.9(a)(ii) through Section 2.9(a)(vi) below:

(i)    a true and correct copy of the Sale Order;

(ii)    duly executed deeds sufficient to transfer such Seller's right, title and interest in, to and under all of the Purchased Assets that are Owned Real Property or Owned Mining Claims;

(iii)    duly executed assignments sufficient to transfer such Seller's right, title and interest in, to and under all of the Purchased Assets that are Leased Real Property or Leased Mining Claims;

(iv)    duly executed deeds or assignments sufficient to transfer such Seller's right, title and interest in, to and under all of the Purchased Assets that are Water Rights;

(v)    duly executed assignments and bills of sale sufficient to transfer such Seller's right, title and interest in, to and under the Purchased Assets that are Tangible Property;

(vi)    duly executed assignments sufficient to transfer all of the Purchased Assets that are Assigned Contracts or Material Permits; and

12

(vii)    all other agreements, documents, instruments or certificates required to be delivered by such Seller at or prior to the Closing pursuant to Section 6.2.

(b)    Buyer shall deliver to, or on behalf of (in the case of Section 2.9(b)(ii)), Sellers the following:

(i)    the Cash Amount;

(ii)    the Cure Amounts required to be paid by Buyer in accordance with the terms hereof to the counterparties of the applicable Assigned Contracts;

(iii)    a counterpart in form and substance satisfactory to Buyer and Sellers, acting reasonably, pursuant to which Buyer agrees to be bound by the Exploration Agreement to the same extent as Sellers;

(iv)    duly executed assumption agreements sufficient to assume the Assumed Liabilities substantially in the form attached as Exhibit C hereto; and

(v)    all other agreements, documents, instruments or certificates required to be delivered by Buyer at or prior to the Closing pursuant to Section 6.3.

Section 2.10    Allocation of Purchase Price. Within 60 days after the Closing Date, Buyer shall deliver to Sellers a schedule allocating the Purchase Price and any other amounts required to be taken into account among the applicable assets of each Seller (the "Allocation Schedule"). The Allocation Schedule shall be prepared, and subsequently adjusted, in accordance with section 1060 of the Code. The Allocation Schedule shall be deemed final unless Sellers notify Buyer in writing that Sellers objects to one or more items reflected in the Allocation Schedule within 30 days after delivery of the Allocation Schedule to Sellers. In the event of any such objection, Buyer and Sellers will work expeditiously and in good faith in an attempt to resolve such dispute within a further period of 15 days after the date of notification by Sellers to Buyer of such dispute, failing which the dispute shall be submitted for determination to an independent national firm of certified public accountants mutually agreed to by Sellers and Buyer (and, failing agreement between Sellers and Buyer on the firm of certified public accountants within a further period of five Business Days, such independent national firm of certified public accountants shall be Ernst & Young LLP). The determination of the firm of certified public accountants shall be final and binding upon the parties and shall not be subject to appeal. The firm of certified public accountants shall be deemed to be acting as experts and not as arbitrators. The fees and expenses of such accounting firm shall be borne equally by Sellers, on the one hand, and Buyer, on the other. Sellers and Buyer agree to (a) file their respective IRS Forms 8594 and all federal, state and local Tax Returns in a manner consistent with the Allocation Schedule (as it may be subsequently adjusted) and (b) notify and provide the other party with reasonable assistance in the event of an examination, audit or other proceeding relating to Taxes or any other filing with a Governmental Authority regarding the appropriate allocation of the Purchase Price among the Purchased Assets. Notwithstanding the preceding sentence, the parties may settle any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the allocation of the Purchase Price and other applicable items among the Purchased Assets, and neither Buyer nor Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority challenging any final Allocation Schedule. Notwithstanding anything in this Agreement to the contrary, this Section 2.10 shall survive the Closing Date without limitation.

Section 2.11    Withholding. Buyer shall be entitled to withhold from amounts payable to any Seller hereunder amounts of Taxes that are required to be withheld under applicable Law and if any such Taxes are withheld, they shall be remitted by Buyer in accordance with applicable Law; provided that, if a Seller has provided the FIRPTA Certificate in accordance with Section 6.2(e) upon which Buyer may rely that reasonably establishes that the transactions contemplated hereby are not

subject to withholding under Code section 1445(a), Buyer shall not deduct or withhold any amount for Taxes under Code section 1445(a) with respect to such Seller. To the extent that such Taxes are withheld and paid over to the applicable Governmental Authority with respect to amounts payable to a Seller hereunder, such amounts shall be treated for purposes of this Agreement as having been paid to such Seller.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Schedules, Sellers jointly and severally represent and warrant to Buyer as follows:

Section 3.1    Organization. Such Seller is a corporation or limited liability company, as applicable, duly organized, validly existing and in good standing under the Laws of the state of its formation, is duly qualified to do business as a foreign corporation or limited liability company, as applicable, and is in good standing under the Laws of each jurisdiction that requires such qualification as a consequence of the Spring Valley Business or the Additional Spring Valley Business.

Section 3.2    Due Authorization, Execution and Delivery; Enforceability. Subject to the entry of the Sale Order by the Bankruptcy Court, such Seller has the requisite organizational power and authority to enter into this Agreement and the other agreements contemplated hereby, and to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby. Subject to the entry of the Sale Order by the Bankruptcy Court, the execution and delivery by such Seller of this Agreement, the performance by such Seller of its obligations hereunder and the consummation by such Seller of the transactions contemplated hereby have been duly authorized by all requisite organizational action. This Agreement has been duly executed and delivered by such Seller and, subject to the entry of the Sale Order by the Bankruptcy Court, constitutes the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 3.3    No Conflicts; Consents. Except as set forth in Schedule 3.3 or pursuant to the ROFR (if applicable), subject to the Sale Order having been entered by the Bankruptcy Court, the execution, delivery and performance by such Seller of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (i) conflict with or result in a violation or breach of any provision of its organizational documents, (ii) conflict with or result in a violation or breach of any Governmental Order applicable to such Seller, or (iii) require the consent of any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel, any Material Contract. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority or other Person is required by or with respect to such Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, except (x) as set forth in Schedule 3.3, (y) entry of the Sale Order by the Bankruptcy Court, and (z) such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not have a Material Adverse Effect.

Section 3.4    Assets.

(a)    Schedule 2.1(c) sets forth a true and complete list of (i) all Owned Real Property held or used in connection with the Additional Spring Valley Business and (ii) to the

Knowledge of Sellers, all Owned Real Property held or used in connection with the Spring Valley Business.

(b)      Schedule 2.1(d) sets forth a true and complete list of (i) all Leased Real Property held or used in connection with the Additional Spring Valley Business and (ii) to the Knowledge of Sellers, all Leased Real Property held or used in connection with the Spring Valley Business.

(c)      Schedule 2.1(e) sets forth a true and complete list of (i) all Owned Mining Claims held or used in connection with the Additional Spring Valley Business and (ii) to the Knowledge of Sellers, all Owned Mining Claims held or used in connection with the Spring Valley Business.

(d)      Schedule 2.1(f) sets forth a true and complete list of (i) all Leased Mining Claims held or used in connection with the Additional Spring Valley Business and (ii) to the Knowledge of Sellers, all Leased Mining Claims held or used in connection with the Spring Valley Business.

(e)      Schedule 2.1(g) sets forth a true and complete list of (i) all Water Rights held or used in connection with the Additional Spring Valley Business and (ii) to the Knowledge of Sellers, all Water Rights held or used in connection with the Spring Valley Business.

(f)      Midway US owns a 30% undivided interest in and to the Spring Valley Venture and (i) a 30% legal interest in the Owned Real Property held or used in connection with the Spring Valley Business set forth in part (i) of Schedule 2.1(c), to which it has good record title, (ii) a 30% legal interest in the Leased Real Property held or used in connection with the Spring Valley Business set forth in part (i) of Schedule 2.1(d), to which it has a valid and enforceable leasehold or subleasehold interest, (iii) subject to the paramount title of the United States, a 30% legal interest in the Owned Mining Claims held or used in connection with the Spring Valley Business set forth in part (i) of Schedule 2.1(e), to which it has good record title, (iv) subject to the paramount title of the United States, a 30% legal interest in the Leased Mining Claims held or used in connection with the Spring Valley Business set forth in part (i) of Schedule 2.1(f), to which it has a valid and enforceable leasehold or subleasehold interest, and (v) a 30% legal interest in the Water Rights held or used in connection with the Spring Valley Business set forth in part (i) of Schedule 2.1(g), to which it has valid title, in each case, free and clear of all Encumbrances except for Permitted Encumbrances. To the Knowledge of Sellers, other than those assets held by Barrick or its Affiliates and any global supply contracts to which Affiliates of Barrick are a party, the Purchased Assets represent all of the material assets and property used by the Spring Valley Venture in carrying on the Spring Valley Business for exploration purposes as it is currently conducted and, together with any services to be provided by Barrick and its Affiliates pursuant to the Transitional Services Agreement, constitute all assets that are necessary for the conduct of the Spring Valley Business in all material respects for exploration purposes as it is currently conducted. Except for Buyer under this Agreement, the ROFR (if applicable) and as set forth in Schedule 3.3, no Person has any written or oral agreement, option, understanding or commitment, or any right or privilege capable of becoming such for the purchase or other acquisition from Sellers or their Affiliates of any of the Purchased Assets, other than such rights that have been waived by such Person and other than with respect to Purchased Assets which are obsolete and which individually or in the aggregate do not exceed $500,000. All material assets, properties and rights used by the Spring Valley Venture in the conduct of the Spring Valley Business are held solely by Sellers and Barrick, and all material Contracts, obligations, expenses and transactions relating to the Spring Valley Business have been entered into, incurred and conducted only by Sellers and Barrick.

(g)      Sellers have not sold, assigned, transferred or conveyed their interest in the Purchased Assets, or any right, title or interest therein, to any Person other than the sale to Buyer

contemplated hereby, and Sellers have not created or consented to any Encumbrance arising by, through or under such Seller, other than Permitted Encumbrances.

(h) With respect to the Owned Mining Claims listed, or required to be listed, on Schedule 2.1(e), all required claim maintenance fees have been paid in the manner required by Law in order to maintain the Owned Mining Claims in good standing through the end of the current assessment year (inclusive of the Closing Date), and proof thereof has been properly and timely recorded and filed in accordance with Law, and with respect to the Leased Mining Claims listed, or required to be listed, on Schedule 2.1(f), to the Knowledge of Sellers, all required claim maintenance fees have been paid in the manner required by Law in order to maintain the Leased Mining Claims in good standing through the end of the current assessment year (inclusive of the Closing Date), and proof thereof has been properly and timely recorded and filed in accordance with Law.

(i) To the Knowledge of Sellers, Schedule 2.3(e) and Schedule 3.4(i) set forth a true and complete list of all royalties on or burdening all or any portion of the Owned Real Property, Leased Real Property, Owned Mining Claims, Leased Mining Claims, whether such royalty is characterized as a net smelter return royalty, overriding royalty, net profit interest, gross proceeds royalty, production payment, streaming transaction, share of mineral production or otherwise.

(j) Sellers own (i) all of the legal interest in the Owned Real Property set forth (or required to be set forth) in Schedule 2.1(m) and part (ii) of Schedule 2.1(c), to which they have good record title, (ii) all of the legal interest in the Leased Real Property set forth (or required to be set forth) in Schedule 2.1(m) and part (ii) of Schedule 2.1(d), to which they have a valid and enforceable leasehold or subleasehold interest, (iii) subject to the paramount title of the United States, all of the legal interest in the Owned Mining Claims set forth (or required to be set forth) in Schedule 2.1(m) and part (ii) of Schedule 2.1(e), to which they have good record title, (iv) subject to the paramount title of the United States, all of the legal interest in the Leased Mining Claims set forth (or required to be set forth) in Schedule 2.1(m) and part (ii) of Schedule 2.1(f), to which they have a valid and enforceable leasehold or subleasehold interest, and (v) all of the legal interest in the Water Rights set forth (or required to be set forth) in Schedule 2.1(m) and part (ii) of Schedule 2.1(g), to which they have valid title, in each case, free and clear of all Encumbrances except for Permitted Encumbrances.

(k) The Tangible Property that is (i) material and used regularly in the conduct of the Additional Spring Valley Business has been maintained in all material respects in the ordinary course consistent with standard industry practice or (ii) material and used regularly in the conduct of the Spring Valley Business has, to the Knowledge of Sellers, been maintained in all material respects in the ordinary course consistent with standard industry practice.

(l) No Affiliate of any Seller owns or has any rights in or to any of the Purchased Assets or other properties or rights relating primarily to the Spring Valley Business or the Additional Spring Valley Business.

Section 3.5    [Reserved].

Section 3.6    Ordinary Course of Business. Except as expressly contemplated by this Agreement or as set forth in Schedule 3.6, from and after September 30, 2015, (a) the Spring Valley Business has, to the Knowledge of Sellers, been operated in the ordinary course of business in all material respects, (b) the Additional Spring Valley Business has been operated in the ordinary course of business in all material respects and (c) there has not been any change, event or development or prospective change, event or development with respect to the Purchased Assets that, individually or in the aggregate, has had a Material Adverse Effect.

Section 3.7    Material Contracts.

(a)      Schedule 3.7(a) lists (i) all of the Material Contracts entered into by any Seller with respect to the Spring Valley Business or the Purchased Assets (other than the Additional Spring Valley Assets) and (ii) all other Contracts entered into by any Seller with respect to the Additional Spring Valley Business or the Additional Spring Valley Assets (the "Other Contracts"). Schedule 3.7(a) also lists or describes all material written or unwritten Contracts, arrangements, understandings or dealings, including with respect to the provision of any toll-processing or shared services, between Sellers and an Affiliate or other non-arm's length party with respect to the Spring Valley Business or the Purchased Assets (it being acknowledged that these arrangements, understandings or dealings shall not be included in the Purchased Assets).

(b)      Except as disclosed in Schedule 3.7(b), each Material Contract or Other Contract is a legal, valid, binding and enforceable agreement of the applicable Seller, and is in full force and effect and will continue to be in full force and effect immediately following the Closing Date. Except as disclosed in Schedule 3.7(b) or as a result of the Chapter 11 Cases, such Seller: (i) has performed in all material respects all of the obligations required to be performed by it under each Material Contract or Other Contract, and (ii) is not in material breach of, or default under, any Material Contract or Other Contract.

(c)      Schedule 3.7(c) sets forth Sellers' estimate, based on reasonable inquiry, as of the date hereof, of the Cure Amounts associated with each Assigned Contract.

Section 3.8      Legal Proceedings. Except for the Disclosed Litigation, there are no actions, suits, claims or other legal proceedings pending, in each case before a Governmental Authority, or to such Sellers' Knowledge threatened, against any Seller relating to the Additional Spring Valley Business or, to the Knowledge of Sellers, the Spring Valley Business, which would reasonably be expected to be material and adverse to such Seller in connection with its conduct of the Spring Valley Business, the Additional Spring Valley Business or the Purchased Assets.

Section 3.9      Compliance with Laws; Permits.

(a)      Except as disclosed in Schedule 3.9(a), each Seller is, and, to the Knowledge of Sellers, the Spring Valley Venture is, in compliance with all Laws applicable to the Spring Valley Business or the Additional Spring Valley Business, as applicable, except where the failure to be in such compliance would not be expected to be material and adverse to such Seller or the Spring Valley Venture in connection with the conduct of the Spring Valley Business or the Additional Spring Valley Business, as applicable.

(b)      Schedule 3.9(b) sets forth the material Permits necessary for the operation of the Additional Spring Valley Business and, to the Knowledge of Sellers, the Spring Valley Business as presently being conducted (the "Material Permits"). The Material Permits necessary for the operation of the Additional Spring Valley Business and, to the Knowledge of Sellers, the Material Permits necessary for the operation of the Spring Valley Business, have been duly obtained and neither Sellers nor, to the Knowledge of Sellers, the Spring Valley Venture is in material default or material breach of any such Material Permit.

(c)      None of the representations and warranties contained in this Section 3.9 shall relate to or be deemed to relate to environmental matters (which are governed exclusively by Section 3.10) or tax matters (which are governed exclusively by Section 3.12).

Section 3.10      Environmental Matters.

(a)      To Sellers' Knowledge, except as set forth in Schedule 3.10(a), the Spring Valley Business, the Additional Spring Valley Business and the Purchased Assets are in compliance with all Environmental Laws except where the failure to be in such compliance would not be expected to be material and adverse to any Seller or the conduct of the Spring Valley Business or the

Additional Spring Valley Business, and neither such Seller nor, to the Knowledge of Sellers, the Spring Valley Venture has received any Environmental Notice or Environmental Claim relating to the Spring Valley Business, the Additional Spring Valley Business or the Purchased Assets, which either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)    To the Knowledge of Sellers, Schedule 3.10(b) sets forth each of the material Environmental Permits necessary for the operation of the Spring Valley Business, each of which is in full force and effect. Sellers and, to the Knowledge of Sellers, the Spring Valley Venture, have obtained and are in material compliance with all Environmental Permits listed in Schedule 3.10(b). No Environmental Permits are necessary for the operation of the Additional Spring Valley Business.

(c)    To Sellers' Knowledge, and except as set forth in Schedule 3.10(c), there has been no Release of Hazardous Materials in contravention of Environmental Laws or that would give rise to any material liability or response costs with respect to the Additional Spring Valley Business or the Additional Spring Valley Assets.

(d)    Except as indicated in Schedule 3.10(d), neither Seller nor, to the Knowledge of Sellers, the Spring Valley Venture has entered into, and the Additional Spring Valley Assets are not, and to the Knowledge of Sellers, the Spring Valley Assets are not, otherwise subject to (i) any consent decree, order, judgment or judicial order relating to compliance with Environmental Laws or Environmental Permits or the investigation, sampling, monitoring, treatment, remediation, removal or cleanup of Hazardous Materials, and no litigation is pending with respect thereto, or (ii) any environmental indemnification in connection with any threatened or asserted claim by any third party for any liability under any Environmental Law or relating to any Hazardous Materials.

Section 3.11    [Reserved].

Section 3.12    Taxes.

(a)    Except as set forth in Schedule 3.12(a), (i) all Taxes due and owing by each Seller have been duly and timely paid in full, (ii) no Tax deficiencies are being proposed in writing or have been assessed by any Governmental Authority with respect to any Seller that remain outstanding or unsatisfied, (iii) there are no Tax liens on any of the Purchased Assets for which any Seller would be responsible, other than liens for Taxes not yet due and payable, (iv) no federal, state, local or foreign audits or administrative or judicial proceedings are presently pending, or threatened in writing, with regard to any Taxes or Tax Returns with respect to any Seller, and (v) all Tax Returns required to be filed by each Seller have been filed, and all such Tax Returns are true and correct in all material respects.

(b)    Neither Seller is a "foreign person" as that term is used in Treasury Regulations section 1.1445-2(b).

(c)    None of the Purchased Assets is treated, or required to be treated, as held in an arrangement requiring a partnership income Tax Return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code.

(d)    Neither Seller has entered into an agreement with any Governmental Authority requiring it or its Affiliates to take action, or refrain from taking action, in order to secure Tax benefits not otherwise available.

(e)    The representations and warranties set forth in this Section 3.12 are the exclusive representations and warranties made by the Sellers with respect to Taxes.

18

Section 3.13    Financial Advisors. Except for Moelis & Company LLC, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Sellers.

Section 3.14    Reclamation Bonds. To the Knowledge of Sellers, Schedule 3.14 sets forth a description of all surety instruments, bonds, letters of credit, guarantees and other instruments or arrangements securing or guarantying performance of obligations with respect to the operation, closure, reclamation or remediation of the Purchased Assets (collectively, the "Reclamation Bonds"). To the Knowledge of Sellers, no Governmental Authority has claimed any deficiency with respect to, or called on, any Reclamation Bond. No Reclamation Bonds are in place or required with respect to the Additional Spring Valley Assets.

Section 3.15    No Other Representations and Warranties. Except for the representations and warranties contained in this ARTICLE 3 (including the related portions of the Disclosure Schedules), Sellers have not and no Affiliate or Representative of Sellers, or any other Person, has made or makes any other express or implied representation or warranty, either written or oral, on behalf of either Seller, including any representation or warranty as to the accuracy or completeness of any information furnished or made available to Buyer and its Representatives (including any projections, information, documents or material made available to Buyer, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Spring Valley Business or the Additional Spring Valley Business or any representation or warranty arising from statute or otherwise in law.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

Section 4.1    Organization. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Nevada.

Section 4.2    Due Authorization, Execution and Delivery; Enforceability. Buyer has the requisite company power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite company action. This Agreement has been duly executed and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 4.3    No Conflicts; Consents. The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (i) result in a violation or breach of any provision of the organizational documents of Buyer, or (ii) result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer. No consent, approval, Permit, Governmental Order (other than in connection with the Chapter 11 Cases), declaration or filing with, or notice to, any Governmental Authority or other Person is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

Section 4.4    Financial Advisors. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

Section 4.5    Sufficiency of Funds. As of the date of this Agreement, Buyer has received an executed equity commitment letter dated the date of this Agreement (the "Equity Commitment Letter") from Buyer Parent, pursuant to which Buyer Parent has committed, subject to the terms and conditions set forth therein, to provide to Buyer cash in an aggregate amount set forth in the Equity Commitment Letter, which Equity Commitment Letter provides that Midway US is a third party beneficiary thereof. A true and complete copy of the fully executed Equity Commitment Letter as in effect on the date hereof has been provided to Sellers. As of the date of this Agreement, the Equity Commitment Letter is valid and in full force and effect and enforceable in accordance with its terms against Buyer and each other party thereto, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 4.6    Solvency. Immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due, (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities), and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Sellers. In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

Section 4.7    Legal Proceedings. There are no actions, suits, claims or other legal proceedings pending against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

Section 4.8    Independent Investigation. Buyer has conducted its own independent investigation, review and analysis of the Spring Valley Business, the Additional Spring Valley Business and the Purchased Assets. Buyer acknowledges and agrees that: (i) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied upon its own investigation and the express representations and warranties of Sellers set forth in ARTICLE 3 (including the related portions of the Disclosure Schedules), and (ii) none of Sellers, the Spring Valley Venture or any Affiliate or Representative of Sellers, the Spring Valley Venture or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Sellers.

## ARTICLE 5
## COVENANTS

Section 5.1    Conduct of Business Prior to the Closing. From the date hereof until the Closing:

(a)    Each Seller shall use its commercially reasonable efforts to:

(i)    conduct the Additional Spring Valley Business in the ordinary course of business;

(ii)    maintain and preserve intact the current organization, business and franchise of the Additional Spring Valley Business and to preserve the rights, franchises, goodwill and relationships of the customers, lenders, suppliers, regulators and others having business relationships with the Additional Spring Valley Business;

(iii)    pay all Taxes when due with respect to the Purchased Assets required to be paid by any Seller and not allow the Purchased Assets to become subject to a lien for Taxes required to be paid by any Seller, other than for Taxes not yet due and payable; and

(b)    except (i) as expressly required or permitted by this Agreement, (ii) as required pursuant to applicable Laws, (iii) as set forth in Schedule 5.1, (iv) as consented to in writing by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), or (v) as required to respond reasonably and prudently to an emergency or disaster (including the right to take forthwith any action required to insure the safety and integrity of the Additional Spring Valley Business), no Seller shall:

(i)    acquire any business, other than acquisitions with a purchase price that does not exceed $250,000 individually or $1,000,000 in the aggregate;

(ii)    sell, transfer, dispose of, lease, encumber, relinquish or abandon any of the Purchased Assets, except (A) pursuant to the exercise of the ROFR (if applicable) or in compliance with a Governmental Order, (B) with respect to Tangible Property, sales and other dispositions in the ordinary course of business or (C) sales, transfers or dispositions of Tangible Property that do not exceed $250,000 in the aggregate (excluding those sales described in clauses (A) or (B));

(iii)    enter into any Contract that would reasonably be likely to become an Assigned Contract;

(iv)    hire any employees to work in the Spring Valley Business or the Additional Spring Valley Business;

(v)    incur any indebtedness for borrowed money that will constitute an Assumed Liability other than short-term indebtedness, letters of credit or sureties in the ordinary course of business consistent with past practices;

(vi)    make any loans or advances that will be a Purchased Asset to any Person or assume or guarantee the liabilities of any Person that will constitute an Assumed Liability other than in the ordinary course of business;

(vii)    settle, offer or propose to settle, compromise, assign or release any material proceeding brought against such Seller in respect of or in connection with the Purchased Assets;

(viii)    enter into any agreement creating a joint venture or partnership or effecting a business combination or other similar arrangement with another Person in respect of any of the Purchased Assets;

(ix)    permit the Spring Valley Venture to acquire any asset that would materially change the conduct of the business as contemplated by the Exploration Agreement; and

(x)    attempt or agree to do any of the foregoing matters listed in clauses (i) through (ix) above.

Section 5.2    Access to Information. From the date hereof until the Closing, each Seller shall: (a) afford Buyer and its Representatives reasonable access to and the right to inspect all of the properties, assets, premises, Books and Records, Contracts and other documents and data related to the Additional Spring Valley Business and shall enforce Midway US's rights under the Exploration Agreement to obtain such access with respect to the Spring Valley Business, (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the

21

Additional Spring Valley Business as Buyer or any of its Representatives may reasonably request and furnish Buyer and its Representatives with all financial, operating and other data and information received by Sellers from Barrick related to the Spring Valley Business, and (c) instruct the Representatives of such Seller to cooperate with Buyer in its investigation of the Purchased Assets and the Spring Valley Business; provided, however, that any such investigation shall be conducted at Buyer's sole risk and expense during normal business hours upon reasonable advance notice to such Seller, under the supervision of such Seller's personnel, in compliance with all of such Seller's health, safety and environmental regulations and procedures, and in such a manner as not to interfere with the normal operations of the Additional Spring Valley Business or Spring Valley Business. Notwithstanding anything to the contrary in this Agreement, such Seller shall not be required to disclose any information to Buyer if such disclosure would, in such Seller's discretion: (x) cause significant competitive harm to such Seller, the Additional Spring Valley Business or the Spring Valley Business if the transactions contemplated by this Agreement are not consummated, (y) jeopardize any attorney-client or other privilege, or (z) contravene any applicable Law, fiduciary duty or binding agreement entered into prior to the date of this Agreement. Prior to the Closing, without the prior written consent of such Seller, Buyer shall not contact any suppliers to, or customers of, the Additional Spring Valley Business or the Spring Valley Business and Buyer shall have no right to perform invasive or subsurface investigations of any properties. Buyer shall, and shall cause its Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided pursuant to this Section 5.2.

Section 5.3    Notice of Certain Events. Sellers and Buyer agree that, subject to applicable Law, each shall provide the other prompt notice in writing of:

(a)    any notice or communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)    any material notice or communication from any Governmental Authority in connection with the transactions contemplated by this Agreement;

(c)    any material proceeding commenced or threatened against it which relates to the consummation of the transactions contemplated by this Agreement;

(d)    any failure by it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied under this Agreement; and

(e)    and copies of all documents related thereto, provided that the giving of any such notice shall not in any way change or modify the representations and warranties of the parties or the conditions in their favor contained in this Agreement or otherwise affect the remedies available to Sellers and Buyer under this Agreement.

Section 5.4    Confidentiality. Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 5.4 shall nonetheless continue in full force and effect. Notwithstanding the foregoing provisions of this Section 5.4, the parties hereto agree and acknowledge that (a) this Agreement and any and all schedules, exhibits and other ancillary documents may be disclosed to third parties and filed with the Bankruptcy Court in connection with the Chapter 11 Cases and Sellers' efforts to obtain entry of the Sale Order by the Bankruptcy Court and (b) such provisions shall not be construed to prohibit or restrict any party hereto or its Affiliates from making disclosures required by, or in connection with, applicable Laws or stock exchange requirements, rules or regulations.

Section 5.5    Governmental Approvals and Other Third-Party Consents.

(a)    Each party hereto shall, as promptly as possible use commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement, except for consents, authorizations, orders and approvals with respect to Permits that cannot be obtained until after the Closing. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)    [Reserved.]

(c)    [Reserved.]

(d)    Sellers and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents or waivers from, all third parties that are described in Schedule 3.3; provided, however, that (i) the foregoing shall not require Sellers or Buyer to give notices to (other than the notices provided for in Section 5.20(b)(ii)), or obtain consents or waivers from, any non-debtor parties to Material Contracts regarding assignments thereof to Buyer and (ii) neither Sellers nor Buyer shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested, other than customary filing fees.

Section 5.6    Right of First Refusal

(a)    Sellers shall give or cause to be given such required notices to the holder of the ROFR as a result of entry into this Agreement. To the extent permitted by the ROFR, Sellers shall provide to Buyer copies of all written notices and written responses received in response to the notices given by Sellers pursuant to this Section 5.6. Buyer shall, at the request of Sellers, co-operate with Sellers and use all reasonable efforts to assist Sellers to comply with the provisions of this Section 5.6 and shall promptly give to Sellers such information and copies of such documents relating to Buyer which Sellers may reasonably request from time to time as is necessary and appropriate in order to comply with the provisions of this Section 5.6. Buyer and Sellers shall use all reasonable efforts to obtain a waiver from Barrick of any rights it has under the ROFR with respect to the transactions contemplated by this Agreement.

(b)    The parties agree to cooperate in good faith to take such actions and execute such documents or instruments as may be necessary or desirable in order to effectuate the provisions of this Section 5.6.

(c)    (i) Sellers intend that nothing in this Agreement shall be construed as an admission, concession, acknowledgment or agreement that Barrick or any other party has any rights under the ROFR as a result of the parties' execution and delivery of, the entering into, and/or the consummation of the transactions contemplated in, this Agreement and (ii) Sellers reserve all rights to challenge, contest or otherwise take the position that neither Barrick nor any other party has any rights under the ROFR as a result of the parties' execution and delivery of, the entering into, and/or the consummation of the transactions contemplated in, this Agreement.

Section 5.7    Books and Records.

(a)    In order to facilitate the resolution of any claims made against or incurred by any Seller prior to the Closing, or for any other reasonable purpose, for a period of seven years after the Closing, Buyer shall: (i) retain the Books and Records (including personnel files) of the Spring Valley Business delivered to Buyer relating to periods prior to the Closing in accordance with Buyer's

document retention policies, and (ii) upon reasonable notice, afford the Representatives of such Seller reasonable access (including the right to make, at such Seller's expense, photocopies), during normal business hours, to those portions, and only those portions, of such Books and Records as relate to the Purchased Assets prior to Closing and, if required by Buyer, subject to such Seller executing a non-disclosure agreement with respect to such information, in form and substance acceptable to the parties, acting reasonably.

(b)     Buyer shall not be obligated to provide any Seller with access to any books or records (including personnel files) pursuant to this Section 5.7 where such access would violate any Law.

Section 5.8     Closing Conditions. From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in ARTICLE 6 for which it is responsible.

Section 5.9     Public Announcements. Sellers and Buyer shall consult with each other prior to issuing any press releases or otherwise making public statements with respect to this Agreement or the transactions contemplated by this Agreement and, to the extent practicable, shall provide the other parties with no less than two Business Days to review and comment on all such press releases or statements prior to the release thereof. To the extent that any such press release or public statement is required by applicable Law, by a rule of a stock exchange on which a party's shares (or those of any of its Affiliates) are listed or traded or by a Governmental Authority, the press release or public announcement shall be issued or made after consultation with the other parties and after taking into account the other parties' comments. If such advance consultation is not reasonably practicable or legally permitted, to the extent permitted by applicable Law, the disclosing party shall provide the other parties with a copy of any written disclosure made by such disclosing party as soon as practicable thereafter.

Section 5.10     Further Assurances. Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to vest title to the Purchased Assets in Buyer, carry out the provisions hereof and give effect to the transactions contemplated by this Agreement, in each case, at the sole cost and expense of the requesting party; provided that with respect to any Purchased Asset that is not transferred by Sellers at Closing , any such cost and expense shall be borne by Sellers.

Section 5.11     [Reserved.]

Section 5.12     [Reserved.]

Section 5.13     Taxes.

(a)     Transfer Taxes. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement (including any real property transfer Tax and any other similar Tax) (all such Taxes collectively, "Transfer Taxes") shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax Return with respect to Transfer Taxes (and Sellers shall cooperate with respect thereto as necessary). Each of Buyer and Sellers agree to timely sign and deliver (or to cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate and otherwise to cooperate to establish any available exemption from (or otherwise reduce) any Transfer Taxes.

(b)     Tax Cooperation. Sellers, on the one hand, and Buyer, on the other hand, agree to furnish or cause to be furnished to the other, upon written request, such information and assistance as is reasonably necessary (i) for the filing of any Tax Return with respect to the Purchased

Assets or otherwise relating to any of the payments to be made pursuant to this Agreement with respect to Taxes, (ii) for the preparation for any audit or responding to any information document requests (or other requests for information, materials or documents) in connection with any Tax audit with respect to the Purchased Assets, and (iii) for the prosecution or defense of any Tax claim relating to any Tax adjustment or proposed Tax adjustment with respect to the Purchased Assets. Such assistance shall include making employees available on a mutually convenient basis to provide additional information and explanations of any material provided hereunder. Buyer and Seller shall retain all books and records of the Spring Valley Venture with respect to Taxes for a period of at least seven (7) years following the Closing.

Section 5.14    [Reserved.]

Section 5.15    Financing.  Buyer covenants and agrees that it shall ensure and take all necessary steps to ensure that at Closing it will have sufficient funds on hand to pay the Purchase Price to Sellers in full in cash.

Section 5.16    [Reserved.]

Section 5.17    [Reserved.]

Section 5.18    Nature of Transaction.  The Sellers are selling, and the Buyer is acquiring, the Purchased Assets "as is", "where is" and with all faults, limitations and defects (hidden and apparent) and subject only to the representations and warranties contained in ARTICLE 3, without any other representation or warranty of any nature whatsoever and without any guarantee or warranty (whether express or implied) as to their title, quality, merchantability or their fitness for the Buyer's intended use or a particular purpose or any use or purpose whatsoever. Further, except as set forth in this Agreement, neither Sellers nor any director, officer, manager, employee, agent, consultant, or Representative of Sellers have made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets, or the physical condition of the Purchased Assets. Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Purchased Assets as contemplated hereunder. Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. Buyer and Sellers further acknowledge that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Sellers and Buyer after good-faith arms'-length negotiation. Buyer has relied, and shall rely, solely upon its own investigation of all such matters and the representations, warranties and covenants contained in ARTICLE 3. Following the Closing, each of the parties hereto hereby agrees and acknowledges that (a) the parties hereto hereby disclaim all Losses and responsibility for any representation or warranty (including any representation or warranty set forth in ARTICLE 3 or ARTICLE 4 or any express or implied warranty, any warranty as to accuracy or completeness or any warranty as to fitness for a particular purposes), omission, agreement, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to any other party hereto or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided, directly or indirectly (including on or by access to any online data room), to any other party hereto or its Affiliates or Representatives by any director, officer, manager, employee, agent, consultant, or Representative of such party); (b) no Seller makes any representations or warranties to Buyer regarding the probable success, profitability or value of any of the Purchased Assets; and (c) no party hereto shall have any liability with respect to, and no party hereto shall be permitted nor shall it assert any indemnification claim, liability or Loss with respect to, the foregoing matters, whether pursuant to this Agreement, common law, or otherwise.

Section 5.19    Supplements to Schedules. Following the Cut-Off Date, each Seller will promptly notify Buyer if such Seller becomes aware of any Contract relating to the Additional Spring Valley Assets that should have been identified on Schedule 2.1(h) and provide Buyer a true, correct and complete copy of such Contract. Within 10 Business Days following receipt of such notice and a copy of such Contract, Buyer shall have the option to include or exclude such Contract from the Assigned Contracts included in the Purchased Assets. Subject to the terms and conditions herein provided, following the Closing Date, each Seller shall execute and deliver to Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to Buyer, and take such additional actions as Buyer may reasonably request, to promptly vest in Buyer all of such Seller's right, title and interest in and to the Purchased Assets, including the prompt transfer of Permits.

Section 5.20    Bankruptcy Matters.

(a)    Competing Transaction. Sellers intend to seek entry of the Sale Order by the Bankruptcy Court without soliciting proposals or offers for the sale of the Purchased Assets from parties other than Buyer or conducting an auction. Notwithstanding the foregoing, subject to applicable fiduciary duties of each Seller that, upon the advice of Sellers' counsel, would reasonably require that either Seller not comply with the next sentence of this Section 5.20(a), each Seller shall not, and shall cause its Affiliates and Representatives not to, directly or indirectly, initiate, solicit, entertain, or encourage submission of any inquiries, proposals or offers, or enter into or continue discussions or negotiations with or provide any information to or enter into any agreements or understandings with any Person (other than Buyer and its Affiliates and Representatives) with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of the Purchased Assets or any other transaction that could impede or preclude the transactions contemplated under this Agreement being consummated with Buyer or any of its Affiliates or accept an offer or proposal from any Person (other than Buyer and its Affiliates, agents and representatives) with respect to any of the foregoing.

(b)    Compliance.

(i)    Each Seller shall comply with all of the obligations of such Seller under the Sale Order (after the entry of such Governmental Order by the Bankruptcy Court).

(ii)    Each Seller shall use efforts to comply with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement. Each Seller shall serve on all required Persons in the Chapter 11 Cases, including (A) all entities that assert any Encumbrance, Claim or interest in the Purchased Assets; (B) all parties to each Contract that is potentially an Assigned Contract; (C) all governmental taxing authorities that have or as a result of the sale of the Purchased Assets may have Claims, contingent or otherwise, against such Seller; (D) all state and local taxing authorities having jurisdiction over any of the Purchased Assets, including the Internal Revenue Service; (E) all state and local governmental agencies and environmental agencies in any jurisdiction where such Seller owns or has owned or used real property; (F) the Nevada Division of Environmental Protection; (G) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (H) all known creditors (whether liquidated, contingent or unmatured) of such Seller; (I) all interested governmental, pension, environmental and other regulatory entities; (J) the Office of the Attorney General of Nevada; (K) any other applicable state attorneys general; (L) the United States Department of the Interior, Bureau of Land Management; (M) the Office of the United States Trustee for the District of Colorado; (N) the United States Department of Justice; and (O) counsel to Buyer and all other notice parties reasonably requested by Buyer in writing to Sellers within two (2) Business Days after the execution of this Agreement, any notice of the sale motion, the Sale Hearing, the Sale Order, and all objection deadlines in accordance with all applicable Bankruptcy Rules and any applicable local rules of the Bankruptcy Court.

(iii)     Each Seller shall move to assume and assign to Buyer the Assigned Contracts that are executory contracts capable of being assumed pursuant to section 365 of the Bankruptcy Code and shall provide notice thereof to (A) all counterparties to such contracts, (B) any third party beneficiary to such contracts as requested by Buyer (which third party beneficiaries shall be identified by such Seller using its best efforts), (C) any other Person that Buyer requests, and (D) any other Person as may be required by applicable Bankruptcy Rules and any applicable local rules of the Bankruptcy Court and any other Person requested by Buyer. Each Seller has the right to reject any Contract that is not an Assigned Contract in accordance with the Bankruptcy Code.

(c)     Sale Order.  The Sale Order will provide, among other things, that pursuant to sections 105, 363 and 365 of the Bankruptcy Code:

(i)     the Purchased Assets shall be sold to Buyer free and clear of all Encumbrances (except for Permitted Encumbrances and Assumed Liabilities);

(ii)     to the extent that (A) there are restrictions on the sale, assignment, transfer, conveyance or delivery, or attempted sale, assignment, transfer, conveyance or delivery, to Buyer of any Purchased Asset or (B) the same would require the consent, authorization, approval or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement (including any Governmental Authority), then (1) such consent, authorization, approval or waiver is not required and/or (2) the Purchased Asset subject to such consent, authorization, approval or waiver shall be assigned or transferred regardless of any such restriction or necessary consent, authorization, approval or waiver and that there shall be no breach or adverse effect on the rights of Sellers or the Buyer for the failure to obtain any such consent, authorization, approval or waiver or otherwise comply with such restriction;

(iii)     the transactions contemplated by this Agreement were negotiated at arm's length, that Buyer acted in good faith in all respects and Buyer shall be found to be a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code;

(iv)     the terms and conditions of the sale of the Purchased Assets to Buyer as set forth herein are approved;

(v)     each Seller is authorized and directed to consummate the transactions contemplated by this Agreement and to comply in all respects with the terms of this Agreement;

(vi)     Buyer and Sellers did not engage in any conduct that would allow the transactions contemplated by this Agreement to be set aside pursuant to section 363(m) of the Bankruptcy Code;

(vii)     the Sale Order is binding upon any successors to each Seller, including any trustees in respect of such Seller or the Purchased Assets in the case of any proceeding under chapter 7 of the Bankruptcy Code; and

(viii)     effective as of the Closing, assuming the Closing (as defined in the Barrick Asset Purchase Agreement) shall have occurred prior to, or contemporaneously with, the Closing, all Claims of Barrick against the Sellers and their Affiliates who are debtors in the Bankruptcy Case, whether or not such Claims were asserted by Barrick in its Proofs of Claim (Claim Nos. 223 and 224) are disallowed in their entirety and there shall be no recovery from the Sellers or their Affiliates in respect of such Claims.

(d)     If the Sale Order is appealed, Buyer and Sellers shall use their respective commercially reasonable efforts to defend such appeal at their own cost and expense.

27

(e)    Each Seller further covenants and agrees that the terms of any plan of reorganization or liquidation, or any order of dismissal, submitted to the Bankruptcy Court by such Seller shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

## ARTICLE 6
## CONDITIONS TO CLOSING

Section 6.1    Conditions to Obligations of All Parties.    The obligations of Sellers and Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    No Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or causing the transactions contemplated by this Agreement to be rescinded following completion thereof and there shall not have been enacted or made applicable any Law that makes the transactions contemplated by this Agreement illegal or otherwise prohibited.

(b)    The ROFR shall not have been exercised; provided, however, that if, after exercise, the holder's rights under the ROFR shall have terminated before the sale of the Purchased Assets pursuant to the ROFR, this condition shall be considered satisfied.

The foregoing conditions are for the exclusive benefit of Sellers and Buyer and any such condition may be waived in whole or in part by Sellers and Buyer at or prior to the time of Closing by each delivering to the other a written waiver to that effect. Delivery of any such waiver shall be without prejudice to any rights and remedies at law and in equity any Seller or Buyer may have, including any claims any Seller or Buyer may have for breach of covenant, representation or warranty by the other party, and also without prejudice to any Seller's and Buyer's rights of termination in the event of non-performance of any other conditions in whole or in part.

Section 6.2    Conditions to Obligations of Buyer.    The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of each Seller contained in ARTICLE 3 shall be true and correct in all respects without giving effect to any limitation indicated by the words "Material Adverse Effect", "in all material respects", "material", "materially" or like words or expressions, except where the failure of such representations and warranties to be true and correct does not in aggregate result in a Material Adverse Effect, as of the Closing Date as if made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, then as of such date, or except as affected by transactions contemplated or permitted by this Agreement) and each Seller shall have delivered to Buyer a certificate dated the Closing Date executed by a senior officer to the foregoing effect with respect to such Seller's representations and warranties.

(b)    Each Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date and such Seller shall have delivered to Buyer a certificate dated the Closing Date executed by a senior officer to the foregoing effect with respect to such Seller's agreements, covenants and conditions.

(c)    Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of each Seller certifying that attached thereto are true and complete copies of the constating documents of such Seller, all resolutions adopted by the board of directors of such Seller authorizing the execution, delivery and performance of this Agreement and the

consummation of the transactions contemplated hereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby.

(d)     Buyer shall have received certificates of good standing for each Seller from the Secretary of State of Nevada.

(e)     Buyer shall have received a certificate pursuant to Treasury Regulations section 1.1445-2(b) (the "FIRPTA Certificate") that each Seller is not a foreign person within the meaning of section 1445 of the Code duly executed by such Seller.

(f)     Closing (as defined in the Barrick Asset Purchase Agreement) shall have occurred.

(g)     Each Seller shall have delivered to Buyer duly executed counterparts of each other document, certificate and instrument set forth in Section 2.9(a) to be executed and delivered by such Seller.

(h)     The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to Buyer in its sole and absolute discretion, and, as of the Closing Date the Sale Order shall be in full force and effect and shall not have been reversed, vacated, or stayed, and shall not have been amended, supplemented, or otherwise modified in any material respect without the prior written consent of Buyer.

(i)     The Sale Order shall be non-appealable and not otherwise subject to review, reversal, modification or amendment, by appeal or writ of certiorari. Notwithstanding anything herein to the contrary, the parties may, in their sole and absolute discretion, complete the transactions contemplated by this Agreement prior to the Sale Order becoming a final non-appealable order of the Bankruptcy Court, *but only* to the extent the Sale Order provides that Buyer is a "Good Faith Purchaser" pursuant to section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded to such purchasers by that section of the Bankruptcy Code.

(j)     The Assigned Contracts shall have been assumed by each Seller, as applicable, and assigned to Buyer pursuant to sections 365(a) and 365(f) of the Bankruptcy Code.

The foregoing conditions are for the exclusive benefit of Buyer and any such condition may be waived in whole or in part by Buyer at or prior to the time of Closing by delivering to Sellers a written waiver to that effect executed by Buyer. Delivery of any such waiver shall be without prejudice to any rights and remedies at law and in equity Buyer may have, including any claims Buyer may have for breach of covenant, representation or warranty by any Seller, and also without prejudice to Buyer's rights of termination in the event of non-performance of any other conditions in whole or in part.

Section 6.3     Conditions to Obligations of Seller. The obligations of each Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or such Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Buyer contained in ARTICLE 4 shall be true and correct in all material respects as of the Closing Date as if made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, then as of such date) and Buyer shall have delivered to Sellers a certificate dated the Closing Date executed by a senior officer to the foregoing effect with respect to Buyer's representations and warranties.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by Buyer prior to or on the Closing Date and Buyer shall have delivered to Sellers a certificate

dated the Closing Date executed by a senior officer to the foregoing effect with respect to its agreements, covenants and conditions.

(c)     Sellers shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of the constating documents of the Buyer all resolutions adopted by the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby.

(d)     Sellers shall have received certificates of good standing for Buyer from the Secretary of State of Nevada.

(e)     Buyer shall have delivered to Sellers the Cash Amount in accordance with Section 2.7(b).

(f)     Buyer shall have delivered to Sellers duly executed counterparts of each other document, certificate and instrument set forth in Section 2.9(b) to be executed and delivered by Buyer.

(g)     The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to Sellers, and no Governmental Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(h)     The Sale Order shall be non-appealable and not otherwise subject to review, reversal, modification or amendment, by appeal or writ of certiorari. Notwithstanding anything herein to the contrary, the parties may, in their sole and absolute discretion, complete the transactions contemplated by this Agreement prior to the Sale Order becoming a final non-appealable order of the Bankruptcy Court, *but only* to the extent the Sale Order provides that Buyer is a "Good Faith Purchaser" pursuant to section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded to such purchasers by that section of the Bankruptcy Code.

The foregoing conditions are for the exclusive benefit of Sellers and any such condition may be waived in whole or in part by Sellers at or prior to the time of Closing by delivering to Buyer a written waiver to that effect executed by Sellers. Delivery of any such waiver shall be without prejudice to any rights and remedies at law and in equity any Seller may have, including any claims such Seller may have for breach of covenant, representation or warranty by Buyer, and also without prejudice to such Seller's rights of termination in the event of non-performance of any other conditions in whole or in part.

### ARTICLE 7
### [RESERVED]

### ARTICLE 8
### TERMINATION

Section 8.1     Automatic Termination. This Agreement shall be terminated automatically if the ROFR is exercised and the sale of the Purchased Assets is consummated as a result of such exercise.

Section 8.2     Termination by the Parties. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Sellers and Buyer;

      (b)     by Buyer by written notice to Sellers if:

      (i)     the Closing has not occurred on or prior to January 29, 2016 (the "Drop Dead Date"), except that the right to terminate this Agreement under this Section 8.2(b)(i) shall not be available to Buyer if Buyer's or Buyer Parent's failure to fulfill any of Buyer's or Buyer Parent's covenants or obligations or if the breach of any of Buyer's or Buyer Parent's representations and warranties under this Agreement or the Equity Commitment Letter, as applicable, has been the cause of, or resulted in, the failure of the Closing to occur by the Drop Dead Date;

      (ii)     any of the conditions set forth in Section 6.1 or Section 6.2 shall not have been satisfied or waived by the Drop Dead Date or is incapable of satisfaction by the Drop Dead Date, provided that Buyer is not then in breach of this Agreement so as to cause any of the conditions in Section 6.1 or Section 6.2 not to be satisfied;

      (iii)     the Sale Order, once entered, is changed in a manner that is adverse to Buyer without the consent of Buyer in its sole discretion;

      (iv)     any Seller seeks to have the Bankruptcy Court enter an order dismissing the Chapter 11 Case of such Seller or converting it to a case under chapter 7 of the Bankruptcy Code, or if the Bankruptcy Court enters an order dismissing the Chapter 11 Case of any Seller or converting the Chapter 11 Case of such Seller to a case under chapter 7 of the Bankruptcy Code, or appoints a trustee in any Seller's Chapter 11 Case or an examiner with enlarged powers relating to the operation of such Seller's businesses, and such dismissal, conversion or appointment is not reversed or vacated within three business days after the entry thereof; or

      (v)     the Barrick Asset Purchase Agreement is terminated;

      (c)     by Sellers by written notice to Buyer if:

      (i)     the Closing has not occurred on or prior to the Drop Dead Date, except that the right to terminate this Agreement under this Section 8.2(c)(i) shall not be available to Sellers if the failure of any Seller to fulfill any of its covenants or obligations or if the breach of any of its representations and warranties under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur by the Drop Dead Date;

      (ii)     any of the conditions set forth in Section 6.1 or Section 6.3 shall not have been satisfied or waived by the Drop Dead Date or is incapable of satisfaction by the Drop Dead Date, provided that no Seller is then in breach of this Agreement so as to cause any of the conditions in Section 6.1 or Section 6.3 not to be satisfied; or

      (iii)     the board of directors of either Seller shall have determined in good faith, after considering applicable provisions of applicable Law and consulting with outside counsel, that such termination is required by its fiduciary obligations under applicable Law;

      (d)     by Buyer or Sellers in the event that:

      (i)     any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or causing the transactions contemplated by this Agreement to be rescinded following completion thereof, and such Governmental Order shall have become permanent, final and non-appealable;

      (ii)     there shall be enacted or made applicable any Law that makes the transactions contemplated by this Agreement illegal or otherwise prohibited; or

(iii)  a court issues a final non-appealable order that prevents Sellers from selling the Purchased Assets to Buyer.

Section 8.3  Effect of Termination.

(a)  In the event of the termination of this Agreement pursuant to Section 8.1, Section 8.2(a) or Section 8.2(d), except as provided in Section 8.3(e), this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto.

(b)  In the event of the termination of this Agreement pursuant to Section 8.2(c)(iii), Sellers shall reimburse Buyer for expenses actually incurred by Buyer in connection with negotiating and documenting the purchase and sale of the Purchased Assets, provided that Sellers shall not be required to reimburse Buyer for any expenses incurred by Buyer in excess of One Hundred Fifty Thousand Dollars ($150,000).

(c)  Notwithstanding the termination of this Agreement by Buyer pursuant to Section 8.2(b), Buyer may bring an action against any Seller for Losses suffered by Buyer where the event giving rise to the right of termination is a result of a breach of covenant, representation or warranty by such Seller.

(d)  Notwithstanding the termination of this Agreement by Sellers pursuant to Section 8.2(c), any Seller may bring an action against Buyer for Losses suffered by such Seller where the event giving rise to the right of termination is a result of a breach of covenant, representation or warranty by Buyer.

(e)  Notwithstanding any other provisions of this Agreement, if this Agreement is terminated (whether by a party or automatically or otherwise), the provisions of Section 5.4, ARTICLE 6 and this Section 8.3 (subject to any time limitations referred to therein) shall survive such termination and remain in full force and effect, along with any other provisions of this Agreement which expressly or by their nature survive the termination hereof.

## ARTICLE 9
## MISCELLANEOUS

Section 9.1  Survival. Each and every representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered pursuant to this Agreement shall expire and be of no further force and effect as of the Closing and no party hereto shall thereafter have any liability whatsoever with respect thereto; provided, however, that the covenants contained in this Agreement that by their terms are to be performed (in whole or in part) by the parties hereto following the Closing shall survive in accordance with their respective terms. Following the Closing Date with respect to the representations, warranties, and agreements contained in this Agreement or in any instrument delivered pursuant to this Agreement and, with respect to the covenants contained in this Agreement or in any instrument delivered pursuant to this Agreement, following the applicable survival date of such covenant, such representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered pursuant to this Agreement shall terminate and be of no further force or effect and no party hereto shall have any liability with respect thereto.

Section 9.2  Expenses. Except as otherwise expressly provided herein (including in Section 5.13), all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

Section 9.3  Notices. All notices, requests, consents, claims, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (i) when

32

delivered by hand (with written confirmation of receipt), (ii) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested), (iii) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (iv) when received by the addressee if mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9.3):

| | |
|---|---|
| If to Sellers: | Midway Gold US Inc. |
| | 8310 South Valley Highway |
| | Suite 280 |
| | Englewood, Colorado, 80112 |
| | U.S.A. |
| | Attn: James Wilbourn, General Counsel |
| | Email: jwilbourn@midwaygold.com |
| | Fax: (720) 979-0898 |
| | |
| with a copy to: | Squire Patton Boggs (US) LLP |
| | 221 E. Fourth Street |
| | Suite 2900 |
| | Cincinnati, OH 45202 |
| | U.S.A. |
| | Attention: Stephen D. Lerner |
| | Email: stephen.lerner@squirepb.com |
| | Fax: 513-361-1201 |
| | |
| If to Buyer: | Solidus Resources, LLC |
| | c/o Elko Mining Group LLC |
| | 905 Railroad Street, Suite 101 |
| | Elko, Nevada 89801 |
| | U.S.A. |
| | Attn: Jack McMahon, President |
| | Email: jack.mcmahon@carlinresources.com |
| | Fax: 775-623-5767 |
| | |
| with a copy to: | Waterton Precious Metals Fund II Cayman, LP |
| | c/o Waterton Global Resource Management, Inc. |
| | Commerce Court West |
| | 199 Bay Street, Suite 5050 |
| | Toronto, Ontario, Canada M5L 1E2 |
| | Attention: Kamal Toor, General Counsel |
| | Email: ktoor@watertonglobal.com |
| | Fax: 416-504-3200 |
| | |
| with a copy to: | Sidley Austin LLP |
| | One South Dearborn |
| | Chicago, Illinois 60603 |
| | USA |
| | Attention: Jessica Boelter |
| | Email: jboelter@sidley.com |
| | Fax: 312-853-7036 |

Section 9.4    Interpretation. For purposes of this Agreement: (i) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation", (ii) the word "or" is not exclusive, and (iii) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (i) to Articles and Sections mean the Articles and Sections of this Agreement, (ii) to Schedules mean the Schedules attached to the Disclosure Schedules, (iii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof, and (iv) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

Section 9.5    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 9.6    Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto or invalidate or render unenforceable such term or provision in any other jurisdiction.

Section 9.7    Entire Agreement. This Agreement and the Confidentiality Agreement constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

Section 9.8    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

Section 9.9    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 9.10    Amendment and Modification; Waiver. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 9.11    Governing Law; Submission to Jurisdiction; Venue. This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the Laws of the State of New York, without giving effect to any provision thereof that would require the application of the substantive Laws of any other jurisdiction and, to the extent applicable, the Bankruptcy Code. With the exception of any appeals, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes that may

arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated.

Section 9.12    Specific Performance. The parties hereby agree that irreparable damage would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, and that money damages or other legal remedies would not be an adequate remedy for any such damages. Accordingly, the parties acknowledge and hereby agree that in the event of any breach or threatened breach by any party of any of its covenants or obligations set forth in this Agreement, the other parties shall be entitled to injunctive relief to prevent or restrain breaches or threatened breaches of this Agreement by the other, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of the other under this Agreement. Each of the parties hereby agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches or threatened breaches of this Agreement by it, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of the other parties under this Agreement.

Section 9.13    Limitation on Damages. In no event shall any party be liable to any other party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement or diminution of value or any damages based on any type of multiple.

Section 9.14    Disclosure Schedules. The information in the Disclosure Schedules constitutes exceptions or qualifications to representations and warranties of each Seller as set forth in this Agreement. Any disclosure made in the Disclosure Schedules shall be deemed to be disclosures made with respect to all representations and warranties contained in this Agreement to the extent reasonably apparent on their face, regardless of whether or not a specific cross-reference is made thereto. No disclosure on the Disclosure Schedules relating to a possible breach or violation of any contract or Law shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Capitalized terms used in the Disclosure Schedules that are not defined therein shall have the meaning given them in this Agreement.

Section 9.15    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Signature Page Follows]*

The parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**MIDWAY US**

MIDWAY GOLD US INC., a Nevada corporation

By: _William M. Zisch_

Name: William M. Zisch
Title: President

**NEVADA TALON**

NEVADA TALON LLC, a Nevada limited liability company

By: _William M. Zisch_

Name: William M. Zisch
Title: President, MIDWAY GOLD US INC.,
     Sole Member of NEVADA TALON LLC

**BUYER**

SOLIDUS RESOURCES, LLC, a Nevada limited liability company

By: _____
Name:
Title:

The parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**MIDWAY US**

MIDWAY GOLD US INC., a Nevada corporation

By: _____
Name:
Title:

**NEVADA TALON**

NEVADA TALON LLC, a Nevada limited liability company

By: _____
Name:
Title:

**BUYER**

SOLIDUS RESOURCES, LLC, a Nevada limited liability company

By: _____
    Jack McMahon
    Authorized Signatory

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:

MIDWAY GOLD US INC., et al.,[1]

           Debtors.

Case No. 15-16835 (MER)

Chapter 11

Jointly Administered Under
Case No. 15-16835 (MER)

## ORDER (A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

Upon the motion, dated December 1, 2015 [Docket No. __] (the "***Motion***")[2], of Midway

Gold US Inc. and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") in

the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), for entry of an order, pursuant to

sections 105, 363 and 365 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules

2002, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"***Bankruptcy Rules***") and Rules 2002-1 and 6004-1 of the Local Bankruptcy Rules for the

United States Bankruptcy Court for the District of Colorado (the "***Local Rules***"), seeking, among

other things, approval of the sale (the "***Sale***") to Solidus Resources, LLC (the "***Purchaser***")[3] of

---

[1] The Debtors and their respective case numbers subject to this order are: Midway Gold US Inc. (15-16835 MER); Midway Gold Corp.(15-16836 MER); Golden Eagle Holding, Inc. (15-16837); MDW-GR Holding Corp. (15-16838 MER); RR Exploration, LLC (15-16839 MER); Midway Services Company (15-16840); Nevada Talon, LLC (15-16841 MER); MDW Pan Holding Corp. (15-16842 MER); MDW Pan LLP (15-16843 MER); MDW Gold Rock LLP (15-16844 MER); Midway Gold Realty LLC (15-16845 MER); MDW Mine ULC (15-16846 MER); GEH (B.C.) Holding Inc. (15-16847 MER); GEH (US) Holding Inc. (15-16848 MER).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion, or, if not defined in the Motion, shall have the meanings ascribed to them in the Asset Purchase Agreement (as defined herein).

[3] Purchaser is an indirect, wholly-owned subsidiary of Waterton Precious Metals Fund II Cayman, LP ("***Waterton***").

1

all of the right, title and interest in the Selling Debtors'[4] Purchased Assets (as defined in the

Motion), free and clear of all liens, claims (including, without limitation, as defined in section

101(5) of the Bankruptcy Code), rights or claims based on any successor or transferee liability,

interests, encumbrances, rights, remedies, restrictions, liabilities and contractual commitments of

any kind or nature whatsoever, whenever arising, whether at law or in equity, and granting

certain related relief; and the Selling Debtors having agreed to enter into and consummate the

Asset Purchase Agreement attached hereto as Exhibit A with the Purchaser (such Asset Purchase

Agreement, the "*Asset Purchase Agreement*"); and the Sale Hearing having been held on

December __, 2015; and upon the record of the Sale Hearing, and all of the proceedings before

this Court; and this Court having reviewed the Motion and any objections thereto and having

found and determined that the relief sought in the Motion, and entry of this Order, is in the best

interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest; and

after due deliberation thereon and sufficient cause appearing therefore:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:**[5]

A.     **Jurisdiction, Venue and Core Proceeding:** This Court has jurisdiction over

these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. The matters are core

proceedings under 28 U.S.C. § 157(b)(2). Venue is proper in this district and before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409. Venue in this district and before this Court was proper

as of the Petition Date and continues to be proper.

---

[4] The Selling Debtors are Midway Gold US Inc. ("*Midway Gold*") and Nevada Talon, LLC.

[5] Findings of fact shall be construed as conclusions of law and conclusions of law shall be constructed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

2

B. **Statutory Predicates**. The statutory predicates for the relief sought in the Motion are 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9008 and 9014 of the Bankruptcy Rules and Rules 2002-1 and 6004-1 of the Local Rules. The consummation of the transactions contemplated by the Motion, the Asset Purchase Agreement and this Order is legal, valid and properly authorized under all such provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transactions.

C. **Notice.** As evidenced by the affidavits of service and publication filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the procedures for assumption and assignment of Assigned Contracts (as defined in paragraph U below), the proposed Cure Amounts, the Sale and all transactions contemplated therein or in connection therewith, and all deadlines related thereto, was given and no further notice need be provided. A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

D. Actual written notice of the Motion, the Sale Hearing, the procedures for assumption and assignment of contracts and leases, the proposed Cure Amounts, the Sale and all transactions contemplated therein or in connection therewith, and all deadlines related thereto has been given to all interested persons and entities, including, without limitation: (i) all entities that assert any Lien, Claim or Interest (each as defined below) in the Purchased Assets; (ii) all parties to the Executory Contracts and Unexpired Leases; (iii) all parties to the Assigned Contracts assumed and sold and assigned pursuant to this Order; (iv) all governmental taxing

3

authorities that have or as a result of the Sale may have Claims, contingent or otherwise, against the Debtors; (v) all state and local taxing authorities having jurisdiction over any of the Purchased Assets, including the Internal Revenue Service; (vi) all state and local governmental agencies and environmental agencies in any jurisdiction where the Debtors own or have owned or used real property; (vii) the Nevada Division of Environmental Protection; (viii) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (ix) all known creditors (whether liquidated, contingent or unmatured) of the Selling Debtors; (x) all interested governmental, pension, environmental and other regulatory entities; (xi) the Office of the Attorney General of the State of Nevada; (xii) the Nevada Department of Taxation; (xiii) any other applicable state attorneys general; (xiv) the Office of the United States Trustee for the District of Colorado; (xv) the United States Department of Justice; (xvi) counsel to Barrick Gold Exploration Inc., (xvi) counsel to the Purchaser and all other notice parties reasonably requested by Purchaser in accordance with the Asset Purchase Agreement; and (xvii) the United States Department of the Interior, Bureau of Land Management. The foregoing constitutes proper, timely, adequate, and sufficient notice under the particular circumstances of these Chapter 11 Cases, and no further notice need be provided.

E.      The Publication Notice was published in The Mining Journal and The Reno Gazette Journal on December __, 2015. See Docket No. [___]. Such publication notice was sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtors.

F.      **Extensive Efforts by Debtors.** The Sale is the product of extensive efforts by the Debtors to identify all available alternatives to maximize the value of their interest in the

4

Purchased Assets, including the Spring Valley Project, including, among other things, (i) a prepetition six-week transaction process to identify possible equity and/or asset transactions which yielded no offers for Midway Gold's 30% interest in the Spring Valley Project; (ii) two postpetition efforts to engage with Barrick with respect to a process to conduct a consensual sale of 100% of the Spring Valley Project, which efforts were ultimately unsuccessful; (iii) the commencement of the Barrick Litigation to exercise their statutory rights under section 363(h) of the Bankruptcy Code to sell 100% of the Spring Valley Project over Barrick's objections; and (iv) extensive negotiations with Waterton over the terms of the Sale and the necessary documentation, which were conducted in good faith and at arm's length.  In effect, the Sale will result in a consensual sale of 100% of the Spring Valley Project, resolve pending and future disputes with Barrick, maximize value by generating not less than $25 million in cash proceeds, and otherwise benefit the Debtors' estates and creditors and other stakeholders.

G. **Business Justification.**    The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale. In light of the circumstances of these Chapter 11 Cases, time is of the essence in (i) consummating the Sale and all related transactions, (ii) preserving the value of the Debtors' assets, and (iii) minimizing the widespread and adverse economic consequences to the Debtors, their estates, and their creditors.

H. **Adequate Marketing; Highest or Best Offer.**  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, (a) the Debtors' prepetition efforts to sell Midway Gold's 30% interest in the Purchased Assets, including the Spring Valley

5

Project, yielded no offers; (b) Barrick executed the Barrick APA with respect to, among other things, its 70% interest in the Spring Valley Project, after an extensive marketing process conducted by Barrick and its investment banker CIBC, which provides for the same pro rata purchase price as provided in the Asset Purchase Agreement for Midway Gold's 30% interest, thus indicating fair market value for Midway Gold's interest; (c) in the opinion of the Debtors' senior management and their investment banker, the consideration provided by the Purchaser in the Asset Purchase Agreement is toward the high range of the value of Midway Gold's 30% interest in the Spring Valley Project that they would have reasonably expected to realize through any further marketing of the Purchased Assets and exceeds the values set forth in prior oral and written expressions of interest received by the Debtors and their investment banker; (d) the consideration provided by the Purchaser in the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Purchased Assets; (e) the consideration provides fair and reasonable consideration for the Purchased Assets and constitutes reasonably equivalent value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia; (f) the Sale will provide a greater recovery for the Debtors' creditors with respect to the Purchased Assets than would be provided by any other practically available alternative, including an auction or other sale process; (g) taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Purchased Assets for greater economic value to the Debtors or their estates; (h) the Debtors' determination that the Asset Purchase Agreement constitutes the highest or best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment; and

6

(i) the sale of the Purchased Assets on the terms set forth in the Asset Purchase Agreement and this order will resolve significant pending and future disputes between the Debtors and Barrick.

I.  **Opportunity to Object.**  A reasonable opportunity to object or be heard with respect to the Motion, and all relief requested therein has been afforded to all interested parties.

J.  **Assets Property of the Estate.**  The Purchased Assets are property of the Selling Debtors' estates and title thereto is vested in the Selling Debtors' estates.

K.  **Sale in Best Interests.**  The actions represented to be taken by the Selling Debtors and the Purchaser are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Debtors, their estates and creditors, and other parties in interest.  Approval of the Asset Purchase Agreement and of the Sale and all related transactions at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

L.  **No *Sub Rosa* Plan.**  The consummation of the Sale outside of a chapter 11 plan pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors.  The Sale and the transactions contemplated therein do not constitute a *sub rosa* plan.

M.  **Arm's-Length Sale.**  The Asset Purchase Agreement, the Sale and the transactions contemplated therein and associated therewith were negotiated, proposed, and entered into by the Selling Debtors and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors, their insiders and affiliates, nor the Purchaser have engaged in any conduct that would cause or permit the Asset Purchase

7

Agreement, the Sale, or any part of the transactions thereby to be avoided under section 363(n) of the Bankruptcy Code.

N. **Good Faith Purchaser.** The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

O. **Prompt Consummation.** The Sale and the transactions related thereto must be approved and consummated as promptly as practicable in order to preserve the value of the Purchased Assets.

P. **Corporate Authority.** Each Selling Debtor (i) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale has been duly and validly authorized by all necessary corporate action of each of the Selling Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, (iii) has taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Selling Debtors of the transactions contemplated thereby, and (iv) needs no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, which may be waived in accordance with the terms therewith.

Q. **Free and Clear Findings Required by the Purchaser.** The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale if the Assets were not being sold to the Purchaser pursuant to section 363(f) of the Bankruptcy Code, free and clear, except for Permitted Encumbrances and Assumed Liabilities, of (i) all liens (statutory or otherwise), claims, mortgages, deeds of trust, pledges, charges, security interests, charges, rights of first refusal, hypothecations, encumbrances, royalties, easements, leases or

8

subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, subleases, leases or conditional sale arrangements (collectively, the "*Liens*"), (ii) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights or causes of action (whether in law or in equity), Proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims or liabilities relating to any act or omission of the Selling Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively the "*Claims*"), and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively the "*Interests*"). Except for Permitted Encumbrances and Assumed Liabilities, the Sale shall be free and clear of, and the Purchaser shall not be responsible for, any Liens, Claims or Interests, including, without limitation, in respect of the following: (i) any rights or Claims based on any successor or transferee liability, (ii) any Liens, Claims or Interests that purport to give to any

9

party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Selling Debtors' or the Purchaser's interest in the Purchased Assets, or any similar rights; (iii) any labor or employment agreements; (iv) mortgages, deeds of trust and security interests; (v) intercompany loans and receivables between the Selling Debtors and any Debtors or non-Debtor affiliates; (vi) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plans of the Selling Debtors or any multiemployer plan to which the Selling Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state law (collectively, "***COBRA***"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (viii) the Federal Mine Safety and Health Act of 1977 or its associated regulations; (ix) penalties of any kind whatsoever assessed against the Debtors by the United States

10

Department of Labor's Mine Safety and Health Administration; (x) any bulk sales or similar law; (xi) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing; (xii) any Executory Contract or Unexpired Lease that is not an Assigned Contract that will be assumed and assigned pursuant to this Order and the Asset Purchase Agreement; (xiii) any other Excluded Liabilities as provided in the Asset Purchase Agreement. A sale of the Purchased Assets other than one free and clear of all Liens, Claims, and Interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale as contemplated. Therefore, the Sale contemplated by the Asset Purchase Agreement free and clear of all Liens, Claims and Interests, except for Permitted Encumbrances and Assumed Liabilities, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

R.    **Binding and Valid Transfer.**    The transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets and, except for the Permitted Encumbrances and Assumed Liabilities, will vest the Purchaser with all right, title, and interest of the Selling Debtors to the Purchased Assets free and clear of all Liens, Claims, and Interests and any liabilities of the Selling Debtors.

S.    **Satisfaction of 363(f) Standards.**    The Selling Debtors may sell the Purchased Assets free and clear of all Liens, Claims and Interests of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens, Claims and Interests, and non-Debtor parties to the Assigned Contracts who did not object, or who withdrew their objections,

11

to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. In all cases, each such person with Liens, Claims or Interests in the Purchased Assets is enjoined from taking any action against the Purchaser, the Purchaser's affiliates or any agent of the foregoing to recover any such Lien, Claim or Interest.

T.    **Necessity of Order.**    The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions without all of the relief provided for in this Order (including, but not limited to, that the transfer of the Purchased Assets to the Purchaser be free and clear of all Liens, Claims and Interests).    The consummation of the transactions pursuant to this Order and the Asset Purchase Agreement is necessary for the Debtors to maximize the value of their estates for the benefit of all creditors and other parties in interest.

U.    **Assigned Contracts.**    The Selling Debtors have demonstrated that it is an exercise of their sound business judgment to sell, assume and assign the Executory Contracts and Unexpired Leases listed on Schedule 2.1(h) of the Asset Purchase Agreement (collectively, the "*Assigned Contracts*", and individually, an "*Assigned Contract*") to the Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest.    The Assigned Contracts being assigned to the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser, and, accordingly, such assumption and assignment of the Assigned Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtors' bankruptcy estates.

12

V.    **Cure and Adequate Assurance.**  The Selling Debtors have cured or the Selling
Debtors have demonstrated their ability to cure any default with respect to any act or omission
that occurred prior to the Closing under any of the Assigned Contracts, within the meaning of
section 365(b)(1)(A) of the Bankruptcy Code.  The proposed Cure Amounts or any other cure
amount reached by agreement after a Cure Payment Objection are deemed the amounts
necessary to "cure" within the meaning of section 365(b)(1) of the Bankruptcy Code all
"defaults" within the meaning of section 365(b) of the Bankruptcy Code under such Assigned
Contracts.  Pursuant to the terms of Asset Purchase Agreement, Purchaser shall pay all such cure
amounts directly to the counterparties to the Assigned Contracts.  The Purchaser's promise to
perform the obligations under the Assigned Contracts arising after the Closing shall constitute
adequate assurance of its future performance of and under the Assigned Contracts, within the
meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  All counterparties to the
Assigned Contracts who did not file a Cure Payment Objection or an objection to the assumption
and assignment of the Assigned Contracts prior to the Sale Hearing, are deemed to consent to the
assumption by the Debtors of their respective Assigned Contract and the assignment thereof to
the Purchaser.  The objections of all counterparties to the Assigned Contracts that did file an
objection to the assumption and assignment of such parties' respective Assigned Contract or
proposed Cure Amount relating thereto were heard at the Sale Hearing (to the extent not
withdrawn), were considered by this Court, and are overruled on the merits with prejudice.  This
Court finds that with respect to all such Assigned Contracts the payment of the proposed Cure
Amounts in accordance with the terms of the Asset Purchase Agreement is appropriate and is
deemed to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code.

13

This Court further finds that the Assumption and Assignment Procedures were reasonable and gave contract counterparties adequate notice of and opportunity to respond to the proposed assumption and assignment of the Assigned Contracts. Accordingly, all of the requirements of section 365(b) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the Debtors to the Purchaser of each of the Assigned Contracts. To the extent any Assigned Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Purchaser in accordance with the terms of this Order that are applicable to the Purchased Assets.

W. **Unenforceability of Anti-Assignment Provisions.** Anti-assignment provisions in any Assigned Contract shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts and should be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

X. **Final Order.** This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

Y. Entry of this Order is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest.

## ORDER

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

1. **Motion is Granted.** The Motion is granted and the relief requested therein with respect to the Sale is granted and approved in its entirety, as set forth herein.

14

2.      **Objections are Overruled.** Any objections to the entry of this Order or to the relief granted herein or the relief requested in the Motion, including any objections to the proposed Cure Amounts or the assumption and assignment of any Assigned Contracts, that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, are hereby denied and overruled on the merits with prejudice.

3.      **Approval.** The Asset Purchase Agreement, and all the terms and conditions thereof, is approved. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Selling Debtors are authorized to perform their obligations under, and comply with the terms of, the Asset Purchase Agreement and consummate the Sale and the related transactions pursuant to, and in accordance with, the terms and conditions of the Asset Purchase Agreement and this Order. The Selling Debtors are authorized to execute and deliver, and empowered to perform under, consummate, and implement, the Asset Purchase Agreement, together with all additional instruments and documents that the Selling Debtors or the Purchaser deem necessary or appropriate to implement the Asset Purchase Agreement and effectuate the transactions contemplated therein, and to take all further actions as may reasonably be required by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to Purchaser's possession the Purchased Assets or as may be necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement.

4.      **Binding Effect of Order.** This Order and the Asset Purchase Agreement shall be binding in all respects upon all known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of Liens, Claims and Interests, all counterparties

15

to the Assigned Contracts, all successors and assigns of the Purchaser, each of the Debtors and their Affiliates and subsidiaries, the Purchased Assets, and any trustees appointed in the Chapter 11 Cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code and this Order shall not be subject to amendment or modification and the Asset Purchase Agreement shall not be subject to rejection. Subject to the terms and conditions of the Asset Purchase Agreement, the terms of this Order shall apply in the event the Sale under the Asset Purchase Agreement is consummated by and under any chapter 11 plan, and may be incorporated into any confirmation order. Nothing contained in any chapter 11 plan confirmed in the Chapter 11 Cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the Asset Purchase Agreement or this Order.

5. **Injunction.** All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Selling Debtors to transfer the Purchased Assets to the Purchaser in accordance with the Asset Purchase Agreement and this Order. Following the Closing, except for persons entitled to enforce Assumed Liabilities and Permitted Encumbrances, all Persons (including, but not limited to, (i) the Debtors and/or their respective successors (including any trustee), (ii) creditors, (iii) investors, (iv) current and former employees and shareholders, (v) administrative agencies, (vi) governmental units, (vii) secretaries of state, (viii) federal, state, and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and (ix) the successors and assigns of each of the foregoing) holding Liens, Claims or Interests in the Purchased Assets or against the Selling Debtors in respect of the Purchased Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting,

16

prosecuting, or otherwise pursuing any Liens, Claims or Interests of any kind or nature whatsoever against the Purchaser or any Affiliate of the Purchaser or any of their respective property, successors and assigns, or the Purchased Assets, as an alleged successor or on any other grounds. No Person shall assert, and the Purchaser and the Purchased Assets shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), liabilities, claims and interests, or basis of any kind or nature whatsoever to delay, defer, or impair any right of the Purchaser or the Selling Debtors, or any obligation of any other party, under or with respect to, any Purchased Assets, with respect to any act or omission that occurred prior to the Closing or with respect to any other agreement or any obligation of the Debtors that is not an Assumed Liability.

6. **General Assignment.** Upon the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Selling Debtors' interests in the Purchased Assets and a bill of sale transferring good and marketable title in the Purchased Assets to the Purchaser free and clear of all Liens, Claims and Interests, except for the Permitted Encumbrances and Assumed Liabilities. Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions.

7. **Transfer Free and Clear.** Except for the Permitted Encumbrances and Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser as required under the Asset Purchase Agreement, and such

17

transfer shall be free and clear of all Liens, Claims, and Interests of any Person, including, without limitation, all such Liens, Claims, and Interests specifically enumerated in paragraph Q of this Order, whether arising by agreement, by statute or otherwise and whether occurring or arising before, on or after the Petition Date, whether known or unknown, occurring or arising prior to such transfer, with all such Liens, Claims and Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of a Lien, Claim or Interest claims or may claim a Lien, Claim or Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Selling Debtors may possess with respect thereto. No proceeds of the Sale shall be paid to any party or otherwise used by the Debtors except in accordance with the *Final Order (A) Authorizing Post-Petition Use of Cash Collateral, (B) Granting Adequate Protection to Secured Parties, and (C) Granting Related Relief [Docket No. 452]* or pursuant to a further order of the Court after written notice and an opportunity to object and be heard is given to parties in interest.

8. **Valid Transfer.** The transfer of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title, and interest of the Selling Debtors in and to the Purchased Assets free and clear of all Liens, Claims and Interests of any kind or nature whatsoever, except for the Permitted Encumbrances and Assumed Liabilities.

9. **Exculpation and Release.** Neither the Purchaser nor any of its affiliates, successors, and assigns, shall have, or incur any liability to, or be subject to any action by, the Debtors or any of their predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the Asset Purchase Agreement and the entry

18

into and consummation of the Sale, except as expressly provided in the Asset Purchase Agreement and this Order.

      10.   **Direction to Release Interests.**  Upon the Closing, each of the Selling Debtors' creditors and any other holder of a Lien, Claim or Interest is authorized and directed to execute such documents and take all other actions as may be necessary to release its Lien, Claim or Interest in the Purchased Assets, if any, as such Lien, Claim or Interest may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing a Lien, Claim or Interest in the Selling Debtors or the Purchased Assets shall not have delivered to the Selling Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens, Claims and Interests, which the person or entity has with respect to the Debtors or the Purchased Assets or otherwise, then (i) the Selling Debtors are authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Debtors or the Purchased Assets, and (ii) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all Liens, Claims and Interests of any kind or nature whatsoever in the Selling Debtors or the Purchased Assets.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Order.  This Order shall be binding upon and shall govern the acts of all Persons including without limitation, all filing agents, filing officers, title agents, title

19

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments (including, without limitation, the Nevada Department of Taxation), secretaries of state, federal, state, and local officials, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or other property interests.

11.  **No Interference.**  Following the Closing, no holder of any Lien, Claim or Interest in the Purchased Assets (except holder of Permitted Encumbrances and Assumed Liabilities solely in accordance with applicable law) shall interfere with the Purchaser's title to, or use and enjoyment of, the Purchased Assets based on, or related to, any such Lien, Claim or Interest, or based on any actions the Selling Debtors may take in the Chapter 11 Cases.

12.  **Surrender of Possession.**  All entities that are currently, or on the Closing may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Purchaser on the Closing, unless the Purchaser otherwise agrees.

13.  **Post-Closing Actions and Transactions.**  The Selling Debtors and the Purchaser, and each of their respective officers, employees, and agents, will be authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Selling Debtors or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the Asset Purchase Agreement and this Order. Further, effective as of the Closing, the Purchaser, its successors and assigns, shall be designated and appointed the Selling Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Selling

20

Debtors' name and stead, its successors and assigns, to demand and receive any and all of the Purchased Assets, and from time to time institute and prosecute in the name of the Purchaser, for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity, or otherwise, that the Purchaser, its successors or assigns, may deem proper for the collection or reduction to possession of any of the Purchased Assets, and to do all acts and things with respect to the Purchased Assets that the Purchaser, its successors and assigns, shall deem desirable. All of the foregoing powers granted to the Purchaser are coupled with an interest and are irrevocable by the Selling Debtors.

14. **Sale is Self-Executing**. The Sale is self-executing, and neither the Selling Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

15. **No Discriminatory Treatment.** To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement.

16. **Assumption and Assignment of Contracts.** Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and subject to and conditioned upon the Closing, the Selling Debtors' sale, assumption and assignment to the Purchaser of the Assigned Contracts is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto

21

are deemed satisfied. In addition, the Assumption and Assignment Procedures are reasonable and approved in their entirety.

17. The Debtors are authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Purchaser, effective as of the Closing, as provided by, and in accordance with, the Asset Purchase Agreement, the Assigned Contracts free and clear of all Liens, Claims and Interests of any kind or nature whatsoever, other than the Permitted Encumbrances and Assumed Liabilities, and (ii) execute and deliver to the Purchaser such documents or other instruments as the Purchaser reasonably deems necessary to assign and transfer the Assigned Contracts to the Purchaser.

18. The Assigned Contracts shall be transferred and assigned to, pursuant to the Asset Purchase Agreement, and thereafter remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer. The Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assumption and assignment to the Purchaser. The Debtors may assign each Assigned Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contracts or terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assigned Contracts, constitute unenforceable anti-assignment provisions which are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of

22

the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of each Assigned Contract have been satisfied.

19. All defaults and all other obligations or liabilities under any Assigned Contract occurring, arising or accruing prior to the date of the assignment or transfer to the Purchaser shall be deemed cured or satisfied upon payment by the Purchaser of the proposed Cure Amount or any other cure amount reached by agreement after a Cure Payment Objection, and, without limiting the foregoing, no effect shall be given to any default of the type set forth in section 365(b)(2) of the Bankruptcy Code, or the type of default concerning an unexpired lease of real property described in section 365(b)(1) of the Bankruptcy Code whether or not such Assigned Contract is an executory contract within the meaning of section 365 of the Bankruptcy Code. The Cure Amounts listed on Schedule 3.7(c) of the Asset Purchase Agreement, or any other cure amount reached by agreement after a Cure Payment Objection, reflect the sole amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due to the non-Debtor parties in connection with the assumption by the Debtors and assignment to the Purchaser of the Assigned Contracts.

20. Except as provided in the Asset Purchase Agreement or this Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assigned Contract, and all holders of such claims arising from and after Closing under any Assigned Contract are forever barred and estopped from asserting any claims under any Assigned Contract against the Debtors, their successors or assigns, and their estates.

23

21.    The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of the Assigned Contracts.

22.    **No Successor Liability.**  Except for the Assumed Liabilities, to be paid solely to the extent provided for in the Asset Purchase Agreement and this Sale Order, neither the Purchaser, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Lien, Claim or Interest that arose or occurred prior to the Closing, or otherwise is assertable against the Selling Debtors or is related to the Purchased Assets prior to the Closing. The Purchaser is not and shall not be deemed a "successor" to the Selling Debtors or their estates, have, de facto or otherwise, merged with or into the Debtors or be a mere continuation or substantial continuation of the Selling Debtors or the enterprise of the Selling Debtors under any theory of law or equity as a result of any action taken in connection with the Asset Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets.

23.    Without limiting the foregoing, and except to the extent the Purchaser assumes the Assumed Liabilities, or takes the Purchased Assets subject to the Permitted Encumbrances, or as otherwise set forth in the Asset Purchase Agreement, the Purchaser shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Liens, Claims or Interests, including under any theory of successor or transferee liability, de facto merger or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with

24

respect to of any of the following: (i) any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, antitrust, environmental, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules or regulations); (ii) under any products liability law, rule, regulation, or doctrine with respect to the Debtors' liability under such law, rule or regulation, or doctrine, or under any product warranty liability law or doctrine; (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which the Debtors are a party; (iv) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (v) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to the (a) Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967, (g) the Americans with Disabilities Act of 1990, or (h) COBRA; (vi) environmental liabilities, debts, Claims, or obligations arising from conditions first existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contamination substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.; (vii) any liabilities, debts, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period; (viii) any liabilities, debts, commitments, or

25

obligations for any taxes relating to the operation of the Purchased Assets prior to the Closing; (ix) any bulk sale law; and (x) any litigation.

24.  **Fair Consideration.**  The consideration provided by the Purchaser for the Purchased Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale may not be avoided under section 363(n) of the Bankruptcy Code.  The Asset Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Selling Debtors nor the Purchaser have entered into the Asset Purchase Agreement or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities.  No other person or entity or group of persons or entities has offered to purchase the Purchased Assets for an amount that would provide greater value to the Debtors and their estates than the value provided by the Purchaser.  The Court's approval of the Motion and the Asset Purchase Agreement are in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

25.  **Retention of Jurisdiction.**  This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) compel delivery of

26

010-8167-8083/2/AMERICAS

the Purchased Assets to the Purchaser; (ii) interpret, implement, and enforce the provisions of this Order; (iii) protect the Purchaser, any of the Purchaser's affiliates, or any agent of the foregoing, against any Liens, Claims or Interests against the Selling Debtors or the Purchased Assets of any kind or nature whatsoever, except for the Permitted Encumbrances and Assumed Liabilities and (iv) enter any order under sections 363 and 365 of the Bankruptcy Code.

26. **Good Faith Purchaser.** The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the transactions shall not affect the validity of the transactions (including the assumption and assignment of any of the Assigned Contracts). The Purchaser is a purchaser in good faith of the Purchased Assets and is entitled to all the protections afforded by section 363(m) of the Bankruptcy Code.

27. **No Bulk Law Application.** No bulk sales law or similar law, shall apply in any way to the transactions contemplated by the Sale, the Asset Purchase Agreement, the Motion, and this Order.

28. **Subsequent Plan Provisions.** Nothing contained in any chapter 11 plan confirmed in any Debtor's bankruptcy case or any order confirming any such plan or in any other order in the Chapter 11 Cases shall alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement or this Order.

29. **Inconsistencies with Prior Orders, Pleadings or Agreements.** To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in the Chapter 11 Cases, the terms of this Order shall govern and any prior orders shall be deemed

27

amended or otherwise modified to the extent required to permit consummation of the Sale. To the extent there is any inconsistency between the terms of this Order and the terms of the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

30. **Failure to Specify Provisions.** The failure to specifically include any particular provisions of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Asset Purchase Agreement be authorized and approved in its entirety.

31. **Non-Material Modifications.** The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, or supplement does not, based on the Debtors' judgment, have any adverse effect on the Debtors' estates.

32. **No Stay or Order.** Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Selling Debtors and the Purchaser are authorized to close the transactions immediately upon entry of this Order. Time is of the essence in closing the transactions referenced herein, and the Selling Debtors and the Purchaser intend to close the transactions as soon as practicable. This Order is a final order and the period in which an appeal must be filed shall commence upon the entry of this Order.

28

33.   **Appointment of Trustee.**  The provisions of the Asset Purchase Agreement and this Order may be specifically enforced in accordance with the Asset Purchase Agreement notwithstanding the appointment of any chapter 7 or chapter 11 trustee after the Closing.

34.   **Barrick Claims.**  Effective as of the Closing, assuming the Closing (as defined in the Barrick Asset Purchase Agreement) shall have occurred prior to, or contemporaneously with, the Closing, all Claims of Barrick against any of the Debtors, including the Selling Debtors, whether or not such Claims were asserted by Barrick in its proofs of claim (Claim Nos. 223 and 224) filed in these Chapter 11 Cases or scheduled by any of the Debtors, are disallowed in their entirety and there shall be no recovery from the Debtors, including the Selling Debtors, in respect of such Claims.

35.   **Equity Commitment Letter**.  The Equity Commitment Letter dated November 30, 2015 issued by Waterton to the Selling Debtors is an essential component of the transactions contemplated by the Asset Purchase Agreement and this Order without which the Selling Debtors would not have entered into the Asset Purchase Agreement.   The Court retains jurisdiction to hear and determine, on an expedited basis, any action by the Selling Debtors arising from a breach by Waterton of its obligations under the Equity Commitment Letter to seek specific performance by Waterton.

36.   **Headings.**  Headings utilized in this Order are for convenience of reference only, and do not constitute a part of this Order for any other purpose

37.   **Time Periods.**  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

29

38.  **Nonseverability.**  The provisions of this order are nonseverable and mutually

dependent.

Dated: _____, 2015
      Denver, Colorado

                                _____
                                THE HONORABLE MICHAEL E. ROMERO
                                UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

ACTIVE 210962052v.5

APN #: See Exhibit A

RECORDED AT THE REQUEST OF, AND
WHEN RECORDED, RETURN TO:

[●]
Attn: [●]
[●]

Mail Tax Statement to:

[●]
Attn: [●]
[●]

Space above for County Recorder's Use

*Affirmation Statement*: The undersigned affirms that this document does not contain any social security numbers or other personal information of any person (Per NRS 239B.030).

## DEED
## (FEE LAND)

This DEED ("Deed"), executed to be effective as of [●][●], 2015 ("Effective Date"), is from [●], a [●] ("Grantor"), with an address of [●],[●],[●], to [●], a [●] ("Grantee"), with an address of [●],[●],[●].

## RECITALS

A.      Grantor has an interest in the real property described in Exhibit A to this Deed ("Properties"), which are located in [●] County, Nevada.

B.      Grantor, Grantee and [●] are parties to that certain Asset Purchase Agreement dated November 30, 2015 ("Purchase Agreement"). Pursuant to the Purchase Agreement, Grantor agreed, among other things, to convey to Grantee all of its right, title and interest in and to the Properties.

C.      Grantor now desires to execute this Deed with respect to the Properties in order to fulfill, in part, its obligations under the Purchase Agreement.

## CONVEYANCE

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor grants, sells, bargains, and conveys to Grantee, all of Grantor's right, title and interest in the Properties and all and singular the tenements, hereditaments, appurtenances, fixtures, buildings and improvements thereon or thereunto belonging to or in anywise appertaining, the reversion and reversions, remainder and remainders, rents, issues, and profits thereof.

TO HAVE AND TO HOLD unto Grantee, its successors and assigns forever.

Executed by Grantor to be effective as of the Effective Date.

GRANTOR:

[•], a [•]

By: _____

Print Name: _____

Its: _____

State of _____ )
                         ) ss.
County of _____ )

This instrument was acknowledged before me on December __, 2015, by _____ as _____ of _____.

_____
Notary Public in and for the State of _____
Residing at: _____
Commission Expires: _____

2

**Exhibit A – Properties (Fee Land)**

[●]

APN #: See Exhibit A

RECORDED AT THE REQUEST OF, AND
WHEN RECORDED, RETURN TO:

[●]
Attn: [●]
[●]

Mail Tax Statement to:

[●]
Attn: [●]
[●]

Space above for County Recorder's Use

*Affirmation Statement*: The undersigned affirms that this document does not contain any social security numbers or other personal information of any person (Per NRS 239B.030).

## ASSIGNMENT AND ASSUMPTION OF REAL PROPERTY LEASES
### ([●])

This Assignment and Assumption of Real Property Leases ("Assignment"), dated to be effective as of [●][●], 2015 ("Effective Date"), is from [●], a [●] ("Assignor"), with an address of [●],[●],[●], to [●], a [●] ("Assignee"), with an address of [●],[●],[●].

### Recitals

A.    Assignor, Assignee and [●] are parties to that certain Asset Purchase Agreement dated November 30, 2015 ("Purchase Agreement").

B.    Pursuant to the Purchase Agreement, Assignor agreed, among other things, to assign to Assignee all of its right, title and interest in and to the real property leases described in Exhibit A to this Assignment (the "Leases").

C.    Assignor and Assignee now desire to execute this Assignment with respect to the Leases in order to fulfill, in part, their obligations under the Purchase Agreement.

1

## Assignment and Assumption

For $10.00 and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Assignor sells and assigns to Assignee, its successors and assigns forever, all of Assignor's right, title, and interest in and to the Leases, to have and to hold forever.

Assignee hereby accepts the foregoing assignment and assumes all of the liabilities and obligations of Assignor under the Leases whether prior to or on or after the Effective Date.

Executed by Assignor and Assignee to be effective as of the Effective Date.

*[Signatures Begin on Next Page]*

2

Signature Page to Assignment (Real Property Leases [●])

<div style="margin-left:40%;">

ASSIGNOR:

[●], a [●]

By: _____

Print Name: _____

Its: _____

</div>

State of _____     )
                          ) ss.
County of _____     )

On this [●] day of [●],[●], before me, the undersigned, a Notary Public in and for the State of [●], personally appeared [●], known or identified to me to be the [●] of [●], the corporation that executed the foregoing instrument, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

<div style="margin-left:45%;">

_____

Notary Public in and for the State of _____

Residing at: _____

Commission Expires: _____

</div>

3

Signature Page to Assignment (Real Property Leases [●])

ASSIGNEE:

[●], a [●]

By: _____

Print Name: _____

Its: _____


State of _____ )
                         ) ss.
County of _____ )

        On this [●] day of [●],[●], before me, the undersigned, a Notary Public in and for the State of [●], personally appeared [●], known or identified to me to be the [●] of [●], the corporation that executed the foregoing instrument, and acknowledged to me that such corporation executed the same.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.


                               _____
                               Notary Public in and for the State of _____
                               Residing at: _____
                               Commission Expires: _____

Exhibit A
to
Assignment and Assumption
List of Real Property Leases

APN #: N/A (unpatented mining claims)

RECORDED AT THE REQUEST OF, AND
WHEN RECORDED, RETURN TO:

[●]
Attn: [●]
[●]

Mail Tax Statement to:

[●]
Attn: [●]
[●]

<div align="right">Space above for County Recorder's Use</div>

*Affirmation Statement*: The undersigned affirms that this document does not contain any social security numbers or other personal information of any person (Per NRS 239B.030).

<div align="center">

**DEED**
**(UNPATENTED MINING CLAIMS)**

</div>

This DEED ("Deed"), executed to be effective as of [●][●], 2015 ("Effective Date"), is from [●], a [●] ("Grantor"), with an address of [●],[●],[●], to [●], a [●] ("Grantee"), with an address of [●],[●],[●].

<div align="center">

**RECITALS**

</div>

A.      Grantor has an interest in the unpatented mining claims described in Exhibit A to this Deed ("Properties"), which are located in [●] County, Nevada.

B.      Grantor, Grantee and [●] are parties to that certain Asset Purchase Agreement dated November 30, 2015 ("Purchase Agreement"). Pursuant to the Purchase Agreement, Grantor agreed, among other things, to convey to Grantee all of its right, title and interest in and to the Properties.

C.      Grantor now desires to execute this Deed with respect to the Properties in order to fulfill, in part, its obligations under the Purchase Agreement.

## CONVEYANCE

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor grants, bargains, sells and conveys to Grantee, all of Grantor's right, title and interest in the Properties, including all of the lodes, ledges, veins and mineral-bearing rock, both known and unknown, intralimital and extralateral lying within or extending beyond the boundaries of the Properties, and all dips, spurs and angles, and all the ores, mineral bearing-quartz, rock and earth or other mineral deposits therein or thereon, and all and singular tenements, hereditaments, appurtenances, fixtures, buildings and improvements thereon or thereunto belonging to or in anywise appertaining, the reversion and reversions, remainder and remainders, rents, issues, and profits thereof.

TO HAVE AND TO HOLD unto Grantee, its successors and assigns forever.

Executed by Grantor to be effective as of the Effective Date.

<div align="center">

GRANTOR:

[●], a [●]

By: _____

Print Name: _____

Its: _____

</div>

State of _____ )
                 ) ss.
County of _____ )

This instrument was acknowledged before me on December __, 2015, by _____ as _____ of _____.

_____
Notary Public in and for the State of _____
Residing at: _____
Commission Expires: _____

2

**Exhibit A – Properties (Unpatented Mining Claims)**

APN #: N/A (unpatented mining claims)

RECORDED AT THE REQUEST OF, AND
WHEN RECORDED, RETURN TO:

[●]
Attn: [●]
[●]

Mail Tax Statement to:

[●]
Attn: [●]
[●]

<div align="right">Space above for County Recorder's Use</div>

*Affirmation Statement*: The undersigned affirms that this document does not contain any social security numbers or other personal information of any person (Per NRS 239B.030).

## ASSIGNMENT AND ASSUMPTION OF MINING LEASES
### ([●])

This Assignment and Assumption of Mining Leases (this "Assignment"), dated to be effective as of [●][●], 2015 ("Effective Date"), is from [●], a [●] ("Assignor"), with an address of [●],[●],[●], to [●], a [●] ("Assignee"), with an address of [●],[●],[●].

### Recitals

A.     Assignor, Assignee and [●] are parties to that certain Asset Purchase Agreement dated November 30, 2015 ("Purchase Agreement").

B.     Pursuant to the Purchase Agreement, Assignor agreed, among other things, to assign to Assignee all of its right, title and interest in and to the mining leases described in Exhibit A to this Assignment (the "Leases").

C.     Assignor and Assignee now desire to execute this Assignment with respect to the Leases in order to fulfill, in part, their obligations under the Purchase Agreement.

### Assignment and Assumption

For $10.00 and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Assignor sells and assigns to Assignee, its successors and assigns forever, all of Assignor's right, title, and interest in and to the Leases, to have and to hold forever.

Assignee hereby accepts the foregoing assignment and assumes all of the liabilities and obligations of Assignor under the Leases whether prior to or on or after the Effective Date.

Executed by Assignor and Assignee to be effective as of the Effective Date.

*[Signatures Begin on Next Page]*

Signature Page to Assignment (Mining Leases [●])

                                     ASSIGNOR:

                                       [●], a [●]

                                       By: _____

                                       Print Name: _____

                                       Its: _____

State of _____ )
                        ) ss.
County of _____ )

On this [●] day of [●],[●], before me, the undersigned, a Notary Public in and for the State of [●], personally appeared [●], known or identified to me to be the [●] of [●], the corporation that executed the foregoing instrument, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

                                       _____

                                       Notary Public in and for the State of _____
                                       Residing at: _____
                                       Commission Expires: _____

Signature Page to Assignment (Mining Leases [●])

ASSIGNEE:

[●], a [●]

By: _____

Print Name: _____

Its: _____


State of _____    )
                              ) ss.
County of _____    )

On this [●] day of [●],[●], before me, the undersigned, a Notary Public in and for the State of [●], personally appeared [●], known or identified to me to be the [●] of [●], the corporation that executed the foregoing instrument, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____

Notary Public in and for the State of _____
Residing at: _____
Commission Expires: _____

4

Exhibit A
to
Assignment and Assumption
List of Mining Leases

APN #: N/A (water rights)

RECORDED AT THE REQUEST OF, AND
WHEN RECORDED, RETURN TO:

[●]
Attn: [●]
[●]

Mail Tax Statement to:

[●]
Attn: [●]
[●]

<div align="right">Space above for County Recorder's Use</div>

*Affirmation Statement*: The undersigned affirms that this document does not contain any social security numbers or other personal information of any person (Per NRS 239B.030).

## WATER RIGHTS DEED
### ([●] County)

This WATER RIGHTS DEED ("Deed"), executed to be effective as of [●][●], 2015 ("Effective Date"), is from [●], a [●] ("Grantor"), with an address of [●],[●],[●], to [●], a [●] ("Grantee"), with an address of [●],[●],[●].

### RECITALS

A.    Grantor has an interest in the water rights described in Exhibit A to this Water Rights Deed ("Water Rights"), which are located in [●] County, Nevada.

B.    Grantor, Grantee and [●] are parties to that certain Asset Purchase Agreement dated November 30, 2015 ("Purchase Agreement"). Pursuant to the Purchase Agreement, Grantor agreed, among other things, to convey to Grantee all of its right, title and interest in and to the Water Rights.

C.    Grantor now desires to execute this Deed with respect to the Water Rights in order to fulfill, in part, its obligations under the Purchase Agreement.

# CONVEYANCE

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor grants, bargains, sells and conveys to Grantee, all of Grantor's right, title and interest in the Water Rights, together with all prior permits and applications to change.

TO HAVE AND TO HOLD unto Grantee, its successors and assigns forever.

Executed by Grantor to be effective as of the Effective Date.

GRANTOR:

[●], a [●]

By: _____

Print Name: _____

Its: _____

State of _____        )
                                ) ss.
County of _____         )

This instrument was acknowledged before me on December __, 2015, by _____ as _____ of _____.

_____
Notary Public in and for the State of _____
Residing at: _____
Commission Expires: _____

2

**Exhibit A – Water Rights ([●] County)**

APN #: See Exhibit A

RECORDED AT THE REQUEST OF, AND
WHEN RECORDED, RETURN TO:

[●]
Attn: [●]
[●]

Mail Tax Statement to:

[●]
Attn: [●]
[●]

Space above for County Recorder's Use

*Affirmation Statement*: The undersigned affirms that this document does not contain any social security numbers or other personal information of any person (Per NRS 239B.030).

## ASSIGNMENT AND ASSUMPTION OF CONTRACTS
### ([●])

This Assignment and Assumption of Contracts (this "Assignment"), dated to be effective as of [●][●], 2015 ("Effective Date"), is from [●], a [●] ("Assignor"), with an address of [●],[●],[●], to [●], a [●] ("Assignee"), with an address of [●],[●],[●].

### Recitals

A.     Assignor, Assignee and [●] are parties to that certain Asset Purchase Agreement dated November 30, 2015 ("Purchase Agreement").

B.     Pursuant to the Purchase Agreement, Assignor agreed, among other things, to assign to Assignee, and Assignee agreed to assume, all of Assignor's right, title and interest in and to the contracts described in Exhibit A to this Assignment ("Contracts").

C.     Assignor and Assignee now desire to execute this Assignment with respect to the Contracts in order to fulfill, in part, their obligations under the Purchase Agreement.

## Assignment and Assumption

For \$10.00 and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Assignor sells and assigns to Assignee, its successors and assigns forever, all of Assignor's right, title, and interest in and to the Contracts, to have and to hold forever.

Assignee hereby accepts the foregoing assignment and assumes all of the liabilities and obligations of Assignor under the Contracts whether prior to or on or after the Effective Date.

Executed by Assignor and Assignee to be effective as of the Effective Date.

*[Signatures Begin on Next Page]*

Signature Page to Assignment (Contracts [●])

<div style="margin-left: 40%;">

ASSIGNOR:

[●], a [●]

By: _____

Print Name: _____

Its: _____

</div>

State of _____    )
                           ) ss.
County of _____     )

     On this [●] day of [●],[●], before me, the undersigned, a Notary Public in and for the State of [●], personally appeared [●], known or identified to me to be the [●] of [●], the corporation that executed the foregoing instrument, and acknowledged to me that such corporation executed the same.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

<div style="margin-left: 40%;">

_____
Notary Public in and for the State of _____
Residing at: _____
Commission Expires: _____

</div>

3

Signature Page to Assignment (Contracts [●])

<div style="text-align: right">

ASSIGNEE:

[●], a [●]

By: _____

Print Name: _____

Its: _____

</div>

State of _____ )
                         ) ss.
County of _____ )

On this [●] day of [●],[●], before me, the undersigned, a Notary Public in and for the State of [●], personally appeared [●], known or identified to me to be the [●] of [●], the corporation that executed the foregoing instrument, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

<div style="text-align: right">

_____

Notary Public in and for the State of _____

Residing at: _____

Commission Expires: _____

</div>

4

Exhibit A
to
Assignment and Assumption
List of Contracts

APN #: See Exhibit A

RECORDED AT THE REQUEST OF, AND
WHEN RECORDED, RETURN TO:

[●]
Attn: [●]
[●]

Mail Tax Statement to:

[●]
Attn: [●]
[●]

<div align="right">Space above for County Recorder's Use</div>

*Affirmation Statement*: The undersigned affirms that this document does not contain any social security numbers or other personal information of any person (Per NRS 239B.030).

## ASSIGNMENT AND ASSUMPTION OF PERMITS
### ([●])

This Assignment and Assumption of Permits (this "Assignment"), dated to be effective as of [●][●], 2015 (the "Effective Date"), is from [●], a [●] ("Assignor"), with an address of [●],[●],[●], to [●], a [●] ("Assignee"), with an address of [●],[●],[●].

### Recitals

A.    Assignor, Assignee and [●] are parties to that certain Asset Purchase Agreement dated November 30, 2015 (the "Purchase Agreement").

B.    Pursuant to the Purchase Agreement, Assignor agreed, among other things, to assign to Assignee, and Assignee agreed to assume, all of Assignor's right, title and interest in and to the permits described in Exhibit A to this Assignment ("Permits").

C.    Assignor and Assignee now desire to execute this Assignment with respect to the Permits in order to fulfill, in part, their obligations under the Purchase Agreement.

## Assignment and Assumption

For $10.00 and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Assignor sells and assigns to Assignee, its successors and assigns forever, all of Assignor's right, title, and interest in and to the Permits, to have and to hold forever.

Assignee hereby accepts the foregoing assignment and assumes all of the liabilities and obligations of Assignor under the Permits whether prior to or on or after the Effective Date.

Executed by Assignor and Assignee to be effective as of the Effective Date.

*[Signatures Begin on Next Page]*

Signature Page to Assignment (Permits [●])

ASSIGNOR:

[●], a [●]

By: _____

Print Name: _____

Its: _____


State of _____ )
                  ) ss.
County of _____ )

     On this [●] day of [●],[●], before me, the undersigned, a Notary Public in and for the State of [●], personally appeared [●], known or identified to me to be the [●] of [●], the corporation that executed the foregoing instrument, and acknowledged to me that such corporation executed the same.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.


                        _____

                        Notary Public in and for the State of _____

                        Residing at: _____

                        Commission Expires: _____

Signature Page to Assignment (Permits [●])

ASSIGNEE:

[●], a [●]

By: _____

Print Name: _____

Its: _____

State of _____ )
                       ) ss.
County of _____ )

On this [●] day of [●],[●], before me, the undersigned, a Notary Public in and for the State of [●], personally appeared [●], known or identified to me to be the [●] of [●], the corporation that executed the foregoing instrument, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public in and for the State of _____
Residing at: _____
Commission Expires: _____

4

Exhibit A
to
Assignment and Assumption
List of Permits

## BILL OF SALE
## ([●])

This Bill of Sale ("Bill of Sale"), dated to be effective as of [●][●], 2015 ("Effective Date"), by and between [●], a [●] ("Seller"), with an address of [●],[●],[●], and [●], a [●] ("Buyer"), with an address of [●],[●],[●].

### Recitals

A.      Seller, Buyer and [●] are parties to that certain Asset Purchase Agreement dated November 30, 2015 ("Purchase Agreement").

B.      Pursuant to the Purchase Agreement, Seller agreed, among other things, to sell to Buyer, and Buyer agreed to purchase, all of Seller's right, title and interest in and to the personal property described in Exhibit A to this Bill of Sale ("Tangible Property").

C.      Seller and Buyer now desire to execute this Bill of Sale with respect to the Tangible Property in order to fulfill, in part, their obligations under the Purchase Agreement.

### Purchase and Sale

For $10.00 and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Seller hereby sells, assigns, transfers and delivers to Buyer, and Buyer hereby purchases and accepts, the Tangible Property.

Executed by Seller and Buyer to be effective as of the Effective Date.

SELLER:                                          BUYER:

[●], a [●]                                       [●], a [●]

By: _____             By: _____

Print Name: _____             Print Name: _____

Its: _____             Its: _____

1

Exhibit A
to
Bill of Sale

Tangible Property

# EXHIBIT C

ACTIVE 210962082v.4

APN #: N/A

RECORDED AT THE REQUEST OF, AND
WHEN RECORDED, RETURN TO:

_____

[●]
Attn: [●]
[●]

Mail Tax Statement to:

[●]
Attn: [●]
[●]

<div align="right">Space above for County Recorder's Use</div>

*Affirmation Statement*: The undersigned affirms that this document does not contain any social security numbers or other personal information of any person (Per NRS 239B.030).

## **ASSIGNMENT AND ASSUMPTION OF ASSUMED LIABILITIES**
### ([●])

This Assignment and Assumption of Assumed Liabilities ("Assignment"), dated to be effective as of [●][●], 2015 (the "Effective Date"), is from [●], a [●] ("Assignor"), with an address of [●],[●],[●], to [●], a [●] ("Assignee"), with an address of [●],[●],[●].

### **Recitals**

A.     Assignor, Assignee and [●] are parties to that certain Asset Purchase Agreement dated November 30, 2015 (the "Purchase Agreement").

B.     Pursuant to the Purchase Agreement, Assignor agreed, among other things, to assign to Assignee, and Assignee agreed to assume, any and all of Assignor's liabilities and obligations with respect to the items listed on Exhibit A ("Assumed Liabilities").

C.     Assignor and Assignee now desire to execute this Assignment with respect to the Assumed Liabilities in order to fulfill, in part, their obligations under the Purchase Agreement.

## Assignment and Assumption

For $10.00 and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Assignor sells and assigns to Assignee, its successors and assigns forever, all of Assignor's liabilities and obligations with respect to the Assumed Liabilities.

Assignee hereby accepts the foregoing assignment and agrees to assume, pay, satisfy, perform and discharge when due any and all of the liabilities and obligations of Assignor under the Assumed Liabilities.

Executed by Assignor and Assignee to be effective as of the Effective Date.

*[Signatures Begin on Next Page]*

Signature Page to Assignment (Assumed Liabilities [●])

<div align="right">

ASSIGNOR:

[●], a [●]

By: _____

Print Name: _____

Its: _____

</div>

State of _____   )
                   ) ss.
County of _____   )

On this [●] day of [●],[●], before me, the undersigned, a Notary Public in and for the State of [●], personally appeared [●], known or identified to me to be the [●] of [●], the corporation that executed the foregoing instrument, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

<div align="right">

_____

Notary Public in and for the State of _____

Residing at: _____

Commission Expires: _____

</div>

3

Signature Page to Assignment (Assumed Liabilities [●])

                    ASSIGNEE:

                    [●], a [●]

                    By: _____

                    Print Name: _____

                    Its: _____

State of _____ )
                          ) ss.
County of _____ )

      On this [●] day of [●],[●], before me, the undersigned, a Notary Public in and for the State of [●], personally appeared [●], known or identified to me to be the [●] of [●], the corporation that executed the foregoing instrument, and acknowledged to me that such corporation executed the same.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

                    _____
                    Notary Public in and for the State of _____
                    Residing at: _____
                    Commission Expires: _____

Exhibit A
to
Assignment and Assumption
List of Assumed Liabilities

Capitalized Terms have the meaning set forth in the Purchase Agreement.

1.      all liabilities and obligations under the Assigned Contracts, Permits and Environmental Claims whether arising prior to or on or after the Closing Date, including, without limitation, the Cure Amounts;

2.      all liabilities and obligations with respect to the Disclosed Litigation, excluding any expenses or costs (including legal costs and work-in-progress) accrued with respect to the defense of such Disclosed Litigation prior to the Closing Date;

3.      all liabilities and obligations for (i) Taxes relating to the Spring Valley Business, the Additional Spring Valley Business, the Purchased Assets or the Assumed Liabilities for any taxable period or portion thereof following the Closing Date (and for this purpose, any Taxes for any Straddle Period shall be allocated between the portion of such Straddle Period ending on the Closing Date and the portion of such Straddle Period beginning after the Closing Date on an interim "closing of the books method", provided that any Taxes (such as property Taxes) that are not imposed on income, receipts or otherwise on a transactional basis shall be allocated on a daily basis, with "Straddle Period" meaning any taxable period beginning before and ending after the Closing Date), and (ii) Taxes for which Buyer is liable pursuant to Section 5.13 of the Purchase Agreement;

4.      all liabilities and obligations arising on or after the Closing Date from or relating to any condition of the Purchased Assets, the Spring Valley Business or the Additional Spring Valley Business, whether known or unknown or contingent;

5.      Excluding any expenses or costs (including legal costs, work in progress and ordinary claim maintenance and other like fees) accruing prior to the Closing Date, any additional claims, royalties, obligations, demands or other liabilities arising from or relating to:

> (i)      the August 15, 2003 *Option Agreement* between Paul G. Schmidt and Midway Gold Corp.;
>
> (ii)     the August 13, 2007 *Mining Deed (With Reservation and Conveyance of Royalty)* between Paul G. Schmidt and MGC Resources Inc. ("Mining Deed"), including without limitation the Primary Royalty, the Perimeter Royalty, or the Perimeter Area, as defined therein; and
>
> (iii)    any claims for royalties or payments arising from or relating to the following mining claims situated in proximity to the Claims, as defined in the Mining Deed:

| Claim Name | BLM Serial # | Recording Information |
|------------|--------------|------------------------|
| SVB 1 | NMC 1023658 | Pershing, BK 453 Pg 660 Doc Nbr 366815 |
| SVB 2 | NMC 1023659 | Pershing, BK 453 Pg 661 Doc Nbr 366816 |

Exhibit A-1

| Claim Name | BLM Serial # | Recording Information |
|---|---|---|
| SVB 3 | NMC 1023660 | Pershing, BK 453 Pg 662 Doc Nbr 366817 |
| SVB 4 | NMC 1023661 | Pershing, BK 453 Pg 663 Doc Nbr 366818 |
| SVB 5 | NMC 1023662 | Pershing, BK 453 Pg 664 Doc Nbr 366819 |
| SVB 6 | NMC 1023663 | Pershing, BK 453 Pg 665 Doc Nbr 366820 |
| SVB 7 | NMC 1023664 | Pershing, BK 453 Pg 666 Doc Nbr 366821 |
| SVB 8 | NMC 1023665 | Pershing, BK 453 Pg 667 Doc Nbr 366822 |
| SVB 9 | NMC 1023666 | Pershing, BK 453 Pg 668 Doc Nbr 366823 |
| . SVB 10 | NMC 1023667 | Pershing, BK 453 Pg 669 Doc Nbr 366824 |
| SVB 11 | NMC 1023668 | Pershing, BK 453 Pg 670 Doc Nbr 366825 |
| SVB 12 | NMC 1023669 | Pershing, BK 453 Pg 671 Doc Nbr 366826 |
| SVB 13 | NMC 1011089 | Pershing, BK 449 Pg 865 Doc Nbr 364917 |
| SV 1 | NMC 817628 | Pershing, BK 352 Pg 678 |
| SV 2 | NMC 817629 | Pershing, BK 352 Pg 679 |
| SV 3 | NMC 817630 | Pershing, BK 352 Pg 680 |
| SV 4 | NMC 817631 | Pershing, BK 352 Pg 681 |
| SV 5 | NMC 817632 | Pershing, BK 352 Pg 682 |
| SV 6 | NMC 817633 | Pershing, BK 352 Pg 683 |
| SV 7 | NMC 817634 | Pershing, BK 352 Pg 684 |
| SV 8 | NMC 748203 | Pershing, BK 304 Pg 446 |
| SV 9 | NMC 817635 | Pershing, BK 352 Pg 685 |
| SV 10 | NMC 748205 | Pershing, BK 304 Pg 448 |
| SV 11 | NMC 817636 | Pershing, BK 352 Pg 686 |
| SV 12 | NMC 748207 | Pershing, BK 304 Pg 450 |
| SV 13 | NMC 817637 | Pershing, BK 352 Pg 687 |
| SV 14 | NMC 748209 | Pershing, BK 304 Pg 452 |
| SV 15 | NMC 817638 | Pershing, BK 352 Pg 688 |
| SV 16 | NMC 748211 | Pershing, BK 304 Pg 454 |
| SV 17 | NMC 817639 | Pershing, BK 352 Pg 689 |
| SV 18 | NMC 748213 | Pershing, BK 304 Pg 456 |
| SV 19 | NMC 817640 | Pershing, BK 352 Pg 690 |
| SV 20 | NMC 748215 | Pershing, BK 304 Pg 458 |
| SV 21 | NMC 817641 | Pershing, BK 352 Pg 691 |
| SV 22 | NMC 817642 | Pershing, BK 352 Pg 692 |
| SV 23 | NMC 817643 | Pershing, BK 352 Pg 693 |
| SV 24 | NMC 817644 | Pershing, BK 352 Pg 694 |
| SV 25 | NMC 817645 | Pershing, BK 352 Pg 695 |
| SV 26 | NMC 817646 | Pershing, BK 352 Pg 696 |
| SV 27 | NMC 748222 | Pershing, BK 304 Pg 465 |
| SV 28 | NMC 817647 | Pershing, BK 352 Pg 697 |
| SV 29 | NMC 748224 | Pershing, BK 304 Pg 467 |

| Claim Name | BLM Serial # | Recording Information |
|------------|--------------|------------------------|
| SV 30 | NMC 748225 | Pershing, BK 304 Pg 468 |
| SV 31 | NMC 748226 | Pershing, BK 304 Pg 469 |
| SV 32 | NMC 748227 | Pershing, BK 304 Pg 470 |
| SV 33 | NMC 748228 | Pershing, BK 304 Pg 471 |
| SV 34 | NMC 748229 | Pershing, BK 304 Pg 472 |
| SV 35 | NMC 748230 | Pershing, BK 304 Pg 473 |
| SV 36 | NMC 748231 | Pershing, BK 304 Pg 474 |
| SV 37 | NMC 748232 | Pershing, BK 304 Pg 475 |
| SV 38 | NMC 748233 | Pershing, BK 304 Pg 476 |
| SV 39 | NMC 748234 | Pershing, BK 304 Pg 477 |
| SV 40 | NMC 748235 | Pershing, BK 304 Pg 478 |
| SV 41 | NMC 748236 | Pershing, BK 304 Pg 479 |
| SV 42 | NMC 748237 | Pershing, BK 304 Pg 480 |
| SV 43 | NMC 748238 | Pershing, BK 304 Pg 481 |
| SV 44 | NMC 748239 | Pershing, BK 304 Pg 482 |

6.     Any claims, demands or litigation accruing or arising after the Closing Date associated with the Assumed Liabilities, Purchased Assets, Spring Valley Business and the Additional Spring Valley Business;

7.     Any liabilities or obligations accruing or arising after the Closing Date from or relating to statutory, regulatory or other legal requirements;

8.     Excluding any expense or costs (including legal costs and work in progress) accruing prior to the Closing Date, any ancillary or related claims or demands made in connection with the Disclosed Litigation; and

9.     Claims asserted by Barrick in its Proofs of Claim (Claim Nos. 223 and 224).

## Disclosure Schedules

These Disclosure Schedules are made and given pursuant to that certain Asset Purchase Agreement (the "Agreement") dated as of November 30, 2015, by and among Midway Gold US Inc., a Nevada corporation ("Midway US"), Nevada Talon LLC, a Nevada limited liability company ("Nevada Talon" and, together with Midway US, "Sellers") and Solidus Resources, LLC, a Nevada limited liability company ("Buyer"). Capitalized terms used and not defined herein shall have the meaning set forth in the Agreement.

These Disclosure Schedules are qualified in their entirety by reference to the Agreement, and are not intended to constitute, and shall not be construed as constituting, any representations or warranties of Sellers except as and to the extent specifically provided in Article 3 of the Agreement, subject to the limitations therein and herein. Certain of the information contained in these Disclosure Schedules may not be required to be disclosed pursuant to the Agreement. Such information is included solely for informational purposes, and disclosure of such information shall not be deemed to enlarge or enhance any of the representations or warranties in the Agreement or otherwise alter in any way the terms of the Agreement. These Disclosure Schedules do not necessarily include other information of a similar nature. Disclosure of any item in any section hereof shall not constitute an admission or indication that such item or matter is material.

Midway US, Barrick Gold Exploration Inc. and Coeur Rochester, Inc. are parties to that certain Agreement dated May 29, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc., and Coeur Rochester, Inc., as amended by that certain First Amendment to Agreement dated July 24, 2015, that certain Second Amendment to Agreement dated September 14, 2015, and that certain Third Amendment to Agreement dated October 30, 2015 (together, the "Coeur Settlement Agreement"), and a motion for an order authorizing the Coeur Settlement Agreement is currently pending before the United States Bankruptcy Court for the District of Colorado. The Coeur Settlement Agreement, such motion, and any order granting that motion and/or authorizing the Coeur Settlement Agreement shall be deemed to be referenced in any schedule in these Disclosure Schedules where the same is necessary to make correct the applicable representation and warranty to which such Disclosure Schedule applies.

The references and headings in these Disclosure Schedules are inserted for convenience only and shall not have the effect of amending or changing the information presented. The section numbers herein correspond to the section and subsection numbers of the representation and warranties in the Agreement that are modified or supplemented by the disclosures hereinafter. Any disclosure made in these Disclosure Schedules shall be deemed to be disclosures made with respect to all representations and warranties contained in the Agreement to the extent reasonably apparent on their face, regardless of whether or not a specific cross-reference is made thereto.

In disclosing the information in these Disclosure Schedules, Sellers do not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any matters disclosed or discussed herein. Inclusion of any item in these Disclosure Schedules shall not constitute, or be deemed to be, an admission to any third party concerning such item. No disclosure in any section hereof relating to a possible breach or violation of any contract or applicable law shall be construed as an admission or indication that a breach or violation exists or has actually occurred.

None of the parties to the Agreement assumes any responsibility to any Person that is not a party to the Agreement for the accuracy of any information contained herein. The information was not prepared or disclosed with a view to its potential disclosure to others. Subject to applicable legal requirements, this information is disclosed in confidence for the purposes contemplated in the Agreement and is subject to any confidentiality agreement or other confidentiality obligations between or among any of the parties to the Agreement.

\* \* \* \* \* \*

## Schedule 2.1(c) – Owned Real Property

### (i) Spring Valley Business

### Fee Lands - Pershing County

Township 28 North, Range 34 East

Section 1: Lots 1 & 6; W1/2 of Lot 7; N1/2 of Lot 8; Lot 10; N1/2 of Lot13; Lots 14-17; NW1/4SE1/4; N1/2SW1/4
Section 3: Lots 1 and 2 (excepting portion below 200 feet)
Section 3: Lots 3-12; E1/2 of Lot 15; Lot 16; NE1/4SE1/4; E1/2NW1/4SE1/4; N1/2SE1/4SE1/4; NE1/4SW1/4SE1/4

Township 29 North, Range 34 East

Section 25:                     E1/2; N1/2NW1/4; SE1/4NW1/4; E1/2NE1/4SW1/4; E1/2SE1/4SW1/4
Section 27: SE1/4; SE1/4SW1/4; E1/2NE1/4
Section 35: W1/2NW1/4; SE1/4NW1/4; NE1/4NW1/4

Township 28 North, Range 35 East

Section 5: All

### Fee Lands - Pershing County – Buena Vista Valley Ranch

Township 30 North, Range 35 East

Section 29: N1/2S1/2S1/2; SE1/4SE1/4SE1/4; E1/2SW1/4SE1/4SE1/4
(EXCEPTING THEREFROM, a strip of land 400 feet wide, lying equally on each side of main track, side track, spur, switch and branch line of the railroad now constructed on said land and reserved by Central Pacific Railway Company, a Utah corporation, in the Deed in Book 4, Page 318, under File No. 10060, Deed Records.)
Section 32: SE1/4SE1/4
Section 33: E1/2; W1/2

Township 29 North, Range 35 East

Section 4: NW1/4
Section 5: SW1/4SE1/4; W1/2 of Lot 1 and the E1/2 of Lot 2 of the NE1/4, excepting 75% of all oil, gas and minerals
Section 22: NW1/4; SE1/4NE1/4; W1/2NE1/4

### (ii)     Additional Spring Valley Business

See Schedule 2.1(m), part (i).

3

## Schedule 2.1(d) – Leased Real Property

### (i) Spring Valley Business

Mining Sublease dated December 2, 2010 between Newmont USA Limited (successor in interest to SFP Minerals Corporation) and Barrick Gold Exploration Inc.

| Pershing County, Nevada, Township 28 North, Range 34 East | | Acres |
|---|---|---|
| Section 1: | Lots 1, 6, W1/2 of Lot 7, N1/2 of Lot 8, Lot 10, N1/2 of Lot 13, Lots 14-17, NW1/4SE1/4, N1/2SW1/4 | 461.00 |
| Section 3: | Lots 3-12, E1/2 of Lot 15, Lot 16, NE1/4SE1/4, E1/2NW1/4SE1/4, N1/2SE1/4SE1/4, NE1/4SW1/4SE1/4 | 544.00 |
| Section 3: | Lots 1-2 (portions below 200 ft.) | 76.40 |

Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc., and Addendum to Lease dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. and First Amendment to that Certain Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. and effective October 15, 2011, and Second Amendment to that Certain Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. and effective March 1, 2013.

### (ii)    Additional Spring Valley Business

See Schedule 2.1(m), part (ii).

4

## Schedule 2.1(e) – Owned Mining Claims

**(i)**    **Spring Valley Business**

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|---|---|---|---|---|---|---|
| SVB 13 | NMC | 1011089 | Pershing | NV | 449 | 865 |
| SVB 1 | NMC | 1023658 | Pershing | NV | 453 | 660 |
| SVB 2 | NMC | 1023659 | Pershing | NV | 453 | 661 |
| SVB 3 | NMC | 1023660 | Pershing | NV | 453 | 662 |
| SVB 4 | NMC | 1023661 | Pershing | NV | 453 | 663 |
| SVB 5 | NMC | 1023662 | Pershing | NV | 453 | 664 |
| SVB 6 | NMC | 1023663 | Pershing | NV | 453 | 665 |
| SVB 7 | NMC | 1023664 | Pershing | NV | 453 | 666 |
| SVB 8 | NMC | 1023665 | Pershing | NV | 453 | 667 |
| SVB 9 | NMC | 1023666 | Pershing | NV | 453 | 668 |
| SVB 10 | NMC | 1023667 | Pershing | NV | 453 | 669 |
| SVB 11 | NMC | 1023668 | Pershing | NV | 453 | 670 |
| SVB 12 | NMC | 1023669 | Pershing | NV | 453 | 671 |
| SHO 60 | NMC | 1034792 | Pershing | NV | 461 | 284 |
| SHO 61 | NMC | 1034793 | Pershing | NV | 461 | 285 |
| SHO 62 | NMC | 1034794 | Pershing | NV | 461 | 286 |
| SHO 63 | NMC | 1034795 | Pershing | NV | 461 | 287 |
| SHO 64 | NMC | 1034796 | Pershing | NV | 461 | 288 |
| SHO 65 | NMC | 1034797 | Pershing | NV | 461 | 289 |
| SHO 4A | NMC | 1034798 | Pershing | NV | 461 | 290 |
| SHO 5A | NMC | 1034799 | Pershing | NV | 461 | 291 |
| HMS 4A | NMC | 1034800 | Pershing | NV | 461 | 292 |
| SVB 14 | NMC | 1062740 | Pershing | NV | 477 | 247 |
| SVB 15 | NMC | 1062741 | Pershing | NV | 477 | 248 |
| SVB 16 | NMC | 1062742 | Pershing | NV | 477 | 249 |
| SVB 17 | NMC | 1062743 | Pershing | NV | 477 | 250 |
| SVB 18 | NMC | 1096898 | Pershing | NV | 500 | 753 |
| SVB 19 | NMC | 1096899 | Pershing | NV | 500 | 754 |
| SVB 20 | NMC | 1096900 | Pershing | NV | 500 | 755 |
| SVB 21 | NMC | 1096901 | Pershing | NV | 500 | 756 |
| SVB 22 | NMC | 1096902 | Pershing | NV | 500 | 757 |
| SVB 23 | NMC | 1096903 | Pershing | NV | 500 | 758 |
| SVB 24 | NMC | 1096904 | Pershing | NV | 500 | 759 |
| SVB 25 | NMC | 1096905 | Pershing | NV | 500 | 760 |
| SVB 26 | NMC | 1096906 | Pershing | NV | 500 | 761 |
| SVB 27 | NMC | 1096907 | Pershing | NV | 500 | 762 |
| SVB 28 | NMC | 1096908 | Pershing | NV | 500 | 763 |
| SVB 29 | NMC | 1096909 | Pershing | NV | 500 | 764 |
| SVB 30 | NMC | 1096910 | Pershing | NV | 500 | 765 |
| SVB 31 | NMC | 1096911 | Pershing | NV | 500 | 766 |
| SVB 32 | NMC | 1096912 | Pershing | NV | 500 | 767 |
| SVB 33 | NMC | 1096913 | Pershing | NV | 500 | 768 |

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|---|---|---|---|---|---|---|
| SVB 34 | NMC | 1096914 | Pershing | NV | 500 | 769 |
| SVB 35 | NMC | 1096915 | Pershing | NV | 500 | 770 |
| SVB 36 | NMC | 1096916 | Pershing | NV | 500 | 771 |
| SVB 37 | NMC | 1096917 | Pershing | NV | 500 | 772 |
| SVB 38 | NMC | 1096918 | Pershing | NV | 500 | 773 |
| SVB 39 | NMC | 1096919 | Pershing | NV | 500 | 774 |
| HMS 4 | NMC | 140862 | Pershing | NV | 106 | 179 |
| HMS 5 | NMC | 140863 | Pershing | NV | 106 | 180 |
| HMS 6 | NMC | 140864 | Pershing | NV | 106 | 181 |
| HMS 84 | NMC | 140941 | Pershing | NV | 106 | 258 |
| HMS 85 | NMC | 140942 | Pershing | NV | 106 | 259 |
| HMS 86 | NMC | 140943 | Pershing | NV | 106 | 260 |
| HMS 87 | NMC | 140944 | Pershing | NV | 106 | 261 |
| SDB - 1 | NMC | 349508 | Pershing | NV | 173 | 127 |
| SDB - 2 | NMC | 349509 | Pershing | NV | 173 | 128 |
| SDB - 3 | NMC | 349510 | Pershing | NV | 173 | 129 |
| SDB - 4 | NMC | 349511 | Pershing | NV | 173 | 130 |
| SDB - 5 | NMC | 349512 | Pershing | NV | 173 | 131 |
| SDB - 6 | NMC | 349513 | Pershing | NV | 173 | 132 |
| SDB - 7 | NMC | 349514 | Pershing | NV | 173 | 133 |
| SDB - 8 | NMC | 349515 | Pershing | NV | 173 | 134 |
| IDA # 12 | NMC | 364282 | Pershing | NV | 177 | 124 |
| IDA # 13 | NMC | 364283 | Pershing | NV | 177 | 125 |
| IDA # 14 | NMC | 364284 | Pershing | NV | 177 | 126 |
| IDA # 15 | NMC | 364285 | Pershing | NV | 177 | 127 |
| IDA # 16 | NMC | 364286 | Pershing | NV | 177 | 128 |
| IDA # 17 | NMC | 364287 | Pershing | NV | 177 | 129 |
| IDA # 18 | NMC | 364288 | Pershing | NV | 177 | 130 |
| IDA # 19 | NMC | 364289 | Pershing | NV | 177 | 131 |
| IDA # 20 | NMC | 364290 | Pershing | NV | 177 | 132 |
| IDA # 21 | NMC | 364291 | Pershing | NV | 177 | 133 |
| IDA # 22 | NMC | 364292 | Pershing | NV | 177 | 134 |
| IDA # 23 | NMC | 364293 | Pershing | NV | 177 | 135 |
| IDA # 25 | NMC | 364295 | Pershing | NV | 177 | 137 |
| SHO # 3 | NMC | 364363 | Pershing | NV | 177 | 205 |
| SHO # 4 | NMC | 364364 | Pershing | NV | 177 | 206 |
| SHO # 5 | NMC | 364365 | Pershing | NV | 177 | 207 |

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|------------|--------|------|--------|-------|------|------|
| SHO # 6 | NMC | 364366 | Pershing | NV | 177 | 208 |
| SHO # 7 | NMC | 364367 | Pershing | NV | 177 | 209 |
| SHO # 8 | NMC | 364368 | Pershing | NV | 177 | 210 |
| SHO # 9 | NMC | 364369 | Pershing | NV | 177 | 211 |
| SHO # 10 | NMC | 364370 | Pershing | NV | 177 | 212 |
| SHO # 11 | NMC | 364371 | Pershing | NV | 177 | 213 |
| SHO # 12 | NMC | 364372 | Pershing | NV | 177 | 214 |
| SHO # 13 | NMC | 364373 | Pershing | NV | 177 | 215 |
| SHO # 14 | NMC | 364374 | Pershing | NV | 177 | 216 |
| SHO # 15 | NMC | 364375 | Pershing | NV | 177 | 217 |
| SHO # 16 | NMC | 364376 | Pershing | NV | 177 | 218 |
| SHO # 17 | NMC | 364377 | Pershing | NV | 177 | 219 |
| SHO # 18 | NMC | 364378 | Pershing | NV | 177 | 220 |
| SHO # 19 | NMC | 364379 | Pershing | NV | 177 | 221 |
| SHO # 20 | NMC | 364380 | Pershing | NV | 177 | 222 |
| SHO # 24 | NMC | 364384 | Pershing | NV | 177 | 226 |
| SHO # 25 | NMC | 364385 | Pershing | NV | 177 | 227 |
| SHO # 26 | NMC | 364386 | Pershing | NV | 177 | 228 |
| SHO # 27 | NMC | 364387 | Pershing | NV | 177 | 229 |
| SHO # 28 | NMC | 364388 | Pershing | NV | 177 | 230 |
| SHO # 29 | NMC | 364389 | Pershing | NV | 177 | 231 |
| SHO # 30 | NMC | 364390 | Pershing | NV | 177 | 232 |
| SHO # 31 | NMC | 364391 | Pershing | NV | 177 | 233 |
| SHO # 32 | NMC | 364392 | Pershing | NV | 177 | 234 |
| SHO # 33 | NMC | 364393 | Pershing | NV | 177 | 235 |
| SHO # 34 | NMC | 364394 | Pershing | NV | 177 | 236 |
| SHO # 35 | NMC | 364395 | Pershing | NV | 177 | 237 |
| SHO # 36 | NMC | 364396 | Pershing | NV | 177 | 238 |
| SHO # 37 | NMC | 364397 | Pershing | NV | 177 | 239 |
| SHO # 38 | NMC | 364398 | Pershing | NV | 177 | 240 |
| SHO # 39 | NMC | 364399 | Pershing | NV | 177 | 241 |
| SHO # 40 | NMC | 364400 | Pershing | NV | 177 | 242 |
| SHO # 41 | NMC | 364401 | Pershing | NV | 177 | 243 |
| SHO # 42 | NMC | 364402 | Pershing | NV | 177 | 244 |
| SHO # 43 | NMC | 364403 | Pershing | NV | 177 | 245 |
| SHO # 44 | NMC | 364404 | Pershing | NV | 177 | 246 |

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|---|---|---|---|---|---|---|
| SHO # 45 | NMC | 364405 | Pershing | NV | 177 | 247 |
| SHO # 46 | NMC | 364406 | Pershing | NV | 177 | 248 |
| SHO # 47 | NMC | 364407 | Pershing | NV | 177 | 249 |
| SHO # 48 | NMC | 364408 | Pershing | NV | 177 | 250 |
| SHO # 49 | NMC | 364409 | Pershing | NV | 177 | 251 |
| SHO # 50 | NMC | 364410 | Pershing | NV | 177 | 252 |
| SHO # 51 | NMC | 364411 | Pershing | NV | 177 | 253 |
| SHO # 52 | NMC | 364412 | Pershing | NV | 177 | 254 |
| SHO # 53 | NMC | 364413 | Pershing | NV | 177 | 255 |
| SHO # 54 | NMC | 364414 | Pershing | NV | 177 | 256 |
| SHO # 55 | NMC | 364415 | Pershing | NV | 177 | 257 |
| SHO # 56 | NMC | 364416 | Pershing | NV | 177 | 258 |
| SHO # 57 | NMC | 364417 | Pershing | NV | 177 | 259 |
| SHO # 58 | NMC | 364418 | Pershing | NV | 177 | 260 |
| SHO # 59 | NMC | 364419 | Pershing | NV | 177 | 261 |
| Porcupine 1 | NMC | 371072 | Pershing | NV | 180 | 24 |
| Porcupine 2 | NMC | 371073 | Pershing | NV | 180 | 25 |
| Porcupine 3 | NMC | 371074 | Pershing | NV | 180 | 26 |
| Porcupine 4 | NMC | 371075 | Pershing | NV | 180 | 27 |
| Porcupine 5 | NMC | 371076 | Pershing | NV | 180 | 28 |
| Porcupine 6 | NMC | 371077 | Pershing | NV | 180 | 29 |
| Porcupine 7 | NMC | 371078 | Pershing | NV | 180 | 30 |
| Porcupine 8 | NMC | 371079 | Pershing | NV | 180 | 31 |
| Porcupine 9 | NMC | 371080 | Pershing | NV | 180 | 32 |
| Porcupine 10 | NMC | 371081 | Pershing | NV | 180 | 33 |
| Porcupine 11 | NMC | 371082 | Pershing | NV | 180 | 34 |
| Crown Hills No. 7 | NMC | 39574 | Pershing | NV | 33 | 277 |
|  |  |  |  |  | 42 | 510 |
| Crown Hills No. 8 | NMC | 39593 | Pershing | NV | 33 | 278 |
|  |  |  |  |  | 42 | 511 |
| Crown Hills No. 9 | NMC | 39594 | Pershing | NV | 33 | 279 |
|  |  |  |  |  | 42 | 512 |
| Crown Hills No. 10 | NMC | 39595 | Pershing | NV | 33 | 280 |

8

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|---|---|---|---|---|---|---|
| | | | | | 42 | 513 |
| Porcupine 28 | NMC | 662873 | Pershing | NV | 267 | 567 |
| SV 8 | NMC | 748203 | Pershing | NV | 304 | 446 |
| SV 10 | NMC | 748205 | Pershing | NV | 304 | 448 |
| SV 12 | NMC | 748207 | Pershing | NV | 304 | 450 |
| SV 14 | NMC | 748209 | Pershing | NV | 304 | 452 |
| SV 16 | NMC | 748211 | Pershing | NV | 304 | 454 |
| SV 18 | NMC | 748213 | Pershing | NV | 304 | 456 |
| SV 20 | NMC | 748215 | Pershing | NV | 304 | 458 |
| SV 27 | NMC | 748222 | Pershing | NV | 304 | 465 |
| SV 29 | NMC | 748224 | Pershing | NV | 304 | 467 |
| SV 30 | NMC | 748225 | Pershing | NV | 304 | 468 |
| SV 31 | NMC | 748226 | Pershing | NV | 304 | 469 |
| SV 32 | NMC | 748227 | Pershing | NV | 304 | 470 |
| SV 33 | NMC | 748228 | Pershing | NV | 304 | 471 |
| SV 34 | NMC | 748229 | Pershing | NV | 304 | 472 |
| SV 35 | NMC | 748230 | Pershing | NV | 304 | 473 |
| SV 36 | NMC | 748231 | Pershing | NV | 304 | 474 |
| SV 37 | NMC | 748232 | Pershing | NV | 304 | 475 |
| SV 38 | NMC | 748233 | Pershing | NV | 304 | 476 |
| SV 39 | NMC | 748234 | Pershing | NV | 304 | 477 |
| SV 40 | NMC | 748235 | Pershing | NV | 304 | 478 |
| SV 41 | NMC | 748236 | Pershing | NV | 304 | 479 |
| SV 42 | NMC | 748237 | Pershing | NV | 304 | 480 |
| SV 43 | NMC | 748238 | Pershing | NV | 304 | 481 |
| SV 44 | NMC | 748239 | Pershing | NV | 304 | 482 |
| SV 1 | NMC | 817628 | Pershing | NV | 352 | 678 |
| SV 2 | NMC | 817629 | Pershing | NV | 352 | 679 |
| SV 3 | NMC | 817630 | Pershing | NV | 352 | 680 |
| SV 4 | NMC | 817631 | Pershing | NV | 352 | 681 |
| SV 5 | NMC | 817632 | Pershing | NV | 352 | 682 |
| SV 6 | NMC | 817633 | Pershing | NV | 352 | 683 |
| SV 7 | NMC | 817634 | Pershing | NV | 352 | 684 |
| SV 9 | NMC | 817635 | Pershing | NV | 352 | 685 |
| SV 11 | NMC | 817636 | Pershing | NV | 352 | 686 |
| SV 13 | NMC | 817637 | Pershing | NV | 352 | 687 |

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|---|---|---|---|---|---|---|
| SV 15 | NMC | 817638 | Pershing | NV | 352 | 688 |
| SV 17 | NMC | 817639 | Pershing | NV | 352 | 689 |
| SV 19 | NMC | 817640 | Pershing | NV | 352 | 690 |
| SV 21 | NMC | 817641 | Pershing | NV | 352 | 691 |
| SV 22 | NMC | 817642 | Pershing | NV | 352 | 692 |
| SV 23 | NMC | 817643 | Pershing | NV | 352 | 693 |
| SV 24 | NMC | 817644 | Pershing | NV | 352 | 694 |
| SV 25 | NMC | 817645 | Pershing | NV | 352 | 695 |
| SV 26 | NMC | 817646 | Pershing | NV | 352 | 696 |
| SV 28 | NMC | 817647 | Pershing | NV | 352 | 697 |
| SV 51[1] | NMC | 825454 | Pershing | NV | 362 | 325 |
| SV 52[1] | NMC | 825455 | Pershing | NV | 362 | 326 |
| SV 53[1] | NMC | 825456 | Pershing | NV | 362 | 327 |
| SV 54[1] | NMC | 825457 | Pershing | NV | 362 | 328 |
| SV 60[1] | NMC | 832254 | Pershing | NV | 369 | 571 |
| SV 61[1] | NMC | 832255 | Pershing | NV | 369 | 572 |
| SV 62[1] | NMC | 832256 | Pershing | NV | 369 | 573 |
| SV 63[1] | NMC | 832257 | Pershing | NV | 369 | 574 |
| SV 64[1] | NMC | 832258 | Pershing | NV | 369 | 575 |
| SV 65[1] | NMC | 832259 | Pershing | NV | 369 | 576 |
| SV 66[1] | NMC | 832260 | Pershing | NV | 369 | 577 |
| SV 67[1] | NMC | 832261 | Pershing | NV | 369 | 578 |
| SV 68[1] | NMC | 832262 | Pershing | NV | 369 | 579 |
| SV 69[1] | NMC | 832263 | Pershing | NV | 369 | 580 |
| SV 70[1] | NMC | 832264 | Pershing | NV | 369 | 581 |
| SV 71[1] | NMC | 832265 | Pershing | NV | 369 | 582 |
| SV 72[1] | NMC | 832266 | Pershing | NV | 369 | 583 |
| SV 73[1] | NMC | 832267 | Pershing | NV | 369 | 584 |
| SV 74[1] | NMC | 832268 | Pershing | NV | 369 | 585 |
| SV 75[1] | NMC | 832269 | Pershing | NV | 369 | 586 |
| SV 76[1] | NMC | 832270 | Pershing | NV | 369 | 587 |
| SV 77[1] | NMC | 832271 | Pershing | NV | 369 | 588 |
| SV 78[1] | NMC | 832272 | Pershing | NV | 369 | 589 |
| SV 79[1] | NMC | 832273 | Pershing | NV | 369 | 590 |

[1] These claims were transferred pursuant to a Mining Deed dated as of September 1, 2009 between Echo Bay Exploration Inc. and MGC Resources Inc., but remain in the name of Echo Bay Exploration Inc. in Bureau of Land Management records.

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|------------|--------|------|--------|-------|------|------|
| SV 80[1] | NMC | 832274 | Pershing | NV | 369 | 591 |
| SV 81[1] | NMC | 832275 | Pershing | NV | 369 | 592 |
| SV 82[1] | NMC | 832276 | Pershing | NV | 369 | 593 |
| SV 83[1] | NMC | 832277 | Pershing | NV | 369 | 594 |
| SV 45 | NMC | 860702 | Pershing | NV | 380 | 569 |
|  |  |  |  |  | 429 | 867 |
| SV 46 | NMC | 860703 | Pershing | NV | 380 | 570 |
| SV 47 | NMC | 860704 | Pershing | NV | 380 | 571 |
|  |  |  |  |  | 429 | 868 |
| SV 48 | NMC | 860705 | Pershing | NV | 380 | 572 |
| SV 49 | NMC | 860706 | Pershing | NV | 380 | 573 |
|  |  |  |  |  | 429 | 869 |
| SV 50 | NMC | 860707 | Pershing | NV | 380 | 574 |
| SV 51 | NMC | 860708 | Pershing | NV | 380 | 575 |
|  |  |  |  |  | 429 | 870 |
| SV 52 | NMC | 860709 | Pershing | NV | 380 | 576 |
| SV 53 | NMC | 860710 | Pershing | NV | 380 | 577 |
| SV 54 | NMC | 860711 | Pershing | NV | 380 | 578 |
| SV 55 | NMC | 860712 | Pershing | NV | 380 | 579 |
| SV 56 | NMC | 860713 | Pershing | NV | 380 | 580 |
| SV 57 | NMC | 860714 | Pershing | NV | 380 | 581 |
| SV 58 | NMC | 860715 | Pershing | NV | 380 | 582 |
| SV 59 | NMC | 860716 | Pershing | NV | 380 | 583 |
| SV 60 | NMC | 860717 | Pershing | NV | 380 | 584 |
| SV 61 | NMC | 860718 | Pershing | NV | 380 | 585 |
| SV 62 | NMC | 860719 | Pershing | NV | 380 | 586 |
|  |  |  |  |  | 429 | 871 |
| SV 63 | NMC | 860720 | Pershing | NV | 380 | 587 |
| SV 64 | NMC | 860721 | Pershing | NV | 380 | 588 |
|  |  |  |  |  | 429 | 872 |
| SV 65 | NMC | 860722 | Pershing | NV | 380 | 589 |
| SV 66 | NMC | 860723 | Pershing | NV | 380 | 590 |
|  |  |  |  |  | 429 | 873 |
| SV 67 | NMC | 860724 | Pershing | NV | 380 | 591 |
| SV 68 | NMC | 860725 | Pershing | NV | 380 | 592 |
|  |  |  |  |  | 429 | 874 |

11

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|------------|--------|------|--------|-------|------|------|
| SV 69 | NMC | 860726 | Pershing | NV | 380 | 593 |
| SV 70 | NMC | 860727 | Pershing | NV | 380 | 594 |
| SV 71 | NMC | 860728 | Pershing | NV | 380 | 595 |
| SV 72 | NMC | 860729 | Pershing | NV | 380 | 596 |
| SV 73 | NMC | 860730 | Pershing | NV | 380 | 597 |
| SV 74 | NMC | 860731 | Pershing | NV | 380 | 598 |
| SV 75 | NMC | 860732 | Pershing | NV | 380 | 599 |
| SV 76 | NMC | 860733 | Pershing | NV | 380 | 600 |
| SV 77 | NMC | 860734 | Pershing | NV | 380 | 601 |
| SV 78 | NMC | 860735 | Pershing | NV | 380 | 602 |
| SV 84 | NMC | 872357 | Pershing | NV | 384 | 488 |
| SV 85 | NMC | 872358 | Pershing | NV | 384 | 489 |
| SV 86 | NMC | 872359 | Pershing | NV | 384 | 490 |
| SV 87 | NMC | 872360 | Pershing | NV | 384 | 491 |
| SV 88 | NMC | 872361 | Pershing | NV | 384 | 492 |
| SV 89 | NMC | 872362 | Pershing | NV | 384 | 493 |
| SV 90 | NMC | 872363 | Pershing | NV | 384 | 494 |
| SV 91 | NMC | 872364 | Pershing | NV | 384 | 495 |
| SV 92 | NMC | 872365 | Pershing | NV | 384 | 496 |
| SV 93 | NMC | 872366 | Pershing | NV | 384 | 497 |
| SV 94 | NMC | 872367 | Pershing | NV | 384 | 498 |
| SV 95 | NMC | 872368 | Pershing | NV | 384 | 499 |
| SV 96 | NMC | 872369 | Pershing | NV | 384 | 500 |
| SV 97 | NMC | 872370 | Pershing | NV | 384 | 501 |
| SV 98 | NMC | 872371 | Pershing | NV | 384 | 502 |
| SV 99 | NMC | 872372 | Pershing | NV | 384 | 503 |
| SV 100 | NMC | 887449 | Pershing | NV | 390 | 17 |
| SV 101 | NMC | 887450 | Pershing | NV | 390 | 18 |
| SV 102 | NMC | 887451 | Pershing | NV | 390 | 19 |
| SV 103 | NMC | 887452 | Pershing | NV | 390 | 20 |
| SV 104 | NMC | 887453 | Pershing | NV | 390 | 21 |
| SV 105 | NMC | 887454 | Pershing | NV | 390 | 22 |
| SV 106 | NMC | 887455 | Pershing | NV | 390 | 23 |
| SV 107 | NMC | 887456 | Pershing | NV | 390 | 24 |
| SV 108 | NMC | 887457 | Pershing | NV | 390 | 25 |
| SV 109 | NMC | 887458 | Pershing | NV | 390 | 26 |

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|------------|--------|------|--------|-------|------|------|
| SV 110 | NMC | 887459 | Pershing | NV | 390 | 27 |
| SV 111 | NMC | 887460 | Pershing | NV | 390 | 28 |
| SV 112 | NMC | 887461 | Pershing | NV | 390 | 29 |
| SV 113 | NMC | 887462 | Pershing | NV | 390 | 30 |
| SV 114 | NMC | 887463 | Pershing | NV | 390 | 31 |
| SV 115 | NMC | 887464 | Pershing | NV | 390 | 32 |
| SV 116 | NMC | 887465 | Pershing | NV | 390 | 33 |
| SV 117 | NMC | 887466 | Pershing | NV | 390 | 34 |
| SV 118 | NMC | 887467 | Pershing | NV | 390 | 35 |
| SV 119 | NMC | 887468 | Pershing | NV | 390 | 36 |
| SV 120 | NMC | 887469 | Pershing | NV | 390 | 37 |
| SV 121 | NMC | 887470 | Pershing | NV | 390 | 38 |
| SV 122 | NMC | 887471 | Pershing | NV | 390 | 39 |
| SV 123 | NMC | 887472 | Pershing | NV | 390 | 40 |
| SV 124 | NMC | 887473 | Pershing | NV | 390 | 41 |
| SV 125 | NMC | 887474 | Pershing | NV | 390 | 42 |
| SV 126 | NMC | 889143 | Pershing | NV | 390 | 437 |
| SV 127 | NMC | 889144 | Pershing | NV | 390 | 438 |
| SV 128 | NMC | 889145 | Pershing | NV | 390 | 439 |
| SV 129 | NMC | 889146 | Pershing | NV | 390 | 440 |
| SV 130 | NMC | 889147 | Pershing | NV | 390 | 441 |
| SV 131 | NMC | 889148 | Pershing | NV | 390 | 442 |
| SV 132 | NMC | 889149 | Pershing | NV | 390 | 443 |
| SV 133 | NMC | 889150 | Pershing | NV | 390 | 444 |
| SV 134 | NMC | 889151 | Pershing | NV | 390 | 445 |
| SV 135 | NMC | 889152 | Pershing | NV | 390 | 446 |
| SVP 1 | NMC | 906917 | Pershing | NV | 398 | 285 |
| SVP 2 | NMC | 906918 | Pershing | NV | 398 | 286 |
| SVP 3 | NMC | 906919 | Pershing | NV | 398 | 287 |
| SVP 4 | NMC | 906920 | Pershing | NV | 398 | 288 |
| SVP 5 | NMC | 906921 | Pershing | NV | 398 | 289 |
| SVP 6 | NMC | 906922 | Pershing | NV | 398 | 290 |
| SVP 7 | NMC | 906923 | Pershing | NV | 398 | 291 |
| SVP 8 | NMC | 906924 | Pershing | NV | 398 | 292 |
| SVP 9 | NMC | 906925 | Pershing | NV | 398 | 293 |
| SVP 10 | NMC | 906926 | Pershing | NV | 398 | 294 |

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|---|---|---|---|---|---|---|
| SVP 11 | NMC | 906927 | Pershing | NV | 398 | 295 |
| SVP 12 | NMC | 906928 | Pershing | NV | 398 | 296 |
| SVP 13 | NMC | 906929 | Pershing | NV | 398 | 297 |
| SVP 14 | NMC | 906930 | Pershing | NV | 398 | 298 |
| SVP 15 | NMC | 906931 | Pershing | NV | 398 | 299 |
| SVP 16 | NMC | 906932 | Pershing | NV | 398 | 300 |
| SVP 17 | NMC | 906933 | Pershing | NV | 398 | 301 |
| SVP 18 | NMC | 906934 | Pershing | NV | 398 | 302 |
| SVP 19 | NMC | 906935 | Pershing | NV | 398 | 303 |
| SVP 20 | NMC | 906936 | Pershing | NV | 398 | 304 |
| SVP 21 | NMC | 906937 | Pershing | NV | 398 | 305 |
| SVP 22 | NMC | 906938 | Pershing | NV | 398 | 306 |
| SVP 23 | NMC | 906939 | Pershing | NV | 398 | 307 |
| SVP 24 | NMC | 906940 | Pershing | NV | 398 | 308 |
| SVP 25 | NMC | 906941 | Pershing | NV | 398 | 309 |
| SVP 26 | NMC | 906942 | Pershing | NV | 398 | 310 |
| SVP 27 | NMC | 906943 | Pershing | NV | 398 | 311 |
| SVP 28 | NMC | 906944 | Pershing | NV | 398 | 312 |
| SVP 29 | NMC | 906945 | Pershing | NV | 398 | 313 |
| SVP 30 | NMC | 906946 | Pershing | NV | 398 | 314 |
| SVP 31 | NMC | 906947 | Pershing | NV | 398 | 315 |
| SVP 32 | NMC | 906948 | Pershing | NV | 398 | 316 |
| SVP 33 | NMC | 906949 | Pershing | NV | 398 | 317 |
| SVP 34 | NMC | 906950 | Pershing | NV | 398 | 318 |
| SVP 35 | NMC | 906951 | Pershing | NV | 398 | 319 |
| SVP 36 | NMC | 906952 | Pershing | NV | 398 | 320 |
| SVP 37 | NMC | 906953 | Pershing | NV | 398 | 321 |
| SVP 38 | NMC | 906954 | Pershing | NV | 398 | 322 |
| SVP 39 | NMC | 906955 | Pershing | NV | 398 | 323 |
| SVP 40 | NMC | 906956 | Pershing | NV | 398 | 324 |
| SV 136 | NMC | 906957 | Pershing | NV | 398 | 281 |
| SV 137 | NMC | 906958 | Pershing | NV | 398 | 282 |
| SV 138 | NMC | 906959 | Pershing | NV | 398 | 283 |
| SV 139 | NMC | 906960 | Pershing | NV | 398 | 284 |
| SV 146 | NMC | 925039 | Pershing | NV | 407 | 352 |
| SV 147 | NMC | 925040 | Pershing | NV | 407 | 353 |

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|---|---|---|---|---|---|---|
| SV 148 | NMC | 925041 | Pershing | NV | 407 | 354 |
| SV 149 | NMC | 925042 | Pershing | NV | 407 | 355 |
| SV 150 | NMC | 925043 | Pershing | NV | 407 | 356 |
| SV 151 | NMC | 925044 | Pershing | NV | 407 | 357 |
| SV 152 | NMC | 925045 | Pershing | NV | 407 | 358 |
| SV 153 | NMC | 925046 | Pershing | NV | 407 | 359 |
| SV 154 | NMC | 925047 | Pershing | NV | 407 | 360 |
| SV 155 | NMC | 925048 | Pershing | NV | 407 | 361 |
| SV 156 | NMC | 925049 | Pershing | NV | 407 | 362 |
| SV 157 | NMC | 925050 | Pershing | NV | 407 | 363 |
| SV 158 | NMC | 925051 | Pershing | NV | 407 | 364 |
| SV 159 | NMC | 925052 | Pershing | NV | 407 | 365 |
| SV 160 | NMC | 925053 | Pershing | NV | 407 | 366 |
| SV 161 | NMC | 925054 | Pershing | NV | 407 | 367 |
| SV 162 | NMC | 925055 | Pershing | NV | 407 | 368 |
| SV 163 | NMC | 925056 | Pershing | NV | 407 | 369 |
| SV 164 | NMC | 925057 | Pershing | NV | 407 | 370 |
| SV 165 | NMC | 925058 | Pershing | NV | 407 | 371 |
| SV 166 | NMC | 925059 | Pershing | NV | 407 | 372 |
| SV 167 | NMC | 925060 | Pershing | NV | 407 | 373 |
| SV 168 | NMC | 925061 | Pershing | NV | 407 | 374 |
| SV 169 | NMC | 925062 | Pershing | NV | 407 | 375 |
| SV 170 | NMC | 925063 | Pershing | NV | 407 | 376 |
| SV 171 | NMC | 925064 | Pershing | NV | 407 | 377 |
| SV 172 | NMC | 925065 | Pershing | NV | 407 | 378 |
| SV 173 | NMC | 925066 | Pershing | NV | 407 | 379 |
| SV 174 | NMC | 925067 | Pershing | NV | 407 | 380 |
| SV 175 | NMC | 925068 | Pershing | NV | 407 | 381 |
| SV 176 | NMC | 925069 | Pershing | NV | 407 | 382 |
| SV 178 | NMC | 925071 | Pershing | NV | 407 | 384 |
| SV 180 | NMC | 925073 | Pershing | NV | 407 | 386 |
| SV 182 | NMC | 925075 | Pershing | NV | 407 | 388 |
| SV 184 | NMC | 925077 | Pershing | NV | 407 | 390 |
| SV 185 | NMC | 925078 | Pershing | NV | 407 | 391 |
| SV 186 | NMC | 925079 | Pershing | NV | 407 | 392 |
| SV 187 | NMC | 925080 | Pershing | NV | 407 | 393 |

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|------------|--------|--------|----------|-------|------|------|
| SV 188 | NMC | 925081 | Pershing | NV | 407 | 394 |
| SV 189 | NMC | 925082 | Pershing | NV | 407 | 395 |
| SV 190 | NMC | 925083 | Pershing | NV | 407 | 396 |
| SV 191 | NMC | 925084 | Pershing | NV | 407 | 397 |
| SV 192 | NMC | 925085 | Pershing | NV | 407 | 398 |
| SV 193 | NMC | 925086 | Pershing | NV | 407 | 399 |
| SV 194 | NMC | 925087 | Pershing | NV | 407 | 400 |
| SV 195 | NMC | 925088 | Pershing | NV | 407 | 401 |
| SV 196 | NMC | 925089 | Pershing | NV | 407 | 402 |
| SV 197 | NMC | 925090 | Pershing | NV | 407 | 403 |
| SV 198 | NMC | 925091 | Pershing | NV | 407 | 404 |
| SV 199 | NMC | 925092 | Pershing | NV | 407 | 405 |
| SV 200 | NMC | 925093 | Pershing | NV | 407 | 406 |
| SV 201 | NMC | 925094 | Pershing | NV | 407 | 407 |
| SV 202 | NMC | 925095 | Pershing | NV | 407 | 408 |
| SV 203 | NMC | 925096 | Pershing | NV | 407 | 409 |
| SV 204 | NMC | 925097 | Pershing | NV | 407 | 410 |
| SV 205 | NMC | 925098 | Pershing | NV | 407 | 411 |
| SV 206 | NMC | 925099 | Pershing | NV | 407 | 412 |
| SV 207 | NMC | 925100 | Pershing | NV | 407 | 413 |
| SV 208 | NMC | 925101 | Pershing | NV | 407 | 414 |
| SV 209 | NMC | 925102 | Pershing | NV | 407 | 415 |
| SV 210 | NMC | 925103 | Pershing | NV | 407 | 416 |
| SV 211 | NMC | 925104 | Pershing | NV | 407 | 417 |
| SV 212 | NMC | 925105 | Pershing | NV | 407 | 418 |
| SV 213 | NMC | 925106 | Pershing | NV | 407 | 419 |
| SV 215 | NMC | 925108 | Pershing | NV | 407 | 421 |
| SV 216 | NMC | 925109 | Pershing | NV | 407 | 422 |
| SV 217 | NMC | 925110 | Pershing | NV | 407 | 423 |
| SV 218 | NMC | 925111 | Pershing | NV | 407 | 424 |
| SV 219 | NMC | 925112 | Pershing | NV | 407 | 425 |
| SV 220 | NMC | 925113 | Pershing | NV | 407 | 426 |
| SV 221 | NMC | 925114 | Pershing | NV | 407 | 427 |
| SV 222 | NMC | 925115 | Pershing | NV | 407 | 428 |
| SV 223 | NMC | 925116 | Pershing | NV | 407 | 429 |
| SV 224 | NMC | 925117 | Pershing | NV | 407 | 430 |

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|------------|--------|------|--------|-------|------|------|
| SV 225 | NMC | 925118 | Pershing | NV | 407 | 431 |
| SV 226 | NMC | 925119 | Pershing | NV | 407 | 432 |
| SV 227 | NMC | 925120 | Pershing | NV | 407 | 433 |
| SV 228 | NMC | 925121 | Pershing | NV | 407 | 434 |
| SV 229 | NMC | 925122 | Pershing | NV | 407 | 435 |
| SV 230 | NMC | 925123 | Pershing | NV | 407 | 436 |
| SV 231 | NMC | 925124 | Pershing | NV | 407 | 437 |
| SV 232 | NMC | 925125 | Pershing | NV | 407 | 438 |
| SV 233 | NMC | 925126 | Pershing | NV | 407 | 439 |
| SV 234 | NMC | 925127 | Pershing | NV | 407 | 440 |
| SV 235 | NMC | 925128 | Pershing | NV | 407 | 441 |
| SV 236 | NMC | 925129 | Pershing | NV | 407 | 442 |
| SV 237 | NMC | 925130 | Pershing | NV | 407 | 443 |
| SV 238 | NMC | 925131 | Pershing | NV | 407 | 444 |
| SV 239 | NMC | 925132 | Pershing | NV | 407 | 445 |
| SV 240 | NMC | 925133 | Pershing | NV | 407 | 446 |
| SV 241 | NMC | 925134 | Pershing | NV | 407 | 447 |
| SV 242 | NMC | 925135 | Pershing | NV | 407 | 448 |
| SV 243 | NMC | 925136 | Pershing | NV | 407 | 449 |
| SV 244 | NMC | 925137 | Pershing | NV | 407 | 450 |
| SV 245 | NMC | 925138 | Pershing | NV | 407 | 451 |
| SV 246 | NMC | 925139 | Pershing | NV | 407 | 452 |
| SV 247 | NMC | 925140 | Pershing | NV | 407 | 453 |
| SV 248 | NMC | 925141 | Pershing | NV | 407 | 454 |
| SV 249 | NMC | 925142 | Pershing | NV | 407 | 455 |
| SV 250 | NMC | 925143 | Pershing | NV | 407 | 456 |
| SV 251 | NMC | 925144 | Pershing | NV | 407 | 457 |
| SV 252 | NMC | 925145 | Pershing | NV | 407 | 458 |
| SV 253 | NMC | 925146 | Pershing | NV | 407 | 459 |
| SV 254 | NMC | 925147 | Pershing | NV | 407 | 460 |
| SV 255 | NMC | 925148 | Pershing | NV | 407 | 461 |
| SV 256 | NMC | 925149 | Pershing | NV | 407 | 462 |
| SV 257 | NMC | 925150 | Pershing | NV | 407 | 463 |
| SV 258 | NMC | 925151 | Pershing | NV | 407 | 464 |
| SV 259 | NMC | 925152 | Pershing | NV | 407 | 465 |
| SV 260 | NMC | 925153 | Pershing | NV | 407 | 466 |

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|------------|--------|------|--------|-------|------|------|
| SV 261 | NMC | 925154 | Pershing | NV | 407 | 467 |
| SV 277 | NMC | 925156 | Pershing | NV | 407 | 469 |
| SV 278 | NMC | 925157 | Pershing | NV | 407 | 470 |
| SV 285 | NMC | 925158 | Pershing | NV | 407 | 471 |
| SV 286 | NMC | 925159 | Pershing | NV | 407 | 472 |
| SV 287 | NMC | 925160 | Pershing | NV | 407 | 473 |
| SV 288 | NMC | 925161 | Pershing | NV | 407 | 474 |
| SV 289 | NMC | 925162 | Pershing | NV | 407 | 475 |
| SV 290 | NMC | 925163 | Pershing | NV | 407 | 476 |
| SV 291 | NMC | 925164 | Pershing | NV | 407 | 477 |
| SV 292 | NMC | 925165 | Pershing | NV | 407 | 478 |
| SV 293 | NMC | 925166 | Pershing | NV | 407 | 479 |
| SV 294 | NMC | 925167 | Pershing | NV | 407 | 480 |
| SV 295 | NMC | 925168 | Pershing | NV | 407 | 481 |
| SV 296 | NMC | 925169 | Pershing | NV | 407 | 482 |
| SV 297 | NMC | 925170 | Pershing | NV | 407 | 483 |
| SV 298 | NMC | 925171 | Pershing | NV | 407 | 484 |
| SV 299 | NMC | 925172 | Pershing | NV | 407 | 485 |
| SV 300 | NMC | 925173 | Pershing | NV | 407 | 486 |
| SV 301 | NMC | 925174 | Pershing | NV | 407 | 487 |
| SV 302 | NMC | 925175 | Pershing | NV | 407 | 488 |
| SV 303 | NMC | 925176 | Pershing | NV | 407 | 489 |
| SV 304 | NMC | 925177 | Pershing | NV | 407 | 490 |
| SV 305 | NMC | 925178 | Pershing | NV | 407 | 491 |
| SV 306 | NMC | 925179 | Pershing | NV | 407 | 492 |
| SV 307 | NMC | 925180 | Pershing | NV | 407 | 493 |
| SV 308 | NMC | 925181 | Pershing | NV | 407 | 494 |
| SV 309 | NMC | 925182 | Pershing | NV | 407 | 495 |
| SV 310 | NMC | 925183 | Pershing | NV | 407 | 496 |
| SV 311 | NMC | 925184 | Pershing | NV | 407 | 497 |
| SV 312 | NMC | 925185 | Pershing | NV | 407 | 498 |
| SV 313 | NMC | 925186 | Pershing | NV | 407 | 499 |
| SV 314 | NMC | 925187 | Pershing | NV | 407 | 500 |
| SV 319 | NMC | 925192 | Pershing | NV | 407 | 505 |
| SV 320 | NMC | 925193 | Pershing | NV | 407 | 506 |
| SV 321 | NMC | 925194 | Pershing | NV | 407 | 507 |

18

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|------------|--------|------|--------|-------|------|------|
| SV 322 | NMC | 925195 | Pershing | NV | 407 | 508 |
| SV 323 | NMC | 925196 | Pershing | NV | 407 | 509 |
| SV 324 | NMC | 925197 | Pershing | NV | 407 | 510 |
| SV 325 | NMC | 925198 | Pershing | NV | 407 | 511 |
| SV 326 | NMC | 925199 | Pershing | NV | 407 | 512 |
| SV 327 | NMC | 925200 | Pershing | NV | 407 | 513 |
| SV 328 | NMC | 925201 | Pershing | NV | 407 | 514 |
| SV 329 | NMC | 925202 | Pershing | NV | 407 | 514A |
| SV 330 | NMC | 925203 | Pershing | NV | 407 | 515 |
| SV 331 | NMC | 925204 | Pershing | NV | 407 | 516 |
| SV 332 | NMC | 925205 | Pershing | NV | 407 | 517 |
| SV 333 | NMC | 925206 | Pershing | NV | 407 | 518 |
| SV 334 | NMC | 925207 | Pershing | NV | 407 | 519 |
| SV 335 | NMC | 925208 | Pershing | NV | 407 | 520 |
| SV 336 | NMC | 925209 | Pershing | NV | 407 | 521 |
| SV 341 | NMC | 925214 | Pershing | NV | 407 | 526 |
| SV 342 | NMC | 925215 | Pershing | NV | 407 | 527 |
| SV 343 | NMC | 925216 | Pershing | NV | 407 | 528 |
| SV 344 | NMC | 925217 | Pershing | NV | 407 | 529 |
| SV 345 | NMC | 925218 | Pershing | NV | 407 | 530 |
| SV 346 | NMC | 925219 | Pershing | NV | 407 | 531 |
| SV 347 | NMC | 925220 | Pershing | NV | 407 | 532 |
| SV 348 | NMC | 925221 | Pershing | NV | 407 | 533 |
| SV 349 | NMC | 925222 | Pershing | NV | 407 | 534 |
| SV 350 | NMC | 925223 | Pershing | NV | 407 | 535 |
| SV 351 | NMC | 925224 | Pershing | NV | 407 | 536 |
| SV 352 | NMC | 925225 | Pershing | NV | 407 | 537 |
| SV 353 | NMC | 925226 | Pershing | NV | 407 | 538 |
| SV 354 | NMC | 925227 | Pershing | NV | 407 | 539 |
| SV 355 | NMC | 925228 | Pershing | NV | 407 | 540 |
| SV 356 | NMC | 925229 | Pershing | NV | 407 | 541 |
| SV 357 | NMC | 925230 | Pershing | NV | 407 | 542 |
| SV 266 | NMC | 929379 | Pershing | NV | 409 | 624 |
| SV 267 | NMC | 929380 | Pershing | NV | 409 | 625 |
| SV 268 | NMC | 929381 | Pershing | NV | 409 | 626 |
| SV 269 | NMC | 929382 | Pershing | NV | 409 | 627 |

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|------------|--------|------|--------|-------|------|------|
| SV 270 | NMC | 929383 | Pershing | NV | 409 | 628 |
| SV 271 | NMC | 929384 | Pershing | NV | 409 | 629 |
| SV 272 | NMC | 929385 | Pershing | NV | 409 | 630 |
| SV 273 | NMC | 929386 | Pershing | NV | 409 | 631 |
| SV 274 | NMC | 929387 | Pershing | NV | 409 | 632 |
| SV 275 | NMC | 929388 | Pershing | NV | 409 | 633 |
| SV 276 | NMC | 929389 | Pershing | NV | 409 | 634 |
| SV 283 | NMC | 929394 | Pershing | NV | 409 | 639 |
| SV 284 | NMC | 929395 | Pershing | NV | 409 | 640 |
| Dry 1 | NMC | 954162 | Pershing | NV | 423 | 200 |
| Dry 2 | NMC | 954163 | Pershing | NV | 423 | 201 |
| Dry 3 | NMC | 954164 | Pershing | NV | 423 | 202 |
| SSV 142 | NMC | 954582 | Pershing | NV | 423 | 203 |
| SSV 143 | NMC | 954583 | Pershing | NV | 423 | 204 |
| SSV 144 | NMC | 954584 | Pershing | NV | 423 | 205 |
| SSV 370 | NMC | 954585 | Pershing | NV | 423 | 206 |
| SSV 371 | NMC | 954586 | Pershing | NV | 423 | 207 |
| SSV 372 | NMC | 954587 | Pershing | NV | 423 | 208 |
| SSV 373 | NMC | 954588 | Pershing | NV | 423 | 209 |
| SSV 374 | NMC | 954589 | Pershing | NV | 423 | 210 |
| SSV 375 | NMC | 954590 | Pershing | NV | 423 | 211 |
| SSV 376 | NMC | 954591 | Pershing | NV | 423 | 212 |
| SSV 377 | NMC | 954592 | Pershing | NV | 423 | 213 |
| SSV 378 | NMC | 954593 | Pershing | NV | 423 | 214 |
| SSV 379 | NMC | 954594 | Pershing | NV | 423 | 215 |
| SSV 380 | NMC | 954595 | Pershing | NV | 423 | 216 |
| SSV 381 | NMC | 954596 | Pershing | NV | 423 | 217 |
| SSV 382 | NMC | 954597 | Pershing | NV | 423 | 218 |
| SSV 383 | NMC | 954598 | Pershing | NV | 423 | 219 |
| SSV 385 | NMC | 954599 | Pershing | NV | 423 | 220 |
| SSV 386 | NMC | 954600 | Pershing | NV | 423 | 221 |
| SSV 387 | NMC | 954601 | Pershing | NV | 423 | 222 |
| SV 262 | NMC | 954602 | Pershing | NV | 423 | 223 |
| SV 214 | NMC | 977866 | Pershing | NV | 432 | 395 |
| SVR 1 | NMC | 987526 | Pershing | NV | 435 | 587 |
| SVR 2 | NMC | 987527 | Pershing | NV | 435 | 588 |

| Claim Name | Prefix | BLM# | County | State | Book | Page |
|---|---|---|---|---|---|---|
| SVR 3 | NMC | 987528 | Pershing | NV | 435 | 589 |
| SVR 4 | NMC | 987529 | Pershing | NV | 435 | 590 |
| SVR 5 | NMC | 987530 | Pershing | NV | 435 | 591 |
| SVR 6 | NMC | 987531 | Pershing | NV | 435 | 592 |
| SVR 7 | NMC | 987532 | Pershing | NV | 435 | 593 |
| SVR 8 | NMC | 987533 | Pershing | NV | 435 | 594 |
| SVR 9 | NMC | 987534 | Pershing | NV | 435 | 595 |
| SVR 10 | NMC | 987535 | Pershing | NV | 435 | 596 |
| SVR 11 | NMC | 987536 | Pershing | NV | 435 | 597 |
| SVR 12 | NMC | 987537 | Pershing | NV | 435 | 598 |
| SVR 13 | NMC | 987538 | Pershing | NV | 435 | 599 |
| SVR 14 | NMC | 987539 | Pershing | NV | 435 | 600 |
| SVR 15 | NMC | 987540 | Pershing | NV | 435 | 601 |
| SVR 16 | NMC | 987541 | Pershing | NV | 435 | 602 |

**(ii)    Additional Spring Valley Business**

See Schedule 2.1(m), part (iii).

## Schedule 2.1(f) – Leased Mining Claims

### (i) Spring Valley Business

Mineral Lease Agreement and Option to Purchase dated October 30, 2006 from Dale Chabino and Diana Chabino to MGC Resources Inc.

| Claim Name | Prefix | BLM # | Book | Page | Type |
|---|---|---|---|---|---|
| Freedom #1 | NMC | 785920 | 325 | 522 | lode |
| Freedom #2 | NMC | 780754 | 325 | 50 | placer |

Mineral Lease Agreement and Option to Purchase dated April 25, 2006 from Lamonte J. Duffy to MGC Resources Inc.

| Claim Name | Prefix | BLM # | Book | Page |
|---|---|---|---|---|
| Duffy #5 | NMC | 828705 | 365 | 239 |
| | NMC | 965332 | | |
| Duffy #6 | NMC | 828706 | 365 | 240 |
| | NMC | 965333 | | |
| Duffy #7 | NMC | 828707 | 365 | 241 |
| | NMC | 965334 | | |
| Duffy #8 | NMC | 828708 | 365 | 242 |
| | NMC | 965335 | | |
| SV 315 | NMC | 925188 | | |
| SV 316 | NMC | 925189 | | |
| SV 317 | NMC | 925190 | | |
| SV 318 | NMC | 925191 | | |
| SV 337 | NMC | 925210 | | |
| SV 338 | NMC | 925211 | | |
| SV 339 | NMC | 925212 | | |
| SV 340 | NMC | 925213 | | |

Mineral Lease Agreement and Option to Purchase dated June 1, 2007 from George D. Duffy to MGC Resources Inc.

| Claim Name | Prefix | BLM # | Book | Page |
|---|---|---|---|---|
| Duffy #1 | NMC | 811224 | 348 | 308 |
| Duffy #2 | NMC | 811225 | 348 | 309 |

22

Mineral Lease Agreement and Option to Purchase dated July 7, 2006 from Dave Rowe and Randall Stoeberl to MGC Resources Inc.

| Claim Name | Prefix | BLM # | Book | Page | Date Located |
|---|---|---|---|---|---|
| PS 1 | NMC | 930781 | 410 | 362 | April 20, 2006 |
| PS 2 | NMC | 930782 | 410 | 363 | April 20, 2006 |
| PS 3 | NMC | 930783 | 410 | 364 | April 20, 2006 |
| PS 4 | NMC | 930784 | 410 | 365 | April 20, 2006 |
| PS 5 | NMC | 930785 | 410 | 366 | April 20, 2006 |
| PS 6 | NMC | 930786 | 410 | 367 | April 20, 2006 |
| PS 7 | NMC | 930787 | 410 | 368 | April 20, 2006 |
| PS 8 | NMC | 930788 | 410 | 369 | April 20, 2006 |
| PS 9 | NMC | 930789 | 410 | 370 | April 20, 2006 |
| PS 10 | NMC | 930790 | 410 | 371 | April 20, 2006 |
| PS 11 | NMC | 930791 | 410 | 372 | April 20, 2006 |
| PS 12 | NMC | 930792 | 410 | 373 | April 20, 2006 |
| PS 13 | NMC | 930793 | 410 | 374 | April 20, 2006 |
| PS 14 | NMC | 930794 | 410 | 375 | April 20, 2006 |
| PS 15 | NMC | 930795 | 410 | 376 | April 20, 2006 |
| PS 16 | NMC | 930796 | 410 | 377 | April 20, 2006 |
| PS 17 | NMC | 930797 | 410 | 378 | April 20, 2006 |
| PS 18 | NMC | 930798 | 410 | 379 | April 20, 2006 |
| PS 19 | NMC | 930799 | 410 | 380 | April 20, 2006 |
| PS 20 | NMC | 930800 | 410 | 381 | April 20, 2006 |
| PS 21 | NMC | 930801 | 410 | 382 | April 20, 2006 |
| PS 22 | NMC | 930802 | 410 | 383 | April 20, 2006 |
| PS 28 | NMC | 930808 | 410 | 389 | April 20, 2006 |
| PS 29 | NMC | 930809 | 410 | 390 | April 20, 2006 |
| PS 30 | NMC | 930810 | 410 | 391 | April 20, 2006 |
| PS 31 | NMC | 930811 | 410 | 392 | April 20, 2006 |
| PS 32 | NMC | 930812 | 410 | 393 | April 20, 2006 |
| PS 34 | NMC | 930814 | 410 | 395 | May 17, 2006 |
| PS 35 | NMC | 930815 | 410 | 396 | May 17, 2006 |
| PS 36 | NMC | 930816 | 410 | 397 | May 17, 2006 |
| PS 37 | NMC | 930817 | 410 | 398 | May 17, 2006 |
| PS 38 | NMC | 930818 | 410 | 399 | May 17, 2006 |
| PS 39 | NMC | 930819 | 410 | 400 | May 17, 2006 |
| PS 40 | NMC | 930820 | 410 | 401 | May 17, 2006 |
| PS 43 | NMC | 930823 | 410 | 404 | April 20, 2006 |
| PS 44 | NMC | 930824 | 410 | 405 | April 20, 2006 |
| PS 45 | NMC | 930825 | 410 | 406 | April 20, 2006 |

| Claim Name | Prefix | BLM # | Book | Page | Date Located |
|---|---|---|---|---|---|
| PS 46 | NMC | 930826 | 410 | 407 | April 20, 2006 |
| PS 47 | NMC | 930827 | 410 | 408 | April 20, 2006 |
| PS 48 | NMC | 930828 | 410 | 409 | April 20, 2006 |
| PS 58 | NMC | 930838 | 410 | 419 | April 20, 2006 |
| PS 59 | NMC | 930839 | 410 | 420 | April 20, 2006 |
| PS 60 | NMC | 930840 | 410 | 421 | April 20, 2006 |
| PS 61 | NMC | 930841 | 410 | 422 | April 20, 2006 |
| PS 62 | NMC | 930842 | 410 | 423 | April 20, 2006 |
| PS 63 | NMC | 930843 | 410 | 424 | April 20, 2006 |

**(ii)    Additional Spring Valley Business**

See Schedule 2.1(m), part (iv).

### Schedule 2.1(g) – Water Rights

#### (i) Spring Valley Business

| Permit | Cert. | Owner of | C.F.S. | Duty (AFA) | Use | Ac. | Src. | Src. Name | Place of Use | Remarks |
|--------|-------|----------|--------|------------|-----|-----|------|-----------|--------------|---------|
| 29065 | | Barrick Gold Exploration Inc. | 1.5641 | 1132.37 | IRR | 500 | UG | Kendricks Well #2 | Kendrick's Shining K Ranch | Total Combined Annual Duty ("TCD") of Barrick portion Permits 29065 - 29067, 31208, 40892 - 40894 not to exceed 2,000 acre feet annually ("AFA"). |
| 29066 | | Barrick Gold Exploration Inc. | 1.5641 | 1132.37 | IRR | 500 | UG | Kendricks Well #5 | Kendrick's Shining K Ranch | Total Combined Annual Duty ("TCD") of Barrick portion Permits 29065 - 29067, 31208, 40892 - 40894 not to exceed 2,000 AFA. |
| 29067 | | Barrick Gold Exploration Inc. | 1.5641 | 1132.37 | IRR | 500 | UG | Kendricks Well #6 | Kendrick's Shining K Ranch | Total Combined Annual Duty ("TCD") of Barrick portion Permits 29065 - 29067, 31208, 40892 - 40894 not to exceed 2,000 AFA. |
| 31208 | | Barrick Gold Exploration Inc. | 1.5380 | 1131.68 | IRR | 500 | UG | Kendricks Well #4 | Kendrick's Shining K Ranch | Total Combined Annual Duty ("TCD") of Barrick portion Permits 29065 - 29067, 31208, 40892 - 40894 not to exceed 2,000 AFA. |
| 40892 | | Barrick Gold Exploration Inc. | 0.3816 | 172.50 AFS ("acre feet seasonally") Feb. 1 – Oct. 15 | IRR | 500 | UG | Kendricks Well #7 | Kendrick's Shining K Ranch | Total Combined Annual Duty ("TCD") of Barrick portion Permits 29065 - 29067, 31208, 40892 - 40894 not to exceed 2,000 AFA. |

| Permit | Cert. | Owner of | C.F.S. | Duty (AFA) | Use | Ac. | Src. | Src. Name | Place of Use | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| 40893 | | Barrick Gold Exploration Inc. | 0.4419 | 225.18 AFS Feb. 1 – Oct. 15 | IRR | 500 | UG | Kendricks Well #3 | Kendrick's Shining K Ranch | Total Combined Annual Duty ("TCD") of Barrick portion Permits 29065 - 29067, 31208, 40892 - 40894 not to exceed 2,000 AFA. |
| 40894 | | Barrick Gold Exploration Inc. | 1.5954 | 488.00 AFS Feb. 1 – Oct. 15 | IRR | 500 | UG | Kendricks Well #1 | Kendrick's Shining K Ranch | Total Combined Annual Duty ("TCD") of Barrick portion Permits 29065 - 29067, 31208, 40892 - 40894 not to exceed 2,000 AFA. |
| 82431 | | Barrick Gold Exploration Inc. | 0.01547 | 11.29 | MM | ---- | UG | Mine Well #1 | Spring Valley Mine | TCD under mining permits 82431 & 82432 not to exceed 20.0 AFA. Expires July 1, 2018. |
| 82432 | | Barrick Gold Exploration Inc. | 0.01547 | 11.29 | MM | ---- | UG | Mine Well #2 | Spring Valley Mine | TCD under mining permits 82431 & 82432 not to exceed 20.0 AFA. Expires July 1, 2018. |
| 84578T | | Stanley W. & Darlene McCart (45% UDI); Perry D. & Vesta McCart (45%UDI); Dorothy F. McCart (10% UDI) | 0.9000 | 100.00 | MM | ---- | UG | Mine Well SV14-EW1 | Spring Valley Mine | Temporarily a portion of irrigation Permit 67238. Expires Dec. 29, 2015. |

26

| Permit | Cert. | Owner of | C.F.S. | Duty (AFA) | Use | Ac. | Src. | Src. Name | Place of Use | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| 13432 | 4214 | Stanley W. & Darlene McCart (45% UDI); Perry D. & Vesta McCart (45%UDI); Dorothy F. McCart (10% UDI) | 1.4400 | 643.48 AFS Apr. 1 – Sept. 30 | IRR | 160.87 | UG | McCart Ranch Well | McCart Ranch (portion) | Water rights conveyed to Barrick Exploration, Inc., confirmation pending @ NDWR. TCD under Permits 13432, 25139, 42761, 45191, 67237, 67238, Certificates 9694 and 11037, and a portion of Cottonwood Creek under Vested Right V01132 not to exceed 3,600 AFA. |
| 25139 | 9694 | Stanley W. & Darlene McCart (45% UDI); Perry D. & Vesta McCart (45%UDI); Dorothy F. McCart (10% UDI) | 8.8000 | 1,860.6 | IRR | 465.16 | Surface | Cottonwood Creek | McCart Ranch (portion) | Water rights conveyed to Barrick Exploration, Inc., confirmation pending @ NDWR. TCD under Permits 13432, 25139, 42761, 45191, 67237, 67238, Certificates 9694 and 11037, and a portion of Cottonwood Creek under Vested Right V01132 not to exceed 3,600 AFA. |
| 42761 | 11037 | Stanley W. & Darlene McCart (45% UDI); Perry D. & Vesta McCart (45%UDI); Dorothy F. McCart (10% UDI) | 4.7000 | 509.24 | IRR | 127.31 | Surface | Indian Creek | Strief Ranch (portion) | Water rights conveyed to Barrick Exploration, Inc., confirmation pending @ NDWR. TCD under Permits 13432, 25139, 42761, 45191, 67237, 67238, Certificates 9694 and 11037, and a portion of Cottonwood Creek under Vested Right V01132 not to exceed 3,600 AFA. |

| Permit | Cert. | Owner of | C.F.S. | Duty (AFA) | Use | Ac. | Src. | Src. Name | Place of Use | Remarks |
|--------|-------|----------|--------|------------|-----|-----|------|-----------|--------------|---------|
| 45191 | | Stanley W. & Darlene McCart (45% UDI); Perry D. & Vesta McCart (45% UDI); Dorothy F. McCart (10% UDI) | 6.0000 | 2,080.0 | IRR | 520 | UG | McCart North Well | McCart Ranch (portion) | Water rights conveyed to Barrick Exploration, Inc., confirmation pending @ NDWR. TCD under Permits 13432, 25139, 42761, 45191, 67237, 67238, Certificates 9694 and 11037, and a portion of Cottonwood Creek under Vested Right V01132 not to exceed 3,600 AFA. |
| 67237 | | Stanley W. & Darlene McCart (45% UDI); Perry D. & Vesta McCart (45% UDI); Dorothy F. McCart (10% UDI) | 6.0000 | 3,680.0 | IRR | 920 | UG | McCart North Well | McCart Ranch & Strief Ranch | Water rights conveyed to Barrick Exploration, Inc., confirmation pending @ NDWR. TCD under Permits 13432, 25139, 42761, 45191, 67237, 67238, Certificates 9694 and 11037, and a portion of Cottonwood Creek under Vested Right V01132 not to exceed 3,600 AFA. |

| Permit | Cert. | Owner of | C.F.S. | Duty (AFA) | Use | Ac. | Src. | Src. Name | Place of Use | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| 67238[2] | | Stanley W. & Darlene McCart (45% UDI); Perry D. & Vesta McCart (45%UDI); Dorothy F. McCart (10% UDI) | 5.8696 | 3,600.0 | IRR | 900 | UG | Strief Well | McCart Ranch & Strief Ranch | Water rights conveyed to Barrick Exploration, Inc., confirmation pending @ NDWR. TCD under Permits 13432, 25139, 42761, 45191, 67237, 67238, Certificates 9694 and 11037, and a portion of Cottonwood Creek under Vested Right V01132 not to exceed 3,600 AFA. |
| V01132 (Unadj.) | | | 14.4 (576 Miners Inches) | Seasonal Mar. 15 – Oct. 15 | IRR & STK | 360 | Surface | Cottonwood Creek | McCart Ranch (portion) | Water rights conveyed to Barrick Exploration, Inc., confirmation pending @ NDWR. TCD under Permits 13432, 25139, 42761, 45191, 67237, 67238, Certificates 9694 and 11037, and a portion of Cottonwood Creek under Vested Right V01132 not to exceed 3,600 AFA. |

The rights conveyed for Permits 29065, 29066, 29067, 31208, 40892, 40893, and 40894 are for a total combined annual duty of 2,000.0 acre-feet of supplemental groundwater rights appurtenant to a common 500.0 acres located within Buena Vista Valley Hydrographic Groundwater Basin 10-129, such rights being completely non-supplemental to any existing surface water rights or claims of vested rights. The 2,000.0 acre-feet conveyed herein are intended to be appurtenant to those to those acres which are in production and on which underground irrigation water is being beneficially used at the time of this conveyance. *See that certain Water Rights Deed recorded November 24, 2014 as Document 0490606, Book 509, Page 0370, Pershing County, NV.*

---

[2] 80 AFA, with a diversion rate of 0.1304 cfs, for the irrigation of 20 acres conveyed to Stanley McCart. Water Rights Deed dated July 6, 2015 from Barrick Gold Exploration Inc. to Stanley W. McCart, as to an undivided 50% interest, and Perry D. McCart, as to an undivided 50% interest, Pershing County, Nevada, Official Record, Doc. No. 0492938.

**(ii) Additional Spring Valley Business**

See Schedule 2.1(m), part (v).

## Schedule 2.1(h) – Assigned Contracts

### (i)     Spring Valley Business

<u>JV Agreements</u>

1.     Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc.

a)     First Amendment to Exploration, Development and Mine Operating Agreement dated March 15, 2010 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc.

b)     Letter Agreement and Second Amendment dated April 19, 2013 by and between Midway Gold U.S. Inc. and Barrick Gold Exploration, Inc.

c)     Third Amendment to Spring Valley Exploration, Development and Mine Operation Agreement dated January 10, 2014 by and between Midway Gold U.S. Inc. f/k/a MGC Resources, Inc. and Barrick Gold Exploration, Inc.

d)     Fourth Amendment to Spring Valley Exploration, Development and Mine Operating Agreement dated February 23, 2014 by and between Midway Gold U.S., Inc. f/k/a MGC Resources Inc. and Barrick Gold Exploration, Inc.

e)     Letter dated July 9, 2014 from Midway Gold US Inc. to Barrick Gold Exploration Inc. regarding Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc.

f)     Letter dated April 19, 2013 from Barrick Gold Exploration, Inc. to Midway Gold US Inc. regarding Barrick Gold Exploration, Inc.'s earn-in of 60% of the properties and all other rights of the Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc.

g)     Letter dated November 15, 2013 from Barrick Gold Exploration, Inc. to MGC Resources Inc., Midway Gold, and Midway Gold Corp. regarding Barrick Gold Exploration, Inc.'s earn-in of 70% of the properties and all other rights of the Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc.

2.     Agreement dated November 30, 2009 by and between Barrick Gold Exploration, Inc., MGC Resources, Inc. and MGC Properties, Inc.

<u>Other Agreements</u>

3.     Mineral Lease Agreement and Option to Purchase dated October 30, 2006 by and between Dale Chabino, Diana Chabino and MGC Resources, Inc.

4.     Purchase and Sale Agreement effective January 25, 2006 by and between Coeur Rochester, Inc. and MGC Resources Inc.

a) Obligations, including without limitation, a sliding scale net returns royalty, pursuant to Deed and Assignment dated December 15, 1983 from ASARCO Incorporated to Coeur d'Alene Mines Corporation.

5. Mining Deed with Reservation of Royalty dated February 1, 2006 by and between Coeur Rochester, Inc. and MGC Resources, Inc. Recorded in Pershing County, Nevada as Entry No. 247362 at Book: 404, Page: 862 of Official Records.

6. Mineral Lease Agreement and Option to Purchase dated April 25, 2006 by and between Lamonte J. Duffy and MGC Resources, Inc.

7. Quit Claim Deed effective July 5, 2006 from MGC Resources Inc. to Lamonte J. Duffy.

8. Option Agreement dated September 1, 2003 by and between Echo Bay Exploration Inc. and Midway Gold Corp.

9. Mining Deed effective September 1, 2009 from Echo Bay Exploration Inc. to MGC Resources Inc.

10. Mining Deed with Reservation and Conveyance of Royalty dated August 13, 2007 by and between Paul G. Schmidt and MGC Resources, Inc. Recorded in Pershing County, Nevada as Entry No. 356954 at Book: 427, Page: 443 of Official Records.

11. Option Agreement dated August 15, 2003 by and between Paul G. Schmidt and Midway Gold Corp.

12. Quit Claim Deed effective November 2, 2004 from Paul G. Schmidt and Mary Ann J. Schmidt to MGC Resources Inc.

13. Mining Deed with Reservation of Royalty dated May 5, 2006 by and between Seymork Investments, Ltd. and MGC Resources, Inc. Recorded in Pershing County, Nevada as Entry No. 248839 at Book: 408, Page: 207 of Official Records.

14. Mineral Lease Agreement and Option to Purchase dated July 17, 2006 by and between Dave Rowe, Randall Stoeberl, and MGC Resources, Inc.

15. Mining Sublease dated December 2, 2010 by and between Newmont USA Limited d/b/a Newmont Mining Corporation and Barrick Gold Exploration Inc.

a) Exhibit A to Mining Sublease dated December 2, 2010 by and between Newmont USA Limited d/b/a Newmont Mining Corporation and Barrick Gold Exploration Inc. (Property)

b) Exhibit 2 to Mining Sublease dated December 2, 2010 by and between Newmont USA Limited d/b/a Newmont Mining Corporation and Barrick Gold Exploration Inc. (the "Newmont Leases")

      i.     Mineral Lease Agreement and Option to Purchase dated March 23, 1999 by and between Nevada Land & Resource Company, LLC and Santa Fe Pacific Gold Corporation.

      ii.    Exhibit A to Mineral Lease Agreement and Option to Purchase dated March 23, 1999 by and between Nevada Land & Resource Company, LLC and Santa Fe Pacific Gold Corporation.

          a.     Schedule I – Advance Royalty.

          b.     Schedule II – Production Royalty;

          c)     Exhibit 3 to Mining Sublease dated December 2, 2010 by and between Newmont USA Limited d/b/a Newmont Mining Corporation and Barrick Gold Exploration Inc. (Encumbrances);

      i.     SPL-6528 Mineral Lease dated May 1, 1986 by and between Southern Pacific Land Company and SFP Minerals Corporation.

      16.     Agreement dated May 29, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc., and Coeur Rochester, Inc.

      a)     First Amendment to Agreement dated July 24, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc.

      b)     Second Amendment to Agreement dated September 10, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc.

      c)     Third Amendment to Agreement dated October 30, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc.

      d)     Deeds and agreements (if any) entered into by Midway Gold US Inc. pursuant to the Agreement dated May 29, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc., and Coeur Rochester, Inc. (as amended).

      17.     Mineral Lease Agreement and Option to Purchase dated March 23, 1999 by and between Nevada Land & Resource Company, LLC and Santa Fe Pacific Gold Corporation.

      18.     Mineral Lease Agreement and Option to Purchase dated June 1, 2007 by and between George D. Duffy and MGC Resources Inc.

      19.     Purchase and Sale Agreement dated September 26, 2014 by and between Buena Vista Valley Ranch (a Nevada general partnership comprised of Stanley W. McCart, Perry D. McCart and Dorothy F. McCart) and Barrick Gold Exploration Inc.

      a)     First Amendment to Purchase and Sale Agreement dated October 30, 2014 by and between Buena Vista Valley Ranch and Barrick Gold Exploration Inc.

      b)     Second Amendment to Purchase and Sale Agreement dated March 25, 2015 by and between Buena Vista Valley Ranch and Barrick Gold Exploration Inc.

33

20.     Purchase and Sale Agreement dated November 12, 2014 by and between by Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007, and Barrick Gold Exploration Inc. (For the avoidance of doubt, Buyer specifically agrees to be bound by the right of first refusal contained in Section 5 of the Purchase and Sale Agreement.).

21.     Notice of Right of First Refusal dated November 12, 2014 by and between Barrick Gold Exploration Inc. and Charles A. Kendricks and Carlinda A. Kendricks relating to a right of first refusal with respect to the Buena Vista Valley Ranch.

22.     Notice of Right of First Refusal dated November 12, 2014 by and between Charles A. Kendricks and Carlinda A. Kendricks and Barrick Gold Exploration Inc. relating to a right of first refusal with respect to for the Shining K Ranch.

23.     Water Rights Deed dated November 12, 2014 from Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007, to Barrick Gold Exploration Inc.

24.     Management Agreement dated May 6, 2015 by and between Barrick Gold Exploration Inc. and Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007.

25.     Waiver Agreement dated October 20, 2015 by and between Barrick Gold Exploration Inc. and Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007.

26.     Agricultural Lease Agreement dated May 28, 2015 by and between Barrick Gold Exploration Inc. and Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007.

27.     Purchase and Sale Agreement dated February 23, 2015 by and between New Nevada Lands LLC and Barrick Gold Exploration Inc.

28.     Special Warranty Deed and Assignment effective February 28, 2014 from Barrick Gold Exploration Inc. to Midway Gold US Inc., recorded in Pershing County, Nevada, as Document No. 0488427.

29.     Special Warranty Deed and Assignment effective February 28, 2014 from Midway Gold US Inc. to Barrick Gold Exploration Inc., recorded in Pershing County, Nevada, as Document No. 0488428.

30.     Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc.

        *a)*     Addendum to Lease dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. amending that Commercial Lease and Deposit Receipt dated May 11, 2011.

34

b) First Amendment to that certain Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. and effective October 15, 2011;

c) Second Amendment to that certain Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. and effective March 1, 2013.

31. Easement dated February 25, 2015 from Stanley W. McCart and Perry D. McCart to Barrick Gold Exploration Inc. and recorded as Document No. 492121 of the Records of Pershing County, Nevada.

32. Utilities License #181982 dated February 14, 1986 by and between Nevada Land & Resource Company and Coeur D'Alene Mines Corp., and Memorandum of License dated September 5, 2000 and recorded at Book 354 Page 353 of the Records of Pershing County, Nevada.

33. Access Agreement dated February 10, 2015 by and between Midway Gold US Inc. and Barrick Gold Exploration Inc.

34. County Tax Deed dated June 18, 2015 from Lacey Donaldson, Treasurer of the County of Pershing, State of Nevada to Barrick Gold Exploration Inc. and recorded as Document No. 492479 of the Records of Pershing County, Nevada.

35. Exchange Agreement dated June 12, 2015 between Stanley W. McCart and Perry D. McCart and Barrick Gold Exploration Inc.

a) Grant Bargain and Sale Deed dated July 6, 2015 from Stanley W. McCart and Perry D. McCart to Barrick Gold Exploration Inc. and recorded as Document No. 492937 of the Records of Pershing County, Nevada.

b) Water Rights Deed dated July 13, 2015 by from Barrick Gold Exploration Inc. to Stanley W. McCart and Perry D. McCart and recorded as Document No. 492938 of the Records of Pershing County, Nevada.

c) Easement Agreement dated July 6, 2015 from Stanley W. McCart and Perry McCart to Barrick Gold Exploration Inc. and recorded as Document No. 492940 of the Records of Pershing County, Nevada.

d) Easement Agreement between Barrick Gold Exploration Inc. to Stanley W. McCart and Perry D. McCart and recorded as Document No. 492939 of the Records of Pershing County, Nevada.

36. License Agreement by and between Barrick Gold Exploration Inc. and Stanley W. McCart and Perry D. McCart.

37. Option to Purchase dated June 6, 2015 executed by and between Musahsi T. Tazaki and Barrick Gold Exploration Inc.

35

38.     Option to Purchase dated June 9, 2015 executed by and between Reese Investment Properties, Inc. and Barrick Gold Exploration Inc.

39.     Option to Purchase dated June 25, 2015 executed by and between Finance ALL, LLC and Barrick Gold Exploration Inc. (APN# 012-280-04, apprx. 39.98 acres in S1/2N1/2, Sec. 29, T29 R35)

40.     Option to Purchase dated June 25, 2015 executed by and between Finance ALL, LLC and Barrick Gold Exploration Inc. (APN# 012-280-05, apprx. 39.98 acres in N1/2S1/2, Sec. 29, T29 R35)

41.     Option to Purchase dated June 25, 2015 executed by and between Finance ALL, LLC and Barrick Gold Exploration Inc. (APN# 012-280-06, apprx. 83.36 acres in S1/2, Sec. 29, T29 R35).

42.     Option to Purchase dated June 6, 2015 executed by and between Jonathan Caldwell and Barrick Gold Exploration Inc.

43.     Option to Purchase dated April 20, 2015 executed by and between Essie Brakefield and Barrick Gold Exploration Inc.

44.     Water Rights Lease Agreement dated November 12, 2014 by and between by Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007, and Barrick Gold Exploration Inc.

*a)*     Notice of Election to Extend dated November 10, 2015 the Water Rights Lease Agreement dated November 12, 2014 by and between by Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007, and Barrick Gold Exploration Inc.

## (ii)    Additional Spring Valley Business

See Schedule 2.1(m), part (vi).

## Schedule 2.1(j) – Tangible Property

### (i) Spring Valley Business

1. PQ Core

2. HQ Core

3. Pulps

4. Rejects

5. Gold samples and safe

6. 7 5/8 in drill casing, 800 ft (used)

### (ii) Additional Spring Valley Business

See Schedule 2.1(m), part (viii).

## Schedule 2.1(m) – Additional Spring Valley Assets

**(i)    Owned Real Property**

None.

**(ii)    Leased Real Property**

None.

**(iii)    Owned Mining Claims**

The following 216 lode claims in Pershing County, Nevada held by Nevada Talon LLC.

| BLM Serial # | Claim Name | Book/Page | Doc |
|---|---|---|---|
| NMC1051456 | NT 1 | 470/312 | 474160 |
| NMC1051457 | NT 2 | 470/313 | 474161 |
| NMC1051458 | NT 3 | 470/314 | 474162 |
| NMC1051459 | NT 4 | 470/315 | 474163 |
| NMC1051460 | NT 5 | 470/316 | 474164 |
| NMC1051461 | NT 6 | 470/317 | 474165 |
| NMC1051462 | NT 7 | 470/318 | 474166 |
| NMC1051463 | NT 8 | 470/319 | 474167 |
| NMC1051464 | NT 9 | 470/320 | 474168 |
| NMC1051465 | NT 10 | 470/321 | 474169 |
| NMC1051466 | NT 11 | 470/322 | 474170 |
| NMC1051467 | NT 12 | 470/323 | 474171 |
| NMC1051468 | NT 13 | 470/324 | 474172 |
| NMC1051469 | NT 14 | 470/325 | 474173 |
| NMC1051470 | NT 15 | 470/326 | 474174 |
| NMC1051471 | NT 16 | 470/327 | 474175 |
| NMC1051472 | NT 17 | 470/328 | 474176 |
| NMC1051473 | NT 18 | 470/329 | 474177 |
| NMC1051474 | NT 19 | 470/330 | 474178 |
| NMC1051475 | NT 20 | 470/331 | 474179 |
| NMC1051476 | NT 21 | 470/332 | 474180 |
| NMC1051477 | NT 22 | 470/333 | 474181 |
| NMC1051478 | NT 23 | 470/334 | 474182 |
| NMC1051479 | NT 24 | 470/335 | 474183 |
| NMC1051480 | NT 25 | 470/336 | 474184 |
| NMC1051481 | NT 26 | 470/337 | 474185 |
| NMC1051482 | NT 27 | 470/338 | 474186 |
| NMC1051483 | NT 28 | 470/339 | 474187 |
| NMC1051484 | NT 29 | 470/340 | 474188 |
| NMC1051485 | NT 30 | 470/341 | 474189 |
| NMC1051486 | NT 31 | 470/342 | 474190 |
| NMC1051487 | NT 32 | 470/343 | 474191 |
| NMC1051488 | NT 33 | 470/344 | 474192 |
| NMC1051489 | NT 34 | 470/345 | 474193 |

| BLM Serial # | Claim Name | Book/Page | Doc |
|---|---|---|---|
| NMC1051490 | NT 35 | 470/346 | 474194 |
| NMC1051491 | NT 36 | 470/347 | 474195 |
| NMC1051492 | NT 99 | 470/348 | 474196 |
| NMC1051493 | NT 100 | 470/349 | 474197 |
| NMC1051494 | NT 101 | 470/350 | 474198 |
| NMC1051495 | NT 102 | 470/351 | 474199 |
| NMC1051496 | NT 103 | 470/352 | 474200 |
| NMC1051497 | NT 104 | 470/353 | 474201 |
| NMC1051498 | NT 105 | 470/354 | 474202 |
| NMC1051499 | NT 106 | 470/355 | 474203 |
| NMC1051500 | NT 107 | 470/356 | 474204 |
| NMC1051501 | NT 108 | 470/357 | 474205 |
| NMC1051502 | NT 109 | 470/358 | 474206 |
| NMC1051503 | NT 110 | 470/359 | 474207 |
| NMC1051504 | NT 111 | 470/360 | 474208 |
| NMC1051505 | NT 112 | 470/361 | 474209 |
| NMC1051506 | NT 113 | 470/362 | 474210 |
| NMC1051507 | NT 114 | 470/363 | 474211 |
| NMC1051508 | NT 115 | 470/364 | 474212 |
| NMC1051509 | NT 116 | 470/365 | 474213 |
| NMC1051510 | NT 117 | 470/366 | 474214 |
| NMC1051511 | NT 118 | 470/367 | 474215 |
| NMC1051512 | NT 119 | 470/368 | 474216 |
| NMC1051513 | NT 120 | 470/369 | 474217 |
| NMC1051514 | NT 121 | 470/370 | 474218 |
| NMC1051515 | NT 122 | 470/371 | 474219 |
| NMC1051516 | NT 123 | 470/372 | 474220 |
| NMC1051517 | NT 124 | 470/373 | 474221 |
| NMC1051518 | NT 125 | 470/374 | 474222 |
| NMC1051519 | NT 126 | 470/375 | 474223 |
| NMC1051520 | NT 127 | 470/376 | 474224 |
| NMC1051521 | NT 128 | 470/377 | 474225 |
| NMC1051522 | NT 129 | 470/378 | 474226 |
| NMC1051523 | NT 130 | 470/379 | 474227 |
| NMC1051524 | NT 131 | 470/380 | 474228 |
| NMC1051525 | NT 132 | 470/381 | 474229 |
| NMC1051526 | NT 133 | 470/382 | 474230 |
| NMC1051527 | NT 134 | 470/383 | 474231 |
| NMC1051528 | NT 135 | 470/384 | 474232 |
| NMC1051529 | NT 136 | 470/385 | 474233 |
| NMC1051530 | NT 137 | 470/386 | 474234 |
| NMC1051531 | NT 138 | 470/387 | 474235 |
| NMC1051532 | NT 139 | 470/388 | 474236 |
| NMC1051533 | NT 140 | 470/389 | 474237 |
| NMC1051534 | NT 141 | 470/390 | 474238 |
| NMC1051535 | NT 142 | 470/391 | 474239 |
| NMC1051536 | NT 143 | 470/392 | 474240 |
| NMC1051537 | NT 144 | 470/393 | 474241 |
| NMC1051538 | NT 145 | 470/394 | 474242 |
| NMC1051539 | NT 146 | 470/395 | 474243 |
| NMC1051540 | NT 147 | 470/396 | 474244 |
| NMC1051541 | NT 148 | 470/397 | 474245 |

| BLM Serial # | Claim Name | Book/Page | Doc |
|---|---|---|---|
| NMC1051542 | NT 149 | 470/398 | 474246 |
| NMC1051543 | NT 150 | 470/399 | 474247 |
| NMC1051544 | NT 151 | 470/400 | 474248 |
| NMC1051545 | NT 152 | 470/401 | 474249 |
| NMC1051546 | NT 153 | 470/402 | 474250 |
| NMC1051547 | NT 154 | 470/403 | 474251 |
| NMC1051548 | NT 155 | 470/404 | 474252 |
| NMC1051549 | NT 156 | 470/405 | 474253 |
| NMC1051550 | NT 157 | 470/406 | 474254 |
| NMC1051551 | NT 158 | 470/407 | 474255 |
| NMC1051552 | NT 159 | 470/408 | 474256 |
| NMC1051553 | NT 160 | 470/409 | 474257 |
| NMC1051554 | NT 161 | 470/410 | 474258 |
| NMC1051555 | NT 162 | 470/411 | 474259 |
| NMC1051556 | NT 163 | 470/412 | 474260 |
| NMC1051557 | NT 164 | 470/413 | 474261 |
| NMC1051558 | NT 165 | 470/414 | 474262 |
| NMC1051559 | NT 166 | 470/415 | 474263 |
| NMC1051560 | NT 167 | 470/416 | 474264 |
| NMC1051561 | NT 168 | 470/417 | 474265 |
| NMC1051562 | NT 169 | 470/418 | 474266 |
| NMC1051563 | NT 170 | 470/419 | 474267 |
| NMC1051564 | NT 171 | 470/420 | 474268 |
| NMC1051565 | NT 172 | 470/421 | 474269 |
| NMC1051566 | NT 173 | 470/422 | 474270 |
| NMC1051567 | NT 174 | 470/423 | 474271 |
| NMC1051568 | NT 175 | 470/424 | 474272 |
| NMC1051569 | NT 176 | 470/425 | 474273 |
| NMC1051570 | NT 177 | 470/426 | 474274 |
| NMC1051571 | NT 178 | 470/427 | 474275 |
| NMC1051572 | NT 179 | 470/428 | 474276 |
| NMC1051573 | NT 180 | 470/429 | 474277 |
| NMC1051574 | NT 181 | 470/430 | 474278 |
| NMC1051575 | NT 182 | 470/431 | 474279 |
| NMC1051576 | NT 183 | 470/431A | 474280 |
| NMC1051577 | NT 184 | 470/432 | 474281 |
| NMC1051578 | NT 185 | 470/433 | 474282 |
| NMC1051579 | NT 186 | 470/434 | 474283 |
| NMC1051580 | NT 187 | 470/435 | 474284 |
| NMC1051581 | NT 188 | 470/436 | 474285 |
| NMC1051582 | NT 189 | 470/437 | 474286 |
| NMC1051583 | NT 190 | 470/438 | 474287 |
| NMC1051584 | NT 191 | 470/439 | 474288 |
| NMC1051585 | NT 192 | 470/440 | 474289 |
| NMC1051586 | NT 193 | 470/441 | 474290 |
| NMC1051587 | NT 194 | 470/442 | 474291 |
| NMC1051588 | NT 195 | 470/443 | 474292 |
| NMC1051589 | NT 196 | 470/444 | 474293 |
| NMC1051590 | NT 197 | 470/445 | 474294 |
| NMC1051591 | NT 198 | 470/446 | 474295 |
| NMC1051592 | NT 199 | 470/447 | 474296 |
| NMC1051593 | NT 200 | 470/448 | 474297 |

| BLM Serial # | Claim Name | Book/Page | Doe |
|---|---|---|---|
| NMC1051594 | NT 201 | 470/449 | 474298 |
| NMC1051595 | NT 202 | 470/450 | 474299 |
| NMC1051596 | NT 203 | 470/451 | 474300 |
| NMC1051597 | NT 204 | 470/452 | 474301 |
| NMC1051598 | NT 205 | 470/453 | 474302 |
| NMC1051599 | NT 206 | 470/454 | 474303 |
| NMC1051600 | NT 207 | 470/455 | 474304 |
| NMC1051601 | NT 208 | 470/456 | 474305 |
| NMC1051602 | NT 209 | 470/457 | 474306 |
| NMC1051603 | NT 210 | 470/458 | 474307 |
| NMC1051604 | NT 211 | 470/459 | 474308 |
| NMC1051605 | NT 212 | 470/460 | 474309 |
| NMC1051606 | NT 213 | 470/461 | 474310 |
| NMC1051607 | NT 214 | 470/462 | 474311 |
| NMC1051608 | NT 215 | 470/463 | 474312 |
| NMC1051609 | NT 216 | 470/464 | 474313 |
| NMC1051610 | NT 217 | 470/465 | 474314 |
| NMC1051611 | NT 218 | 470/466 | 474315 |
| NMC1051612 | NT 219 | 470/467 | 474316 |
| NMC1051613 | NT 220 | 470/468 | 474317 |
| NMC1051614 | NT 221 | 470/469 | 474318 |
| NMC1051615 | NT 222 | 470/470 | 474319 |
| NMC1051616 | NT 223 | 470/471 | 474320 |
| NMC1051617 | NT 224 | 470/472 | 474321 |
| NMC1051618 | NT 225 | 470/473 | 474322 |
| NMC1051619 | NT 226 | 470/474 | 474323 |
| NMC1051620 | NT 227 | 470/475 | 474324 |
| NMC1051621 | NT 228 | 470/476 | 474325 |
| NMC1051622 | NT 229 | 470/477 | 474326 |
| NMC1051623 | NT 230 | 470/478 | 474327 |
| NMC1051624 | NT 231 | 470/479 | 474328 |
| NMC1051625 | NT 232 | 470/480 | 474329 |
| NMC1051626 | NT 233 | 470/481 | 474330 |
| NMC1051627 | NT 234 | 470/482 | 474331 |
| NMC1051628 | NT 235 | 470/483 | 474332 |
| NMC1051629 | NT 236 | 470/484 | 474333 |
| NMC1051630 | NT 237 | 470/485 | 474334 |
| NMC1051631 | NT 238 | 470/486 | 474335 |
| NMC1051632 | NT 239 | 470/487 | 474336 |
| NMC1051633 | NT 240 | 470/488 | 474337 |
| NMC1051634 | NT 241 | 470/489 | 474338 |
| NMC1051635 | NT 242 | 470/490 | 474339 |
| NMC1051636 | NT 243 | 470/491 | 474340 |
| NMC1051637 | NT 244 | 470/492 | 474341 |
| NMC1051638 | NT 245 | 470/493 | 474342 |
| NMC1051639 | NT 246 | 470/494 | 474343 |
| NMC1051640 | NT 247 | 470/495 | 474344 |
| NMC1051641 | NT 248 | 470/496 | 474345 |
| NMC1051642 | NT 249 | 470/497 | 474346 |
| NMC1051643 | NT 250 | 470/498 | 474347 |
| NMC1051644 | NT 251 | 470/499 | 474348 |
| NMC1051645 | NT 252 | 470/500 | 474349 |

| BLM Serial # | Claim Name | Book/Page | Doc |
|---|---|---|---|
| NMC1051646 | NT 253 | 470/501 | 474350 |
| NMC1051647 | NT 254 | 470/502 | 474351 |
| NMC1051648 | NT 255 | 470/503 | 474352 |
| NMC1051649 | NT 256 | 470/504 | 474353 |
| NMC1051650 | NT 257 | 470/505 | 474354 |
| NMC1051651 | NT 258 | 470/506 | 474355 |
| NMC1051652 | NT 259 | 470/507 | 474356 |
| NMC1051653 | NT 260 | 470/508 | 474357 |
| NMC1051654 | NT 261 | 470/509 | 474358 |
| NMC1051655 | NT 262 | 470/510 | 474359 |
| NMC1051656 | NT 263 | 470/511 | 474360 |
| NMC1051657 | NT 264 | 470/512 | 474361 |
| NMC1051658 | NT 265 | 470/513 | 474362 |
| NMC1051659 | NT 266 | 470/514 | 474363 |
| NMC1051660 | NT 267 | 470/515 | 474364 |
| NMC1051661 | NT 268 | 470/516 | 474365 |
| NMC1051662 | NT 269 | 470/517 | 474366 |
| NMC1051663 | NT 270 | 470/518 | 474367 |
| NMC1051664 | NT 271 | 470/519 | 474368 |
| NMC1051665 | NT 272 | 470/520 | 474369 |
| NMC1051666 | NT 273 | 470/521 | 474370 |
| NMC1051667 | NT 274 | 470/522 | 474371 |
| NMC1051668 | NT 275 | 470/523 | 474372 |
| NMC1051669 | NT 276 | 470/524 | 474373 |
| NMC1051670 | NT 277 | 470/525 | 474374 |
| NMC1051671 | NT 278 | 470/526 | 474375 |

**(iv)   Leased Mining Claims**

Mineral Lease Agreement and Option to Purchase dated July 26, 2011 by and between David E. Rowe, Carelon Rowe, RS Gold, LLC and MGC Resources Inc. (headed "Section 32 Lease").

The following 36 unpatented lode mining claims located within Section 32, Township 29 North, Range 35 East, M.D.B.&M., Pershing County, Nevada:

| BLM Serial # | Claim Name | Book/Page | Doc |
|---|---|---|---|
| NMC1050430 | PS 50 | 469/687 | 473906 |
| NMC1050431 | PS 51 | 469/688 | 473907 |
| NMC1050432 | PS 52 | 469/689 | 473908 |
| NMC1050433 | PS 53 | 469/690 | 473909 |
| NMC1050434 | PS 54 | 469/691 | 473910 |
| NMC1050435 | PS 55 | 469/692 | 473911 |
| NMC1050436 | PS 56 | 469/693 | 473912 |
| NMC1050437 | PS 57 | 469/694 | 473913 |
| NMC1050442 | PS 68 | 469/699 | 473918 |
| NMC1050443 | PS 69 | 469/700 | 473919 |
| NMC1050444 | PS 70 | 469/701 | 473920 |
| NMC1050445 | PS 71 | 469/702 | 473921 |

| BLM Serial # | Claim Name | Book/Page | Doc |
|---|---|---|---|
| NMC1050446 | PS 72 | 469/703 | 473922 |
| NMC1050447 | PS 73 | 469/704 | 473923 |
| NMC1050448 | PS 74 | 469/705 | 473924 |
| NMC1050449 | PS 75 | 469/706 | 473925 |
| NMC1050454 | PS 80 | 469/711 | 473930 |
| NMC1050455 | PS 81 | 469/712 | 473931 |
| NMC1050456 | PS 82 | 469/713 | 473932 |
| NMC1050457 | PS 83 | 469/714 | 473933 |
| NMC1050458 | PS 84 | 469/715 | 473934 |
| NMC1050459 | PS 85 | 469/716 | 473935 |
| NMC1050460 | PS 86 | 469/717 | 473936 |
| NMC1050461 | PS 87 | 469/718 | 473937 |
| NMC1050464 | PS 90 | 469/721 | 473940 |
| NMC1050465 | PS 91 | 469/722 | 473941 |
| NMC1050466 | PS 92 | 469/723 | 473942 |
| NMC1050467 | PS 93 | 469/724 | 473943 |
| NMC1050468 | PS 94 | 469/725 | 473944 |
| NMC1050469 | PS 95 | 469/726 | 473945 |
| NMC1050470 | PS 96 | 469/727 | 473946 |
| NMC1050471 | PS 97 | 469/728 | 473947 |
| NMC1050472 | PS 98 | 469/729 | 473948 |
| NMC1050473 | PS 99 | 469/730 | 473949 |
| NMC1050474 | PS 100 | 469/731 | 473950 |
| NMC1050475 | PS 101 | 469/732 | 473951 |

Mineral Lease Agreement and Option to Purchase dated July 26, 2011 by and between David E. Rowe, Carelon Rowe, RS Gold, LLC and MGC Resources Inc. (headed "Section 31 and Section 6 Lease").

The following 19 unpatented lode mining claims located within Section 31, Township 29 North, Range 35 East, and Section 6, Township 28 North, Range 35 East, M.D.B.&M., Pershing County, Nevada:

| BLM Serial # | Claim Name | Book/Page | Doc |
|---|---|---|---|
| NMC1050421 | PS 23 | 469/678 | 473897 |
| NMC1050422 | PS 24 | 469/679 | 473898 |
| NMC1050423 | PS 25 | 469/680 | 473899 |
| NMC1050424 | PS 26 | 469/681 | 473900 |
| NMC1050425 | PS 27 | 469/682 | 473901 |
| NMC1050426 | PS 33 | 469/683 | 473902 |
| NMC1050427 | PS 41 | 469/684 | 473903 |
| NMC1050428 | PS 42 | 469/685 | 473904 |
| NMC1050429 | PS 49 | 469/686 | 473905 |
| NMC1050438 | PS 64 | 469/695 | 473914 |
| NMC1050439 | PS 65 | 469/696 | 473915 |
| NMC1050440 | PS 66 | 469/697 | 473916 |
| NMC1050441 | PS 67 | 469/698 | 473917 |

| BLM Serial # | Claim Name | Book/Page | Doc |
|---|---|---|---|
| NMC1050450 | PS 76 | 469/707 | 473926 |
| NMC1050451 | PS 77 | 469/708 | 473927 |
| NMC1050452 | PS 78 | 469/709 | 473928 |
| NMC1050453 | PS 79 | 469/710 | 473929 |
| NMC1050462 | PS 88 | 469/719 | 473938 |
| NMC1050463 | PS 89 | 469/720 | 473939 |

**(v)    Water Rights**

None.

**(vi)    Assigned Contracts**

1.  Mineral Lease Agreement and Option to Purchase dated July 26, 2011 by and between David E. Rowe, Carelon Rowe, RS Gold, LLC and MGC Resources Inc. (headed "Section 32 Lease").

2.  Mineral Lease Agreement and Option to Purchase dated July 26, 2011 by and between David E. Rowe, Carelon Rowe, RS Gold, LLC and MGC Resources Inc. (headed "Section 31 and Section 6 Lease").

3.  Access Agreement dated as of February 10, 2015 Midway Gold US Inc. (formerly MGC Resources, Inc.), and Barrick Gold Exploration Inc.

**(vii)    Permits**

None.

**(viii)    Tangible Property**

None.

44

## Schedule 2.2(i) – Other Excluded Assets

All assets other than Purchased Assets.

## Schedule 2.3(e) – Other Assumed Liabilities

1.    Excluding any expenses or costs (including legal costs, work in progress and ordinary claim maintenance and other like fees) accruing prior to the Closing Date, any additional claims, royalties, obligations, demands or other liabilities arising from or relating to:

(i)    the August 15, 2003 *Option Agreement* between Paul G. Schmidt and Midway Gold Corp.;

(ii)    the August 13, 2007 *Mining Deed (With Reservation and Conveyance of Royalty)* between Paul G. Schmidt and MGC Resources Inc. ("Mining Deed"), including without limitation the Primary Royalty, the Perimeter Royalty, or the Perimeter Area, as defined therein; and

(iii)    any claims for royalties or payments arising from or relating to the following mining claims situated in proximity to the Claims, as defined in the Mining Deed:

| Claim Name | BLM Serial # | Recording Information |
|---|---|---|
| SVB 1 | NMC 1023658 | Pershing, BK 453 Pg 660 Doc Nbr 366815 |
| SVB 2 | NMC 1023659 | Pershing, BK 453 Pg 661 Doc Nbr 366816 |
| SVB 3 | NMC 1023660 | Pershing, BK 453 Pg 662 Doc Nbr 366817 |
| SVB 4 | NMC 1023661 | Pershing, BK 453 Pg 663 Doc Nbr 366818 |
| SVB 5 | NMC 1023662 | Pershing, BK 453 Pg 664 Doc Nbr 366819 |
| SVB 6 | NMC 1023663 | Pershing, BK 453 Pg 665 Doc Nbr 366820 |
| SVB 7 | NMC 1023664 | Pershing, BK 453 Pg 666 Doc Nbr 366821 |
| SVB 8 | NMC 1023665 | Pershing, BK 453 Pg 667 Doc Nbr 366822 |
| SVB 9 | NMC 1023666 | Pershing, BK 453 Pg 668 Doc Nbr 366823 |
| SVB 10 | NMC 1023667 | Pershing, BK 453 Pg 669 Doc Nbr 366824 |
| SVB 11 | NMC 1023668 | Pershing, BK 453 Pg 670 Doc Nbr 366825 |
| SVB 12 | NMC 1023669 | Pershing, BK 453 Pg 671 Doc Nbr 366826 |
| SVB 13 | NMC 1011089 | Pershing, BK 449 Pg 865 Doc Nbr 364917 |
| SV 1 | NMC 817628 | Pershing, BK 352 Pg 678 |
| SV 2 | NMC 817629 | Pershing, BK 352 Pg 679 |
| SV 3 | NMC 817630 | Pershing, BK 352 Pg 680 |
| SV 4 | NMC 817631 | Pershing, BK 352 Pg 681 |
| SV 5 | NMC 817632 | Pershing, BK 352 Pg 682 |
| SV 6 | NMC 817633 | Pershing, BK 352 Pg 683 |
| SV 7 | NMC 817634 | Pershing, BK 352 Pg 684 |
| SV 8 | NMC 748203 | Pershing, BK 304 Pg 446 |
| SV 9 | NMC 817635 | Pershing, BK 352 Pg 685 |
| SV 10 | NMC 748205 | Pershing, BK 304 Pg 448 |
| SV 11 | NMC 817636 | Pershing, BK 352 Pg 686 |
| SV 12 | NMC 748207 | Pershing, BK 304 Pg 450 |
| SV 13 | NMC 817637 | Pershing, BK 352 Pg 687 |

| Claim Name | BLM Serial # | Recording Information |
|---|---|---|
| SV 14 | NMC 748209 | Pershing, BK 304 Pg 452 |
| SV 15 | NMC 817638 | Pershing, BK 352 Pg 688 |
| SV 16 | NMC 748211 | Pershing, BK 304 Pg 454 |
| SV 17 | NMC 817639 | Pershing, BK 352 Pg 689 |
| SV 18 | NMC 748213 | Pershing, BK 304 Pg 456 |
| SV 19 | NMC 817640 | Pershing, BK 352 Pg 690 |
| SV 20 | NMC 748215 | Pershing, BK 304 Pg 458 |
| SV 21 | NMC 817641 | Pershing, BK 352 Pg 691 |
| SV 22 | NMC 817642 | Pershing, BK 352 Pg 692 |
| SV 23 | NMC 817643 | Pershing, BK 352 Pg 693 |
| SV 24 | NMC 817644 | Pershing, BK 352 Pg 694 |
| SV 25 | NMC 817645 | Pershing, BK 352 Pg 695 |
| SV 26 | NMC 817646 | Pershing, BK 352 Pg 696 |
| SV 27 | NMC 748222 | Pershing, BK 304 Pg 465 |
| SV 28 | NMC 817647 | Pershing, BK 352 Pg 697 |
| SV 29 | NMC 748224 | Pershing, BK 304 Pg 467 |
| SV 30 | NMC 748225 | Pershing, BK 304 Pg 468 |
| SV 31 | NMC 748226 | Pershing, BK 304 Pg 469 |
| SV 32 | NMC 748227 | Pershing, BK 304 Pg 470 |
| SV 33 | NMC 748228 | Pershing, BK 304 Pg 471 |
| SV 34 | NMC 748229 | Pershing, BK 304 Pg 472 |
| SV 35 | NMC 748230 | Pershing, BK 304 Pg 473 |
| SV 36 | NMC 748231 | Pershing, BK 304 Pg 474 |
| SV 37 | NMC 748232 | Pershing, BK 304 Pg 475 |
| SV 38 | NMC 748233 | Pershing, BK 304 Pg 476 |
| SV 39 | NMC 748234 | Pershing, BK 304 Pg 477 |
| SV 40 | NMC 748235 | Pershing, BK 304 Pg 478 |
| SV 41 | NMC 748236 | Pershing, BK 304 Pg 479 |
| SV 42 | NMC 748237 | Pershing, BK 304 Pg 480 |
| SV 43 | NMC 748238 | Pershing, BK 304 Pg 481 |
| SV 44 | NMC 748239 | Pershing, BK 304 Pg 482 |

2.  Any claims, demands or litigation accruing or arising after the Closing Date associated with the Assumed Liabilities, Purchased Assets, Spring Valley Business and the Additional Spring Valley Business.

3.  Any liabilities or obligations accruing or arising after the Closing Date from or relating to statutory, regulatory or other legal requirements.

4.  Excluding any expense or costs (including legal costs and work in progress) accruing prior to the Closing Date, any ancillary or related claims or demands made in connection with the Disclosed Litigation.

5.  Claims asserted by Barrick in its Proofs of Claim in the Chapter 11 Cases (Claim Nos. 223 and 224).

## Schedule 2.4(f) – Other Excluded Liabilities

None.

## Schedule 3.3 – Conflicts; Consents

### (i) Spring Valley Business

            1.     Exploration, Development and Mine Operating Agreement dated March 9, 2009, granting a Participant a right of first refusal that applies to Transfers of the other Participant's Participating Interest, or Transfer by an Affiliate of Control of the other Participant in specified circumstances. (Without limitation to Section 5.6(c) of this Asset Purchase Agreement, Article XV contains preemptive rights in favor of Barrick Gold Exploration Inc. in certain circumstances.)

            2.     Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc., and Addendum to Lease dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc.; and First Amendment to that Certain Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. and effective October 15, 2011, and Second Amendment to that Certain Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. and effective March 1, 2013. (Section 6 prevents assignment without consent).

            3.     Mining Sublease dated December 2, 2010 by and between Newmont USA Limited d/b/a Newmont Mining Corporation and Barrick Gold Exploration Inc. (Section 12 prevents assignment without consent).

            a)     Schedule I to Mining Lease between Nevada Land & Resources Company LLC and Santa Fe Pacific Gold Corporation;

            b)     Schedule II - Production Royalty;

            c)     Exhibit 3 to Mining Sublease between Barrick Gold Exploration Inc. and Newmont USA Limited (Encumbrances);

            d)     Mining Lease dated March 23, 1999 by and between Nevada Land & Resource Company, LLC and Santa Fe Pacific Gold Corporation;

            e)     SPL-6528 Mineral Lease dated May 1, 1986 by and between Southern Pacific Land Company and SFP Minerals Corporation.

            4.     Mineral Lease Agreement and Option to Purchase dated October 30, 2006 from Dale Chabino and Diana Chabino to MGC Resources Inc. (Section 12.D requires assignee to agree in writing to assume all, or a portion if applicable, of the obligations of lessee before transfer can become effective).

            5.     Mineral Lease Agreement and Option to Purchase dated April 25, 2006 from Lamonte J. Duffy to MGC Resources Inc. (Before transfer can become effective, Section 12.D requires (1) assignee to agree in writing to assume all, or a portion if applicable, of the obligations of transferring party, and (2) notice to non-transferring party).

            6.     Mineral Lease Agreement and Option to Purchase dated June 1,

2007 from George D. Duffy to MGC Resources Inc. (Before transfer can become effective, Section 12.D requires (1) assignee to agree in writing to assume all, or a portion if applicable, of the obligations of transferring party, and (2) notice to non-transferring party).

    7.    Mineral Lease Agreement and Option to Purchase dated July 17, 2006 by and between Dave Rowe and Randall Stoeberl and MGC Resources Inc. (Before transfer can become effective, Section 12.D requires (1) assignee to agree in writing to assume all, or a portion if applicable, of the obligations of transferring party, and (2) notice to non-transferring party).

    8.    Agreement dated November 30, 2009 by and between Barrick Gold Exploration, Inc., MGC Resources, Inc. and MGC Properties, Inc. (Section 9 requires assignee to agree in writing to be bound by agreement).

    9.    Option Agreement dated September 1, 2003 by and between Echo Bay Exploration Inc. and Midway Gold Corp., and Mining Deed effective September 1, 2009 from Echo Bay Exploration Inc. to MGC Resources Inc. (Section 11 of Option Agreement requires notice before assignment is effective).

    10.    Option Agreement dated August 15, 2003 by and between Paul G. Schmidt and Midway Gold Corp., Quit Claim Deed effective November 2, 2004 from Paul G. Schmidt and Mary Ann J. Schmidt to MGC Resources Inc., and Mining Deed effective August 13, 2007 from Paul G. Schmidt to MGC Resources Inc. (Section 11 of Option Agreement requires notice before assignment is effective).

    11.    Agreement dated May 29, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc., and Coeur Rochester, Inc., as amended by that First Amendment to Agreement dated July 24, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc., and that Second Amendment to Agreement dated September 10, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc., and as may be amended by that Third Amendment to Agreement dated October 30, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US In. and Coeur Rochester, Inc. ("Coeur Agreements"). (The Coeur Agreements will be filed with the court for approval in the bankruptcy proceedings involving In re Midway Gold Corp. listed in Schedule 3.8, and if approved, the property transfers contained in the Coeur Agreements will occur).

### (ii) Additional Spring Valley Business

    12.    Mineral Lease Agreement and Option to Purchase dated July 26, 2011 by and between David E. Rowe, Carelon Rowe, RS Gold, LLC and MGC Resources Inc. (headed "Section 32 Lease"). (Section 13(D) requires transferee to agree in writing to assume obligations of lessee).

    13.    Mineral Lease Agreement and Option to Purchase dated July 26, 2011 by and between David E. Rowe, Carelon Rowe, RS Gold, LLC and MGC Resources Inc. (headed "Section 31 and Section 6 Lease"). (Section 13(D) requires transferee to agree in writing to assume obligations of lessee).

## Schedule 3.4(i) – Royalties

### (i)  Spring Valley Business

1.  Obligations, including, without limitation, a sliding scale primary NSR and a 1.0% NSR perimeter area royalty, pursuant to Option Agreement dated August 15, 2003 by and between Paul G. Schmidt and Midway Gold Corp., and Mining Deed effective August 13, 2007 from Paul G. Schmidt to MGC Resources Inc.

   *a)*  Quit Claim Deed effective November 2, 2004 from Paul G. Schmidt and Mary Ann J. Schmidt to MGC Resources Inc. (Claims under this Quit Claim Deed are subject to the Perimeter Royalty set forth in, the Option Agreement dated August 15, 2003 by and between Paul G. Schmidt and Midway Gold Corp. and Mining Deed effective August 13, 2007 from Paul G. Schmidt to MGC Resources Inc.).

2.  Obligations, including, without limitation, an advance royalty and 3.0% NSR royalty, pursuant to Mineral Lease Agreement and Option to Purchase dated October 30, 2006 by and between Dale Chabino and Diana Chabino and MGC Resources Inc.

3.  Obligations, including, without limitation, a 3.0% NSR royalty, pursuant to Purchase and Sale Agreement effective January 25, 2006 by and between Coeur Rochester, Inc. and MGC Resources Inc., and Mining Deed effective February 1, 2006 from Coeur Rochester, Inc. to MGC Resources, Inc.

   *a)*  Obligations, including without limitation, a sliding scale net returns royalty, pursuant to Deed and Assignment dated December 15, 1983 from ASARCO Incorporated to Coeur d'Alene Mines Corporation.

4.  Obligations, including, without limitation, an advance royalty and 3.0% NSR royalty, pursuant to Mineral Lease Agreement and Option to Purchase dated April 25, 2006 by and between Lamonte J. Duffy and MGC Resources Inc., and Quit Claim Deed effective July 5, 2006 from MGC Resources Inc. to Lamonte J. Duffy

5.  Obligations, including, without limitation, a 3.0% NSR royalty, pursuant to Mining Deed effective May 5, 2006 from Seymork Investments Ltd. to MGC Resources Inc.

6.  Obligations, including, without limitation, an advance royalty and 3.0% NSR royalty, pursuant to Mineral Lease Agreement and Option to Purchase dated July 17, 2006 by and between Dave Rowe and Randall Stoeberl and MGC Resources Inc.

7.  Obligations, including, without limitation, a 2.0% NSR royalty, pursuant to Option Agreement dated September 1, 2003 by and between Echo Bay Exploration Inc. and Midway Gold Corp., and Mining Deed effective September 1, 2009 from Echo Bay Exploration Inc. to MGC Resources Inc.

8.  Obligations, including, without limitation, rental payments and a 3.0% NSR royalty, pursuant to Mining Sublease effective December 2, 2010 by and between Newmont USA Limited doing business as Newmont Mining Corporation and Barrick Gold Exploration Inc.

9.    Obligations, including, without limitation, an advance Royalty and 3.5% NSR royalty pursuant to Mining Lease dated March 23, 1999 by and between Nevada Land & Resources Company, LLC and Santa Fe Pacific Gold Corporation.

10.    One-half of gold recovered from testing area as well as Monthly and One-Time Payments pursuant to Mineral Lease Agreement and Option to Purchase dated July 1, 2007 by and between George D. Duffy Jr. and MGC Resources Inc.

### (ii)    Additional Spring Valley Business

11.    Obligations, including, without limitation, an advance royalty and 3% NSR royalty pursuant to Mineral Lease Agreement and Option to Purchase dated July 26, 2011 by and between David E. Rowe, Carelon Rowe, RS Gold, LLC and MGC Resources Inc. (headed "Section 32 Lease").

12.    Obligations, including, without limitation, an advance royalty and 3% NSR royalty pursuant to Mineral Lease Agreement and Option to Purchase dated July 26, 2011 by and between David E. Rowe, Carelon Rowe, RS Gold, LLC and MGC Resources Inc. (headed "Section 31 and Section 6 Lease").

## Schedule 3.6 – Ordinary Course of Business

### (i) Spring Valley Business

To Sellers' Knowledge, exploration has been conducted by the Manager under the Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc. (as amended) using its employees and contract drilling and related services. While exploration at Spring Valley has ceased temporarily, the facilities such as exploration warehouses and office are present for resumption of exploration.

### (ii) Additional Spring Valley Business

None.

## Schedule 3.7(a) – Material Contracts

JV Agreements

1.     Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc.

a)     First Amendment to Exploration, Development and Mine Operating Agreement dated March 15, 2010 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc.

b)     Letter Agreement and Second Amendment dated April 19, 2013 by and between Midway Gold U.S. Inc. and Barrick Gold Exploration, Inc.

c)     Third Amendment to Spring Valley Exploration, Development and Mine Operation Agreement dated January 10, 2014 by and between Midway Gold U.S. Inc. f/k/a MGC Resources, Inc. and Barrick Gold Exploration, Inc.

d)     Fourth Amendment to Spring Valley Exploration, Development and Mine Operating Agreement dated February 23, 2014 by and between Midway Gold U.S., Inc. f/k/a MGC Resources Inc. and Barrick Gold Exploration, Inc.

e)     Letter dated July 9, 2014 from Midway Gold US Inc. to Barrick Gold Exploration Inc. regarding Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc.

f)     Letter dated April 19, 2013 from Barrick Gold Exploration, Inc. to Midway Gold US Inc. regarding Barrick Gold Exploration, Inc.'s earn-in of 60% of the properties and all other rights of the Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc.

g)     Letter dated November 15, 2013 from Barrick Gold Exploration, Inc. to MGC Resources Inc., Midway Gold, and Midway Gold Corp. regarding Barrick Gold Exploration, Inc.'s earn-in of 70% of the properties and all other rights of the Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc.

2.     Agreement dated November 30, 2009 by and between Barrick Gold Exploration, Inc., MGC Resources, Inc. and MGC Properties, Inc.

Other Agreements

3.     Mineral Lease Agreement and Option to Purchase dated October 30, 2006 by and between Dale Chabino, Diana Chabino and MGC Resources, Inc.

4.     Purchase and Sale Agreement effective January 25, 2006 by and between Coeur Rochester, Inc. and MGC Resources Inc.

*a)* Obligations, including without limitation, a sliding scale
net returns royalty, pursuant to Deed and Assignment dated December 15, 1983 from ASARCO
Incorporated to Coeur d'Alene Mines Corporation.

5. Mining Deed with Reservation of Royalty dated February 1, 2006 by
and between Coeur Rochester, Inc. and MGC Resources, Inc. Recorded in Pershing County, Nevada
as Entry No. 247362 at Book: 404, Page: 862 of Official Records.

6. Mineral Lease Agreement and Option to Purchase dated April 25,
2006 by and between Lamonte J. Duffy and MGC Resources, Inc.

7. Quit Claim Deed effective July 5, 2006 from MGC Resources Inc. to
Lamonte J. Duffy.

8. Option Agreement dated September 1, 2003 by and between Echo
Bay Exploration Inc. and Midway Gold Corp.

9. Mining Deed effective September 1, 2009 from Echo Bay
Exploration Inc. to MGC Resources Inc.

10. Mining Deed with Reservation and Conveyance of Royalty dated
August 13, 2007 by and between Paul G. Schmidt and MGC Resources, Inc. Recorded in Pershing
County, Nevada as Entry No. 356954 at Book: 427, Page: 443 of Official Records.

11. Option Agreement dated August 15, 2003 by and between Paul G.
Schmidt and Midway Gold Corp.

12. Quit Claim Deed effective November 2, 2004 from Paul G. Schmidt
and Mary Ann J. Schmidt to MGC Resources Inc.

13. Mining Deed with Reservation of Royalty dated May 5, 2006 by and
between Seymork Investments, Ltd. and MGC Resources, Inc. Recorded in Pershing County,
Nevada as Entry No. 248839 at Book: 408, Page: 207 of Official Records.

14. Mineral Lease Agreement and Option to Purchase dated July 17,
2006 by and between Dave Rowe, Randall Stoeberl, and MGC Resources, Inc.

15. Mining Sublease dated December 2, 2010 by and between Newmont
USA Limited d/b/a Newmont Mining Corporation and Barrick Gold Exploration Inc.

a) Exhibit A to Mining Sublease dated December 2, 2010 by and
between Newmont USA Limited d/b/a Newmont Mining Corporation and Barrick Gold Exploration
Inc. (Property)

b) Exhibit 2 to Mining Sublease dated December 2, 2010 by and
between Newmont USA Limited d/b/a Newmont Mining Corporation and Barrick Gold Exploration
Inc. (the "Newmont Leases")

i.      Mineral Lease Agreement and Option to Purchase dated March 23, 1999 by and between Nevada Land & Resource Company, LLC and Santa Fe Pacific Gold Corporation.

ii.     Exhibit A to Mineral Lease Agreement and Option to Purchase dated March 23, 1999 by and between Nevada Land & Resource Company, LLC and Santa Fe Pacific Gold Corporation.

a.      Schedule I – Advance Royalty.

b.      Schedule II – Production Royalty;

*c)*    Exhibit 3 to Mining Sublease dated December 2, 2010 by and between Newmont USA Limited d/b/a Newmont Mining Corporation and Barrick Gold Exploration Inc. (Encumbrances);

i.      SPL-6528 Mineral Lease dated May 1, 1986 by and between Southern Pacific Land Company and SFP Minerals Corporation.

16.     Agreement dated May 29, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc., and Coeur Rochester, Inc.

a)      First Amendment to Agreement dated July 24, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc.

b)      Second Amendment to Agreement dated September 10, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc.

c)      Third Amendment to Agreement dated October 30, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc.

d)      Deeds and agreements (if any) entered into by Midway Gold US Inc. pursuant to the Agreement dated May 29, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc., and Coeur Rochester, Inc. (as amended).

17.     Mineral Lease Agreement and Option to Purchase dated March 23, 1999 by and between Nevada Land & Resource Company, LLC and Santa Fe Pacific Gold Corporation.

18.     Mineral Lease Agreement and Option to Purchase dated June 1, 2007 by and between George D. Duffy and MGC Resources Inc.

19.     Purchase and Sale Agreement dated September 26, 2014 by and between Buena Vista Valley Ranch (a Nevada general partnership comprised of Stanley W. McCart, Perry D. McCart and Dorothy F. McCart) and Barrick Gold Exploration Inc.

a)      First Amendment to Purchase and Sale Agreement dated October 30, 2014 by and between Buena Vista Valley Ranch and Barrick Gold Exploration Inc.

b) Second Amendment to Purchase and Sale Agreement dated March 25, 2015 by and between Buena Vista Valley Ranch and Barrick Gold Exploration Inc.

20. Purchase and Sale Agreement dated November 12, 2014 by and between by Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007, and Barrick Gold Exploration Inc. (For the avoidance of doubt, Buyer specifically agrees to be bound by the right of first refusal contained in Section 5 of the Purchase and Sale Agreement.).

21. Notice of Right of First Refusal dated November 12, 2014 by and between Barrick Gold Exploration Inc. and Charles A. Kendricks and Carlinda A. Kendricks relating to a right of first refusal with respect to the Buena Vista Valley Ranch.

22. Notice of Right of First Refusal dated November 12, 2014 by and between Charles A. Kendricks and Carlinda A. Kendricks and Barrick Gold Exploration Inc. relating to a right of first refusal with respect to for the Shining K Ranch.

23. Water Rights Deed dated November 12, 2014 from Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007, to Barrick Gold Exploration Inc.

24. Management Agreement dated May 6, 2015 by and between Barrick Gold Exploration Inc. and Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007.

25. Waiver Agreement dated October 20, 2015 by and between Barrick Gold Exploration Inc. and Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007.

26. Agricultural Lease Agreement dated May 28, 2015 by and between Barrick Gold Exploration Inc. and Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007.

27. Purchase and Sale Agreement dated February 23, 2015 by and between New Nevada Lands LLC and Barrick Gold Exploration Inc.

28. Special Warranty Deed and Assignment effective February 28, 2014 from Barrick Gold Exploration Inc. to Midway Gold US Inc., , recorded in Pershing County, Nevada, as Document No. 0488427.

29. Special Warranty Deed and Assignment effective February 28, 2014 from Midway Gold US Inc. to Barrick Gold Exploration Inc., recorded in Pershing County, Nevada, as Document No. 0488428.

30. Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc.

                    *a)*     Addendum to Lease dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. amending that Commercial Lease and Deposit Receipt dated May 11, 2011.

                    b)     First Amendment to that certain Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. and effective October 15, 2011;

                    c)     Second Amendment to that certain Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. and effective March 1, 2013.

                  31.     Easement dated February 25, 2015 from Stanley W. McCart and Perry D. McCart to Barrick Gold Exploration Inc. and recorded as Document No. 492121 of the Records of Pershing County, Nevada.

                  32.     Utilities License #181982 dated February 14, 1986 by and between Nevada Land & Resource Company and Coeur D'Alene Mines Corp., and Memorandum of License dated September 5, 2000 and recorded at Book 354 Page 353 of the Records of Pershing County, Nevada.

                  33.     Access Agreement dated February 10, 2015 by and between Midway Gold US Inc. and Barrick Gold Exploration Inc.

                  34.     County Tax Deed dated June 18, 2015 from Lacey Donaldson, Treasurer of the County of Pershing, State of Nevada to Barrick Gold Exploration Inc. and recorded as Document No. 492479 of the Records of Pershing County, Nevada.

                  35.     Exchange Agreement dated June 12, 2015 between Stanley W. McCart and Perry D. McCart and Barrick Gold Exploration Inc.

                  a)     Grant Bargain and Sale Deed dated July 6, 2015 from Stanley W. McCart and Perry D. McCart to Barrick Gold Exploration Inc. and recorded as Document No. 492937 of the Records of Pershing County, Nevada.

                  b)     Water Rights Deed dated July 13, 2015 by from Barrick Gold Exploration Inc. to Stanley W. McCart and Perry D. McCart and recorded as Document No. 492938 of the Records of Pershing County, Nevada.

                  c)     Easement Agreement dated July 6, 2015 from Stanley W. McCart and Perry McCart to Barrick Gold Exploration Inc. and recorded as Document No. 492940 of the Records of Pershing County, Nevada.

                  d)     Easement Agreement between Barrick Gold Exploration Inc to Stanley W. McCart and Perry D. McCart and recorded as Document No. 492939 of the Records of Pershing County, Nevada.

                  36.     License Agreement by and between Barrick Gold Exploration Inc. and Stanley W. McCart and Perry D. McCart.

                  37.     Option to Purchase dated June 6, 2015 executed by and between

Musahsi T. Tazaki and Barrick Gold Exploration Inc.

38.      Option to Purchase dated June 9, 2015 executed by and between Reese Investment Properties, Inc. and Barrick Gold Exploration Inc.

39.      Option to Purchase dated June 25, 2015 executed by and between Finance ALL, LLC and Barrick Gold Exploration Inc. (APN# 012-280-04, apprx. 39.98 acres in S1/2N1/2, Sec. 29, T29 R35)

40.      Option to Purchase dated June 25, 2015 executed by and between Finance ALL, LLC and Barrick Gold Exploration Inc. (APN# 012-280-05, apprx. 39.98 acres in N1/2S1/2, Sec. 29, T29 R35)

41.      Option to Purchase dated June 25, 2015 executed by and between Finance ALL, LLC and Barrick Gold Exploration Inc. (APN# 012-280-06, apprx. 83.36 acres in S1/2, Sec. 29, T29 R35).

42.      Option to Purchase dated June 6, 2015 executed by and between Jonathan Caldwell and Barrick Gold Exploration Inc.

43.      Option to Purchase dated April 20, 2015 executed by and between Essie Brakefield and Barrick Gold Exploration Inc.

44.      Water Rights Lease Agreement dated November 12, 2014 by and between by Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007, and Barrick Gold Exploration Inc.

*a)*      Notice of Election to Extend dated November 10, 2015 the Water Rights Lease Agreement dated November 12, 2014 by and between by Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007, and Barrick Gold Exploration Inc.

45.      Mineral Lease Agreement and Option to Purchase dated July 26, 2011 by and between David E. Rowe, Carelon Rowe, RS Gold, LLC and MGC Resources Inc. (headed "Section 32 Lease").

46.      Mineral Lease Agreement and Option to Purchase dated July 26, 2011 by and between David E. Rowe, Carelon Rowe, RS Gold, LLC and MGC Resources Inc. (headed "Section 31 and Section 6 Lease").

**Schedule 3.7(b) – Material Contracts Status**

None.

## Schedule 3.7(c) – Cure Amounts

| ASSIGNED CONTRACT | CURE AMOUNT |
|---|---|
| **(i) Spring Valley Business** | |
| JV Agreements | |
| 1.    Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc. | None. |
| a)    First Amendment to Exploration, Development and Mine Operating Agreement dated March 15, 2010 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc. | None. |
| b)    Letter Agreement and Second Amendment dated April 19, 2013 by and between Midway Gold U.S. Inc. and Barrick Gold Exploration, Inc. | None. |
| c)    Third Amendment to Spring Valley Exploration, Development and Mine Operation Agreement dated January 10, 2014 by and between Midway Gold U.S. Inc. f/k/a MGC Resources, Inc. and Barrick Gold Exploration, Inc. | None. |
| d)    Fourth Amendment to Spring Valley Exploration, Development and Mine Operating Agreement dated February 23, 2014 by and between Midway Gold U.S., Inc. f/k/a MGC Resources Inc. and Barrick Gold Exploration, Inc. | None. |
| e)    Letter dated July 9, 2014 from Midway Gold US Inc. to Barrick Gold Exploration Inc. regarding Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc. | None. |
| f)    Letter dated April 19, 2013 from Barrick Gold Exploration, Inc. to Midway Gold US Inc. regarding Barrick Gold Exploration, Inc.'s earn-in of 60% of the properties and all other rights of the Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc. | None. |
| g)    Letter dated November 15, 2013 from Barrick Gold Exploration, Inc. to MGC Resources Inc., Midway Gold, and Midway Gold Corp. regarding Barrick Gold Exploration, Inc.'s earn-in of 70% of the properties and all other rights of the Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc. | None. |
| 2.    Agreement dated November 30, 2009 by and | None. |

| ASSIGNED CONTRACT | CURE AMOUNT |
|---|---|
| between Barrick Gold Exploration, Inc., MGC Resources, Inc. and MGC Properties, Inc. | |
| Other Agreements | |
| 3.      Mineral Lease Agreement and Option to Purchase dated October 30, 2006 by and between Dale Chabino, Diana Chabino and MGC Resources, Inc. | None. |
| 4.      Purchase and Sale Agreement effective January 25, 2006 by and between Coeur Rochester, Inc. and MGC Resources Inc. | None. |
| a)      Obligations, including without limitation, a sliding scale net returns royalty, pursuant to Deed and Assignment dated December 15, 1983 from ASARCO Incorporated to Coeur d'Alene Mines Corporation. | None. |
| 5.      Mining Deed with Reservation of Royalty dated February 1, 2006 by and between Coeur Rochester, Inc. and MGC Resources, Inc. Recorded in Pershing County, Nevada as Entry No. 247362 at Book: 404, Page: 862 of Official Records. | None. |
| 6.      Mineral Lease Agreement and Option to Purchase dated April 25, 2006 by and between Lamonte J. Duffy and MGC Resources, Inc. | None. |
| 7.      Quit Claim Deed effective July 5, 2006 from MGC Resources Inc. to Lamonte J. Duffy. | None. |
| 8.      Option Agreement dated September 1, 2003 by and between Echo Bay Exploration Inc. and Midway Gold Corp. | None. |
| 9.      Mining Deed effective September 1, 2009 from Echo Bay Exploration Inc. to MGC Resources Inc. | None. |
| 10.     Mining Deed with Reservation and Conveyance of Royalty dated August 13, 2007 by and between Paul G. Schmidt and MGC Resources, Inc. Recorded in Pershing County, Nevada as Entry No. 356954 at Book: 427, Page: 443 of Official Records. | None. |
| 11.     Option Agreement dated August 15, 2003 by and | None. |

| ASSIGNED CONTRACT | CURE AMOUNT |
|---|---|
| between Paul G. Schmidt and Midway Gold Corp. | |
| 12. Quit Claim Deed effective November 2, 2004 from Paul G. Schmidt and Mary Ann J. Schmidt to MGC Resources Inc. | None. |
| 13. Mining Deed with Reservation of Royalty dated May 5, 2006 by and between Seymork Investments, Ltd. and MGC Resources, Inc. Recorded in Pershing County, Nevada as Entry No. 248839 at Book: 408, Page: 207 of Official Records. | None. |
| 14. Mineral Lease Agreement and Option to Purchase dated July 17, 2006 by and between Dave Rowe, Randall Stoeberl, and MGC Resources, Inc. | None. |
| 15. Mining Sublease dated December 2, 2010 by and between Newmont USA Limited d/b/a Newmont Mining Corporation and Barrick Gold Exploration Inc. | None. |
| a) Exhibit A to Mining Sublease dated December 2, 2010 by and between Newmont USA Limited d/b/a Newmont Mining Corporation and Barrick Gold Exploration Inc. (Property) | None. |
| b) Exhibit 2 to Mining Sublease dated December 2, 2010 by and between Newmont USA Limited d/b/a Newmont Mining Corporation and Barrick Gold Exploration Inc. (the "Newmont Leases") | None. |
| i. Mineral Lease Agreement and Option to Purchase dated March 23, 1999 by and between Nevada Land & Resource Company, LLC and Santa Fe Pacific Gold Corporation. | None. |
| ii. Exhibit A to Mineral Lease Agreement and Option to Purchase dated March 23, 1999 by and between Nevada Land & Resource Company, LLC and Santa Fe Pacific Gold Corporation. | None. |
| a. Schedule I – Advance Royalty. | None. |
| b. Schedule II – Production Royalty; | None. |
| c) Exhibit 3 to Mining Sublease dated December 2, 2010 by and between Newmont USA Limited d/b/a Newmont Mining Corporation | None. |

| ASSIGNED CONTRACT | CURE AMOUNT |
|---|---|
| and Barrick Gold Exploration Inc. (Encumbrances); | |
|      i.    SPL-6528 Mineral Lease dated May 1, 1986 by and between Southern Pacific Land Company and SFP Minerals Corporation. | None. |
| 16.    Agreement dated May 29, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc., and Coeur Rochester, Inc. | None. |
| a) First Amendment to Agreement dated July 24, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc. | None. |
| b) Second Amendment to Agreement dated September 10, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc. | None. |
| c) Third Amendment to Agreement dated October 30, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc. | None. |
| d) Deeds and agreements (if any) entered into by Midway Gold US Inc. pursuant to the Agreement dated May 29, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc., and Coeur Rochester, Inc. (as amended). | None. |
| 17.    Mineral Lease Agreement and Option to Purchase dated March 23, 1999 by and between Nevada Land & Resource Company, LLC and Santa Fe Pacific Gold Corporation. | None. |
| 18.    Mineral Lease Agreement and Option to Purchase dated June 1, 2007 by and between George D. Duffy and MGC Resources Inc. | None. |
| 19.    Purchase and Sale Agreement dated September 26, 2014 by and between Buena Vista Valley Ranch (a Nevada general partnership comprised of Stanley W. McCart, Perry D. McCart and Dorothy F. McCart) and Barrick Gold Exploration Inc. | None. |
| a) First Amendment to Purchase and Sale Agreement dated October 30, 2014 by and between Buena Vista Valley Ranch and Barrick Gold Exploration Inc. | None. |
| b) Second Amendment to Purchase and Sale Agreement dated March 25, 2015 by and between Buena Vista Valley Ranch and Barrick Gold Exploration Inc. | None. |
| 20.    Purchase and Sale Agreement dated November | None. |

| ASSIGNED CONTRACT | CURE AMOUNT |
|---|---|
| 12, 2014 by and between by Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007, and Barrick Gold Exploration Inc. (For the avoidance of doubt, Buyer specifically agrees to be bound by the right of first refusal contained in Section 5 of the Purchase and Sale Agreement.). | |
| 21. Notice of Right of First Refusal dated November 12, 2014 by and between Barrick Gold Exploration Inc. and Charles A. Kendricks and Carlinda A. Kendricks relating to a right of first refusal with respect to the Buena Vista Valley Ranch. | None. |
| 22. Notice of Right of First Refusal dated November 12, 2014 by and between Charles A. Kendricks and Carlinda A. Kendricks and Barrick Gold Exploration Inc. relating to a right of first refusal with respect to for the Shining K Ranch. | None. |
| 23. Water Rights Deed dated November 12, 2014 from Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007, to Barrick Gold Exploration Inc. | None. |
| 24. Management Agreement dated May 6, 2015 by and between Barrick Gold Exploration Inc. and Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007. | None. |
| 25. Waiver Agreement dated October 20, 2015 by and between Barrick Gold Exploration Inc. and Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007. | None. |
| 26. Agricultural Lease Agreement dated May 28, 2015 by and between Barrick Gold Exploration Inc. and Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007. | None. |
| 27. Purchase and Sale Agreement dated February 23, 2015 by and between New Nevada Lands LLC and Barrick Gold Exploration Inc. | None. |
| 28. Special Warranty Deed and Assignment effective February 28, 2014 from Barrick Gold Exploration Inc. to Midway Gold US Inc., recorded in Pershing County, Nevada, as Document No. 0488427. | None. |
| 29. Special Warranty Deed and Assignment effective February 28, 2014 from Midway Gold US Inc. to Barrick Gold Exploration Inc., recorded in Pershing County, Nevada, as Document No. 0488428. | None. |
| 30. Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. | None. |
| a) Addendum to Lease dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. amending that Commercial Lease and Deposit Receipt dated May 11, 2011. | None. |
| b) First Amendment to that certain Commercial Lease and Deposit Receipt dated May 11, 2011 by and between | None. |

| ASSIGNED CONTRACT | CURE AMOUNT |
|---|---|
| Lovelock Industrial, LLC and Barrick Gold Exploration Inc. and effective October 15, 2011; | |
|         c)      Second Amendment to that certain Commercial Lease and Deposit Receipt dated May 11, 2011 by and between Lovelock Industrial, LLC and Barrick Gold Exploration Inc. and effective March 1, 2013. | None. |
| 31.      Easement dated February 25, 2015 from Stanley W. McCart and Perry D. McCart to Barrick Gold Exploration Inc. and recorded as Document No. 492121 of the Records of Pershing County, Nevada. | None. |
| 32.      Utilities License #181982 dated February 14, 1986 by and between Nevada Land & Resource Company and Coeur D'Alene Mines Corp., and Memorandum of License dated September 5, 2000 and recorded at Book 354 Page 353 of the Records of Pershing County, Nevada. | None. |
| 33.      Access Agreement dated February 10, 2015 by and between Midway Gold US Inc. and Barrick Gold Exploration Inc. | None. |
| 34.      County Tax Deed dated June 18, 2015 from Lacey Donaldson, Treasurer of the County of Pershing, State of Nevada to Barrick Gold Exploration Inc. and recorded as Document No. 492479 of the Records of Pershing County, Nevada. | None. |
| 35.      Exchange Agreement dated June 12, 2015 between Stanley W. McCart and Perry D. McCart and Barrick Gold Exploration Inc. | None. |
|         a)      Grant Bargain and Sale Deed dated July 6, 2015 from Stanley W. McCart and Perry D. McCart to Barrick Gold Exploration Inc. and recorded as Document No. 492937 of the Records of Pershing County, Nevada. | None. |
|         b)      Water Rights Deed dated July 13, 2015 by from Barrick Gold Exploration Inc. to Stanley W. McCart and Perry D. McCart and recorded as Document No. 492938 of the Records of Pershing County, Nevada. | None. |
|         c)      Easement Agreement dated July 6, 2015 from Stanley W. McCart and Perry McCart to Barrick Gold Exploration Inc. and recorded as Document No. 492940 of the Records of Pershing County, Nevada. | None. |
|         d)      Easement Agreement between Barrick Gold Exploration Inc. to Stanley W. McCart and Perry D. McCart and recorded as Document No. 492939 of the Records of Pershing County, Nevada. | None. |
| 36.      License Agreement by and between Barrick Gold Exploration Inc. and Stanley W. McCart and Perry D. McCart. | None. |
| 37.      Option to Purchase dated June 6, 2015 executed by and between Musahsi T. Tazaki and Barrick Gold Exploration Inc. | None. |
| 38.      Option to Purchase dated June 9, 2015 executed by and between Reese Investment Properties, Inc. and Barrick Gold Exploration Inc. | None. |
| 39.      Option to Purchase dated June 25, 2015 executed | None. |

| ASSIGNED CONTRACT | CURE AMOUNT |
|---|---|
| by and between Finance ALL, LLC and Barrick Gold Exploration Inc. (APN# 012-280-04, apprx. 39.98 acres in S1/2N1/2, Sec. 29, T29 R35) | |
| 40. Option to Purchase dated June 25, 2015 executed by and between Finance ALL, LLC and Barrick Gold Exploration Inc. (APN# 012-280-05, apprx. 39.98 acres in N1/2S1/2, Sec. 29, T29 R35) | None. |
| 41. Option to Purchase dated June 25, 2015 executed by and between Finance ALL, LLC and Barrick Gold Exploration Inc. (APN# 012-280-06, apprx. 83.36 acres in S1/2, Sec. 29, T29 R35). | None. |
| 42. Option to Purchase dated June 6, 2015 executed by and between Jonathan Caldwell and Barrick Gold Exploration Inc. | None. |
| 43. Option to Purchase dated April 20, 2015 executed by and between Essie Brakefield and Barrick Gold Exploration Inc. | None. |
| 44. Water Rights Lease Agreement dated November 12, 2014 by and between by Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007, and Barrick Gold Exploration Inc. | None. |
| a) Notice of Election to Extend dated November 10, 2015 the Water Rights Lease Agreement dated November 12, 2014 by and between by Charles A. Kendricks, Carlinda A. Kendricks, and Charles A. Kendricks and Carlinda A. Kendricks as Trustees of the Kendricks Family Living Trust dated February 14, 2007, and Barrick Gold Exploration Inc. | None. |
| (ii) Additional Spring Valley Business | |
| 45. Mineral Lease Agreement and Option to Purchase dated July 26, 2011 by and between David E. Rowe, Carelon Rowe, RS Gold, LLC and MGC Resources Inc. (headed "Section 32 Lease"). | None. |
| 46. Mineral Lease Agreement and Option to Purchase dated July 26, 2011 by and between David E. Rowe, Carelon Rowe, RS Gold, LLC and MGC Resources Inc. (headed "Section 31 and Section 6 Lease"). | None. |
| 47. Access Agreement dated as of February 10, 2015 Midway Gold US Inc. (formerly MGC Resources, Inc.), and Barrick Gold Exploration Inc. | See item 33 above. |

## Schedule 3.8 – Disclosed Litigation

          *1.*      *In re Midway Gold US Inc., et al.*, Jointly Administered Case No. 15-16835 MER (Bankr. D. Colo.)

          *2.*      *Schmidt Family Mining Partnership, LLC, et al. v. Barrick Gold Exploration, Inc., et al.*, 15RP00001 1B (First Jud. Dist. Ct. Nev.)

          *3.*      *Midway Gold US Inc. v. Barrick Gold Exploration, Inc.*, Adv. Pro. No. 15-01412 MER (Bankr. D. Colo.)

          *4.*      *Earthworks et al v. U.S. Dep't of the Interior*, 1:09-cv-01972-FJS (U.S. Dist. Ct. D.C.). Plaintiffs seek an order vacating and remanding the 2003 Mill Site Rule, which reversed limitations on the number and acreage of allowable mill site claims, and the 2008 Mining Claim Rule, which eliminated certain surface-use fees on public lands for mining operations. An adverse ruling would fundamentally alter U.S. federal mining law and negatively impact mining operations on public land in the U.S.

## <u>Schedule 3.9(a) – Compliance with Laws</u>

### (i) Spring Valley Business

None.

### (ii) Additional Spring Valley Business

None.

## Schedule 3.9(b) – Material Permits

### (i) Spring Valley Business

All Environmental Permits listed in Schedule 3.10(b).

### (ii) Additional Spring Valley Business

None.

## Schedule 3.10(a) – Environmental Compliance

### (i) Spring Valley Business

      1. Nevada Commission of Mineral Resources, Division of Minerals, Notice under Abandoned Mine Lands Program (August 15, 2014).

      2. Nevada Commission of Mineral Resources, Division of Minerals, Notice under Abandoned Mine Lands Program (November 24, 2014).

### (ii) Additional Spring Valley Business

None.

## Schedule 3.10(b) – Environmental Permits

### (i) Spring Valley Business

| CATEGORY | MATERIAL PERMITS, LICENSES, AND APPROVALS | PERMIT HOLDER | PERMIT DATE | AMENDMENT DATE | NOTES |
|---|---|---|---|---|---|
| Plan of Operations | | | | | |
| | PoO/Revised Permit for Reclamation | MGC Resources, Inc. | September 2005 | Revised: December 2005 January 2006 August 2006 April 2007 | |
| | BLM EA: Spring Valley Exploration Project | MGC Resources, Inc. | | May 2007 | Notice level mineral exploration activities |
| | PoO Amendment | Barrick Gold Exploration Inc. | | April 27, 2011 | Boundary modification and drill plan and updated reclamation cost estimate |
| | PoO Amendment **Reclamation Permit No. 0258/NVN-81071** | Barrick Gold Exploration Inc. | | April 17, 2011 | To increase the approved surface area disturbance by approximately 10 acres. |
| | PoO/Reclamation Permit Amendment No. 1 **Reclamation Permit No. 0258/NVN-81071** | Barrick Gold Exploration Inc. | | May 2012 | |
| | PoO Amendment Approval of Minor Modification | Barrick Gold Exploration Inc. | | February 17,2015 | To increase the approved surface area disturbance by approximately 10 acres. |
| Reclamation and Financial Assurance Documentation | | | | | |
| | **Bond No. NVB001862 BLM Case No. NVN072662** | Barrick Gold Exploration Inc. | June 26, 2015 | | Surface reclamation in the amount of $8,000,000 |
| | **Reclamation Record No. NVN-081071 and Reclamation Permit No. 258** | | September 2005 | | |

| CATEGORY | MATERIAL PERMITS, LICENSES, AND APPROVALS | PERMIT HOLDER | PERMIT DATE | AMENDMENT DATE | NOTES |
|---|---|---|---|---|---|
| | **Reclamation Record No. NVN-081071 and Reclamation Permit No. 258** | Barrick Gold Exploration Inc. | January 12, 2015 | | Approval of reclamation cost update for Spring Valley Exploration Project |
| | **Reclamation Permit No. 258** | Barrick Gold Exploration Inc. | April 17, 2015 | | Approval of reclamation cost update for Spring Valley Exploration Project |
| | Release of Disturbance Acreage **(BLM No. NVN-81071)** | Barrick Gold Exploration Inc. | June 22, 2011 | | BLM letter of concurrence with BMRR's acceptance of reclamation activity on 25.31 acres |
| | **BLM Bond No. NVB001040** (replacing Bond No. NVB000791 held in MGC Resources , Inc.'s name) | Barrick Gold Exploration Inc. | May 18, 2009 | | Bond amount of $4,000,000 |
| WATER QUALITY PERMITS (including discharge permits for water treatment and dewatering plans) | | | | | |
| | **Permit No. NEV2014119** Discharge permit | Barrick Gold Exploration Inc. | March 25, 2015 to March 24, 2020 | | |
| | **General Permit No. NVR300000** Storm Water | Barrick Gold Exploration Inc. | August 1, 2013 | | |
| | Army Corps of Engineer, Concurrence Letter | Barrick Gold Exploration, Inc. | August 16, 2012 | | Jurisdictional determination that there are no WOTUS. Verification is valid for 5-years |

| CATEGORY | MATERIAL PERMITS, LICENSES, AND APPROVALS | PERMIT HOLDER | PERMIT DATE | AMENDMENT DATE | NOTES |
|---|---|---|---|---|---|
| | Waters of the U.S. Survey | Barrick Gold Exploration, Inc. | March 14, 2014 | | Report evaluates jurisdictional status of aquatic features on additional lands within Spring Valley that were not part of the original survey area. |

**(ii) Additional Spring Valley Business**

None.

## Schedule 3.10(c) – Hazardous Materials

### (i) Spring Valley Business

       1. Nevada Commission of Mineral Resources, Division of Minerals, Notice under Abandoned Mine Lands Program (August 15, 2014).

       2. Nevada Commission of Mineral Resources, Division of Minerals, Notice under Abandoned Mine Lands Program (November 24, 2014).

### (ii) Additional Spring Valley Business

None.

## Schedule 3.10(d) – Environmental Enforcement

### (i) Spring Valley Business

None.

### (ii) Additional Spring Valley Business

None.

**<u>Schedule 3.12(a) – Tax Matters</u>**

None.

## Schedule 3.14 – Reclamation Bonds

### (i) Spring Valley Business

Surface Management Personal Bond No. NVB001862 in the amount of $327,600.00 for the Spring Valley Business.

### (ii) Additional Spring Valley Business

None.

## Schedule 5.1 - Conduct of Business Prior to Closing

### (i) Spring Valley Business

1. The Spring Valley Business is conducted by the Manager under the Exploration, Development and Mine Operating Agreement dated March 9, 2009 by and between MGC Resources, Inc. and Barrick Gold Exploration, Inc. (as amended).

2. Pursuant to the Agreement dated May 29, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc., and Coeur Rochester, Inc., as amended by that First Amendment to Agreement dated July 24, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc., and that Second Amendment to Agreement dated September 10, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US Inc. and Coeur Rochester, Inc., and amended by that Third Amendment to Agreement dated October 30, 2015 by and between Barrick Gold Exploration, Inc., Midway Gold US In. and Coeur Rochester, Inc. ("Coeur Agreements"), and if the Coeur Agreements are approved by the court in the bankruptcy proceedings involving In re Midway Gold Corp. listed in Schedule 3.8, the property transfers contained in the Coeur Agreements will occur.

### (ii) Additional Spring Valley Business

None.

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "Amendment"), dated as of December ___, 2015, is entered into by and among Midway Gold US Inc., a Nevada corporation ("Midway US"), Nevada Talon LLC, a Nevada limited liability company ("Nevada Talon" and, together with Midway US, "Sellers") and Solidus Resources, LLC, a Nevada limited liability company ("Buyer").

## RECITALS

A.   The parties hereto are party to that certain Asset Purchase Agreement dated as of November 30, 2015 (the "Purchase Agreement").

B.   In accordance with Section 9.10 of the Purchase Agreement, the parties hereto have determined to amend the Purchase Agreement as set forth in this Amendment.

## AGREEMENT

In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   Definitions.  Certain capitalized words and phrases used herein and not otherwise defined have the meanings set forth or referenced in the Purchase Agreement.

2.   Amendment.  The parties hereto hereby agree that the Purchase Agreement shall be amended as follows:

(a)   Section 5.20(c)(vii) is amended by deleting the word "and" at the end thereof;

(b)   Section 5.20(c)(viii) is deleted and replaced with the following:

"Effective as of the Closing, assuming the Closing (as defined in the Barrick Asset Purchase Agreement) shall have occurred prior to, or contemporaneously with, the Closing, all Claims of Barrick acquired by Buyer (including, without limitation, Proof of Claim No. 223 filed by Barrick against Midway US) against Sellers and any of their Affiliates who are debtors in the Chapter 11 Cases are disallowed in their entirety and there shall be no recovery from Sellers and their Affiliates who are debtors in the Chapter 11 Cases in respect of such Claims, whether or not such Claims were asserted by Barrick in proofs of claim filed in the Chapter 11 Cases or scheduled by Sellers and their Affiliates who are debtors in the Chapter 11 Cases.  Proof of Claim No. 224 filed by Barrick Gold US Inc. (an affiliate of Barrick) against MDW Pan LLP is not affected in any way by the Sale Order.  MDW Pan LLP, Sellers and their Affiliates who are debtors in the Chapter 11 Cases, and parties in interest retain any and all rights to object to Proof of Claim No. 224.  For the avoidance of doubt, it is the intention that all Claims of Barrick acquired by Buyer arising out of or relating to the Spring Valley Development Project in any way are disallowed pursuant to the Sale Order; and";

(c)   New Section 5.20(c)(ix) will immediately follow Section 5.20(c)(viii) and will read as follows:

"Nothing in the Sale Order releases, discharges, nullifies, precludes, or enjoins the enforcement of any environmental liability to a governmental unit that any entity would be subject to as the owner or operator of the Purchased Assets after the Closing Date. Nothing in the Sale Order authorizes the transfer or assignment to Buyer of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments. Notwithstanding the foregoing sentence, nothing in the Sale Order shall: (i) be interpreted to deem Buyer as the successor to Sellers under any successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to the Closing Date or for liabilities relating to off-site disposal of waste by Sellers prior to the Closing Date; (ii) create for any governmental unit any substantive right that does not already exist under law; or (iii) be deemed or construed to be an admission of liability by Sellers. Nothing in the Sale Order shall be construed to guarantee that any water right is in good standing or otherwise bind the State of Nevada Division of Water Resources and the Nevada State Engineer to any interpretation of the terms and conditions of any water right set forth in Schedule 2.1(g) which conflict with the official records maintained by the State of Nevada Division of Water Resources with respect to each water right permit."; and

(d)     Item #5 of Schedule 2.3(e) is amended and restated in its entirety to read as follows:  "Claims asserted by Barrick in its Proof of Claim in the Chapter 11 Cases (Claim No. 223)."

3.     Meaning of "Agreement".  The term "Agreement" as used in the Purchase Agreement, shall, unless otherwise specified or unless the context otherwise requires, mean and include the Purchase Agreement and this Amendment, together, it being the intent of the parties hereto that the foregoing be applied and construed as a single instrument.

4.     Ratification and Confirmation of the Purchase Agreement.  The parties hereto do hereby ratify and reaffirm all of the terms and provisions of the Purchase Agreement, which, as amended and supplemented by this Amendment shall remain in full force and effect.

5.     Counterparts.  This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same instrument. A signed copy of this Amendment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Amendment.

*[Signature Page Follows]*

2

The parties hereto have caused this Amendment to be executed as of the date first written above by their respective officers thereunto duly authorized.

**MIDWAY US**

MIDWAY GOLD US INC., a Nevada corporation


By:_____
Name:  William M. Zisch
Title: President


**NEVADA TALON**

NEVADA TALON LLC, a Nevada limited liability company

By:_____
Name: William M. Zisch
Title: President of Midway Gold US Inc., the Sole Member of Nevada Talon LLC


**BUYER**

SOLIDUS RESOURCES, LLC, a Nevada limited liability company


By:_____
Name:
Title: