**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero**

In re:

MIDWAY GOLD US, INC. *et al.*,[1]

      Debtors.

Case No. 15-16835 MER

Jointly Administered Cases Under
Chapter 11

## ORDER

    These jointly-administered cases present, among other disputed confirmation issues, the question of whether Tenth Circuit law categorically forbids third-party releases in Chapter 11 plans, or whether prospective releases of inchoate third-party claims may be allowed in appropriate circumstances.  The Court has considered the evidence and legal argument submitted by the parties in connection with confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Liquidation ("Plan") and the objections thereto by the United States Trustee, and makes the following findings of fact and conclusions of law.[2]

### JURISDICTION

    The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (L) as it involves the administration of the estate and confirmation of the Debtors' Plan.

---

[1] The Debtors and their respective case numbers are: Midway Gold US Inc. (15-16835 MER); Midway Gold Corp.(15-16836 MER); Golden Eagle Holding, Inc. (15-16837); MDWGR Holding Corp. (15-16838 MER); RR Exploration, LLC (15-16839 MER); Midway Services Company (15-16840); Nevada Talon, LLC (15-16841 MER); MDW Pan Holding Corp. (15-16842 MER); MDW Pan LLP (15-16843 MER); MDW Gold Rock LLP (15-16844 MER); Midway Gold Realty LLC (15-16845 MER); MDW Mine ULC (15-16846 MER); GEH (B.C.) Holding Inc. (15-16847 MER); GEH (US) Holding Inc. (15-16848 MER) (collectively, "Chapter 11 Cases").

[2] Capitalized terms not otherwise specifically defined herein shall have the same meanings as under the Plan and Disclosure Statement for Second Amended Joint Chapter 11 Plan of Liquidation ("Disclosure Statement").

## BACKGROUND FACTS

### I.      Overview.

Prior to filing their Chapter 11 petitions, the Debtors engaged in the business of exploration and mining of gold reserves.  The Midway Gold Pan Mine, in White Pine County, Nevada, was the only project commercially mined.  Other projects were in various stages of exploration and permitting.[3]

On June 22, 2015 ("Petition Date"), each of the fourteen Debtors filed a voluntary Chapter 11 petition for relief under Chapter 11 of the Bankruptcy Code.[4]  The Chapter 11 Cases are jointly administered for procedural purposes only under Case No. 15-16835 MER.

The following nine cases are non-asset cases:  a) Golden Eagle Holding, Inc., 15-16837-MER; b) MDW GR Holding Corporation, 15-16838-MER; c) RR Exploration, LLC, 15-16839-MER; d) Midway Services Company, 15-16840-MER; e) Nevada Talon, LLC, 15-16841-MER; f) MDW Pan Holding Corporation, 15-16842-MER; g) MDW Mine, ULC, 15-16846-MER; h) GEH (BC) Holding, Inc., 15-16847-MER; and i) GEH (U.S.) Holding, Inc., 15-16848-MER.

The following five cases are asset cases:  a) Midway Gold US Inc., 15-16835-MER; b) Midway Gold Corporation, 15-16836-MER; c) MDW Pan, LLP, 15-16843-MER; d) MDW Gold Rock, LLP, 15-16844-MER; and e) Midway Gold Realty, LLC, 15-16845-MER.

### II.      Corporate Structure.

As of the Petition Date, Midway Mine, ULC, a British Columbia corporation, owned 100% of Debtor Midway Gold Corporation, another British Columbia Corporation.  Midway Gold Corporation owns 100% of Debtor Midway Gold US, Inc. ("MGUS"), a Nevada Corporation which in turn owns 100% of the following Nevada corporations:  1) Debtor MDW Pan Holding Corporation; 2) Debtor MDW-GR Holding Corporation; 3) Debtor Midway Services Company; 4) Midway Pan Mine Company; 5) Midway Gold Rock Mining Company; 6) RR Exploration, LLC; 7) Debtor Nevada Talon,

---

[3] The Gold Rock project, in White Pine County, Nevada was partially permitted, but never mined.  The Golden Eagle project, in Ferry County, Washington, was never permitted or mined.  In addition, the Debtors and Barrick Gold Exploration, Inc. formed a joint venture with respect to the Spring Valley project, in Pershing County, Nevada.

[4] Unless otherwise specified, all references herein to "Section," "§" and "Code" refer to the U.S. Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

LLC; 8) Debtor Midway Gold Realty, LLC; 9) Mine Services, LLC; and 10) Midway Exploration, LLC.

Midway Gold Corporation also owns 100% of another British Columbia corporation, GEH (BC) Holding, Inc., which in turn owns 100% of Debtor GEH (US) Holding, Inc., a Nevada corporation, and 100% of Debtor Golden Eagle Holding, Inc., a Washington corporation.

Debtor MDW Pan, LLP ("MDW Pan"), a Delaware corporation, is owned 87.5% by Debtor MDW Pan Holding Corporation, 12.5% by Midway Gold Corporation, and 1% by the above-noted Canadian company, Midway Mine, ULC.  A Delaware limited partnership, Debtor MDW Gold Rock, LLP, is owned 75% by Debtor MDW GR Holding Corporation, 25% by Midway Gold Corporation, and 1% by Midway Mine, ULC.

Non-debtor affiliates include Midway Pan Mine Company, Midway Gold Rock Mine Co., Mine Services, LLC, and Midway Exploration, LLC.  Each of these non-Debtors has no material property or operations.[5]

The principal business of Debtor Midway Gold Corporation, the parent company of MGUS, is the acquisition, exploration and development of mineral properties located in Nevada and Washington. Midway Gold Corporation's stock trades on the New York Stock Exchange and the Toronto Stock Exchange.  Midway Gold Corporation's executive offices are located in Englewood, Colorado, and its senior management, including its Chief Executive Officer, Chief Financial Officer and General Counsel, work in the Englewood headquarters.  All the Debtors in these jointly administered cases operate primarily through MGUS.

As of the Petition Date, the Debtors owed approximately $47.5 million under their Senior Debt Facility, described below.  They also owed approximately $7.85 million under their Subordinated Debt Facility, described below.

## III.  Major Parties in Interest.

### A. Commonwealth Bank of Australia, Senior Agent for Senior Debt Facility.

The Senior Debt Facility consists of senior lenders, with Commonwealth Bank of Australia ("CBA") serving as the Senior Agent. These creditors loaned $55 million to MDW Pan through a three-year senior secured project finance facility, intended to fund the development and

---

[5] *See* Docket No. 22, Ex. 1.

construction of the Pan gold mine project.  As of the Petition Date, the outstanding principal balance of the Senior Debt Facility was $47.5 million.[6]

MDW Pan's obligations under the Senior Credit Agreement were guaranteed by each of the other Debtors and the four non-Debtor affiliates. The Senior Secured obligations are secured by substantially all of the assets of MDW Pan, as described in detail in the Cash Collateral Order.  In addition, each of the Debtors and the four non-debtor affiliates pledged 100% of the common stock they own in the other Debtors and non-debtors to secure the Senior Secured Obligations.

The Debtors drew down $47.5 million under the Senior Credit Agreement prior to the Petition Date.  The Debtors' ability to draw additional amounts was contingent on various conditions precedent, including funding expected cost overruns and the establishment of an un-margined hedging program through the Senior Agent.  The Debtors satisfied the gold hedging requirements on October 7, 2014, by entering into commitments to deliver to the Senior Agent, at a flat forward price of $1,200 per ounce, 80,500 ounces of gold over a 23-month period commencing in May 2015.

However, the Debtors lacked sufficient funds to complete construction of the Pan gold mine, fund operating and reserve accounts, and satisfy other requirements under the Senior Credit Agreement.  On March 13, 2015, MDW Pan and CBA entered into a waiver which granted MDW Pan until April 20, 2015, to meet certain covenants set forth in the Senior Credit Agreement.

As consideration for the waiver, MDW Pan agreed to pay to the Senior Agent a non-refundable waiver fee equal to $0.2 million by June 30, 2015. The Debtors were unable to comply with their obligations under the waiver, resulting in an event of default under the Senior Credit Agreement on May 20, 2015.[7]

MDW Pan and CBA also entered into an ISDA Master Agreement dated October 3, 2014 ("Secured Hedge Agreement"), modified by a Letter Agreement dated May 21, 2015 ("Secured Hedge Termination").  Under the Secured Hedge Termination, MDW Pan was permitted to terminate all

---

[6] The Senior Credit Agreement provided for two tranches of debt:  i) a project finance facility of $43 million; and ii) a cost overrun facility of $10 million.  Advances under the project finance facility bear interest at LIBOR plus 3.75% until economic completion and LIBOR plus 3.50% thereafter.  Advances under the cost overrun facility bear interest at the project finance facility rate plus 2%.

[7] Since January 30, 2015, the Senior Secured Parties have not provided any additional financing to the Debtors.

Secured Hedge Agreements and all transactions thereunder.  In addition, MDW Pan's obligations to execute and maintain mandatory derivative transactions under the Risk Management Program (as defined in the Senior Creditor Agreement) were waived.

Upon achieving economic completion and meeting certain other requirements under the Senior Debt Facility, the Senior Agent's collateral was to be limited to the assets of MDW Pan and a guaranty from Midway Gold.  However, as of the Petition Date, these requirements had not been met.

The cash collateral budget negotiated with the Senior Agent in connection with the Final Cash Collateral Order expired on June 3, 2016.  Given the sale of substantially all of the assets of MDW Pan, resulting in the cessation of revenue generation for the Debtors and the availability of substantial unencumbered cash held by MGUS as a result of the sale of the Spring Valley property,[8] the Debtors no longer required the use of cash collateral.  However, the technical failure of the Debtors and the Senior Agent to agree on an Amended Budget by June 6, 2016, constituted an automatic Termination Event under paragraph 15(a) of the Final Cash Collateral Order.

On June 10, 2016, counsel for the Senior Agent delivered a notice by email to counsel for the Debtors, counsel for the Committee, counsel for the Subordinate Agent, and the Office of the United States Trustee ("UST").  This notice constituted i) a Carve-Out Trigger Notice pursuant to paragraph 10(e) of the Final Cash Collateral Order and ii) an Enforcement Notice pursuant to paragraph 17 of the Final Cash Collateral Order.  Pursuant to the Enforcement Notice, the Senior Agent, among other things, invoked the Post-Carve-Out Trigger Notice Cap with immediate effect and reserved its rights to exercise available remedies following expiration of the Notice Period on June 17, 2016.

On August 29, 2016, the Senior Agent swept cash totaling approximately $5.7 million, held in MDW Pan's bank account at Wells Fargo Bank.  This cash represented the remaining proceeds from the sale of gold prior to the sale of MDW Pan's assets to GRP Minerals and does not include any of the proceeds of that sale.  The sale proceeds are maintained in a separate account and were not swept by the Senior Agent.  The Senior Agent has since swept additional MDW Pan Cash Collateral, bringing the total amount swept to approximately $5.89 million.

---

[8] See Note 3, above.

MDW Pan also has a post-petition intercompany obligation owed to MGUS in excess of $2 million with respect to allocated professional fees and other administrative obligations.  According to the Debtors, CBA's collection of MDW Pan's cash is subject to offset for such post-petition amounts and the Debtors reserve all rights with respect to amounts collected.

## B. Hale Capital Partners.

The Debtors also have a Subordinated Debt Facility.  On April 17, 2015, MDW Pan, as borrower, and the Subordinate Secured Parties entered into a Subordinate Credit Agreement.  Hale Capital Partners, L.P. ("Hale Capital") is the administrative and collateral agent ("Subordinate Agent") under the Subordinate Credit Agreement.

The Debtors received an initial draw of $3.85 million under the Subordinate Credit Agreement.  The Subordinate Credit Agreement was to mature on September 30, 2017, bearing interest at a rate of 13.5% per annum and subject to a 5% per annum commitment fee on the undrawn commitment through September 30, 2015.  The proceeds of the Subordinated Debt Facility were to be used to pay for costs for the Pan gold mine project and for general corporate purposes.  As of the Petition Date, the principal balance of the Subordinate Credit Agreement was $7.85 million.

The Subordinated Debt Facility was secured by the same collateral, guaranties and pledges as the Senior Debt Facility but is subordinated to the interests of the Senior Agent and Senior Secured Parties.

Also on April 17, 2015, the Senior Agent, the Subordinate Agent, Midway Gold, MDW Pan and certain other parties entered into a Subordination Agreement to determine the respective rights of the Senior Agent and the Subordinate Agent.

The Debtors went out of compliance with the terms of the Subordinated Debt Facility prior to the Petition Date.  After May 15, 2015, the Subordinate Agent has not provided any additional financing to the Debtors.

## C. RBC Dominion Securities.

On April 14, 2015, the Debtors hired RBC Dominion Securities Inc. ("RBC") as their strategic advisors to develop, evaluate and assist the Debtors in implementing potential strategies and transaction alternatives, including the issuance of securities, recapitalization, and sale of substantially all of the Debtors' assets.

With the assistance of RBC, the Debtors contacted twenty-eight third parties, consisting of twenty-three strategic parties and five financial investors to determine interest in engaging in a strategic transaction with the Debtors.  The Debtors provided non-disclosure agreements to interested parties and received fourteen signed non-disclosure agreements back.  The Debtors also provided the parties signing those agreements access to the Debtors' data room. Thereafter, five parties conducted site visits.  As of the June 5, 2015 deadline for the submission of proposals, however, no proposal to engage in a transaction was received.  The Debtors then decided to commence the Chapter 11 Cases.

**D. Barrick Gold.**

MGUS and Barrick Gold Exploration Inc. ("Barrick") entered into an Exploration, Development and Mine Operating Agreement dated March 9, 2009 (as amended, the "Barrick Agreement").  Under the Barrick Agreement, certain properties located in Pershing County, Nevada, and commonly referred to as the "Spring Valley property," which were owned or leased by MGUS, or in which MGUS held a contractual interest, would be explored and developed by Barrick for the benefit of both parties.

Further, the Barrick Agreement granted Barrick the exclusive right to explore, develop and earn an interest in the Spring Valley property.  Barrick completed an expenditure requirement of $38 million enabling Barrick to earn a 70% interest in the Spring Valley property.[9]  As of the Petition Date, MGUS and Barrick owned 30% and 70% interests, respectively, in the Spring Valley property.

MGUS exercised its option under the Barrick Agreement to enter into the joint venture with Barrick on February 23, 2014, and Barrick became the manager of the joint venture.  On February 25, 2015, the Debtors announced that Barrick had published an initial mineral resource for Spring Valley.

The Debtors and Barrick determined to sell their respective interests in the Spring Valley property during the Chapter 11 Cases, but the parties were not able to agree on a consensual joint sale process.  As a result, the Debtors commenced an adversary proceeding against Barrick, pursuant to which, among other relief, the Debtors sought to sell the entirety of the

---

[9] In addition, MGUS elected to allow Barrick to earn an additional 5% interest (for a 75% total) by carrying the Debtors to a production decision and arranging financing for MGUS's share of the mine construction expenses with the carrying and financing costs plus interest to be recouped by Barrick, solely from MGUS's share of project cash flows once production had been established.

7

Spring Valley project pursuant to § 363(h).  The Debtors also sought a preliminary injunction to enjoin Barrick from proceeding with its own sale process.  Ultimately, the adversary proceeding was effectively rendered moot by the successful sale of MGUS's interest in the Spring Valley project to Solidus Resources.  Solidus Resources also acquired Barrick's interest in the Spring Valley project through Barrick's independent sale process, thus acquiring 100% of the Spring Valley project.  The adversary proceeding was thereafter dismissed.

### E. Unsecured Creditors' Committee.

On July 1, 2015, the UST appointed the Official Committee of Unsecured Creditors ("Committee") in these Chapter 11 Cases.[10]  The initial Committee members were:  American Assay Laboratories;  Boart Longyear; EPC Services Company;  InFaith Community Foundation;  Jacobs Engineering Group, Inc.;  SRK Consulting (US), Inc.;  and Sunbelt Rentals.[11]  The Committee retained the law firm of Cooley LLP to serve as its primary bankruptcy counsel and Gavin/Solmonese LLC to serve as its financial advisor.

### F. Mechanics' Lien Parties.

On May 5, 2016, EPC Services Company ("EPC") commenced an adversary proceeding ("EPC Adversary") seeking a determination of the relative rights and priorities with respect to the assets of MDW Pan of EPC, the other Mechanic's Lien Claimants, the Senior Agent, the Subordinate Agent, and certain other parties.[12] Certain of the Debtors were named as co-defendants.

In addition to EPC, the other Mechanics' Lien Parties asserted they hold secured mechanic's lien claims with priority over the allowed claims of the Senior Agent and the Subordinate Agent.  The Plan reflects settlement of the claims of the Mechanics' Lien Parties.

---

[10] Docket No. 95.

[11] EPC Services Company subsequently resigned from the Committee prior to commencing the EPC Adversary Proceeding.

[12] The Plan defines "Mechanic's Lien Claimants" to mean "the following creditors, other than Jacobs and Ledcor, who have asserted mechanic's lien rights with respect to certain assets of the Debtors and were parties to the EPC Adversary Proceeding prior to the dismissal thereof: (i) EPC, (ii) Golder Associates, (iii) Gustavson, (iv) Roscoe Moss, and (v) Sure Steel." Docket No. 1180, Article I.A.87.

**G. Professionals, Financial Advisors, and Attorneys**.

The Debtors retained the law firm of Squire Patton Boggs (US) LLP to serve as their primary bankruptcy counsel and the law firm of Sender Wasserman Wadsworth, P.C. to serve as their local bankruptcy counsel for the Chapter 11 Cases.  The law firm of DLA Piper (Canada) LLP serves as their Canadian bankruptcy counsel in connection with the Canadian Recognition Proceedings.  Additionally, the Debtors retained FTI Consulting, Inc. ("FTI") to serve as their financial advisor and Moelis & Company LLC ("Moelis") to serve as their investment banker.  Moelis replaced RBC as the Debtors' investment banker effective as of August 12, 2015, following RBC's postpetition resignation.  The Debtors appointed Epiq Bankruptcy Solutions, LLC ("Epiq") as noticing and balloting agent.

**H. Trade Debt.**

As a company with significant operations in Nevada, the Debtors purchased or leased mining equipment, processed commodities and used other services and goods from numerous vendors.  As of the Petition Date, the Debtors estimated they collectively owed approximately $17.5 million in trade debt.

**I.  Equity.**

In December 2012, the Debtors issued 37,837,838 Series A Preferred Shares of Midway Gold Corporation at $1.85 per share for gross proceeds of $70 million pursuant to a private placement.  The Series A Preferred Shares are a participating security as they receive dividends with common stock or cash at the Debtors' election.[13]  There is an 8% annual dividend for the Series A Preferred Shares, compounded monthly and payable quarterly.  At their option, the Debtors may pay such dividend with common shares in lieu of cash.

The holders of Series A Preferred Shares are able to convert the shares into common shares on a one-for-one basis at any time on three days' notice to the Debtors. After December 13, 2013, the Debtors could compel conversion of the shares into common shares on a one-for-one basis if certain conditions were met.  Starting on December 13, 2017, the Debtors or each holder of Series A Preferred Shares had the right to redeem or to require the Debtors to redeem, upon 30 days' notice, at their issue price any

---

[13] A "participating security" is a "redeemable, preferred, equity-type securit[y]."  *See* 13 C.F.R. 107.1500(a).

portion of the Series A Preferred Shares plus accumulated unpaid dividends for cash.  As of the Petition Date, there were no conversions.

Holders of the Series A Preferred Shares were given the right to nominate and elect, voting as a separate class, one director to Midway Gold Corporation's board.  Upon liquidation, dissolution or winding-up, the holders of the Series A Preferred Shares are entitled to a liquidation preference equal to 125% of the initial issue price prior to any distribution to the holders of the common shares.  Finally, holders of the Series A Preferred Shares have consent rights over a variety of significant corporate and financing matters.

Of the 37,837,838 Series A Preferred Shares sold, EREF-MID II, LLC and HCP-MID, LLC purchased a combined 17,837,838 Series A Preferred Shares.  On March 26, 2015, Midway Gold Corporation's board of directors declared a dividend payment to the holders of Series A Preferred Shares with a record date of March 30, 2015, totaling $1.4 million, which was paid on April 1, 2015, in common shares, through the issuance of 3.7 million common shares to the holders of the Series A Preferred Shares, and in cash, through the payment of applicable withholding taxes.

Hale Fund Management, LLC ("HFM") is the manager of EREF-MID II, LLC.  HCP is the sole member of HCP-MID, LLC.  Hale Fund Partners, LLC, ("HFP") is the general partner of HCP.  Hale Capital Management, LP ("HCM") is the manager of HCP.  Hale Fund Management, LLC ("HFM"), is the general partner of HCM and exercises voting and investment power over the Series A Preferred Shares held by HCP-MID, LLC.  Mr. Martin Hale, a member of Midway Gold Corporation's board of directors, is the (i) CEO of HCP, (ii) the sole owner and managing member of HFP and (iii) the sole owner and CEO of HFM.

As of May 1, 2015, 180,223,767 shares of common stock of Midway Gold Corporation were outstanding.  Midway Gold Corporation's common stock traded on the New York Stock Exchange and the Toronto Stock Exchange, but has since been delisted from both exchanges.  Midway Gold Corporation's market capitalization was approximately $6.3 million as of the Petition Date.  As of the Petition Date, there were no warrants to purchase shares of Midway Gold Corporation's common stock but there were outstanding stock options with respect to Midway Gold Corporation's common stock.

## EVENTS IN THE CHAPTER 11 CASES

On June 24, 2015, this Court entered an order authorizing MGUS to act as the Debtors' foreign representative in connection with ancillary

Canadian Recognition Proceedings pending in the Canadian Court.[14]  On June 25, 2015, the Canadian Court entered an initial order and a supplemental order recognizing the Chapter 11 Cases as a "foreign main proceeding."[15]  The Canadian Court also appointed Ernst & Young Inc. to serve as Information Officer in the Canadian Recognition Proceedings.[16]  MGUS has also filed status reports with the Canadian Court.

The Spring Valley joint venture was sold to Solidus Resources, which settled the claims between the Debtors and Barrick.  The other mining properties were sold to GRP Minerals, LLC, for the approximate net price of $5.326 million.[17]  GRP Minerals was formed for the purpose of acquiring these assets, and its members include former managers of the Debtors.  At the time the Disclosure Statement was filed, the Tonopah Project, in Nye County, Nevada, was the subject of a pending sale motion.  An order approving the sale of the Tonopah Project was entered March 22, 2017.[18]  The Debtors no longer have any ongoing business operations.

## SUMMARY OF THE PLAN

The remaining assets of the Debtors consist of the cash proceeds from the prior sales, the Tonopah project, personal property, and causes of action.  The Plan provides for a Liquidating Trustee to sell the remaining assets, assert avoidance claims, and distribute proceeds.

Under the Plan, cash proceeds will be distributed to administrative claimants through a consensual carve-out, and to various mechanics' lien claimants in amounts set by settlements.  The Liquidating Trustee will be paid by an additional carve-out.  Priority claims will be paid in cash.  Payment of approximately 2% will be made to general unsecured creditors of the Asset Cases.  All other funds will be distributed to the Senior Agent, Commonwealth Bank of Australia.  Creditors of the non-asset cases will receive nothing.  The Plan creates a Liquidation Committee of three unsecured creditors, which is charged with the duty of appointing and

---

[14] Action No. S-155201, Vancouver Registry, under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended.

[15] *See* Docket No. 161.

[16] As events occurred in these cases, MGUS, as the foreign representative of the Debtors, sought corresponding relief in the Canadian Recognition Proceedings.

[17] Descriptions of the Debtors' mining enterprises and sales thereof described in greater detail in the Disclosure Statement. *See* Docket No. 1181, pp. 4-8.

[18] *See* Docket No. 1227.

overseeing the Liquidating Trustee.  The members of the Liquidating Committee have been elected and the Committee has selected the Liquidating Trustee.

The Liquidating Committee consists of Sunbelt Rentals, Jacobs Engineering Group, Inc., SRK Consulting (US), Inc. and American Assay Laboratories.  The Committee has selected Gavin/Solomonese, LLP as the Liquidating Trustee, with Mr. Edward T. Gavin as the managing agent and Mr. Stanley T. Mastil as the operational agent for the Trustee.

## I.    Treatment of Claims and Interests.

The Plan provides for twelve classes of Claims and Equity Interests.  Of those classes, Class Nos. 1, 3, 4, and 5 ("Classes Deemed to Accept") are unimpaired and deemed to accept the Plan; Class Nos. 2, 6, 7, 8, 9 and 10 ("Voting Classes") are impaired and entitled to vote on the Plan; and Class Nos. 11 and 12 ("Classes Deemed to Reject") are impaired and deemed to reject the Plan.  The Plan proposes the following classification and treatment of claims and interests:

- Administrative Claims – These claims are to be paid 100% on the effective date or soon thereafter, and include $25,000,000 for the Senior Agent Administrative Claim.  As of January 31, 2017, the incurred but unpaid fees and expenses of the Debtors' and the Committee's professionals are approximately $0.4 million ($400,000).  The professional fees and expenses of the Debtors and the Committee after such date are estimated to be $1.8 million, which is inclusive of a "Restructuring Fee" for Moelis in the approximate amount of $1.127 million. These amounts are not capped.  In addition, the Excess Reserve Amount, if any, shall be paid to the Senior Agent as a supplemental distribution on account of the Senior Agent Administrative Claim only upon the completion of the administration of such reserves as determined by the Liquidating Trustee.  Moreover, the Plan provides allowed intercompany Administrative Claims shall be set-off against each other and the net payable amount, if any, shall be paid by the liable Debtor to the applicable Debtor in full from available assets of the liable Debtor.  If no available assets exist, the unpaid portion of the Intercompany Administrative Claim will be deemed waived and forgiven.

- Priority Tax Claims – These claims, in the amount of $25,000, are to be paid 100% on the Effective Date.

- Class 1:   Non-Priority Tax Claims – These claims, in the amount of $12,500, will be paid 100% on the Effective Date to the extent they are not already current.  This class is unimpaired.

- Class 2:  Senior Agent Secured Claim — This claim, in the amount of $49,115,283, is to be paid between 5% and 15% of its claim on the Effective Date from cash collateral or funds previously distributed, and the portion of the sale proceeds allocated to the Pan project, provided that upon the resolution of the lien priority dispute, the difference between the Lien Priority Dispute Reserve and the actual amounts paid to the mechanics' lien claimant shall be paid to the Senior Agent by the Liquidating Trustee.  Any deficiency is a Class 8 unsecured claim.  This class is impaired.

- Class 3: Subordinate Agent Secured Claim — This claim, in the amount of $8,015,234 will receive nothing under the Plan, pursuant to the Subordinate Agent Settlement.  The Debtors assert this class is unimpaired, while the UST asserts it is impaired.

- Class 4: Mechanics' Lien Claims — These claims total $1,612,515.  The agreed recovery for allowed claims in this class is 77% of the original principal claims, to be paid from the Lien Priority Dispute Reserve.  This class is listed as unimpaired.

- Class 5: Other Secured Claims against Debtor's affiliate, MDW Pan — These claims, in the amount of $106,000, will receive 100% (if the claim is senior in priority to the Senior Agent Secured Claim) or 0% (if the claim is junior in priority to the Senior Agent Secured Claim).  These claims consist of mechanics liens which are "contractually subordinate." This class is listed as unimpaired.

- Class 6: General Unsecured Claims against MGUS — These claims, in the amount of $1,495,473, will receive between 15% and 30% of their claims depending on recovery from the Debtors' retained causes of action related to the Tonopah Project.  This class is impaired.

- Class 7: General Unsecured Claims against Midway Gold Corporation — These claims, in the amount of $446,832, will receive between 1% and 2% of their claims depending on recovery from the Debtors' retained causes of action on the Tonopah Project.  This class is impaired.

- Class 8: General Unsecured claims against MDW Pan — These claims, in the amount of $9,809,433, will receive between 1% and 2% of their claims, depending on recovery from the Debtors' retained causes of action on the Tonopah Project.  This class is impaired.

- Class 9: General Unsecured Claims against MDW Gold Rock, LLP — These claims, in the amount of $32,596, will receive between 1% and 2% depending on recovery from the Debtors' retained causes of action on the Tonopah Project.  This class is impaired.

- Class 10: General Unsecured Claims against Midway Gold Realty, LLC – These claims, in the amount of $956, will receive between 1% and 2% depending on recovery from the Debtors' retained causes of action on the Tonopah Project.  This class is impaired.

- Class 11: General Unsecured Claims against No Asset Debtors, held only by the Senior Agent, the Subordinate Agent, and Aspen Insurance – Although this class is listed as impaired, it also lists no amount owing.

- Class 12: Equity Interests – These shall be canceled and receive nothing, and the class is impaired.

## II.    Exculpation/Releases.

The Plan contains the following provisions with respect to exculpation and third-party releases:

46. "Exculpated Parties" means, collectively, the Debtors, the officers and directors of the Debtors that served in such capacity at any time from and after the Petition Date (in their capacity as such as well as in their individual capacities), the Committee and its individual members (solely in their capacity as such), the Liquidating Trustee, the Liquidating Trust Committee and its members (solely in their capacity as such), the Senior Secured Parties, the Subordinate Secured Parties, and each of their respective Representatives (each of the foregoing in its individual capacity as such).[19]

111. "Released Parties" means, collectively, (a) the Debtors, (b) the directors, officers, and employees of the Debtors serving in such capacity on or after the Petition Date (in their capacity as such as well as in their individual capacities), the Committee and its members (solely in their capacity as members of the Committee and not in their individual capacities), (c) the Senior Secured Parties, (d) the Subordinate Secured Parties, and (e) the Representatives of each of the foregoing, including, without limitation, all Professionals.[20]

112. "Releasing Parties" means, collectively, (a) the Released Parties, (b) holders of Claims voting to accept the Plan or who are deemed to accept the Plan, and (c) with respect to any other

---

[19] Docket No. 1180, Article I.A.46.

[20] *Id.* at Article I.A.111.

persons or Entities, holders of Claims or Equity Interests entitled to vote to accept the Plan that do not affirmatively opt out of the release provided by ARTICLE IX hereof pursuant to a duly executed ballot.[21]

. . . .

B.   Releases by the Debtors

1. Releases by the Debtors.   Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, including, without limitation: (a) the satisfaction and elimination of debt and all other good and valuable consideration paid pursuant to the Plan or otherwise; and (b) the services of the Debtors' officers and directors and the Professionals retained in these Chapter 11 Cases in facilitating the expeditious implementation of the Sales of substantially all of the Debtors' assets, each of the Debtors hereby provides a full release, waiver and discharge to the Released Parties (and each Released Party shall be deemed released and discharged by the Debtors) and their respective properties from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that are based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place on or after the Petition Date and prior to or on the Effective Date in any way related to the Debtors, including, without limitation, those that any of the Debtors or the Midway Liquidating Trust would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or Estates and further including those in any way related to the Chapter 11 Cases or the Plan.   In addition, the Debtors, on behalf of themselves and their respective Estates, hereby release each of the Professionals

---

[21] *Id.* at Article I.A.112.

retained by the Debtors and the Committee in these Chapter 11 Cases from any and all Avoidance Actions that may exist as of the Effective Date.  Notwithstanding the foregoing, nothing herein is intended or shall be deemed to release any claims or Causes of Action against any Released Party resulting from gross negligence, willful misconduct, or fraud.

2. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in this ARTICLE IX.B pursuant to Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Debtors or the Liquidating Trustee.[22]

C.  Exculpation

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all Claims and Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, the Liquidating Trust Agreement, the Cash Collateral Order, the Sales or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the Sales or the liquidation of the Debtors; provided, however, that the foregoing provisions of this ARTICLE IX.C shall have no effect on the liability of any Exculpated Party that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or fraud; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of

---

[22] Docket No. 1180, Article IX.B.

counsel concerning its duties pursuant to, or in connection with, the above-referenced documents.[23]

D.  Third-party Releases

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Releasing Parties shall be deemed to have forever released, waived and discharged all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, that are based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place on or after the Petition Date but prior to or on the Effective Date in any way related to the Debtors, the Chapter 11 Cases or the Plan against the Released Parties.  Notwithstanding the foregoing, nothing herein is intended or shall be deemed to release any claims or Causes of Action against any Released Party resulting from gross negligence, willful misconduct, or fraud.

ALL CREDITORS WHO ARE DEEMED TO VOTE TO ACCEPT THE PLAN OR WHO ARE ENTITLED TO VOTE AND VOTE TO ACCEPT THE PLAN WILL IN ALL CASES BE DEEMED TO HAVE ACKNOWLEDGED AND AFFIRMATIVELY CONSENTED TO, AND WILL BE BOUND BY, THE FOREGOING THIRD PARTY RELEASE TO THE FULLEST EXTENT PERMITTED BY LAW.

ALL CREDITORS WHO ARE ENTITLED TO VOTE AND VOTE TO REJECT THE PLAN OR WHO FAIL TO TIMELY SUBMIT A PROPERLY COMPLETED BALLOT WILL BE DEEMED TO HAVE ACKNOWLEDGED AND AFFIRMATIVELY CONSENTED TO, AND WILL BE BOUND BY, THE FOREGOING THIRD PARTY RELEASE TO THE FULLEST EXTENT PERMITTED BY LAW UNLESS SUCH CREDITOR AFFIRMATIVELY OPTS-OUT OF PROVIDING SUCH RELEASE BY MARKING THE APPROPRIATE BOX ON THEIR BALLOT AND TIMELY SUBMITTING THE BALLOT IN ACCORDANCE WITH THE PROCEDURES APPROVED BY THE BANKRUPTCY COURT.

---

[23] *Id.* at Article IX.C.

ALL CREDITORS AND EQUITY HOLDERS WHO ARE NOT ENTITLED
TO VOTE ON THE PLAN AND ARE DEEMED TO REJECT THE PLAN
WILL  BE  DEEMED  TO  HAVE  ACKNOWLEDGED  AND
AFFIRMATIVELY CONSENTED TO, AND WILL BE BOUND BY, THE
FOREGOING THIRD PARTY RELEASE TO THE FULLEST EXTENT
PERMITTED BY LAW UNLESS SUCH CREDITOR OR EQUITY
HOLDER AFFIRMATIVELY OPTS-OUT OF PROVIDING SUCH
RELEASE BY ACCESSING THE BALLOTING AGENT'S WEBSITE
(HTTP://DM.EPIQ11.COM/MGC) AND GOING TO THE OPT-OUT
PORTAL, THEN REGISTERING AND COMPLETING YOUR ELECTION
TO OPT-OUT OF THE RELEASE AND INJUNCTION PROVISIONS BY
THE DEADLINE FOR SUBMITTING VOTES ON THE PLAN.[24]


## DISCUSSION

## I.      The Plan Contents Comply With § 1123 and Rule 3016.

Section 1123(a) requires a plan to "designate, subject to section 1122
of this title, classes of claims, other than claims of the kind specified in
section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of
interests."[25]  The Debtors' Plan does this on pages 20-21.  The Plan places
claims and interests which are substantially similar together, pursuant to
§ 1122(a).[26]  Section 1122(b) is not applicable because the Plan does not
create an administrative convenience class.

The Plan provides for administrative expenses and priority taxes under
§ 507(a)(2) and (8).  There are no "gap" claims under § 507(a)(3) because
this is a voluntary case.  Further, on pages 21—27, the Plan specifies
unimpaired and impaired classes as required by § 1123(a)(2) and (3).  The
members of the classes are treated the same pursuant to § 1123(a)(4), and
the Plan describes how the Liquidating Trustee will liquidate and distribute
assets, pursuant to § 1123(a)(5).  The Plan also complies with § 1123(a)(6)
because no equity securities are being issued under the Plan, and all equity
interests are being canceled under the Plan.  Section 1123(a)(7) also does
not apply because the Debtors are not selecting officers and directors under
the Plan.

---

[24] Docket No. 1180, Article IX.D.

[25] § 1123(a)(1).

[26] Docket No. 1180, pp. 21-27.

As allowed by § 1123(b)(1), the Plan creates both impaired and unimpaired classes.  In addition, it provides for rejection of all unexpired leases unless previously assumed, pursuant to  § 1123(b)(2).  As permitted by § 1123(b)(3), the Plan provides for all the Debtors' assets to be transferred to a Liquidating Trust.

The Plan complies with FED. R. BANKR. P. 3016 because it is dated and identified with the name of the entities submitting it.  Moreover, it was accompanied by a Disclosure Statement approved by the Court.  As to the injunction and exculpation provisions, the Disclosure Statement and the Plan state those provisions in specific and conspicuous language, and identify all acts to be enjoined and identify the entities subject to the injunction.  In addition, pages 85 and 86 of the Disclosure Statement and pages 52—55 of the Plan contain the "opt-out" instructions quoted above.

## II.   Undisputed § 1129 Confirmation Issues.

The parties do not dispute the following confirmation requirements pursuant to § 1129, and the Court finds the Debtors have shown compliance with them.  Specifically, Debtors are proper debtors under § 109 and proper plan proponents under § 1121(a).  They have complied with applicable provisions of the Code except as otherwise indicated by this Order.  Their solicitation and tabulation of votes followed applicable statutes, bankruptcy rules, and local bankruptcy rules.  The evidence presented by the Debtors at the Confirmation Hearing shows solicitation and tabulation of votes was proper.[27]

With the exception of the issues raised by the UST, the parties do not dispute the Plan was proposed in good faith pursuant to § 1129(a)(3).  Further, the payment of costs and expenses provided in the Plan is proper because they are either approved by Court or subject to approval by Court, under § 1129(a)(4).  Sections 1129(a)(5) and (6) do not apply to the Plan because no officers and directors are being appointed, and the Debtors' business is not subject to rate regulation.

In addition, with the exception of the UST's argument, the Class 3 claimant should be classified as impaired, not unimpaired, each holder of a claim or interest in an impaired class has either accepted the plan or will

---

[27] See Docket No. 1258, Declaration of Joseph Arena on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Case on the Second Amended Joint Chapter 11 Plan of Liquidation ("Epiq Declaration"), accepted into evidence at the hearing on confirmation of the Plan.

receive not less than if Debtors were liquidated in Chapter 7, as required by § 1129(a)(7).

With respect to the requirements of § 1129(a)(8), the Debtors contend Classes 4—7 are the only classes entitled to vote, and none of these classes rejected the Plan.  Class 12 equity security holders will receive nothing and are deemed to reject the plan.

The Plan provides for treatment of priority claims as required by § 1129(a)(9).  Specifically, except to the extent the holder of a particular claim has agreed to different treatment, the Plan provides such claims will receive distributions in accordance with § 1129(a)(9).  In addition, the Plan meets the requirement of § 1129(a)(10) of acceptance by at least one impaired class.  Non-insider impaired Classes 6, 7, 8, and 9 voted to accept the plan.

The Court finds this Plan is feasible pursuant to § 1129(a)(11) because liquidating their remaining assets will provide the Debtors sufficient funds to meet their obligations under the Plan.  Further, the Plan provides for payment of all statutory fees under 28 U.S.C. § 1930(a), as required by § 1129(a)(12).[28]  Sections 1129(a)(13)—(16) are not applicable because the Debtors have no retiree benefits, no domestic support obligations, and are not individuals or non-profits.

With respect to the requirements of § 1129(b), the Court finds the Plan does not discriminate unfairly.  The deemed rejecting class of equity holders has no class below it receiving any distributions under the Plan.

As to the Classes Deemed to Accept and each of the Voting Classes except for Class No. 10, the Debtors have met their burden under § 1129(a) of the Bankruptcy Code.

Class No. 10 has not accepted the Plan.[29]  Therefore, the Debtors have not met the requirements of § 1129(a)(7) due to the rejection of the Plan by Class No. 10 and the deemed rejection of the Plan by the Classes Deemed to Reject.

---

[28] *See* Docket No. 1180, Article XI.A.

[29] As set forth in the Epiq Declaration, each of the voting classes except for Class No. 10 voted to accept the Plan. With respect to Class No. 10, only two votes were received, and one of the two voters, holding a claim of approximately $200, voted against the Plan.  Thus, Class No. 10 has not accepted the Plan. *See* Docket No. 1258.

However, as to Class No. 10 and the Classes Deemed to Reject, the Plan is fair and equitable, does not unfairly discriminate against the rejecting classes, and otherwise satisfies the requirements for confirmation on a "cram-down" basis under § 1129(b). Specifically, Class No. 10 is comprised of only general unsecured claims against Debtor Midway Gold Realty, LLC. There is no unfair discrimination amongst holders of Claims against that Debtor because all holders of Claims against that Debtor will receive the same treatment and distributions (estimated to be between 2% and 3%). In addition, the Plan is fair and equitable as to Class No. 10 because no holders of Claims against that Debtor which are junior to the Claims in Class No. 10 or holders of Equity Interests in that Debtor will receive any distribution under the Plan.

## III.  Disputed Confirmation Issues.

The UST contends a separate plan confirmation proceeding is required for each of the fourteen Chapter 11 Cases, and suggests the non-asset cases should be dismissed. The UST also argues Class 3, the secured claim of the Subordinate Agent, should be characterized as impaired rather than unimpaired because that Class receives nothing under the Plan, and the retention of jurisdiction language contained in the Plan was too broad. Finally, the UST contends the Plan, by including the above-discussed releases and exculpations, is proposed by a means forbidden by law, in contravention of § 1129(a)(3). In addition, the UST questions whether this Court has jurisdiction to rule on the issues related to the releases and exculpations. Moreover, according to the UST, the "opt-out" provisions relating to the exculpations and releases are insufficient. The Court will address each of these issues in turn.

### A. Whether Separate Chapter 11 Plans and Confirmation Proceedings are Required for Each of the Debtors.

The UST's argument separate plans or separate confirmations hearing are needed for the Plan is misplaced. The case relied on by the UST, *In re Tribune Co.*,[30] did not deal with whether a separate plan or separate confirmation hearing was needed for joint plans of jointly-administered debtors. Rather, the *Tribune* court addressed whether a plan must be accepted by at least one impaired class for each debtor under § 1129(a)(10), as opposed to one impaired class for a joint plan. The *Tribune* court stated that it must, reasoning:

---

[30] *In re Tribune Co.*, 464 B.R. 126 (Bankr. D. Del. 2011).

In the absence of substantive consolidation, entity separateness is fundamental. . . . [Section]1129(a)(10) must be read in conjunction with the other subsections of § 1129(a), particularly (a)(8), when considering rights of impaired unsecured creditors.

I find nothing ambiguous in the language of § 1129(a)(10), which, absent substantive consolidation or consent, must be satisfied by each debtor in a joint plan.

Would "deemed acceptance" by a non-voting impaired class, in the absence of objection, constitute the necessary "consent" to a proposed "per plan" scheme? I conclude that it may. The Court in *In re Adelphia Communications Corp.*, 368 B.R. 140 (Bankr.S.D.N.Y.2007), directly addressed the "deemed accepted" issue in which the proposed joint plan (i) adopted a presumption that when, in a class eligible to vote, no vote was cast, that class would be deemed to accept the plan; and (ii) this presumption appeared in both the plan and at two places in a supplement to the disclosure statement. The presumption also appeared in bold text directly on the ballot. The *Adelphia* Court concluded that the "presumption was explicit and well advertised," *Id.* at 260, and, therefore, sufficient reason to overrule an objection to treatment of non-voting classes as having been deemed to accept. I acknowledge that the statutory analysis in *Adelphia* centered around §§ 1126(c) and (d) and Bankruptcy Rule 3018(c), but the *Adelphia* Court's reasoning is directly relevant and applicable to analysis of § 1129(a)(10). *See also*, *In re Ruti–Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir.1988), relied upon by Judge Gerber in *Adelphia*, and which did address directly this issue in the § 1129(a)(10) context. Alternatively, a plan proponent could, in light of objections to a proposed "per plan" scheme, drop from a proposed joint plan those debtors that do not or cannot meet the § 1129(a)(10) requirement.[31]

This Plan provides for creditors of Debtors with assets to receive distributions under the Plan. Creditors of Debtors with no assets will receive no distributions. No objections have been raised to this process, and the creditors of the no asset Debtors would receive the same—no distribution—whether their cases were dismissed or not. Moreover, of the creditors of the Debtors with assets, only one creditor, and hence one class, of one Debtor, has rejected the Plan. Because no junior class will receive anything under the Plan, that class may be crammed down, as noted above. Therefore, the

---

[31] *In re Tribune Co.*, 464 B.R. at 182-84 (footnotes omitted).

Court finds each Debtor has met the requirements for confirmation without the need for separate plans or separate confirmation hearings.

## B. Whether the Plan Properly Classifies Class 3 as Unimpaired.

The Court finds Class No. 3 is properly designated as being unimpaired and the Subordinate Agent (the only creditor in that class) has not objected to that designation and is required to support confirmation of the Plan under its Plan Settlement.  However, even if Class 3 were to be designated impaired, the Subordinate Agent has affirmatively indicated it does not oppose confirmation.  The settlement with the Subordinate Agent recognizes its inferior position to that of CBA.  The Subordinate Agent's Secured Claim against Debtor MDW Pan will not receive a distribution under the Plan, which is what it is entitled to receive under its contract.  There is not enough value from the assets to pay the Senior Agent Secured Claim in full.  Therefore, the Subordinate Agent is not entitled to receive a distribution.

Moreover, even if Class 3 were impaired and the Subordinate Agent Secured Claim deemed to reject the Plan, the Plan meets all of the cramdown requirements under § 1129(b).  Further, the Subordinate Agent indicates it would support confirmation by cramdown.  Lastly, there are other impaired Classes of Claims against Debtor MDW Pan, so Class 3's acceptance of the Plan is not required to satisfy § 1129(a)(10) .  For these reasons, whether Class 3 is impaired or unimpaired does not, in this case, affect the Court's analysis of plan confirmation requirements.

## C. The Bankruptcy Court's Post-Confirmation Retention of Jurisdiction.

Regarding the UST's objection on retention of jurisdiction, the Plan clearly states that the Court's post-confirmation retention of jurisdiction is only to the extent "as is legally permissible." At the confirmation hearing, the Court agreed this language sufficiently addressed the concern:

> Retention of jurisdiction – I understand what my fellow Judge Campbell used to do.  I tend to more of the Judge Clark line of thought on that.  So I think the language in there is sufficient for me.[32]

Accordingly, the Court finds the jurisdiction language appropriate.

---

[32] Docket No. 1168, Transcript of September 14, 2016 Hearing on Adequacy of Disclosure Statement, 46:5-8.

**D. Whether the Release and Exculpation Provisions Contained in the Plan are Permissible.**

As the Court quotes above, Article IX of the Plan contains three separate provisions containing releases of claims by the Debtors, exculpations of liability for various individuals and entities, and releases by third-party non-debtors of claims against the Debtors and other non-debtor individuals and entities.  The UST argues these provisions exceed what is allowable under the law of the Tenth Circuit.  The UST cites *Landsing Diversified Properties-II v. First Nat'l Bank and Trust Co. of Tulsa (In re Western Real Estate Fund, Inc.)* ("*Western Real Estate*") and *Abel v. West* to assert Tenth Circuit law categorically precludes granting non-debtors permanent protection from creditors asserting claims against them for their own independent liability.[33]  Under that reasoning, these provisions are impermissible and the Plan cannot be confirmed as written.  The UST further argues even if such provisions are legally permissible, the releases provided in this Plan cannot be approved because they are inappropriate and the release "opt-out" provisions contained in the Plan are impermissible.[34]

The Debtors defend the release and exculpation provisions by arguing against a *per se* ban on such clauses.  They urge the Court to follow the majority of circuits allowing these types of releases subject to a well-noticed opt-out procedure.[35]  The Debtor points to one recent case in which another division of this Court approved consensual third-party releases, *In re Atna Resources, Inc. et al.*[36]  The Debtor further argues the releases in the Plan

---

[33] Docket No. 1252, pp. 4-5; docket no. 1293, pp. 4-5 (citing *In re Western Real Estate Fund, Inc.*, 922 F.2d 592 (10th Cir.1990*), modified sub nom., Abel v. West*, 932 F.2d 898 (10th Cir.1991)).

[34] Docket No. 1252, pp. 5-8; docket no. 1293, pp. 5-8.

[35] Docket No. 1264, pp. 4-22.

[36] See *In re Atna Resources, Inc., et al.*, Case No. 15-22848 JGR, Docket No. 740.  Another division of this Court also recently relied on *Western Real Estate* to deny confirmation of a Chapter 11 plan containing an exculpation clause.  *See In re Morreale Hotels, LLC*, Case No. 12-35230 TBM, Docket No. 1011.  In *Morreale Hotels, LLC*, the exculpation provision purported to release the debtor, the debtor's manager and the debtor's agents, "including, but not limited to, its attorneys, managers, employees, or independent contractors" from any liability "with respect to any action or omission prior to the Effective Date in connection with the [d]ebtor's operations, the [p]lan, or the conduct of the [d]ebtor's bankruptcy case." *Id.* at p. 11.  Judge Thomas B. McNamara found the net effect of such an exculpation clause would be to prohibit suits against, and release claims against, the debtor, its manager and its agents from claims related to the debtor's operations or conduct prior to the effective date – including prepetition conduct.  Therefore, the clause would prevent the debtor's manager from being sued for malfeasance in the performance of his duties and even prevent suits by complete strangers injured in slip-and-fall accidents on the debtor's

are permissible because they are narrow in scope, relate solely to post-petition claims and exclude claims based on gross negligence, willful misconduct or fraud.[37] Further, the Debtors state valuable consideration was given in exchange for the releases, and the releases are consensual.[38]

The threshold issue facing the Court, before considering whether the Plan's release and exculpation provisions are permissible or its opt-out provisions are appropriate, is whether third-party releases are allowable in any form under the law of the Tenth Circuit. If such provisions are categorically impermissible, the inquiry ends there. If the Court determines, however, third-party non-debtor releases are not impermissible as a matter of law, the Court must examine whether the Plan's specific provisions allow it to be confirmed as written.

### 1. Whether Third-Party Releases and Exculpation Provisions Are Permissible Generally in the Tenth Circuit.

Within the Tenth Circuit the key case is *Western Real Estate,* which is generally cited for the proposition non-debtor releases of any type are prohibited.[39] The dispute in *Western Real Estate* had its origins in a pre-petition litigation retainer agreement between the Chapter 11 debtor, Landsing Diversified Properties, II ("LDP"), and its former attorney, Kevin M. Abel and Abel & Busch, Inc. ("Abel").[40] Prior to its bankruptcy case, LDP had retained Abel to pursue litigation against Public Service Company of Oklahoma ("PSO") after two transformers maintained by PSO exploded and caused substantial damage to an LDP facility.[41] The retainer agreement provided for a reduced hourly fee supplemented with a reduced contingency

---

property during the Chapter 11 case. *Id.* The Court found the exculpation clause impermissible under *Western Real Estate. Id.* at pp. 11-13. Judge McNamara also found the debtors in that case failed to present "compelling evidence" to support the need for the non-debtor releases under the factors given by the United States Court of Appeals for the Sixth Circuit in *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir. 2002) and followed by other circuits. *Id.* at pp. 12-13.

[37] Docket No. 1264, pp. 4-11.

[38] *Id.*

[39] *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2nd Cir. 2005) ("The Ninth and Tenth Circuits have held that non-debtor releases are *prohibited* by the Code, except in the asbestos context.") (emphasis original).

[40] *In re Western Real Estate Fund, Inc.*, 922 F.2d at 594.

[41] *Id.*

fee.[42]  After filing suit on behalf of LDP against PSO, Abel obtained a $3 million settlement offer and secured his contractual attorneys' fees by filing an attorneys' lien under state law.[43]

Subsequently, LDP filed for Chapter 11 bankruptcy and commenced an adversary proceeding against First National Bank and Trust Company of Tulsa ("FNB"), the holder of a mortgage against the damaged facility property, to determine the priority of their rights in the settlement of the suit against PSO.[44]  Abel was brought into the proceedings as a third-party defendant to resolve what rights, if any, he would have in the settlement proceeds.[45]  Abel's proof of claim filed in LDP's bankruptcy for attorneys' fees was consolidated into the adversary proceeding involving FNB as well.[46]

The bankruptcy court first held Abel's lien survived the filing of LDP's Chapter 11 petition and would remain intact in the event LDP rejected its pre-petition retainer agreement under § 365.[47]  The court further held that in the event LDP affirmed the retainer agreement Abel would be entitled to recover a share of any settlement under the retainer's contingency fee agreement.[48]  However, the court held should LDP reject the retainer agreement, Abel's recovery, if any, would be determined by *quantum meruit* principles rather than according to the terms of the rejected retainer agreement.[49]  Shortly thereafter, LDP rejected the retainer agreement pursuant to § 365.[50]

The litigation against PSO was later settled, with PSO paying LDP and FNB an amount in excess of the $3 million offer obtained by Abel, unreduced by any fee owed Abel.[51]  As part of the settlement, LDP and FNB agreed to

---

[42] *Id.*

[43] *Id.*

[44] *In re Western Real Estate Fund, Inc.*, 922 F.2d at 594.

[45] *Id.*

[46] *Id.*

[47] *Id.* at 594-95.

[48] *Id.*

[49] *Id.* at 595.

[50] *Id.*

[51] *Id.*

indemnify PSO should it be held liable to Abel for any part of Abel's statutory attorney fee lien.[52]  Abel filed suit against PSO in state court to recover whatever portion of his fees remained unsatisfied through the debtor's bankruptcy case.[53]  The bankruptcy court permanently enjoined Abel from further prosecution, including post-confirmation, of his state court action against PSO, subject only to timely payment of Abel's diminished fee claim allowed against LDP.[54]  The bankruptcy court imposed the stay to prevent Abel from getting a second bite at the apple on his fees entitlement.[55]  The Tenth Circuit determined the bankruptcy court had to rely on its equitable authority under § 105(a) to issue the permanent injunction because LDP was not a party to the state court action, LDP's property was not involved, and the injunction was expressly intended to continue in effect following conclusion of the bankruptcy case.[56]  On appeal, the Tenth Circuit examined the validity of this the bankruptcy court's injunction, both on a temporary and permanent basis.[57]

The Tenth Circuit acknowledged "[§] 105(a) has been widely utilized in attempts to enjoin state court proceedings against nondebtor parties that allegedly will have an impact on the debtor's bankruptcy case."[58]  The Tenth Circuit also recognized other Circuit Courts of Appeal have used a "well-developed approach" to impose stays under § 105(a) during the pendency of a case "to restrain extra-bankruptcy actions against third parties on the ground that the bankruptcy process will somehow be burdened or impaired as a consequence thereof."[59]  According to the court, however, none of the authorities it considered support the issuance of an injunction with respect to state proceedings brought against a nondebtor simply seeking

---

[52] *Id.*

[53] *In re Western Real Estate Fund, Inc.*, 922 F.2d at 595.

[54] *Id.* at 598.

[55] *Id.* at 599-600.

[56] *Id.* at 598.

[57] *Id.* at 598-602.

[58] *Id.* at 599 (quoting 2 Collier on Bankruptcy par. 105.02 at 105-7 to -9 (15th ed. 1990)).

[59] *Id.* at 599. ("Under this approach, such factors as a unity of interest between the debtor and the threatened third party, an indemnification obligation owing from the former to the latter, or simply the debtor's inevitable, burdensome involvement in the ancillary litigation can justify preemptive injunctive relief.") (citing cases).

indemnification from yet another nondebtor.[60]  Therefore, while a temporary injunction during the bankruptcy proceedings against Abel's pursuit of PSO funds subject to indemnification by LDP may have been warranted, the Tenth Circuit held FNB was also contractually required to reimburse PSO, and therefore the injunction could not properly extend to litigation over sums for which PSO may look to FNB for reimbursement.[61]  On its own, LNB's indemnification obligation to PSO was not sufficient to justify enjoining Abel's enforcement in state court of his statutory lien rights against PSO.[62] The Tenth Circuit found "the only viable justification for the temporary injunction rests on the need to protect LDP during preparation and confirmation of a reorganization plan," and that rationale was limited to the portion of Abel's potential recovery from PSO for which LDP may be held responsible.[63]

The Tenth Circuit next commented the explicitly permanent nature of the injunction was the "more serious problem."[64]  The Tenth Circuit found "[t]he injunction was not issued merely to limit and simplify the legal entanglements of the debtor during development and evaluation of a reorganization plan, but also clearly to control in perpetuity the post-confirmation status of Abel's claim against PSO.  By permanently enjoining Abel's action against PSO, the bankruptcy court, in essence, discharged PSO's liability to Abel under state lien law as effectively as it discharged LDP's contractual debt to Abel under federal bankruptcy law."[65]  A permanent post-confirmation injunction precluding Abel from attempting to recover any unpaid portion of his fee from PSO was improper, regardless of who was contractually obligated to indemnify PSO.[66]

The discharge of LDP's indemnification obligation would have occurred following confirmation of its plan and LDP would be protected by the discharge injunction under § 524(a).[67]  Section 524(a) "operates as an

---

[60] *Id.*

[61] *In re Western Real Estate Fund, Inc.*, 922 F.2d at 599.

[62] *Id.*

[63] *Id.* at 600.

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived."[68]  This included preventing PSO from seeking reimbursement from LDP.  While the § 542(a) benefits of a discharge are available to a debtor, under § 524(e) the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for such debt."[69]  Thus, the Tenth Circuit reasoned, Congress did not intend to extend the benefits of a discharge to third parties, such as PSO, who did not invoke and submit to the bankruptcy process.[70]  The Tenth Circuit stated:

> What is important to keep in mind is that a discharge in bankruptcy does not extinguish the debt itself but merely releases the debtor from personal liability. . . .  The debt still exists, however, and can be collected from any other entity that may be liable.  The courts have reconfirmed this basic principle in case after case permitting creditors whose claims have been discharged vis-a-vis the bankrupt to recover on the same claims from third parties in a variety of settings.[71]

The Tenth Circuit found this to be consistent with § 1141(d)(1)(A), which provides the confirmation of a plan expressly discharges the debtor – and not anyone else – from any debt arising before the date of confirmation.[72]  The Tenth Circuit also found § 105(a) could not be used inconsistently with these provisions to impose a post-confirmation permanent injunction effectively relieving a non-debtor of its own shared liability on a debt discharged through confirmation.[73]  A permanent injunction of the type at issue in *Western Real Estate* would improperly insulate non-debtors in violation of § 524(e).[74]

---

[68] § 524(a)(2).

[69] § 524(e).

[70] *In re Western Real Estate Fund, Inc.*, 922 F.2d at 600 (citing Collier on Bankruptcy, ¶ 524.01 [3], at 524–16 (1st ed.1990) (internal citations omitted)).

[71] *Id.* at 600-01 (citations omitted).

[72] *Id.* at 601 (citing 11 U.S.C. § 1141(d)(1)(A)).

[73] *Id.* at 601-02.

[74] *Id.* at 602.  The Tenth Circuit also found the permanent injunction lacked "any countervailing justification of debtor protection . . . the discharge injunction provided for in section 524(a) already frees the debtor from potential derivative claims, such as

To paraphrase the Tenth Circuit's holding, neither confirmation of LDP's plan of reorganization nor Abel's recovery in LDP's bankruptcy case barred Abel's litigation against PSO for the remainder of the discharged debt.[75]  The Tenth Circuit affirmed the bankruptcy court's injunction only insofar as it temporarily precluded Abel's pursuit of fees subject to indemnification by LDP during the bankruptcy case, and vacated the injunction in all other respects.[76]

Therefore, against the backdrop of *Western Real Estate*, this Court must analyze whether the breadth of the release prohibition is as wide as asserted by the UST.  In making this analysis, it is useful to review treatment of such releases by sister circuits.

Courts in the Fifth and Ninth Circuits have held a bankruptcy court does not have authority to issue and enforce third-party non-debtor releases in a Chapter 11 plan.[77]  These Circuits appear to find themselves in the minority on this issue.  The First, Second, Third, Fourth, Sixth, Seventh, Eighth, and Eleventh Circuits have expressed what has become the majority view, discussed below, under which a bankruptcy court may permit non-debtor third-party releases in a Chapter 11 plan under certain circumstances and when certain standards are met.

Under these authorities § 524(e) is not an absolute bar to third-party releases.  According to the Seventh Circuit a "natural reading of [§ 524(e)]

---

indemnification or subrogation, that might arise from the creditor's post-confirmation attempts to recovery the discharged debt from others." *Id.*

[75] *In re Western Real Estate Fund, Inc.*, 922 F.2d at 601 ("[n]either confirmation of a plan nor the creditor's recovery (of partial satisfaction) thereunder bars litigation against third parties for the remainder of the discharged debt.").

[76] *Id.* at 602.

[77] *See In re Pac. Lumber Co.*, 584 F.3d 229, 252–53 (5th Cir. 2009) (fresh start provided debtors under § 524(e) is not intended to absolve non-debtors from negligent conduct occurring during the course of the bankruptcy); *In re Patriot Place, Ltd.*, 486 B.R. 773, 822 (Bankr. W.D. Tex. 2013) ("The Fifth Circuit takes a very restrictive approach to non-debtor releases in bankruptcy cases . . . non-consensual, non-debtor releases in bankruptcy proceedings in [the Fifth Circuit] have been 'explicitly prohibited,' this circuit has 'firmly pronounced its opposition to such releases,' and the 'Bankruptcy Code precludes non-consensual, non-debtor releases.'") (quoting *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1051-53, 1054-55, 1058-89 (5th Cir. 2012); *see also Resorts International, Inc., v. Lowenschuss,* 67 F.3d 1394, 1401 (9th Cir.1995) ("this court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors.").

does not foreclose a third-party release from a creditor's claims."[78]  Rather, § 524(e) "is a saving clause; it limits the operation of other parts of the bankruptcy code and preserves rights that might otherwise be construed as lost after the reorganization."[79]  Consistent with *Western Real Estate*, under the operation of § 524(e) a creditor can still seek to collect a debt from a non-filing co-debtor even if that debt was discharged as to the debtor in the Chapter 11 plan.[80]  Section 524(e) does not purport to limit a bankruptcy court's powers to release a non-debtor from a creditor's claims for which the debtor is not also liable.[81]

Courts subscribing to the majority view also hold the bankruptcy court's broad equitable powers under § 105(a) permit approval of third-party releases in Chapter 11 plans in appropriate circumstances.  Section 105(a) gives the Court authority to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[82]  This section grants the bankruptcy court power to take appropriate equitable measures needed to implement the other sections of the Bankruptcy Code.[83]  Consistent with this authority, the Bankruptcy Code allows courts considerable discretion to approve plans of reorganization.[84]  Section 1123(b)(3)(A) allows a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or the estate."[85]  Section

---

[78] *In re Aradigm Comms., Inc.*, 519 F.3d 640, 656 (7th Cir. 2008) (citing *Matter of Specialty Equipment Companies, Inc.*, 3 F.3d 1042, 1046-47 (7th Cir. 1993) ("while section 524(e) has generally been interpreted to preclude the discharge of guarantors, the statute does not by its specific words preclude all releases that are accepted and confirmed as an integral part of a reorganization.")); *In re Dow Corning Corp.*, 280 F.3d at 657 ("language [of § 524(e)] explains the effect of a debtor's discharge.  It does not prohibit the release of a non-debtor.").

[79] *In re Aradigm Comms., Inc.*, 519 F.3d at 656.

[80] *Id.* ("for example, because of § 524, a creditor can still seek to collect a debt from a co-debtor who did not participate in the reorganization – even if that debt was discharged as the debtor in the plan . . . Or a third party could proceed against the debtor's insurer or guarantor for liabilities incurred by the debtor even if the debtor cannot be held liable.") (internal citations omitted).

[81] *In re Seaside Engineering & Surveying, Inc.*, 780 F.3d 1070, 1078-79 (11th Cir. 2015); *In re Aradigm Comms., Inc.*, 519 F.3d at 656.

[82] 11 U.S.C. § 105(a).

[83] *In re Dow Corning Corp.*, 280 F.3d at 656.

[84] *Id.*

[85] § 1123(b)(3)(A).

31

1123(b)(6) also expressly permits the Court authority to "include any other appropriate provision not inconsistent with the applicable provisions of this title."[86]  Reading these sections of the Bankruptcy Code together, enjoining a creditor's claims against a non-debtor may be necessary, and within the bankruptcy court's authority, to achieve a successful reorganization.  In *Aradigm*, the Seventh Circuit held the "residual authority" permitted under § 105(a) permits bankruptcy courts to release third parties from liability to participating creditors if the release is "appropriate" and not inconsistent with any other provision of the Bankruptcy Code.[87]

At least one bankruptcy court has noted "inclusion in a plan of reorganization of a narrow release of claims relating to the bankruptcy case, running in favor of the debtor, the creditors committee and all professionals and advisors, now appears to be *de rigeur* in cases filed in New York and Delaware."[88]  Regardless of the standards used to evaluate third-party releases, courts in the majority view are in agreement such provisions are proper only in rare cases.[89]  Additionally, the justification for granting such releases in a liquidation case is far less compelling than in a reorganization.[90]

---

[86] § 1123(b)(6).

[87] *In re Aradigm Comms., Inc.*, 519 F.3d at 657; *see also In re Dow Corning Corp.*, 280 F.3d at 656-57 (holding "such an injunction is 'not inconsistent' with the Code, and is authorized by section 1123(b)(6)," but stressing an injunction against a non-consenting creditor's claim against a non-debtor "is a dramatic measure to be used cautiously . . . only appropriate in 'unusual circumstances.'").

[88] *In re Berwick Black Cattle Co.*, 394 B.R. 448, 459 (Bankr. C.D. Ill. 2008) (citing *In re Oneida Ltd.*, 351 B.R. 79, 94 n. 22 (Bankr. S.D.N.Y. 2006) and *In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000)).

[89] *See In re Metromedia Fiber Network, Inc.*, 416 F.3d at 141-42 ("such a release is proper only in rare cases . . . [because it] is a device that lends itself to abuse."); *In re Dow Corning Corp.*, 280 F.3d at 657–58 ("[S]uch an injunction is a dramatic measure to be used cautiously . . . [and] only appropriate in 'unusual circumstances'"); *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 212-13 (3d Cir. 2000) (recognizing non-debtor releases have been approved only in "extraordinary cases"); *In re Berwick Black Cattle Co.*, 394 B.R. at 460 ("prudence demands that third-party releases be viewed with a healthy dose of skepticism.").

[90] *In re SL Liquidating, Inc.*, 428 B.R. 799, 803 (Bankr. S.D. Ohio 2010) (Finding the Sixth Circuit's reference to "reorganization" in its stated factors not unintentional, and finding "a reorganizing debtor, as opposed to a liquidating debtor, needs to be protected from suits that may deplete its assets so that it can, in fact, reorganize" and "[t]o hold otherwise may be to encourage the filing of liquidating chapter 11 cases where the driving purpose is to obtain non-consensual third-party releases."); *In re Berwick Black Cattle Co.*, 394 B.R. at 461.

Courts in the First and Eighth Circuits have allowed third-party non-debtor releases when the factors outlined in *In re Master Mortg. Fund, Inc.* are balanced.[91]  Those factors are:

(1) There is an identity of interest between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.

(2) The non-debtor has contributed substantial assets to the reorganization.

(3) The injunction is essential to reorganization.  Without the it, there is little likelihood of success.

(4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.

(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.[92]

While the Third Circuit has not adopted a specific test for when such releases are appropriate, the U.S. Bankruptcy Court for the District of Delaware believes the *Master Mortgage* factors form the foundation for such an analysis, with additional consideration of other relevant factors.[93]  That

---

[91] *See In re Mahoney Hawkes, LLP*, 289 B.R. 285, 299-303 (Bankr. D. Mass. 2002) (adopting the *Master Mortgage* multi-factor test to determine necessity for non-debtor third-party injunctions, but finding plan provisions did not satisfy factors warranting issuance of permanent injunction) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 519 (Bankr. E.D. Mo. 2012) (finding *Master Mortgage* requirements fulfilled).

[92] *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 935 (finding "[n]o court has set out a rigid 'factor test'" to be applied in every case, and the five factors are neither exclusive nor conjunctive).

[93] *In re Washington Mutual, Inc.*, 442 B.R. 314, 346-47 (Bankr. D. Del. 2011) ("Determining the fairness of a plan which includes the release of nondebtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case.") (citing *In re Continental Airlines*, 203 F.3d at 212-14; *see also In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (in considering debtor's release of third parties, court applied *Master Mortgage* five factor test).

court's analysis of release provisions also distinguished between the debtor's release of non-debtors and third parties' release of non-debtors.[94]

Courts in the Second and Seventh Circuits have allowed third-party non-debtor releases when truly "unusual circumstances" exist.  The Second Circuit has held: "A nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to the success of the plan" and where the scope of the release is necessary to the plan.[95]  The Seventh Circuit has concurred, holding whether a release is appropriate is a fact intensive inquiry and dependent on the nature of the reorganization, and only where the release "was necessary for the reorganization and appropriately tailored" to claims "'arising out of or in connection with' the reorganization itself and does not include 'willful misconduct.'"[96]

The Sixth Circuit agrees with the Second Circuit's test, holding "[b]ecause such an injunction is a dramatic measure to be used cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.'"[97]  The Sixth Circuit held a bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor when the following seven factors are present:

> (1) There is an identity of interests between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

> (2) The non-debtor has contributed substantial assets to the reorganization;

> (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

---

[94] *In re Washington Mutual, Inc.*, 442 B.R. at 346-56 (citing *In re Exide Techs.*, 303 B.R. 48, 71-74 (Bankr. D. Del. 2003) (using different analyses to evaluate releases by a debtor of non-debtor third parties and releases by a non-debtor of other non-debtor third parties)).

[95] *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 143.

[96] *In re Aradigm Comms., Inc.*, 519 F.3d at 657; see also *In re Berwick Black Cattle, Co.*, 394 B.R. at 455-60.

[97] *In re Dow Corning Corp.*, 280 F.3d at 658.

(4) The impacted class, or classes, has overwhelmingly voted to accept the plan;

(5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

(6) The plan provides an opportunity for those claimants who choose not to settle to recover in full; and

(7) The bankruptcy court made a record of specific factual findings that support its conclusions.[98]

The United States Courts of Appeals for the Fourth and Eleventh Circuits have followed the *Dow Corning* factors as well.[99]  This Court notes nothing in any of the majority view cases it has reviewed leads the Court to conclude approval of third-party non-debtor releases is mandatory if the relevant factors are satisfied.[100]

*Western Real Estate* is binding precedent on all courts within this Circuit; however, this Court believes the holding in *Western Real Estate* is limited in scope to those cases where a Chapter 11 plan provides, contrary to § 524(e), for the release of or injunction on claims against a non-debtor, such as a co-debtor or a guarantor, with respect to an obligation jointly owed with the debtor where the non-debtor has not submitted itself to the bankruptcy process.  Section 524(e) provides the "discharge of a debt of the debtor does not affect the liability of another entity on, or the property of any other entity for, *such* debt."[101]  The word "such" in that section refers to the debt of the debtor being discharged.  Section 524(e) does not refer to independent obligations of other entities which are not subject to the discharge.  Under § 524(e), even if a debt is discharged as to the debtor in a Chapter 11 plan, a creditor can still seek to collect that debt from a non-filing co-debtor, guarantor or obligor.  The Tenth Circuit pointed out in

---

[98] *In re Dow Corning Corp.*, 280 F.3d at 658.

[99] *In re Seaside Engineering & Surveying, Inc.*, 780 F.3d at 1079 ("The factors should be considered a nonexclusive list of considerations, and should be applied flexibly, always keeping in mind that such bar orders should be used 'cautiously and infrequently,' and only where essential, fair, and equitable.") (quoting *In re Munford*, 97 F.3d 449, 455 (11th Cir. 1996)); *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 712 (4th Cir. 2011).

[100] *See In re Mahoney Hawkes, LLP*, 289 B.R. at 300 ("using [§ 105(a)] to enjoin a non-debtor third party involves an extraordinary exercise of discretion.") (citing *In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir. 1991)).

[101] 11 U.S.C. § 524(e).

*Western Real Estate* this basic principle has been affirmed by courts in a variety of settings.[102]  Thus, as the Tenth Circuit held in *Western Real Estate*, confirmation of a plan cannot serve to bar litigation against non-debtors for the remainder of the discharged debt.[103]  The Court cannot approve Chapter 11 plans, including the Plan presently before the Court, which would attempt to accomplish otherwise.  Likewise, consistent with the Tenth Circuit's holding in that case, as well as with the United States Supreme Court's decision in *Law v. Seigel*, a bankruptcy court may not use § 105(a) inconsistently with § 524(e) to effectively relieve a non-debtor of its shared obligation on a discharged debt.[104]

Having reviewed the arguments of the parties and the decisions by the various United States Courts of Appeals and other bankruptcy courts, this Court concludes the bar on third-party releases imposed by *Western Real Estate* is not as broad as it has previously been argued and applied in other cases.  Accordingly, the Court is prepared to follow the majority view that while § 524(e) does not expressly provide for the release of a third party's claims against a non-debtor, § 524(e) does not expressly preclude such releases.  This is not *carte blanche*, however.  The Court agrees § 105(a) permits bankruptcy courts to release third parties from liability in certain, and very limited, circumstances if the release is "appropriate" and not inconsistent with any other provision of the Bankruptcy Code, including § 524(e).  The Court believes this interpretation is consistent with, and fully respects, the dictates of the Tenth Circuit as set forth in *Western Real Estate*.

---

[102] *In re Western Real Estate Fund, Inc.*, 922 F.2d at 600-01 (citing *United States v. Anderson*, 366 F.2d 569, 571 (10th Cir.1966) (suit against debtor's guarantor); *In re Jet Florida Sys., Inc.*, 883 F.2d 970, 973 (11th Cir.1989) (suit against debtor's insurance carrier); *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1351 (5th Cir.1989) (suit against debtor's guarantor); *In re Pappas*, 106 B.R. 268, 270-71 (D.Wyo.1989) (suit against debtor's insurance carrier); *United States v. Quinones*, 36 B.R. 77, 79 (D.P.R.1983) (suit against comaker of note); *United States v. Hass*, 152 F.Supp. 715, 716 (E.D.N.Y.1957) (same); *In re Fasse*, 40 B.R. 198, 199-200 (Bankr.D.Colo.1984) (suit against state "Recovery Fund" established for satisfaction of judgments recovered against bankrupt real estate brokers and salesmen)).

[103] *Id.* at 601.

[104] *Id.* at 601-02.  *See also Law v. Siegel*, 134 S.Ct. 1188, 1194 (2014) (Section 105(a) "'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.'") (quoting 2 Collier on Bankruptcy ¶ 105.01[2], p. 105-6 (16th ed. 2013)).

## 2. Whether the Releases and Exculpation Provisions Contained in the Plan Are Permissible.

Turning to the question of whether the specific provisions in this Plan are appropriate and permissible, the Court declines to adopt a specific test or set of factors to be used in determining the appropriateness of third-party non-debtor releases.  Rather, to paraphrase the Delaware bankruptcy court, due consideration should be given to the overlapping factors described above and such a determination should be dictated by the specific facts of each case.

Based on its review of factors examined by other courts, the Court is guided by the following relevant, although not exclusive, principles.  First, and foremost, whether a release is appropriate and permissible should be determined on a case-by-case basis.  Secondly, the Court must parse out exactly who is releasing whom from what.  It is appropriate for the Court's analysis to distinguish between the Debtors' release of non-debtors and third-parties' release of non-debtors.  The Court must also find the release to be necessary for the reorganization and appropriately tailored to apply only to claims arising out of or in connection with the reorganization itself, and not to matters which would have no effect upon the estate.  Otherwise, the releases in question may be beyond the jurisdiction of the bankruptcy court and its authority to finally adjudicate such matters.  The Court must also examine whether the releasing creditors have consented to or objected to the proposed injunctions.  Lastly, the releases may not provide non-debtors with "blanket immunity" for all times, transgressions and omissions and may not include immunity from gross negligence or willful misconduct.  It is not the intention of the Court to permit non-debtors to purchase immunity from unrelated torts, no matter how substantial their contribution to a debtor's reorganization.  With these general principles in mind, and with due consideration of all other relevant factors, the Court now examines the release and exculpation provisions at issue.

### a. Releases by the Debtors.

Although the parties' arguments are not specifically focused on the releases contained in Article IX.B.1, the Court is nonetheless obligated to determine whether the releases given by the Debtors to third-parties in this provision are legally permissible.

i.   *Parties Granting the Releases Under Article IX.B.1.*

Under Article IX.B.1 of the Plan, the Debtors are releasing "Causes of Action"[105] against the "Released Parties," which is defined by the Plan to mean the Debtors themselves, the Debtors' directors, officers and employees, the Committee and its members, the Senior Secured Parties, the Subordinate Secured Parties and the Representatives of each, including all Professionals.  The Debtors are also releasing "each of the Professionals retained by the Debtors and the Committee in these Chapter 11 Cases from any and all Avoidance Actions that may exist as of the Effective Date."

Ordinarily, debtors are authorized under § 1123(b)(3)(A) to settle or release their claims in a Chapter 11 plan.[106]  Section 1123(b)(3)(A) permits a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[107]  Article IX.B.1 does, in part, provide for settlements of claims belonging to the Debtors or to the Estates as well as derivative claims against the Released Parties on behalf of the Debtors or the Estates.[108]  However, this provision goes a step further and purports to release claims "that . . . the Midway Liquidating Trust would have been legally entitled to assert."[109]  Thus, this provision includes at least one non-debtor entity – the Midway Liquidating Trust – as a *releasing* party.  This Court agrees with the Delaware bankruptcy court the Debtors' releases in this provision must be limited to the Debtors and the Estates.[110]  Releases by third-party non-debtors must be separately identified because, as

---

[105] The Plan defines "Causes of Action" to mean "all claims, actions, causes of action, choses in action, Avoidance Actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims of any of the Debtors, the Debtors-in-Possession and/or the Estates (including, without limitation, those actions set forth in the Plan Supplement) that are or may be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date against any entity, based in law or equity, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date." Docket No. 1180, Article I.A.21.

[106] *See* § 1123(b)(2)(A).

[107] *Id.*

[108] Docket No. 1180, Article IX.B.1.

[109] *Id.*

[110] *In re Washington Mutual, Inc.*, 442 B.R. at 346, n. 33.

discussed below, such releases are reviewed under a different standard.[111] Thus, this provision must be rewritten to limit the releasing entities to the Debtors and the Estates only.

> ### ii.   *Releases by the Debtors of Directors, Officers, Employees, Representatives and Professionals.*[112]

The definition of Released Parties in the Plan includes the Debtors' directors, officers and employees serving as such on or after the Petition Date, and the Representatives[113] and Professionals[114] of the Debtors, the Committee and its members, the Senior Secured Parties, the Subordinate Secured Parties.  First, the Court must note while the Debtors have argued the releases being granted by Debtors are narrowly tailored to relate only to post-Petition Date activity, a close examination of this provision reveals this may not be the case.  The language of the provision expressly grants the Released Parties a release from "any and all Causes of Action . . . based whole or in part upon any act or omission, transaction, or other occurrence or circumstances *existing* or taking place *on the Petition Date* and prior to or on the Effective Date in any way related to the Debtors."[115]  A natural reading of this text would extend the Debtors' releases to pre-Petition Date activities – by *all* Released Parties – wholly unrelated to the reorganization efforts.

Moreover, this provision purports to release each of the Professionals retained by the Debtors and the Committee in the Chapter 11 Cases from

---

[111] *In re Washington Mutual, Inc.*, 442 B.R. at 346, n. 33 (Any releases by non-debtors must be clearly and separately identified as they are subject to a different standard.) (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 111); *see also In re Tribune Co.*, 464 B.R. at 186-87.

[112] Because the Court has already determined above this provision must be rewritten to exclude releases by non-debtors, the Court will go on to examine the permissibility of the provision without reference to any releases by non-debtors.

[113] The Plan defines "Representative" as "with regard to any Entity, its officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, members and professionals)." Docket No. 1180, Article I.A.104.

[114] The Plan defines "Professional" to mean "any person or Entity employed pursuant to a Final Order in accordance with Sections 327, 328 or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to and including the Effective Date pursuant to Sections 327, 328, 329, 330 or 331 of the Bankruptcy Code." Docket No. 1180, Article I.A.105.

[115] Docket No. 1180, Article IX.B.1 (emphasis added).

any and all Avoidance Actions existing as of the Plan's Effective Date.[116]  By
their nature, avoidance actions under §§ 544, 547 and 548 relate only to
transfers occurring prior to the Petition Date.[117]  Even if the same release
provision excepts claims resulting from fraud – arguably, including claims for
avoidance of fraudulent transfers under §§ 544 and 548 – this provision
clearly has the effect of releasing Professionals from pre-petition receipts of
preferential transfers.  If it truly is the Debtors' intentions for this release by
the Debtors to be narrowly tailored to relate only to post-Petition Date
activity, this provision should be rewritten to more clearly express that
intent.

Even if it were not the Debtors' intentions to extend their releases to
Released Parties' pre-Petition Date activities, the officers, directors and
Representatives of the Debtors and the Committee who served during the
Chapter 11 Cases are receiving exculpations under in Article IX.C of the Plan
for their actions in the bankruptcy cases, as discussed below.[118]
Accordingly, with respect to those Released Parties the Court finds this
provision duplicative and unnecessary as to them.

> iii.   *Releases by the Debtors of The Committee and its Members.*

This provision also purports to provide a release by the Debtors of "the
Committee and its members (solely in their capacity as members of the
Committee and not in their individual capacities)."  It is acceptable to
provide exculpations for such parties for their roles in the bankruptcy
process.[119]  As with the Debtors' releases of its and the Committee's

---

[116] Docket No. 1180, Article IX.B.1.  The Plan defines "Avoidance Actions" to mean "any and
all avoidance, recovery, subordination or other claims, actions or remedies that may be
brought on behalf of the Debtors or their estates under the Bankruptcy Code or applicable
non-bankruptcy law, including, without limitation, claims, actions or remedies arising under
Chapter 5 of the Bankruptcy Code." *Id.* at Article I.A.8.

[117] *See* §§ 547(b)(4) ("the trustee may avoid any transfer of an interest of the debtor in
property – made – on or within 90 days before the date of the filing of the petition") and
548(a) ("The trustee may avoid any transfer . . . of an interest of the debtor in property, or
an obligation . . . incurred by the debtor, that was made or incurred on or within 2 years
before the date of the filing of the petition").  Post-petition transfers, however, are still
vulnerable under § 549(a).

[118] Though the Plan defines "Released Parties" to include the Debtors' employees, and the
definition of "Exculpated Parties" for purposes of the exculpation provision does not
specifically include the Debtors' employees, the term "Representatives" is defined to include
an Entity's employees and professionals.  *See* Docket No. 1180, Article I.A.46, 111 and 114.

[119] *In re Washington Mutual, Inc.*, 442 B.R. at 348 (citing *In re PWS Holding Corp.*, 228 F.3d
at 246 (holding exculpation clause in plan which provided committee members and estate
professionals had no liability to creditors or shareholders for their actions in the case except

directors, officers, employees, Representatives and Professionals, the Committee and its members are receiving exculpations in Article IX.C of the Plan. Accordingly, the Debtors' releases of the Committee and its members are, in light of their appearance in the Plan's exculpation provision, duplicative and unnecessary.

>    iv.   *Releases by the Debtors of the Senior Secured Parties and the Subordinate Secured Parties and their Representatives.*

As noted above, the Bankruptcy Code authorizes debtors to settle or release their claims in a Chapter 11 plan under § 1123(b)(3)(A).[120] By providing for a release by the Debtors of Causes of Action against the Senior Secured Parties and the Subordinate Secured Parties, as well as their Representatives, this provision of the Plan effectively seeks to accomplish just that.

"A plan may provide for releases by a debtor of non-debtor third parties after considering the specific facts and equities of each case. Moreover, a debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[121] In aid of the Court's determination, Article IX.B contains a stand-alone paragraph stating:

>    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in this ARTICLE IX.B pursuant to Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Debtors or the Liquidating Trustee.[122]

---

for willful misconduct or gross negligence merely conformed to the standard applicable to such fiduciaries and, therefore, did not violate any provision of the Code)).

[120] *See.* § 1123(b)(2)(A).

[121] *In re Spansion*, 426 B.R. 114, 142-43, n. 48 (Bankr. D. Del. 2010) (noting, although there was no evidence of any potential claims, "it is not unreasonable for the Debtors to provide a broad release of its claim in return for creditors' agreement to the Plan.").

[122] Docket No. 1180, Article IX.B.2.

At the May 2, 2017 confirmation hearing, the *Declaration of Daniel Brosious in Support of Plan Confirmation* ("Brosious Declaration") was submitted by the Debtors in support of confirmation of the Plan.[123]   The Brosious Declaration was accepted by the Court without objections.  As stated in the Brosious Declaration, the Plan is premised on heavily negotiated settlements among the Debtors, the Senior Agent, Subordinate Agent, Committee, Mechanic's Lien Claimants, Ledcor and Jacobs.[124]  The settlements, described in Article IV of the Plan, provide for certain releases and exculpations in favor of the settling parties, without which the settling parties would not have agreed to the Plan or the Plan settlements.[125]  According to the Brosious Declaration, the Plan settlements also enable many holders of General Unsecured Claims to receive distributions under the Plan that are in greater amounts than otherwise would have been possible absent the Plan settlements.[126]   The Brosious Declaration also states the settlements were negotiated at arm's length and in good faith.[127]

The settling parties have also given valuable consideration throughout the Chapter 11 Cases and, according to both Brosious Declaration and the Debtors, will provide additional consideration under the Plan.[128]  The Senior Secured Parties and the Subordinate Secured Parties, specifically, have provided financing for the Chapter 11 Cases since their inception and have consented to the use of their cash collateral by the Debtors.[129]  The Debtors argue absent the valuable consideration provided by the Released Parties through the settlement agreements and through use of the lenders' cash collateral, the Plan would not be able to proceed through confirmation.[130]

The Commonwealth Bank of Australia echoes those points, stating the settlements laying the foundation for the Plan among the Debtors, the

---

[123] Docket No. 1270, *Declaration of Daniel Brosious in Support of Plan Confirmation.*  Mr. Brosious is a Managing Director of FTI Consulting, Inc. and served as the lead financial advisor for the Debtors in the Chapter 11 Cases. *Id.*

[124] *Id.* at ¶ 17.

[125] *Id.* at ¶ 20.

[126] *Id.* at ¶ 21.

[127] *Id.* at ¶ 17.

[128] Docket No. 1264, p. 9.

[129] *Id.* at p. 10.

[130] Docket No. 1264, p. 11.

lenders, and other creditors, were the product of extensive, good faith negotiations following contentious litigation, and the settlements prevented a drain of the Estates' remaining assets.[131]  Additionally, the Creditors' Committee states the recovery anticipated for general unsecured creditors would not have been possible outside of the settlement embodied by the Plan.[132]

The Court agrees, and finds the Debtors' releases of the third-party Released Parties, generally, are an integral part of the Plan, a valid exercise of the debtor's business judgment and in the best interests of the Estates. Without the contributions of the third-parties being granted releases by the Debtors, these Chapter 11 Cases would not likely have reached the confirmation stage.  Accordingly, and in light of the absence of any specific objections to the releases being given by the Debtors, this provision can be approved, albeit with the changes to the provision requested by the Court above.

b. <u>Exculpation Provision.</u>

Article IX.C of the Plan, titled "Exculpation," essentially absolves the Exculpated Parties from any Claim or Cause of Action, including from any negligent conduct, arising on or after the Petition Date.  Under the Plan's definition of Exculpated Parties, the exculpation is extended to the Debtors and their officers and directors, the Committee and its members, the Liquidating Trustee and the Liquidating Trust Committee, and the Senior Secured Parties and the Subordinate Secured Parties.[133]  This also includes the Representatives of each of the foregoing entities.[134]  The Court finds this exculpation provision overly broad for several reasons.

First, with respect to the exculpation of the Debtors' officers and directors and the Committee and its individual members, as well as their

---

[131] Docket No. 1268.

[132] Docket No. 1266.

[133] The Plan defines "Exculpated Parties" to mean: "collectively, the Debtors, the officers and directors of the Debtors that served in such capacity at any time from and after the Petition Date (in their capacity as such as well as in their individual capacities), the Committee and its individual members (solely in their capacity as such), the Liquidating Trustee, the Liquidating Trust Committee and its members (solely in their capacity as such), the Senior Secured Parties, the Subordinate Secured Parties, and each of their respective Representatives (each of the foregoing in its individual capacity as such). Docket No. 1180, Article I.A.46.

[134] *Id.*

respective Representatives, the Court finds the universe of potential claims being released too broad to be permissible.  Generally, a creditors' committee and its members and representatives are entitled to qualified immunity for any acts or omissions during a Chapter 11 case.[135]  This principle finds its basis in § 1103(c):  "Section 1103(c) of the Bankruptcy Code, which grants to the Committee broad authority to formulate a plan and perform 'such other services as are in the interest of those represented,' 11 U.S.C. § 1103(c), has been interpreted to imply both a fiduciary duty to committee constituents and a limited grant of immunity to committee members."[136]  This qualified immunity afforded to committees and their members has also been held to apply to professionals who provided services to the committee in fulfilling its duties.[137]  The U.S. Bankruptcy Court for the District of Delaware has held the fiduciary standard applicable only to estate fiduciaries includes the debtors' officers and directors who have served during the Chapter 11 case.[138]  The qualified immunity afforded such fiduciaries does not include willful or gross misconduct, acts outside the scope of their duties in a Chapter 11 case, or acts outside the pendency of the Chapter 11 case.[139]

Despite the Debtors' insistence otherwise, by its terms the exculpation provision does *not* appear to be limited to acts taken solely in connection with the Chapter 11 case.  The provision absolves the Debtors' officers and directors and the Committee and its individual members from:

> any and all Claims and Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, the Liquidating Trust Agreement, the Cash Collateral Order, the

---

[135] *In re Washington Mutual, Inc.*, 442 B.R. at 350; *In re Bigler, LP*, 442 B.R. 537, 545-46 (Bankr. S.D. Tex. 2010) (citing *In re Pilgrim's Pride Corp.*, 2010 WL 200000, at *4 (Bankr. N.D. Tex. 2010) (". . . committees and their members are entitled to qualified immunity for any acts or omissions during a [C]hapter 11 case that were within the scopes of their duties.")).

[136] *In re PWS Holding Corp.*, 228 F.3d at 246 (citations omitted).

[137] *Id.*

[138] *In re Washington Mutual, Inc.*, 442 B.R. at 350-51.

[139] *In re PWS Holding Corp.*, 228 F.3d at 246 ("This immunity covers . . . actions within the scope of their duties."); *In re Bigler LP*, 442 B.R. at 546 (citing *In re Pac. Lumber Co.*, 584 F.3d 229, 253 (5th Cir. 2009)).

> Sales or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the Sales or the liquidation of the Debtors . . .

The Court finds this provision overly broad because there does not appear to be any temporal limitation on the conduct and omissions being exculpated. The provision simply immunizes the Exculpated Parties from claims arising on or *after* the Petition Date as well as "any other postpetition act taken or omitted to be taken in connection with or in contemplation of the Sales or the liquidation of the Debtors."  This language can reasonably be read to extend the exculpation to conduct and omissions arising after the confirmation date and after the Chapter 11 Cases have concluded, including, but not limited to, administration and implementation of the Plan itself.

Moreover, the use of the word "including" is not a limitation on "Claims and Causes of Action," but it simply reiterates what follows is *among* those Claims and Causes of Action being released.  Nor do the Plan's definitions of "Claims" and "Causes of Action" limit themselves to acts or omissions during the Chapter 11 Cases.  This part of the exculpation provision makes the immunity granted to them nearly limitless.  Although the Debtors argue the exculpation provision has been narrowly tailored to only apply to claims arising out of the Chapter 11 Cases, the effect of the language in this provision is otherwise.  Accordingly this provision is impermissible as it goes beyond simply restating the standard applicable to fiduciaries in Chapter 11 cases and cannot be approved as written.  The Plan's exculpation provision should be rewritten to more clearly express § 1103(c)'s inherent limitation to acts or omissions during these Chapter 11 Cases.

Additionally, the Court cannot find the advice-of-counsel language in the exculpation provision is permissible.  As written, the Exculpated Parties have no liability, even when their conduct may constitute gross negligence, willful misconduct or fraud, as long as their actions or omissions are based on the advice of counsel.  While all parties may rely on the advice of counsel, the Court believes it impermissible for such reliance to immunize the Exculpated Parties for any and all future conduct in this manner.[140]  This provision should be stricken.

---

[140] This is not to say that an Exculpated Party could never defeat a claim against it based on a valid advice of counsel defense.  The Court simply finds it inappropriate to prospectively apply this defense to shield the Exculpated Parties from liability in all circumstances where it relied on counsel, before any adjudication on the merits of such a defense by a Court of competent jurisdiction.  *See, e.g, Antolovich v. Brown Group Retail, Inc.*, 1836 P.3d 582,

Second, based on the same reasoning applied by the Third Circuit in *In re PWS Holdings Corp.* and the U.S. Bankruptcy Court for the District of Delaware in *In re Washington Mutual, Inc.*, with which this Court agrees, the immunity granted by the exculpation provision to the Senior Secured Parties and Subordinate Secured Parties and their respective Representatives is impermissible.  In *In re PWS Holdings, Corp.*, the Third Circuit held a plan may exculpate a committee, its members, and estate professionals for their actions in the bankruptcy case except where those actions amount to willful misconduct or gross negligence.[141]  This fiduciary standard applies only to estate fiduciaries.[142]  With respect to the Debtors, its officers, directors and Representatives and the Committee and its members and Representatives, the Plan's exculpation provision, notwithstanding the Court's criticism above, merely seeks to restate that standard.  The Senior Secured Parties and Subordinate Secured Parties and their respective Representatives, while proponents of the Plan, are not estate fiduciaries.  Accordingly, the exculpation provision in the Plan is too broadly written and must be limited to only those parties who have acted as estate fiduciaries and their professionals.[143]

With respect to the Liquidating Trustee and the Liquidating Trust Committee and their respective Representatives, the Court finds this provision appropriate, subject to the infirmities identified above.  The proposed Liquidating Trust Agreement provides the Liquidating Trustee shall: "Exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced, and take all actions that may be or could have been taken with respect to the Liquidating Trust Assets by any officer, director, shareholder or other party acting in the name of the Debtors or their Estates with like effect as if duly authorized, exercised, and taken by action of such officers, directors, shareholders or other party."[144]  Based on this and the language of the proposed Liquidating Trust Agreement, the Court is satisfied the Liquidating

---

600 (Colo. App. 2007) (under Colorado law, advice of counsel must be pled as an affirmative defense).

[141] *In re PWS Holding Corp.*, 228 F.3d at 246; see also *In re Tribune Co.*, 464 B.R. at 189.

[142] *In re Washington Mutual, Inc.*, 442 B.R. at 350.

[143] *In re Tribune Co.*, 464 B.R. at 189 (exculpation provision must exclude non-fiduciaries) (relying on *In re Washington Mutual, Inc.*, 442 B.R. at 350-51 ("The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers.")).

[144] Docket No. 1229, pp. 4-5, Article II, § 2.2(a).

Trustee and Liquidating Trust, although neither coming into fruition unless and until the Plan is confirmed, are bound to discharge their obligations consistent with those of a fiduciary of the Debtors' bankruptcy estates. Moreover, any aggrieved party will have appropriate recourse against both entities under the provisions of the Proposed Liquidating Trust Agreement. Notwithstanding the Court's instruction for the exculpation provision to be rewritten to reflect its limited application to only those actions taken in connection with the Chapter 11 Cases, the Court finds the provision appropriate as to the Liquidating Trustee and Liquidating Trust Committee and their respective Representatives.

c.  Releases by Third Parties.

The bulk of the parties' disputes over the confirmability of the Plan deals with whether the Court has authority to approve the third-party non-debtor releases provided under Article IX.D.  That provision, entitled "Third Party-Releases," states:

> Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Releasing Parties shall be deemed to have forever released, waived and discharged all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, that are based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place on or after the Petition Date but prior to or on the Effective Date in any way related to the Debtors, the Chapter 11 Cases or the Plan against the Released Parties.  Notwithstanding the foregoing, nothing herein is intended or shall be deemed to release any claims or Causes of Action against any Released Party resulting from gross negligence, willful misconduct, or fraud.

The Plan defines "Releasing Parties" to mean "collectively, (a) the Released Parties, (b) holders of Claims voting to accept the Plan or who are deemed to accept the Plan, and (c) with respect to any other persons or Entities, holders of Claims or Equity Interests entitled to vote to accept the Plan that do not affirmatively opt out of the release provided by ARTICLE IX hereof pursuant to a duly executed ballot."[145]  Read in connection with the Plan's

---

[145] Docket No. 1180, Article I.A.112.

definition of Released Parties, this section of the Plan provides for releases by non-debtors of claims against the Debtors and other non-debtors for Causes of Action, claims, debts and other obligations "existing or taking place on or after the Petition Date but prior to or on the Effective Date in any way related to the Debtors, the Chapter 11 Cases or the Plan."

The Plan's third-party release provision also contains a mechanism whereby a creditor who rejects the Plan may opt-out of the releases contained in this particular section.[146]  For creditors who are either deemed to vote to accept the Plan or who are entitled to vote and do accept the Plan, those creditors will be deemed to have acknowledged and affirmatively consented to the third-party releases.[147]  For creditors who are entitled to vote and reject the Plan or who fail to submit a ballot, those creditors will be deemed to have acknowledged and affirmatively consented to the third-party releases *unless* the creditor marks an appropriate box on the ballot to affirmatively opt-out of the third-party releases.[148]  Third, creditors and equity holders not entitled to vote on the Plan and are deemed to reject the Plan will be deemed to have acknowledged and affirmatively consented to the third-party releases *unless* such creditor affirmatively opts-out by taking several steps to do so via the balloting agent's website.[149]

The Debtors argue the third-party release provisions contained in the Plan should be approved because they are narrow in scope and relate solely to post-petition claims, exclude claims based on gross negligence, willful misconduct and fraud, the releases are consensual, the Released Parties have given valuable consideration throughout the Chapter 11 Cases and will continue to do so under the Plan, and their efforts have directly contributed to successfully proposing a heavily negotiated plan of liquidation which will benefit creditors and the Debtors' estates.[150]  Additionally, the Debtors argue the third-party releases satisfy the "essential premise" of the *Dow Corning* test, even if each of the Sixth Circuit's factors is not satisfied.[151]  Lastly, the

---

[146] Docket No. 1180, p. 54.

[147] *Id.*

[148] *Id.*

[149] *Id.*  According to a declaration submitted by the Debtors in support of confirmation of the Plan, nine parties elected to opt-out of the third-party release provisions through their respective ballots or through the opt-out portal of the homepage of the balloting agent's website. *See* Epiq Declaration, Docket No. 1258.

[150] Docket No. 1264, pp. 4-11.

[151] *Id.* at pp. 16-18 (citing *In re Dow Corning Corp.*, 280 F.3d at 658).

Debtors argue the opt-out mechanisms contained in the Plan are appropriate, as creditors were given adequate notice of the third-party releases and the opportunity to object and opt-out of the releases.[152]

>    i.    *Third-Party Releases of the Debtors.*

The Plan's definition of "Released Parties" includes the Debtors themselves.[153]  Thus, under the Plan's third-party release provision, the non-debtor Releasing Parties are granting the Debtors releases from "any and all Causes of Action any and other debts . . . based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place on or after the Petition Date but prior to or on the Effective Date . . . ."[154]  The essence of this provision is to grant the Debtors a release from any debts and other claims arising prior to the Effective Date of the Plan.  Such releases are impermissible under § 1141(c) and (d)(3) because a liquidating Chapter 11 plan may not provide for the discharge of a debtor or enjoin actions against property of the debtor's estate.[155]  However, the discharge purportedly being granted the Debtors in Article IX.D is subject to other express provisions in the Plan, including Article IX.E.1, which provides:

>    Pursuant to Section 1141(d)(3) of the Bankruptcy Code, confirmation of this Plan will not discharge the Debtors; provided, however, upon confirmation of the Plan, the occurrence of the Effective Date, and Distributions hereunder, Claimants may not seek payment or recourse against or otherwise be entitled to any

---

[152] *Id.* at pp. 18-22.

[153] " 'Released Parties' means, collectively, (a) the Debtors, (b) the directors, officers, and employees of the Debtors serving in such capacity on or after the Petition Date (in their capacity as such as well as in their individual capacities), the Committee and its members (solely in their capacity as members of the Committee and not in their individual capacities), (c) the Senior Secured Parties, (d) the Subordinate Secured Parties, and (e) the Representatives of each of the foregoing, including, without limitation, all Professionals." Docket No. 1180, Article I.A.111.

[154] Docket No. 1180, Article IV.D.

[155] *See* § 1141(c) ("Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.") and (d)(3) ("The confirmation of a plan does not discharge a debtor if – (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title."); *see also In re Bigler, LP*, 442 B.R. at 544-56.

Distribution from the Liquidating Trust Assets except as expressly provided in this Plan and the Liquidating Trust Agreement.[156]

The Court finds Article IX.E.1's express limitation on any discharge awarded the Debtors sufficiently overcomes what would otherwise render the Plan unconfirmable as written.

### ii.   Third-party Releases of the Debtors' Directors, Officers, Employees, Representatives and Professionals.

As to the Debtors' directors, officers, employees, Representatives and Professionals, the Court finds the third-party non-debtor releases under Article IX.D of the Plan duplicative and unnecessary.  These individuals are receiving exculpations in Article IX.C from liability to any Entity from any and all Claims and Causes of Action arising on and after the Petition Date in connection with their actions during the Chapter 11 Cases.  The Plan defines "Entity" as having the same meaning under § 101(15), which defines the term broadly enough to encompass the Releasing Parties.[157]

### iii.   Third-Party Releases of the Non-Debtors.

The other Released Parties being granted releases under Article IX.D of the Plan includes the Committee and its members, the Senior Secured Parties, the Subordinate Secured Parties, and the respective Representatives and Professionals of each.  While these entities may have claims against the Debtors and the Estates, none have themselves filed their own bankruptcy petitions in this case and are strictly non-debtors not otherwise entitled to a discharge in the Chapter 11 Cases.[158]

First, at least some portions of this provision are duplicative of other releases in the Plan.  The Debtors are, by definition, among both the Released Parties and Releasing Parties.[159]  Therefore, Article IX.D provides

---

[156] Docket No. 1180, Article IX.E.1.  The UST's objection concedes the Debtors' Plan does not seek a discharge. *See* Docket No. 1252, ¶ 21.

[157] "The term "entity" includes person, estate, trust, governmental unit, and United States trustee." 11 U.S.C. § 101(15).

[158] *In re Western Real Estate Fund, Inc.*, 922 F.2d at 601 (" 'the confirmation of a plan . . . discharges *the debtor* [not anyone else] from any debt that arose before the date of such confirmation.' ") (quoting 11 U.S.C. § 1141(d)(1)(A)) (emphasis original).

[159] The Plan defines Released Parties to include the Debtors. *See* Docket No. 1180, Article I.A.111.  The Plan defines Releasing Parties to include the Released Parties. *See id.*, Article I.A.112.  Thus, the definition of Releasing Parties includes the Debtors.

for releases by the Debtors which are essentially duplicative of the exculpations the Committee and its members are appropriately receiving as estate fiduciaries for any acts or omissions during the Chapter 11 Cases through Article IX.C.  Additionally, the Debtors are already granting the Senior Secured Parties and Subordinate Secured Parties releases in Article IX.B.  The release language in Articles IX.B.1 and IX.D is nearly identical. Accordingly, Article IX.D's releases by the Debtors of the Committee and its members, the Senior Secured Parties and the Subordinate Secured Parties are unnecessary.

After those superfluous releases are removed from Article IX.D, what remains for the Court to consider are pure third-party non-debtor releases: non-debtor Releasing Parties, including the non-debtor Released Parties, forever releasing, waiving and discharging the non-debtor Released Parties from all Causes of Actions and claims, debts and obligations "based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place on or after the Petition Date but prior to or on the Effective Date in any way related to the Debtors, the Chapter 11 Cases or the Plan."[160]  While the mere presence in a Chapter 11 plan of third-party releases may cry out for application of *Western Real Estate* to preclude these releases at the outset, the Court believes distinctions between the injunction at issue in that case and the releases contemplated by Article IX.D undermine a categorical bar of third-party releases in all cases.

Sitting, for lack of a better description, at one end of the third-party release spectrum, the permanent injunction vacated by the Tenth Circuit in *Western Real Estate* would have otherwise released the non-debtor from its own shared liability to the creditor, something expressly precluded by § 524(e).  The third-party non-debtor releases in Article IX.D do not, at least from the Court's reading of the provision, purport to release the Released Parties from their own liability, as, for example, guarantors or co-obligors, for the Debtors' debts.  The Court does not believe it would be disputed such a release in this Plan would be, consistent with *Western Real Estate*, expressly barred by § 524(e).  Conversely, the releases in Article IX.D would bar the non-debtor Releasing Parties from pursuing claims against the non-debtor Released Parties for which the Debtors and the Estates may not have, or never had, any liability whatsoever.  As the majority of courts have concluded, § 524(e) says nothing about the authority of a bankruptcy court to release a non-debtor from a creditor's claims, provided, however,

---

[160] Docket No. 1180, Article IX.D.

exercising such authority under § 105(a) is appropriate and not inconsistent with any other section of the Bankruptcy Code.[161]

The Court's concern in this case is with the breadth of the claims subject to Article IX.D's release provisions and their connection to the Debtors and the Chapter 11 Cases.  Based on the Court's reading of Article IX.D, the non-debtor third-party releases are not as "narrowly tailored" as the Debtors argue – the universe of potentially released claims includes claims strictly among non-debtors which may have no connection to the Debtors, the property of the Debtors' estates or the administration of the Chapter 11 Cases.  Whether the Court may consider approval of releases of or injunctions against such claims hinges on whether the Court has jurisdiction over those peripheral claims in the first place.

Federal courts are courts of limited subject matter jurisdiction – a federal court may adjudicate a case or controversy only if there is both Constitutional authority and statutory authority for federal jurisdiction.[162]  28 U.S.C. § 1334(b) provides: "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."[163]  The terms "arising under," "arising in" and "related to" are unambiguous and well established terms of bankruptcy art.[164]  "A proceeding 'arises under' the Bankruptcy Code if it asserts a cause of action created by the Code, such as exemption claims under 11 U.S.C. § 522, avoidance actions under 11 U.S.C. §§ 544, 547, 548, or 549, or claims of discrimination under 11 U.S.C. § 525."[165]  "Proceedings 'arising in' a bankruptcy case are those that could not exist outside of a bankruptcy case, but that are not causes of action created by the Bankruptcy Code."[166]  "If a proceeding 'could have been commenced in federal or state court independently of the bankruptcy case, but the 'outcome of that proceeding could conceivably have an effect on the estate

---

[161] *In re Seaside Engineering & Surveying, Inc.*, 780 F.3d at 1078;  *In re Aradigm Comms., Inc.*, 519 F.3d at 656.

[162] *In re Digital Impact, Inc.*, 223 B.R. 1, 10 (Bankr. N.D. Okla. 1998) (citing *Henry v. Office of Thrift Supervision,* 43 F.3d 507, 511 (10th Cir.1994);  *also* ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 5.1 at 217 (Little Brown ed.1989)).

[163] 28 U.S.C. § 1334(b).

[164] *In re Excel Storage Products, L.P.*, 458 B.R. 175, 181 (Bankr. M.D. Pa. 2011).

[165] *In re Sunbridge Capital, Inc.*, 454 B.R. 166, 169 (Bankr. D. Kan. 2011) (quoting *In re Midgard Corp.*, 204 B.R. 764, 771 (B.A.P. 10th Cir. 1997)).

[166] *Id.*

being administered in bankruptcy,' it is 'related to' a bankruptcy case."[167] Jurisdiction over such proceedings are referred to bankruptcy courts by the district courts pursuant to 28 U.S.C. § 157(a).[168] The United States District Court for the District of Colorado has referred all proceedings arising under title 11, or arising in or related to a case under title 11, to the United States Bankruptcy Court for the District of Colorado pursuant to D.C.Colo.LCivR 84.1(a).[169]

The claims and disputes between the third-party non-debtors subject to Article IX.D are not, and would not be, cases brought under the Bankruptcy Code because neither the Releasing Parties nor the non-debtor Released Parties are debtors in these bankruptcy cases. Nor are the disputes between the non-debtor Releasing Parties and non-debtor Released Parties strictly "arising under" the Bankruptcy Code because the "Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities" being released under Article IX.D are not limited to causes of action under the Bankruptcy Code, such as avoidance actions.[170] In fact, the Causes of Action purportedly being released by the third-party non-debtors are, by definition, claims "of any of the Debtors, the Debtors-in-Possession and/or the Estates" which the non-debtor Releasing Parties likely lack any standing to assert or release in the first place.

---

[167] *Id.*

[168] "Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a).

[169] "A case or proceeding brought under or related to Title 11, United States Code, shall be referred automatically to the bankruptcy judges of this district under 28 U.S.C. § 157. All pleadings and documents in those cases shall be filed directly in the bankruptcy court, and the bankruptcy judges of this district shall exercise jurisdiction under 28 U.S.C. § 157(b)." D.C.Colo.LCivR 84.1(a).

[170] " 'Causes of Action' means all claims, actions, causes of action, choses in action, Avoidance Actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims of any of the Debtors, the Debtors-in-Possession and/or the Estates (including, without limitation, those actions set forth in the Plan Supplement) that are or may be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date against any entity, based in law or equity, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date." Docket No. 1180, Article I.A.21.

In support of this Court's exercise of subject matter jurisdiction over the third-party releases, the Debtors argue because the releases "are limited to postpetition claims and conduct occurring during these cases, they necessarily arise in these cases."[171]  First, this argument is belied by the actual language of the third-party release, which provides for releases of claims "*existing* or taking place *on* or after the Petition Date."[172]  If the Releasing Parties' claims were in existence on the Petition Date, then it is reasonable for the Court to conclude the universe of claims being released includes pre-petition claims against the non-debtor Released Parties unrelated to the Debtors, the property of the Debtors' estates or the administration of the Chapter 11 Cases.

Moreover, the Court cannot find it has "arising in" jurisdiction over the proceedings simply because the releases are included within a proposed Chapter 11 plan.  It is true the Court has subject matter jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. § 157(a) and "confirmations of plans" are expressly made core proceedings under 28 U.S.C. § 157(b)(2)(L) which the Court may hear and determine on a final basis.  However, the Court cannot permit third-party non-debtors to bootstrap their disputes into a bankruptcy case in this fashion.  There must be some independent statutory basis for the Court to exercise jurisdiction over the third-parties' disputes before the Court may adjudicate them.  Even if the Court may be permitted under § 105(a) to approve third-party non-debtor releases in appropriate circumstances, § 105 does not provide an independent source of federal subject matter jurisdiction.[173]  "If proceedings over which the Court has no independent jurisdiction could be metamorphisized into proceedings within the Court's jurisdiction by simply including their release in a proposed plan, this Court could acquire infinite jurisdiction."[174]

---

[171] Docket No. 1264, p. 24 (citing *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 WL 886433, at *13 (Bankr. D. N.J. March 5, 2014)).

[172] Docket No. 1180, Article IX.D (emphasis added).

[173] *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir. 2004), *as amended* (Feb. 23, 2005); *In re Richard Potasky Jeweler, Inc.*, 222 B.R. 816, 825 (S.D. Ohio 1998) ("§ 105, standing alone, cannot serve as a source of authority for granting a permanent injunction. Rather, § 105 must be tethered to another section of the Code in order to provide the court with such authority . . . any permanent injunction granted pursuant to § 105(a) must have a direct and immediate connection to the property contained in or the administration of the debtor's plan of reorganization in order to be proper.") (internal citations omitted).

[174] *In re Digital Impact, Inc.*, 223 B.R. at 11.

Because the Releasing Parties' Causes of Action and claims against the other non-debtors Released Parties neither "aris[e] under title 11" nor "aris[e] in" the Debtors' bankruptcy cases, approval of these releases must be found to be an exercise of the Court's "related to" jurisdiction under 28 U.S.C. § 1334.[175]

The Tenth Circuit has held while "the proceeding need not be against the debtor or his property" to be "related to" the bankruptcy under 28 U.S.C. § 1334(b), such claims fall under the ambit of "related to" jurisdiction "if the outcome could affect the debtor's rights, liabilities, options, or freedom of action in any way, thereby impacting on the handling and administration of the bankruptcy estate."[176]   "Related to" jurisdiction does not extend to "controversies between third-party creditors which do not involve the debtor or his property unless the court cannot complete administrative duties without resolving the controversy."[177]   Because the universe of third-party claims subject to Article IX.D includes, based on the Court's reading, pre-petition claims against the non-debtor Released Parties unrelated to the Debtors, the property of the Debtors' estates or the administration of the Chapter 11 Cases, the claims may not have any conceivable effect on the Debtors' rights, liabilities, options, or freedom of action in any way, or impact on the handling and administration of the Estates.   Accordingly, the Court finds it lacks subject matter jurisdiction to enjoin or release the third-party non-debtor Causes of Action and claims against the non-debtor Released Parties under Article IX.D as written.

The fact the non-debtor Released Parties may have contributed financially to the proposed Plan is insufficient alone for the Court to find it can exercise "related to" jurisdiction over the claims and Causes of Action being released.   In support of its argument for the third-party release provisions meeting the Sixth Circuit's *Dow Corning* factors, the Debtors argue:

> [E]ach of the Released parties who are non-debtors have contributed significant value during these cases and provide

---

[175] *In re Millennium Lab Holdings II, LLC*, 2017 WL 1032992, at *2 (D. Del. March 20, 2017); *see also In re Digital Impact, Inc.*, 223 B.R. at 11 (holding controversies are not "cases under" title 11 where parties thereto are not debtors in bankruptcy, and that controversies did not "arise under" Code, because "controversies contemplated [between the parties] are not limited to causes of action under the Bankruptcy Code, such as avoidance actions").

[176] *Gardner v. United States, et al. (In re Gardner)*, 913 F.2d 1515, 1518 (10th Cir. 1990).

[177] *Id.* (citing *In re Shirley Duke Assocs.*, 611 F.2d 15, 18 (2d Cir. 1979)).

significant value under the Plan in the form of the Plan Settlements. Among other things, the Plan Settlements resolve all disputes among the principal parties who have been involved in these cases over the past two years and provide for the establishment of the MGUS Reserve and the non-MGUS reserve, which will provide unsecured creditors with recoveries greater than they would otherwise be entitled to receive.[178]

Even if that is the case, and the success of the Plan depends on releases being given in exchange for the contributions and settlements entered into by the Released Parties, this alone does not provide a sufficient basis to exercise "related to" jurisdiction over the third-party claims being released. Otherwise, "a debtor could create subject matter jurisdiction over any non-debtor third-party by structuring a plan in such a way that it depended upon third-party contributions."[179] This would lead to the result warned of by the Court above – the potential for non-debtors to purchase immunity from unrelated torts through their contribution to a debtor's reorganization.

The possibility of contribution or indemnification claims by third parties may support an exercise of "related to" jurisdiction by the Court.[180] Additionally, indemnification obligations are relevant to whether there is "an identity of interest" between a debtor and third parties, and the existence of that obligation may support approval of third-party releases in some cases.[181] The possibility of claims for contribution or indemnification are, in fact, one of the factors analyzed under the *Dow Corning* test cited by the

---

[178] Docket No. 1264, p. 17.

[179] *In re Combustion Eng'g, Inc.*, 391 F.3d at 228 ("Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization."); *In re Digital Impact, Inc.*, 223 B.R. at 13–14 ("a court cannot assume jurisdiction in order to enjoin actions to protect a third party who is capitalizing a plan, even though such an injunction appears to be a critical pre-requisite to the adoption of a successful plan.").

[180] *In re Combustion Eng'g, Inc.*, 391 F.3d at 230-232.

[181] *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.") (citing *In re Washington Mut., Inc.*, 442 B.R. at 347 (recognizing that indemnification may create an identity of interest)); *In re Charter Communications*, 419 B.R. 221, 259 (Bankr. S.D.N.Y. 2009) ("The indemnification obligations between the [d]ebtors and their directors, officers, agents, and professionals produce an identity of interest . . . support[ing] approving the Third-party Releases."); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 937 (non-debtors' right of indemnification against debtor pursuant to pre-petition contracts weighed in favor of injunction).

parties in this case.[182]  However, the Court was not presented, either in the parties' arguments or in their written submissions, with evidence of potential indemnification claims against the Debtors or the Estates.  Nor did the Court's review of the pleadings in this case, including the Plan and Disclosure statement, reveal the existence of any agreements to that effect.[183]

The above analysis of the release provisions is not intended to entirely foreclose on the possibility that third-party non-debtor releases may be approved in some limited circumstances or that the Plan cannot be tailored more narrowly and effectively to address the Court's concerns.  It is not enough for the releases to be narrowly tailored to relate only to conduct or omissions during the Chapter 11 case.  More significantly, the releases must be such that the disputes subject to releases or injunctions would have an effect, for example through indemnification or some other form of post-confirmation liability, on the debtor's property or the administration of the debtor's bankruptcy estate.  Otherwise, there would not be the "identity of interests" between the debtor and the to-be-released third party required under both the *Master Mortgage* and *Dow Corning* tests applied by other courts.[184]  Unless the outcome of non-debtors' claims could conceivably have an effect on the estate, the Court simply lacks, at the very least, "related to" jurisdiction to enjoin or adjudicate the disputes through confirmation of the Plan.

> iv.   Whether the Plan's Opt-Out Mechanism Permits Approval of the Third-Party Non-Debtor Releases.

Lastly, the Court must address whether, despite the lack of subject matter jurisdiction to enjoin the third-party non-debtor claims against the

---

[182] *See In re Dow Corning Corp.*, 280 F.3d at 658 ("We hold that when the following seven factors are present, the bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor:  (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate . . .").

[183] Even if such agreements do exist, it is not the Court's role to scour the record to find uncited evidence in support of a party's argument.  *Cordova v. Aragon*, 569 F.3d 1183, 1191 (10th Cir. 2009) ("It is not our role to sift through the record to find evidence not cited by the parties to support arguments they have not made.").

[184] *See* Note 193 above;  *see also In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 935;  *see also In re Richard Potasky Jeweler, Inc.*, 222 B.R. at 826 ("Upon closer inspection, a common thread can be discerned running through all of these unusual circumstances – all are either connected to the property or to the administration of the debtor's estate.").

non-debtor Released Parties, it nevertheless has authority to do so based on the consent of the Releasing Parties through the Plan's opt-out mechanism.

As described above, the Plan's third-party release provision also contains a mechanism whereby a creditor who rejects the Plan may opt-out of the releases contained in this particular section.[185]  The Debtors argue "because the Article IX Release Provisions are consensual, the parties are deemed to have consented to the Bankruptcy Court's jurisdiction."[186]

Whether one of the third-party non-debtors has consented to the release or chosen to opt-out does not confer this Court with jurisdiction to approve the releases.  The Court cannot adjudicate matters outside its jurisdiction, even if the parties consent, because jurisdiction cannot be created by consent.  Nor, as the Court notes above, can § 105(a) be used to create jurisdiction where it does not exist under some independent statutory basis.  Though some of the Releasing Parties have consented to the third-party releases and thereby consented to the Court's final adjudication of their claims against the non-debtor Released Parties, the Court may only take such action if, in the first instance, it has statutory jurisdiction to do so.  For the reasons stated above, the Court lacks subject matter jurisdiction over the claims against the third-party non-debtor Released Parties and, therefore, the Court can neither entertain nor enjoin such claims.

>    *v.    Third-Party Releases of the Non-Debtors' Representatives and Professionals.*

As discussed above with respect to the Debtors' Representatives and Professionals, the Representatives and Professionals retained by the Committee and its members are already receiving exculpations under Article IX.C for their work as fiduciaries during the Chapter 11 Cases.  Accordingly, even if the third-party release provision in the Plan was more narrowly tailored to be limited to the individuals' post-Petition Date work, the third-party releases given in Article IX.D as to them are duplicative and unnecessary.

With respect to the Representatives and Professionals of the Senior Secured Parties and the Subordinate Secured Lenders, the Court must again raise the issue of a lack of subject matter jurisdiction over independent third-party claims against them.  Not only are these individuals not contributing any of their own assets to the Plan, but the Court cannot think of a scenario, based on the evidence before it, where a suit against any of

---

[185] Docket No. 1180, p. 54.

[186] Docket No. 1264, p. 24.

the Representatives and Professionals of these particular non-debtor Released Parties could conceivably have such an effect on the Debtors' Estates as to confer "related to" jurisdiction by this Court. The apparent consent by some of the Releasing Parties to the third-party releases under the Plan does not cure this jurisdictional defect.

**CONCLUSION**

For the reasons stated above,

IT IS HEREBY ORDERED that confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Liquidation is DENIED.

The Court will set a status and scheduling conference in this matter by separate notice.

Dated October 6, 2017                         BY THE COURT:

Michael E. Romero, Chief Judge
United States Bankruptcy Court